**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
             mconlan@gibbonslaw.com
             btheisen@gibbonslaw.com

*Proposed Counsel to the Debtors
and Debtors-in-Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Joint Administration Requested) |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF TD BANK, N.A.'S CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 (II) GRANTINGADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 363, (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001, AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "**Debtors**" or the

"**Company**"), by and through their undersigned proposed counsel, hereby submit this motion (the

"**Motion**") for entry of an interim order substantially in the forms submitted herewith (the

"**Interim Order**"), and a final order (the "**Final Order**," and together with the Interim Order, the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

"**Orders**") pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 363, authorizing the use of TD Bank, N.A.'s ("**TD Bank**") cash collateral, (ii) providing adequate protection, and (iii) scheduling a final hearing (the "**Final Hearing**") pursuant to Fed. R. Bankr. P. 4001 to consider entry of the Final Order authorizing and approving the use of cash collateral.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Vincent Colistra in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), filed with the Court contemporaneously herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## BRIEF STATEMENT OF RELIEF REQUESTED

By this Motion, the Debtors request that this Court enter interim and final orders authorizing the Debtors to use TD Bank's cash collateral in accordance with the budgets attached hereto as Exhibits "A" and "B."  A copy of the proposed interim order is attached hereto as Exhibit "C".  The Debtors propose to use cash collateral, on an interim basis, for purposes of funding the wind-down operations, including payroll, employee severance, insurance, and ordinary expenses necessary to "clean out the system" of pending deliveries, which the Debtors anticipate will take 1 to 3 weeks at each terminal.

Approval of the instant Motion is necessary and critical to enable the Debtors to conduct wind-down operations in an efficient manner during their orderly liquidation process in order to preserve the value of their assets and minimize further claims against the estate.

The information relevant to the Court's consideration of this Motion is as follows:

- *Affected Secured Creditor:*  *TD Bank, N.A.*
- *Basis for Secured Claim:*  *Deposit Account*
- *Amount Owed:*  *$9,283,000 (letters of credit)*
- *Amount of CC Sought:*  *Approximately $2.8 million*

- *Proposed CC Use:*  *February 11, 2019 through March 11, 2019*

2

- *Adequate Protection:*

  *Replacement liens upon all of the Debtors' property (not already subject to a lien of another secured creditor on the Petition Date) in the amount of any diminution in value of the bank's cash collateral on the Petition Date, the rights set forth in 11 U.S.C. § 361(3), and junior liens on all of the Debtors' assets.*

## I.    JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M).

2.    Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested in this Motion are 11 U.S.C. §§ 105(a), 361, 362 and 363, and Fed. R. Bankr. P. 4001, 6004 and 9014, and D.N.J. LBR 4001-3.

## II.    BACKGROUND

### A.    THE DEBTORS' BUSINESSES

4.    On the date hereof (the "**Petition Date**"), each of the above-captioned Debtors filed voluntary petitions for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), thereby initiating the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed in these Chapter 11 Cases.

2711248.1 115719-100239

5.      The Debtors offer a broad range of transportation services.  Debtor New England Motor Freight, Inc. ("**NEMF**") was founded in 1918 in Elizabeth, New Jersey and is a leading less than truckload ("**LTL**") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United States.  NEMF also offers LTL services to its customers across the United States and Canada through a number of partnerships and interline carrier arrangements with other LTL providers.  In addition to the LTL business the Debtors provide truckload ("**TL**") services through Debtor Eastern Freight Ways, Inc. ("**Eastern**").  Debtor Jans Leasing Corp. ("**Jans Leasing**") is a trucking equipment lessor, Debtor Carrier Industries, Inc. ("**Carrier**") offers dedicated third party logistics services, Debtor Apex Logistics ("**Apex**") offers transportation brokerage services, and Debtor NEMF World Transport, Inc. ("**NEWT**") provides non-vessel operation common carrier operations between the United States and Puerto Rico.  Debtors Myar, LLC ("**Myar**") and MyJon, LLC ("**MyJon**") are both dormant and had no economic actively in 2018.  Debtors Hollywood Avenue Solar, LLC ("**Hollywood Solar**") and United Express Solar, LLC ("**United Solar**") were formed to acquire solar arrays for terminals in South Plainfield and Pennsauken, New Jersey, respectively, at which the Debtors operate.

6.      MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of NEMF.  Myar is a wholly-owned subsidiary of Eastern.  The remaining Debtors are all sister entities owned solely by The Shevell Dynasty Trust, or by the Shevell Dynasty Trust and Myron P. Shevell.

7.      As of the Petition Date, the Debtors employ approximately 3,450  full-time and part-time employees.  Approximately 1,900 of the employees are members of International Association of Machinists and Aerospace Workers, AFL-CIO (the "**Union**") and are covered by a series of collective bargaining agreements with the Union.

4

2711248.1 115719-100239

8.      In 2017, the Debtors' businesses generated consolidated gross revenues of approximately $373 million.  For 2018, the Debtors estimate that their businesses will generate consolidated revenues of approximately $370 million.[2]

9.      The Debtors' principal place of business and corporate headquarters is located at 1-71 North Avenue East, Elizabeth, New Jersey, 07201-2859.  The Debtors operate from 36 trucking terminals located throughout the Mid-Atlantic, the Northeast and Midwest, and two additional locations in New Brunswick, NJ and Jordan, NY, which are used primarily for administrative staff and for Eastern operations.  The only real property owned by the Debtors is located in Miami, Florida (the "**Miami Property**"), and is leased to an unrelated third-party trucking company.

10.     Additional information regarding the Debtors' businesses, the events leading to the Chapter 11 Cases, and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration, which was filed contemporaneously with this Motion and is incorporated herein by reference.

## B.      THE DEBTORS' ORGANIZATIONAL STRUCTURE

11.     The Debtors are all sister entities with common ownership, as described more fully in the First Day Declaration.

---

[2] The Debtors' books for fiscal year ending December 29, 2018 are not yet final.  All references to 2018 financials herein are based on the Debtors' preliminary results and remain subject to change.

5

### C.    THE DEBTORS' PRE-PETITION CAPITAL STRUCTURE[3]

#### i.    Secured Debt

**Vehicle Financing**

12.    The Debtors' primary secured debt is for vehicle and related equipment financing related to its fleet of vehicles.  The Debtors believe that each of these vehicle financing transactions is evidenced by a separate note and security agreement providing for liens on specific financed fleet vehicles and related equipment (the "**Vehicle Financing Agreements**").  The Debtors currently have outstanding obligations for vehicles and equipment with 12 separate lenders[4] (together, the "**Vehicle Lenders**") in the outstanding principal aggregate amount of approximately $57.1 million exclusive of interest and fees.  Of that amount, approximately $47.4 million is owed by NEMF and approximately $9.7 million is owed by Eastern.  It is anticipated that the Vehicle Lenders will assert that the entire amount of that debt is secured.

**Letters of Credit (Partially Secured Up to Deposit Amounts)**

13.    NEMF has obtained various letters of credit to support workers compensation insurance and fleet vehicle and automobile insurance, in the aggregate amount of approximately $30.4 million (the "**Letters of Credit**").  To the best of the Debtors' knowledge, as of the Petition Date none of the Letters of Credit have been drawn upon.  However, because NEMF has been unable to successfully renew or replace the existing Letters of Credit, it is expected that prior to the expiration of the current Letters of Credit, each insurance company beneficiary under each Letter of Credit will draw upon its Letter of Credit.

---

[3] The summary of loan documents and security agreements set forth herein is qualified in its entirety by the documents themselves.  To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.

[4]  The lenders under the Vehicle Financing Agreements are JPMorgan Chase, TD Bank, East West Bank, Santander Bank, Capital One, Wells Fargo, Fifth Third Bank, Daimler, IBM, Mercedes Benz, Webster Capital and Volvo.

2711248.1 115719-100239

14.     The Letters of Credit lenders are JPMorgan Chase ("**Chase**"), TD Bank, Santander Bank, East West Bank and Capital One (the "**L/C Lenders**"). The Letters of Credit, and the potential principal amount of claims based on the Letters of Credit, are as follows:

| Bank | L/C Amount | Beneficiary | Purpose | Exp. Date |
|------|-----------|-------------|---------|-----------|
| JP Morgan Chase | $  7,850,000 | Hartford | Work. Comp. | 4/1/19 |
|  | $  2,450,000 | United Safety | Fleet | 4/10/19 |
|  | $       46,000 | Travelers | Work. Comp. | 3/31/20 |
| TD Bank | $  6,000,000 | Hartford | Work. Comp | 2/1/20 |
|  | $  1,585,000 | Fidelity | Work. Comp | 5/1/19 |
|  | $  1,000,000 | Arch | Work. Comp | 4/1/19 |
|  | $     573,000 | Liberty | Work. Comp | 3/31/19 |
|  | $     125,000 | Hartford | Personal Auto | 4/10/19 |
| East West Bank | $  5,951,656 | Protective | Fleet | 4/10/19 |
| Santander Bank | $  1,419,907 | Protective | Fleet | 4/10/19 |
|  | $  2,167,437 | Protective | Fleet | 4/10/19 |
|  | $     800,000 | Hartford | Work. Comp. | 3/31/19 |
| Capital One | $     428,000 | Liberty | Work. Comp. | 3/31/19 |
| **Total:** | **$  30,396,000** |  |  |  |

15.     The TD Bank Letters of Credit are supported by limited guarantees, limited to $1 million, by Eastern, Carrier and Apex Logistics.

16.     As of the Petition Date, the cumulative amount due under the letters of credit issued by TD Bank totals $9,283,000 (the "**TD Bank Debt**").  TD Bank has frozen approximately $2.8 million of the Debtors' cash in deposit accounts with TD Bank.

**Insurance Premium Debt**

17.     The Debtor also has secured insurance premium financing debt with: (i) Bank Direct Capital Finance with regard to workers compensation insurance and umbrella insurance in the approximate outstanding amount of $968,728 (as of December 31, 2018); and (ii) Agile Premium Finance for cargo insurance in the outstanding approximate amount of $40,818 (as of December 31, 2018).  The amounts owed are secured by the Debtors' reversionary interest in unearned premiums held by the relevant insurance companies.

2711248.1 115719-100239

**Solar Loans**

18.    The Debtors have outstanding term loan obligations for solar electric systems and other related costs (the "**Solar Loans**").  The Debtors owe the principal amount of approximately $1.1 million on these loans.  The Solar Loans are collateralized by the solar electric equipment.

### ii.    Unsecured Debt

**Letters of Credit**

19.    As discussed above, the Debtors' obligations under the Letters of Credit total approximately $30.4 million, no amount of which has been drawn upon to the best of the Debtors' knowledge.  The claims of the L/C Lenders are only partially secured to the extent an L/C Lender has a deposit account holding the Debtors' cash, and only as to those L/C Lenders' rights to setoff. In the aggregate, the L/C Lenders are substantially unsecured.

**Trade and Other Debt**

20.    The Debtors owe their trade creditors approximately $9.5 million as of the Petition Date.  The Debtors owe approximately $3.2 million in other unsecured liabilities as of the Petition Date, including approximately $1.7 million pursuant to a pension settlement agreement.

### D.    THE EVENTS LEADING UP TO CHAPTER 11

21.    Several factors have severely impacted the profitability of the Debtors' businesses, ultimately prompting the current liquidity crisis that dictated the Debtors' decision to commence these Chapter 11 Cases in order to conduct an orderly liquidation of their assets.  While the company's operations were profitable for decades since the current ownership group acquired NEMF in 1977, the Debtors have suffered a downward trend over recent years, which was exacerbated in late 2018 by the unexpected loss of key accounts, the shortage of drivers, a new

2711248.1 115719-100239

union contract with onerous driver overtime terms, and the L/C Lenders' ultimate unwillingness to restructure the Debtors' letters of credit obligations under terms acceptable to the Debtors.

22.    Changes and competition within the industry have had an ongoing negative impact on the Debtors' revenues. The Debtors' workforce is made up of approximately 3,450 full-time and part-time employees. The Union workforce consists of, approximately: 1,425 truck drivers, and 475 dock workers, for a total of approximately 1,900 Union employees. The non-union workforce consists of, approximately: 145 truck drivers at Eastern, 600 part-time workers (primarily dock workers), and 805 other employees, for a total of approximately 1,550 non-union employees. Employee costs for the Debtors are, in the aggregate, substantially above industry norms. Most of the LTL companies competing with the Debtors operate under non-unionized conditions. At the same time, there has developed an industry-wide shortage of drivers, putting the Debtors, with an aging fleet of vehicles, at a severe disadvantage.

23.    While the Debtors have recently made extensive efforts to reduce costs and re-focus business, such efforts were not enough to effectively reduce losses and stave off a bankruptcy filing. Due to the above-described factors, among others, the Debtors have experienced severe liquidity constraints. As a result of the loss of liquidity, the Debtors were unable to successfully renew the Letters of Credit that support its various insurance programs.

24.    The Debtors engaged in negotiations with the L/C Lenders in an attempt to renew each of the thirteen Letters of Credit, ten of which have expiration dates in March and April of this year, with corresponding renewal deadlines in February and March of this year. These negotiations were unsuccessful due to the ongoing losses and reduction in liability.

2711248.1 115719-100239

25.     Beginning in the second half of 2018, the Debtors entered into negotiations with Chase to consolidate all of the Letters of Credit.  These negotiations continued for several months and the Debtors believed they would ultimately be successful.

26.     On December 20, 2018, the Debtors retained hired Vincent J. Colistra as Chief Restructuring Advisor, and his firm, Phoenix Management Services, LLC (together with its wholly owned subsidiary, Phoenix Executive Services, LLC, "**Phoenix**") to assess the situation, analyze the Debtors' liquidity position, and take over the negotiations with the L/C Lenders to implement a debt consolidation and restructuring plan.

27.     Shortly thereafter, NEMF released its results for the third quarter of 2018.  Unfortunately, after Chase reviewed those results, it determined not to proceed under the original terms it had proposed to the Debtors with respect to the debt consolidation and restructuring proposal that had been under negotiation.

28.     Thus, beginning in early January 2019, and continuing for approximately three weeks, Mr. Colistra attempted to negotiate renewals of the Debtors' 13 letters of credit with 5 different banks, 10 of which have expiration dates in March and April of 2019.

29.     On January 18, 2019, TD Bank advised Mr. Colistra that it would agree to hold off on making a determination not to renew its Letters of Credit in order to give Phoenix time to complete its cash flow analysis, but also advised that it would agree to renew its Letters of Credit only if all the other L/C Lenders agreed to renew their respective Letters of Credit.  At that point, Mr. Colistra had secured tentative commitments from three of the other four L/C Lenders to renew.[5]

---

[5] Capital One advised Mr. Colistra that it would not renew, but due to the relatively small size of its letter of credit ($428,000), the Debtors had the ability to offer, and Mr. Colistra did offer, to collateralize the Capital One debt with cash at another one of the L/C Lenders.  At that point, the Capital One negotiations were effectively put on hold while Mr. Colistra focused on the more material negotiations with the other L/C Lenders.

2711248.1 115719-100239

30.     The following week, however, one of the L/C Lenders informed Phoenix that it would not proceed with the renewal commitment unless the Debtors agreed to (i) provide additional collateral as security for the Letters of Credit, and (ii) obtain a commitment from the Debtors' equity holders to put additional capital into the companies.

31.     On January 25, 2019, TD Bank declared a default under its Letters of Credit based on an asserted (and entirely subjective) "insecure" position, and placed an administrative freeze on Debtors' deposit accounts with TD Bank.  TD Bank took this action despite the fact that its Letters of Credit had not been drawn upon and there was, accordingly, no payment default by the Debtors. This action denied Debtors access to approximately $2.8 million in funds needed for business operations.  TD Bank then proposed to modify the account freeze if the Debtors would sign a release of liability related to the default notice.  The Debtors and Mr. Colistra determined that a release was not in the best interests of either the Debtors or their creditors, but as a compromise the Debtors offered to provide $1.2 million to TD Bank as permanent security for their $1 million letter of credit for the benefit of Arch Insurance Company.  TD turned down the offer.

32.     On January 29, 2019, TD Bank sent a notice to Arch Insurance Company of non-renewal of a $1.0 million Letter of Credit which was issued for the benefit of Arch Insurance Company in support of certain workers compensation insurance.  This Letter of Credit is due to expire on April 1, 2019.

33.     Shortly thereafter, Mr. Colistra reached out to Santander Bank and East West Bank, both of which also advised that they would not renew their Letters of Credit.  Chase advised that because it had not received the additional collateral it requested, it did not plan to renew.

2711248.1 115719-100239

34.     Around this same time, several significant financial reports concerning the Debtors were completed.  First, Phoenix completed its 17-week consolidated cash flow projection for the Debtors, which showed that NEMF would burn approximately $18 million during that period; the Debtors overall would burn approximately $16 million during the same period.  Second, the Debtors' chief financial officer provided Phoenix with the Debtors' preliminary 4th quarter and year-end results for 2018.  The results showed NEMF had experienced a 4th quarter operating loss of $8.4 million; the Debtors overall experienced a 4th quarter operating loss of $7.3 million.  NEMF's 12-month results for 2018 showed an aggregate operating loss of $20.9 million; the Debtors overall experienced an aggregate operating loss of $16.2 million in 2018.  Additionally, the Debtors' 2018 EBITDA was only $1.5 million.  Significantly, however, the Debtors were facing a projected debt service in 2019 of over $19 million.  At the same time, the Debtors' year-end cash position for 2018 was $7.8 million, representing a $16.4 million year over year reduction from year-end 2017.  Finally, the Debtors' management provided Phoenix with a preliminary 2019 budget showing a projected 12-month loss of $24 million.

35.     Armed with the foregoing financial analysis and projections, and in light of the anticipated non-renewal of the Letters of Credit, Mr. Colistra determined that the only viable option was to begin a process of orderly liquidation of all of the Debtors' assets.  On January 30, 2019, Mr. Colistra recommended to the Debtors' equity holders and board of directors that the Debtors had no choice but to commence an orderly liquidation process immediately.  Up until that point, the goal had been an out-of-court workout, or, at worst, a reorganization proceeding.

36.     The Debtors therefore determined to transition all of their focus and efforts immediately into wind-down operations and liquidation, under the protection of chapter 11, and

2711248.1 115719-100239

immediately engaged debtors counsel.  On February 6, 2019, the Debtors appointed Mr. Colistra, through Phoenix Executive Services, LLC, and as their Chief Restructuring Officer.

37.      On Monday morning, February 11, 2019, the Debtors reached an agreement in principle with the Union with respect to a severance package for terminated rank and file Union employees.  The Debtors will present this settlement to the Court for approval pursuant to Fed. R. Bank. P. 9019.

## III.     NEED FOR USE OF TD CASH COLLATERAL

38.      By this Motion, the Debtors seek an order authorizing the Debtors to utilize the TD Cash Collateral.  The Debtors urgently need the ability to utilize TD Cash Collateral and intend to provide adequate protection to TD Bank.  Without the immediate use of TD Cash Collateral, the Debtors will be unable to pay ordinary and necessary business expenses including, but not limited to, payroll and related obligations, taxes, utilities, amounts owed to vendors and other suppliers of goods and services, insurance, and other expenses that are crucial ensure the Debtors' transition into chapter 11 with as little disruption as possible and to enable the Debtors to effectuate wind-down operations and an orderly liquidation of their assets, including the pursuit of a value-maximizing sale of Eastern and Carrier.

39.      The Debtors seeks authority to use TD Cash Collateral in accordance with the budgets attached hereto as Exhibits "A" and "B."  Exhibit "A" represents the four-week "interim budget" (the "Interim Budget") which will govern use of cash collateral pending a final hearing on this Motion (the "Interim Period") in order to avoid immediate and irreparable harm to the estate.  Exhibit "B" represents the twelve-week budget which will govern use of cash collateral following a final hearing on this Motion (the "Final Budget") (the Interim Budget and the Final Budget are hereinafter collectively referred to as the "Budgets").

13

40.    The Debtors request that the Court conduct a preliminary hearing pursuant to Fed. R. Bankr. P. 4001(b)(2) and authorize the Debtors to use the TD Cash Collateral on an interim basis pending a final hearing in accordance with the Interim Budget.

41.    The Debtors request that the Court conduct a final hearing and authorize the Debtors' use of TD Cash Collateral in accordance with the Final Budget.

42.    It is essential to the Debtors' proposed orderly liquidation for the Debtors to have the ability to utilize TD Cash Collateral.

43.    The Debtors believe that adequate protection will be provided through the provision of replacement liens. Because the replacement collateral is currently unencumbered, the replacement liens will not prejudice another secured creditor.

44.    There is insufficient time for a full hearing to be held before the Debtors must use the TD Cash Collateral.  If this Motion is not considered on an expedited basis, and if the Debtors are denied the ability to immediately use TD Cash Collateral, there will be a direct and immediate material and adverse impact on the Debtors' wind-down operations and on the value of their assets. The use of TD Cash Collateral as requested herein will allow the Debtors to wind-down their operations and commence an orderly liquidation of assets.  The use of TD Cash Collateral will preserve the value of the Debtors' estates for all parties-in-interest, including TD Bank and the other L/C Lenders, permit the continued—albeit temporary—employment for a significant number of employees during the liquidation process, and permit the Debtors to make immediate severance payments to those and other employees.

## IV.    SUMMARY OF RELIEF REQUESTED

45.    In accordance with the requirements of D.N.J. LBR 4001-3(a)(1), a detailed four-week cash-flow budget is appended hereto as Exhibit A for interim use of cash collateral and a

2711248.1 115719-100239

detailed twelve-week cash-flow budget is appended hereto as <u>Exhibit B</u> for the final use of cash

collateral (together, the "**Budget**").  Further, in accordance with the disclosure requirements of

Bankruptcy Rule 4001(d) and D.N.J. LBR 4001-3(a)(2) and (c), a summary of the material terms

of the relief requested by this Motion are set forth in the chart below.[6]

| | |
|---|---|
| *Amount of Cash Collateral Sought for Use* | Debtors are authorized to utilize the TD Cash Collateral solely for (i) post-petition operating expenses and other working capital, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Cases, including professional fees, and (iv) as otherwise permitted under this Interim Order and the Budget, as applicable, provided, however, that the Debtors may exceed the amount of any weekly line item expenditure Budget by up to ten percent (10%) thereof, so long as the total aggregate expenditures of the Debtors, on a cumulative basis, do not exceed one hundred and ten percent (110%) of the total aggregate expenditures of the Debtors for such budgeted week<br><br>*See* Interim Order at ¶ 9. |
| *Adequate Protection* | The following adequate protection will be provided:<br><br>a. <u>Adequate Protection Liens</u><br><br>As adequate protection for any diminution in the value of TD Bank's interests in the TD Cash Collateral from the Petition Date and thereafter, including any diminution resulting from the use of the TD Cash Collateral on or after the Petition Date,  TD Bank is hereby granted, pursuant to 11 U.S.C. §§ 361, 362 and 363, valid, binding, enforceable and automatically perfected liens on and security interests in (collectively, the "**Adequate Protection Liens**") all of the Debtors' property (not already subject to a lien of another secured creditor on the Petition Date) in the amount of any diminution in value of TD Bank's cash collateral on the Petition Date, being hereinafter referred to as the "**Replacement Collateral**"; and together with the L/C Cash Collateral, the "**Collateral**").  Notwithstanding the foregoing, the Replacement Collateral shall not include any claims or causes of action of the Debtors under 11 U.S.C. §§ 544, 547, |

---

[6]     The descriptions of the material terms of the Debtors' proposed use of Cash Collateral provided in this Motion are intended only as a summary thereof. In the event of any inconsistency between the descriptions set forth herein and the terms of the Orders, the terms of the Orders shall govern.

2711248.1 115719-100239

548, 549, 550 or 551 ("**Avoidance Actions**") or any proceeds of any of such claims or causes of action ("**Avoidance Proceeds**").  The Adequate Protection Liens shall be junior in priority to (i) valid, enforceable, perfected and non-avoidable liens and security interests in the Replacement Collateral that existed on the Petition Date and were superior as of the Petition Date, to the prepetition lien of TD Bank; and (ii) any fees payable to the Clerk of this Court or, pursuant to 28 U.S.C. § 1930, the United States Trustee; and (iii) the amounts set forth on the Budget for professionals retained under the Bankruptcy Code through the date of termination of the authority to use TD Cash Collateral pursuant to this Order.   The Adequate Protection Liens and all claims, rights, interests, administrative claims and other protections granted to or for the benefit of TD Bank pursuant to this Order and the Bankruptcy Code shall constitute valid, enforceable, non-avoidable and duly perfected security interests and liens.  TD Bank shall not be required to file or serve financing statements or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens, but upon request by TD Bank, the Debtors are hereby authorized and directed to execute and deliver any such financing statements or similar instruments.  The failure by TD Bank to request, or the failure or refusal of the Debtors to execute or deliver, any documentation relating to the Adequate Protection Liens shall in no way affect the validity, perfection or priority of such Adequate Protection Liens.

b. Rights Under Section 361(3) of the Bankruptcy Code

TD Bank shall be entitled to assert an administrative priority claim under section 361(3) of the Bankruptcy Code in the amount, if any, by which the protections afforded herein for the Debtors' use, sale, consumption or disposition of the TD Cash Collateral prove to be inadequate.

c. *Pari Passu* with rights granted to Chase

JP Morgan Chase Bank, N.A. is similarly situated to TD Bank, in that Chase has issued in excess of $10,000,000 of letters of credit to the Debtors and is only secured by approximately $2.7 million held in bank accounts maintained by Chase.  The rights granted to TD Bank and Chase as a result of the request of use of cash collateral shall be *pari passu.*

16

| | |
|---|---|
| | *See* Interim Order at ¶¶ 13-14. |
| *Effect of Use of Cash Collateral on Liens* | The Adequate Protection Liens shall be junior in priority to valid, enforceable, perfected and non-avoidable liens upon and security interests in the Replacement Collateral that existed on the Petition Date and any fees payable to the Clerk of this Court, or pursuant to 28 U.S.C. §1930 of the Office of the United States Trustee.<br><br>*See* Interim Order at ¶¶ 13-14. |
| *Termination/Default Provisions* | a. <u>Suspension</u><br><br>The Debtors' authority to use TD Cash Collateral be suspended (and Debtors shall therefore not be authorized to use such TD Cash Collateral for any purpose, except as further ordered by the Court) for so long as any one or more of the following conditions (collectively, an "**Event of Default**") exists: (i) the Debtors have failed to discharge any duty or other obligation imposed upon it in this Order, or has otherwise violated any requirement or condition to use of TD Cash Collateral provided in this Order, and has not cured such failure or violation within ten (10) business days after receiving written notice thereof from TD Bank (provided that the Debtors shall have the ability to seek an emergency hearing within 72 hours to challenge any such written notice, and authority to continue usage of TD Cash Collateral until the Court rules on such dispute), or (ii) there is pending any motion by the Debtors to dismiss or convert this chapter 11 case to a case under chapter 7.<br><br>b. <u>Termination</u><br><br>The Debtors' authority to use TD Cash Collateral shall terminate for all purposes upon the soonest to occur of the following events or conditions: (i) the Interim Period expires and no final order or extension has been approved by the Court, (ii) a chapter 11 trustee is appointed for any of the Debtors, (iii) this chapter 11 case is converted to a chapter 7 case or dismissed, (iv) the Court enters an order confirming a chapter 11 plan of reorganization or liquidation for any of the Debtors, or (v) the Court enters an order granting TD Bank relief from the automatic stay to exercise rights and remedies in respect of any property of the Debtors, provided, however, that the use of TD Cash Collateral will only terminate with regard to the TD Cash Collateral that is granted relief from stay.<br><br>*See* Interim Order at ¶¶ 11-12. |

2711248.1 115719-100239

| | |
|---|---|
| *Limitation or Waiver of Rights under § 506(c)* | TD Bank has not consented to any surcharge of any of the Collateral under section 506(c) of the Bankruptcy Code, and no such consent shall be implied from any action, failure to act, or acquiescence by TD Bank. Likewise, the Debtors and their estates have not waived any rights under section 506(c) of the Bankruptcy Code.<br><br>*See* Interim Order at ¶ 14. |
| *Grant of Interest or Causes of Action Arising under §§ 544, 547, 548 or 549* | The Replacement Collateral shall not include any claims or causes of action of the Debtors under 11 U.S.C. §§ 544, 547, 548, 549, 550 or 551 (*i.e.*, the Avoidance Actions) or any proceeds of any of such claims or causes of action (*i.e.*, the Avoidance Proceeds).<br><br>*See* Interim Order at ¶ 13. |
| *Terms of Non-Material Waivers and Consents after Court's Entry of Orders* | As reflected in the Orders, the Debtors may enter into waivers and/or consents with respect to the use of cash collateral without the need for further Court approval provided that:<br>• the modification is not material;<br>• notice of the proposed modification is filed with the Court; and<br>• notice of the proposed modification is provided in advance to counsel for any official committee, any party requesting notice of all proceedings, and the United States trustee |

## V.    BASIS FOR RELIEF

46.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Thus, pursuant to section 363(c) of the Bankruptcy Code, a debtor may not use cash collateral without the consent of any entity with an interest in such cash collateral or Court approval. Here, TD Bank consents to the proposed use of TD Cash Collateral.

47.    Section 363(e) of the Bankruptcy Code provides, in pertinent part, that "on request of an entity that has an interest in property … proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is

necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (a) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entity's interest in the property; (b) provisions for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entity's interest in the property; and (c) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in the property. 11 U.S.C. § 361.

48.    By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

49.    While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by case basis. *See In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at \*2 (Bankr. D. Del. Feb. 18, 1992); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at \*14 (Bankr. D.N.J. June 29, 2006); *see also In re Mosello*, 195 BR. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 COLLIER ON BANKRUPTCY § 361.01[1] at 361-66 (15th ed. 1993)) (explaining that what constitutes adequate protection is not defined, and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

19

50.    For example, courts have held that replacement liens are sufficient adequate protection.  *See In re Mt. Olive Hospitality, LLC*, Civil No. 13-3395 (RBK), 2014 WL 1309953, at *3, n. 6 (D.N.J. March 31, 2014).  *See also In re Airport Inn Assocs., Ltd.*, 132 B.R. 951, 960 (Bankr. D. Col. 1990) ("The court could order a lien in post-petition accounts receivable as adequate protection if that relief was requested . . . ."); *In re Int'l Design & Display Grp., Inc.*, 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993) (court authorized debtor to use cash collateral and, as adequate protection, granted secured creditor replacement lien on all post-petition accounts receivable, inventory and contracts to the extent the creditor's collateral was depleted).

51.    The Interim Order provides adequate protection for the Debtors' use of the TD Cash Collateral in the form of replacement liens upon all of the Debtors' property (not already subject to a lien of another secured creditor on the Petition Date) in the amount of any diminution in value of TD Bank's cash collateral on the Petition Date.  The total amount of TD Cash Collateral benefitting TD Bank (i.e. the amount of Debtors' funds in NEMF's deposit account at TD Bank) is approximately $2.8 million.  The value of the Replacement Collateral is in excess of $38 million. As of the Petition Date, the Replacement Collateral had not been pledged as collateral to any creditor.  Accordingly, TD Bank's interest in the TD Cash Collateral is more than adequately protected by the Replacement Collateral.

52.    In sum, the adequate protection offered by the Debtors to TD Bank — including the Adequate Protection Liens — is fair, reasonable and sufficient to protect against the diminution of their collateral position.  Accordingly, the Debtors respectfully submit that the use of the TD Cash Collateral on the terms set forth in the proposed Interim Order provides TD Bank with adequate protection and is in the best interest of the Debtors, the Debtors' estates, their creditors and all parties in interest, and, therefore should be authorized by this Court.

2711248.1 115719-100239

53.     In light of the foregoing, the Debtors submit that the use of TD Cash Collateral is appropriate in accordance with the Budgets attached hereto as Exhibits "A" and "B."

**B.    REQUEST FOR A FINAL HEARING**

54.     Pursuant to Fed. R. Bankr. P. 4001(d)(3), the Debtors request that the Court set a date for the Final Hearing as soon as practicable, and fix in the Interim Order a date and time prior to the Final Hearing for parties to file objections to approval of the Motion on a final basis and entry of a Final Order.

## VII.    WAIVER OF MEMORANDUM OF LAW

55.     Because the legal basis upon which the Debtors rely is incorporated herein and the Motion does not raise any novel issues of law, the Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3).

## VIII.   NO PRIOR REQUEST

56.     No previous motion for the relief sought herein has been made to this Court or to any other court.

## IX.    NOTICE

57.     Notice of this Motion has been given to:

   a.     the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102;

   b.     the Internal Revenue Service, 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016;

   c.     the New Jersey Division of Taxation Compliance and Enforcement - Bankruptcy Unit, 50 Barrack Street, 9th Floor, Trenton, NJ 08695;

   d.     the Office of the Attorney General of the State of New Jersey, Division of Law, Richard J. Hughes Justice Complex, 25 Market Street, Trenton, NJ 08625;

2711248.1 115719-100239

e.    the Office of the United States Attorney, Peter Rodino Federal Building, 970 Broad Street, Suite 700, Newark, NJ 07102;

f.    Counsel for TD Bank, N.A., James M. Smith, Gebhardt & Smith LLP, One South St., Suite 2200, Baltimore, MD 21202-3281;

g.    all secured creditors;

h.    the Debtors' thirty-five largest unsecured creditors on a consolidated basis; and

i.    all parties that have requested to receive notice pursuant to Bankruptcy Rule 2002.

58.    In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the form submitted herewith, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  February 11, 2019                    Respectfully submitted,


**GIBBONS P.C.**

By:    /s/ Karen A. Giannelli
     Karen A. Giannelli, Esq.
     Mark B. Conlan, Esq.
     Brett S. Theisen, Esq.
     One Gateway Center
     Newark, New Jersey  07102
     Telephone:  (973) 596-4500
     Facsimile:  (973) 596-0545
     E-mail:  kgiannelli@gibbonslaw.com
             mconlan@gibbonslaw.com
             btheisen@gibbonslaw.com

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

2711248.1 115719-100239