**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
         mconlan@gibbonslaw.com
         btheisen@gibbonslaw.com

*Proposed Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC.,<br>*et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Joint Administration Requested) |

**DECLARATION OF VINCENT COLISTRA
<u>IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS</u>**

I, Vincent Colistra, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Chief Restructuring Officer (the "**CRO**") for the above-captioned debtors (the "**Debtors**" or "**Company**").  My firm, Phoenix Management Services, LLC ("Phoenix") was retained by the Debtors in December 2018 to assist in their debt consolidation and restructuring efforts and I was hired as the Debtors' Chief Restructuring Advisor.  Subsequently, on February

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

6, 2019, the Debtors hired me as CRO, through Phoenix's wholly-owned subsidiary, Phoenix Executive Services, LLC ("**PES**"), subject to Court approval in these Chapter 11 Cases (defined below).

2.     I am a Senior Managing Director of Phoenix, which I joined in 1997 and became a shareholder in 1998.  I have managed or participated in over sixty engagements since joining Phoenix that involved developing and implementing solutions in complex corporate restructurings and reorganizations (both out of court and through bankruptcy proceedings), operational and financial turnarounds, recapitalizations, re-financings, the raising of senior debt, second lien debt, subordinated debt with warrants, as well as representing strategic and financial buyers and sellers of businesses in both the public and private sector.  I am licensed under Phoenix's investment banking affiliate, Phoenix Capital Resources, a registered broker-dealer, and in that capacity I have extensive experience conducting sales under Section 363 of the Bankruptcy Code and other complex transactions.

3.     I submit this declaration (the "**Declaration**") in support of the voluntary petitions for relief for the Debtors' cases (the "**Chapter 11 Cases**") under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and the motions and applications (collectively, the "**First Day Pleadings**") for related relief filed concurrently herewith as of the date hereof (the "**Petition Date**").

4.     In my capacity as CRO for the Debtors, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

5.     The First Day Pleadings are intended to enable the Debtors to effectively and efficiently manage these Chapter 11 Cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases.  Among other things, the First Day

2

Pleadings are designed to meet the Debtors' goals of: (i) transitioning into chapter 11 with as little disruption and loss of value as possible; (ii) maintaining the confidence and support of their customers, employees, vendors and service providers as necessary to effectuate the wind-down of the operations and an orderly liquidation of the Debtors' assets; and (iii) establishing procedures for the smooth and efficient administration of these Chapter 11 Cases.  I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' businesses during the wind-down process; and (b) maximize and preserve the value of the Debtors' chapter 11 estates for all parties-in-interest.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) my review of relevant documents; (iii) information supplied to me by other members of the Debtors' management team or by professionals retained by the Debtors; or (iv) my opinion based on my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

7.      For the Court's benefit, this Declaration is organized into four sections.  **Section I** provides background information with respect to the Debtors' business operations, corporate history, and organizational structure.  **Section II** provides a summary of the Debtors' pre-petition capital structure.  **Section III** describes the circumstances leading to the commencement of these Chapter 11 Cases.  **Section IV** summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings.

2710881.3 115719-100239

I.    **BACKGROUND**

A.    OVERVIEW OF DEBTORS' BUSINESSES AND ORGANIZATIONAL STRUCTURE

8.    The Debtors offer a broad range of transportation services. Debtor New England Motor Freight, Inc. ("**NEMF**") was founded in 1918 in Elizabeth, New Jersey and is a leading less-than-truckload ("**LTL**") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United States. NEMF also offers LTL services to its customers across the United States and Canada through a number of partnerships and interline carrier arrangements with other LTL providers. In addition to the LTL business, the Debtors provide truckload ("**TL**") services through Debtor Eastern Freight Ways, Inc. ("**Eastern**"). Debtor Jans Leasing Corp. ("**Jans Leasing**") is a trucking equipment lessor; Debtor Carrier Industries, Inc. ("**Carrier**") offers dedicated third party logistics services; Debtor Apex Logistics, Inc. ("**Apex**") offers transportation brokerage services, and Debtor NEMF World Transport, Inc. ("**NEWT**") provides non-vessel operation common carrier operations between the United States and Puerto Rico. Debtor NEMF Logistics, LLC ("**Logistics**") is a third-party logistics company specializing in logistics management services, including warehousing, software, brokerage and support. Debtors Myar, LLC ("**Myar**") and MyJon, LLC ("**MyJon**") are both dormant and had no economic actively in 2018. Debtors Hollywood Avenue Solar, LLC ("**Hollywood Solar**") and United Express Solar, LLC ("**United Solar**") were formed to acquire solar arrays for terminals in South Plainfield and Pennsauken, New Jersey, respectively, at which the Debtors operate.

9.    MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of NEMF. Myar is a wholly-owned subsidiary of Eastern. The remaining Debtors are all sister entities owned solely by The Shevell Dynasty Trust, or by the Shevell Dynasty Trust and Myron P. Shevell.

2710881.3 115719-100239

10.    As of the Petition Date, the Debtors employ approximately 3,450 full-time and part-time employees.  Approximately 1,900 of the employees are members of International Association of Machinists and Aerospace Workers, AFL-CIO (the "**Union**") and are covered by a series of collective bargaining agreements with the Union.

11.    In 2017, the Debtors' businesses generated consolidated gross revenues of approximately $373 million.  For 2018, the Debtors estimate that their businesses will generate consolidated revenues of approximately $370 million.[2]

12.    The Debtors' principal place of business and corporate headquarters is located at 1-71 North Avenue East, Elizabeth, New Jersey, 07201-2859.  The Debtors operate from 36 trucking terminals located throughout the Mid-Atlantic, the Northeast and Midwest, and two additional locations in New Brunswick, NJ and Jordan, NY, which are used primarily for administrative staff and for the Eastern operations. The only real property owned by the Debtors is located in Miami, Florida (the "**Miami Property**"), and is leased to an unrelated third-party trucking company.  The Debtors have six main business segments, as described immediately below.

13.    The Debtors commenced these Chapter 11 Cases to maximize the value of their assets and to effectuate an orderly liquidation process for the benefit of all creditors.  The orderly liquidation of the Debtors will involve: (i) the immediate wind-down of nine of the eleven Debtor entities; (ii) the orderly collection of the Debtors' accounts receivables; (iii) the sale of the Debtors' two most profitable entities, Eastern and Carrier, as going-concerns pursuant to a Court-approved Section 363 bidding and auction process; (iv) sales of the Debtors' remaining assets (primarily

---

[2] The Debtors' books for fiscal year ending December 29, 2018 are not yet final.  All references to 2018 financials herein are based on the Debtors' preliminary results and remain subject to change.

2710881.3 115719-100239

rolling stock, equipment, machinery and inventory), which are located across the Debtors' 36 terminals; and (v) the sale of the unencumbered Miami Property.

### i.      NEMF:  LTL Business

14.      NEMF operates as a super-regional provider of LTL trucking services in 15 states, spanning from Maine to Chicago, and into northeastern Kentucky and all of Virginia.  This is the Debtors' core business segment.  NEMF had approximately $345 million in gross revenues in 2017, representing approximately 92% of combined total gross revenues for the Debtors in 2017. The Debtors estimate that NEMF generated gross revenues of approximately $343 million in 2018. In addition to its operations through terminals located in 15 states in the Northeast, Mid-Atlantic and Midwest, NEMF is able to reach an estimated 85% of the U.S. population through partnerships with other leading regional carriers.  Likewise, through partnerships with Canadian carriers, NEMF is also able to reach the entire Canadian population.

### ii.      Eastern:  TL Business

15.      Eastern is based in South Brunswick, New Jersey and was established in 1994 to provide TL services within the Northeast and Mid-Atlantic.  Gross revenues for Eastern were approximately $30.2 million in 2017, representing approximately 8% of the combined total gross revenues for the Debtors in 2017.  The Debtors estimate that Eastern generated gross revenues of approximately $31.0 million in 2018.  Eastern principally provides overnight or same-day delivery with an average length of haul of about 400 miles.  Eastern uses many of the same terminals and facilities as NEMF.

### iii.      Carrier:  Third Party Logistics Business

16.      Carrier is a third-party logistics company that provides supply chain management and logistical planning services.  Carrier's gross revenues represented less than 1% of the Debtors combined total gross revenues in 2017 and 2018.

6

### iv.    Apex:  Brokerage Business

17.    Apex is a brokerage company offering transportation solutions across the country. Apex provides LTL and TL management services and parcel audit from origin to point of sale, including full track and trace systems, as well as partial and periodic reports to monitor shipping progress, service levels, cost effectiveness and other performance indicators.  Apex typically handles shipping assignments that NEMF and Eastern choose not to handle.  Gross revenues for Apex in 2017 and 2018 were *de minimis*.

### v.    NEWT: Puerto Rico Business

18.    NEWT is a non-vessel operation common carrier that provides service between the United States and Puerto Rico.  NEWT offers a barge service with a carrier out of the port of Pennsauken, New Jersey to San Juan, Puerto Rico.  NEWT also offers vessel services out of the ports of Jacksonville, Florida and Houston, Texas to Puerto Rico.  NEWT's gross revenues in 2017 and 2018 represented less than 1% of the Debtors' gross revenues.

### vi.    Jans Leasing: Equipment Rental Business

19.    Jans Leasing is in the business of leasing trucking rigs, trailers and related equipment.  Jans Leasing's gross revenues in 2017 and 2018 represented less than 1% of the Debtors' gross revenues.

### vii.    Hollywood Solar, United Solar, NEMF Logistics, MyJon and Myar

20.    Hollywood Solar, United Solar, NEMF Logistics, MyJon and Myar are either dormant or generating *de minimis* revenues.  Collectively, they generated less than four-tenths of one percent of the Debtors' 2018 revenues.

2710881.3 115719-100239

## II.      DEBTORS' PREPETITION CAPITAL STRUCTURE[3]

### A.      SECURED DEBT

#### i.      Vehicle Financing

21.      The Debtors' primary secured debt is for vehicle and related equipment financing related to its fleet of vehicles.  The Debtors believe that each of these vehicle financing transactions is evidenced by a separate note and security agreement providing for liens on specific financed fleet vehicles and related equipment (the "**Vehicle Financing Agreements**").   The Debtors currently have outstanding obligations for vehicles and equipment with 12 separate lenders[4] (together, the "**Vehicle Lenders**") in the outstanding principal aggregate amount of approximately $57.1 million exclusive of interest and fees.  Of that amount, approximately $47.4 million is owed by NEMF and approximately $9.7 million is owed by Eastern.  It is anticipated that the Vehicle Lenders will assert that the entire amount of that debt is secured.

#### ii.      Letters of Credit (Partially Secured Up to Deposit Amounts)

22.      NEMF has obtained various letters of credit to support workers compensation insurance and fleet vehicle and automobile insurance, in the aggregate amount of approximately $30.4 million (the "**Letters of Credit**").  To the best of my knowledge, as of the Petition Date none of the Letters of Credit have been drawn upon.  However, because NEMF has been unable to successfully renew or replace the existing Letters of Credit, it is expected that prior to the expiration of the current Letters of Credit, each insurance company beneficiary under each Letter of Credit will draw upon its Letter of Credit.

---

[3] The summary of loan documents and security agreements set forth herein is qualified in its entirety by the documents themselves.  To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.
[4] The lenders under the Vehicle Financing Agreements are JPMorgan Chase, TD Bank, East West Bank, Santander Bank, Capital One, Wells Fargo, Fifth Third Bank, Daimler, IBM, Mercedes Benz, Webster Capital and Volvo.

2710881.3 115719-100239

23.    The Letters of Credit lenders are JPMorgan Chase, TD Bank, Santander Bank, East West Bank and Capital One (the "**L/C Lenders**"). The Letters of Credit, and the potential principal amount of claims based on the Letters of Credit, are as follows:

| Bank | L/C Amount | Beneficiary | Purpose | Exp. Date |
|------|-----------|-------------|---------|-----------|
| JP Morgan Chase | $   7,850,000 | Hartford | Work. Comp. | 4/1/19 |
| | $   2,450,000 | United Safety | Fleet | 4/10/19 |
| | $      46,000 | Travelers | Work. Comp. | 3/31/20 |
| TD Bank | $   6,000,000 | Hartford | Work. Comp | 2/1/20 |
| | $   1,585,000 | Fidelity | Work. Comp | 5/1/19 |
| | $   1,000,000 | Arch | Work. Comp | 4/1/19 |
| | $      573,000 | Liberty | Work. Comp | 3/31/19 |
| | $      125,000 | Hartford | Personal Auto | 4/10/19 |
| East West Bank | $   5,951,656 | Protective | Fleet | 4/10/19 |
| Santander Bank | $   1,419,907 | Protective | Fleet | 4/10/19 |
| | $   2,167,437 | Protective | Fleet | 4/10/19 |
| | $      800,000 | Hartford | Work. Comp. | 3/31/19 |
| Capital One | $      428,000 | Liberty | Work. Comp. | 3/31/19 |
| **Total:** | **$ 30,396,000** | | | |

24.    The JPMorgan Chase Letters of Credit are supported by guarantees provided by Eastern, Carrier and Apex.  The TD Bank Letters of Credit are supported by limited guarantees, limited to $1 million, by Eastern, Carrier and Apex.

25.    Certain of the L/C Lenders hold deposit accounts belonging to the Debtors which may give rise to liens or setoff rights. Prior to the Petition Date, TD Bank had frozen approximately $2.8 million of the Debtors' cash in deposit accounts with TD Bank.  As of the Petition Date, the Debtors also have cash in deposit accounts with JPMorgan Chase (approximately $2.7 million); East West Bank ($506.90); Capital One ($534.80); and Santander Bank ($836.48).  However, to the best of my knowledge, none of those four banks have yet taken action to freeze their deposit accounts.

2710881.3 115719-100239

### iii.    Insurance Premium Financing

26.    The Debtor also has secured insurance premium financing debt with: (i) Bank Direct Capital Finance with regard to workers compensation insurance and umbrella insurance in the approximate outstanding amount of $968,728 (as of December 31, 2018); and (ii) Agile Premium Finance for cargo insurance in the outstanding approximate amount of $40,818 (as of December 31, 2018).  The amounts owed are secured by the Debtors' reversionary interest in unearned premiums held by the relevant insurance companies.

### iv.    Solar Loans

27.    The Debtors have outstanding term loan obligations due for solar electric systems and other related costs (the "**Solar Loans**").  The Debtors owe the principal amount of approximately $1.1 million on these loans.  The Solar Loans are collateralized by the solar electric equipment.

### B.    UNSECURED DEBT

### i.    Letters of Credit

28.    As discussed above, the Debtors' obligations under the Letters of Credit total approximately $30.4 million, no amount of which has been drawn upon to the best of my knowledge.  The claims of the L/C Lenders are only partially secured to the extent an L/C Lender has a deposit account holding the Debtors' cash, and only as to those L/C Lenders' rights to setoff.  In the aggregate, the L/C Lenders are substantially unsecured.

### ii.    Trade and Other Debt

29.    The Debtors owe their trade creditors approximately $9.5 million as of the Petition Date.  The Debtors also owe approximately $3.2 million in other unsecured liabilities as of the Petition Date, including approximately $1.7 million pursuant to a pension settlement agreement.

2710881.3 115719-100239

C.    **EQUITY HOLDERS**

30.    The equity interest in each of the Debtors are owned as follows:

a.    NEMF's equity interests are owned by Shevell Dynasty Trust (97.3041%) and Myron P. Shevell (2.6959%);

b.    Apex's equity interests are owned by Shevell Dynasty Trust (90%) and Myron P. Shevell (10%);

c.    Carrier's equity interests are owned by Shevell Dynasty Trust (96.9%) and Myron P. Shevell (3.1%);

d.    Eastern's equity interests are owned by Shevell Dynasty Trust (96.9%) and Myron P. Shevell (3.1%);

e.    Jans Leasing's equity interests are owned by Shevell Dynasty Trust (100%);

f.    NEWT's equity interests are owned by Shevell Dynasty Trust (100%);

g.    MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of NEMF; and

h.    Myar is a wholly-owned subsidiary of Eastern.

## III.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES

31.    Several factors have severely impacted the profitability of the Debtors' businesses, ultimately prompting the current liquidity crisis that dictated the Debtors' decision to commence these Chapter 11 Cases in order to conduct an orderly liquidation of their assets. While the company's operations were profitable for decades since the current ownership group acquired NEMF in 1977, the Debtors have suffered a downward trend over recent years, which was exacerbated in late 2018 by the unexpected loss of key accounts, the shortage of drivers, a new Union contract with onerous retroactive terms, and the L/C Lenders' ultimate unwillingness to restructure the Debtors' letters of credit obligations under terms acceptable to the Debtors.

11

32.    Changes and competition within the industry have had an ongoing negative impact on the Debtors' revenues.  The Debtors' workforce is made up of approximately 3,450 full-time and part-time employees.  The Union workforce consists of approximately: 1,425 truck drivers, and 475 dock workers, for a total of approximately 1,900 Union employees.  The non-union workforce consists of, approximately: 145 truck drivers at Eastern, 600 part-time workers (primarily dock workers), and 805 other employees, for a total of approximately 1,550 non-union employees. Employee costs for the Debtors are, in the aggregate, substantially above industry norms.  Most of the LTL companies competing with the Debtors operate under non-unionized conditions.  At the same time, there has developed an industry-wide shortage of drivers, putting the Debtors, with an aging fleet of vehicles, at a severe disadvantage.

33.    Due to the above-described factors, among others, the Debtors have experienced severe liquidity constraints.  While the Debtors have recently made extensive efforts to reduce costs and re-focus business, such efforts were not enough to effectively reduce losses and stave off a bankruptcy filing.

34.    The Debtors engaged in negotiations with the L/C Lenders in an attempt to renew each of the thirteen Letters of Credit, ten of which have expiration dates in March and April of this year, with corresponding renewal deadlines in February and March of this year.    These negotiations were ultimately unsuccessful due to the ongoing losses and the reduction in liquidity.

35.    Beginning in the second half of 2018, the Debtors entered into negotiations with JP Morgan Chase to consolidate all of the Letters of Credit.  These negotiations continued for several months and the Debtors believed they would ultimately be successful.

2710881.3 115719-100239

36.    On December 20, 2018, the Debtors retained Phoenix to assess the situation, analyze the Debtors' liquidity position, and take over the negotiations with the L/C Lenders to implement a debt consolidation and restructuring plan.

37.    Shortly thereafter, NEMF released its results for the third quarter of 2018. Unfortunately, after JP Morgan Chase reviewed those results, it determined not to proceed under the original terms it had proposed to the Debtors with respect to the debt consolidation and restructuring proposal that had been under negotiation.

38.    Thus, beginning in early January 2019, and continuing for approximately three weeks, I attempted to negotiate renewals of the Debtors' 13 letters of credit with 5 different banks, 10 of which have expiration dates in March and April of 2019.

39.    On January 18, 2019, TD Bank advised it would agree to hold off on making a determination not to renew its Letters of Credit in order to give Phoenix time to complete its cash flow analysis, but also advised that it would agree to renew its Letters of Credit only if all the other L/C Lenders agreed to renew their respective Letters of Credit.  At that point, I had secured tentative commitments from three of the other four L/C Lenders to renew.[5]

40.    The following week, however, one of the L/C Lenders informed me that it would not proceed with the renewal commitment unless the Debtors agreed to (i) provide additional collateral as security for the Letters of Credit, and (ii) obtain a commitment from the Debtors' equity holders to put additional capital into the companies.

41.    On January 25, 2019, TD Bank declared a default under its Letters of Credit based on an asserted (and entirely subjective) "insecure" position, and placed an administrative freeze

---

[5] Capital One advised me that it would not renew, but due to the relatively small size of its letter of credit ($428,000), the Debtors had the ability to offer, and I did offer, to collateralize the Capital One debt with cash at another one of the L/C Lenders.  At that point, the Capital One negotiations were effectively put on hold while I focused on the more material negotiations with the other L/C Lenders.

2710881.3 115719-100239

on Debtors' deposit accounts with TD Bank.  TD Bank took this action despite the fact that its

Letters of Credit have not been drawn upon and there is, accordingly, no payment default by the

Debtors. This action denied Debtors access to approximately $2.8 million in funds needed for

business operations.  TD Bank then proposed to modify the account freeze if the Debtors would

sign a release of liability related to the default notice.  We determined that the release of liability

was not in the Debtors' best interests, but as a compromise offered to provide $1.2 million to TD

Bank as permanent security for its $1.0 million letter of credit for the benefit of Arch Insurance

Company.  TD Bank turned down the offer.

42.    On January 29, 2019, TD Bank sent a notice to Arch Insurance Company of non-

renewal of a $1.0 million Letter of Credit which was issued for the benefit of Arch Insurance

Company in support of certain workers compensation insurance.  This Letter of Credit is due to

expire on April 1, 2019.

43.    Shortly thereafter, I reached out to Santander Bank and East West Bank, both of

which also advised that they would not renew their Letters of Credit.  JPMorgan Chase advised

that because it had not received the additional collateral it requested that it did not plan to renew.

44.    Around this same time, I received several significant financial reports concerning

the Debtors.  First, Phoenix completed its 17-week cash flow projection for each of the eleven

Debtors individually, and on a consolidated basis, which showed that NEMF would burn

approximately $18 million cash during that period; the Debtors overall would burn approximately

$16 million cash during the same period.  Second, the Debtors' chief financial officer provided

Phoenix with the Debtors' preliminary 4th quarter and year-end results for 2018.  The results

showed NEMF had experienced a 4th quarter operating loss of $8.4 million; the Debtors overall

experienced a 4th quarter operating loss of $7.3 million.  NEMF's 12-month results for 2018

2710881.3 115719-100239

showed an aggregate operating loss of $20.9 million; the Debtors overall experienced an aggregate operating loss of $16.2 million in 2018.  Additionally, the Debtors' 2018 EBITDA was only $1.5 million.  Significantly, however, the Debtors were facing a projected debt service in 2019 of over $19 million, comprised primarily of principal payments on the rolling stock, plus applicable interest on the overall debt.  At the same time, the Debtors' year-end cash position for 2018 was $7.8 million, representing a $16.4 million year over year reduction from year-end 2017.  Finally, the Debtors' management provided Phoenix with a preliminary 2019 budget showing a projected 12-month loss of $24 million.

45.     Armed with the foregoing financial analysis and projections, and in light of the anticipated non-renewal of the Letters of Credit, I determined that the only viable option was to begin a process of orderly liquidation of all of the Debtors' assets.  On January 30, 2019, I recommended to the Debtors' equity holders and board of directors that the Debtors had no choice but to commence an orderly liquidation process immediately.  Up until this point, the goal had been an out-of-court workout, or, at worst, a reorganization proceeding.

46.     The Debtors therefore determined to transition all of their focus and efforts immediately into wind-down operations and liquidation, under the protection of chapter 11, and immediately engaged debtors counsel.

47.     On Monday morning, February 11, 2019, the Debtors reached an agreement in principle with the Union with respect to a severance package for terminated rank and file Union employees.  The Debtors will present this settlement to the Court for approval pursuant to Fed. R. Bank. P. 9019.

2710881.3 115719-100239

## IV.    FIRST DAY RELIEF REQUESTED[6]

48.    To minimize the adverse effects of the commencement of these Chapter 11 Cases, and to provide the Debtors' with the liquidity necessary to implement their wind-down and liquidation plan, the Debtors have requested a variety of relief in the First Day Pleadings, a list of which is attached hereto as Exhibit A.  I am familiar with the contents of each of the First Day Pleadings, and to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  I believe that the relief sought therein is necessary to permit an effective transition into chapter 11 and wind-down operations.  In sum, the First Day Pleadings are intended to provide the Debtors with the infrastructure necessary to conduct an orderly liquidation.

49.    With respect to the two Debtor entities, Eastern and Carrier, that will be sold on a going-concern basis, the relief sought will enable the Debtors to promptly stabilize their vendor relationships to secure the flow of product, materials, and services required to continue to meet Eastern's and Carrier's clients' needs, which is essential to preserve and maximize the value of their assets and operations as a going concern pending the completion of a Section 363 sale.

50.    With respect to the other nine Debtor entities, the relief sought will enable the Debtors to operate those businesses in wind-down mode for a short period of time during the liquidation process in order to preserve the value of the assets and minimize further claims against the estate.  Shortly after the filing of the Debtors' chapter 11 petitions, the Debtors intend to provide notice to all (or substantially all) of the employees of those nine entities that their jobs would be terminated as a result of the liquidation.  It is contemplated that over 90% of employees, both Union and non-Union will be terminated within the first three weeks of the Petition Date.  It is anticipated that a certain number of employees will need to be retained to effectuate and

---

[6]    Any capitalized term used but not defined herein shall have the meaning ascribed to such term in the respective First Day Pleadings.

16

complete the wind-down operations.  Specifically, the Debtors estimate that for each of their 35 terminals that will be closed, it will take between one and three weeks to deliver all of the existing inventory presently at the terminals to final destinations.  This clearing of the system will require the Debtors retain a reduced workforce on a temporary basis, and the relief sought will provide certainty to those employees that the Debtors can—and will—meet the obligations under the Debtors' various employee compensation and benefit programs during the wind-down.  A third purpose is to assure the Debtors have the wherewithal to collect and process all outstanding receivables for the ultimate benefit of creditors.  I believe that the relief included in the First Day Pleadings is necessary to accomplish these goals.

51.    The Debtors' estates would suffer immediate and irreparable harm absent the ability to access cash and existing business processes to conduct an orderly liquidation, as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' wind-down operations, thereby preserving and maximizing the value of the Debtors' estates for the benefits of their creditors, employees and customers.

A.    ADMINISTRATIVE/CASE MANAGEMENT MOTIONS

i.    Debtors' Application for Expedited Consideration of First Day Matters (the "Expedited First Day Application")

52.    The Debtors request entry of an order designating their First Day Pleadings as requiring expedited consideration before this Court.  I believe that the relief requested in the Expedited First Day Application is essential to avoid the potentially disruptive impact the commencement of the Chapter 11 Cases might have on the Debtors and will facilitate the Debtors' orderly transition into Chapter 11 and maintain value during the liquidation process.  Accordingly,

2710881.3 115719-100239

on behalf of the Debtors, I respectfully submit that the Expedited First Day Application should be approved.

> ii.    **Debtors' Motion for an Order Pursuant to Bankruptcy Rule 1015 Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

53.    The Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes pursuant to Fed. R. Bankr. P. 1015(b), and that the Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case, New England Motor Freight, Inc.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

54.    The Debtors also seek authority to file the monthly operating reports required by the United States Trustee Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.  Additionally, for purposes of efficiency and in order to streamline notice of all matters that may affect creditors of any of the Debtors, the Debtors seek authority to file a single consolidated list of the 30 largest creditors in each of the Chapter 11 Cases.

55.    Joint administration of the Chapter 11 Cases will provide significant administrative convenience and efficiencies without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow all parties-in- interest to monitor the Chapter 11 Cases with greater ease and efficiency.

56.    I believe the that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient manner possible.

2710881.3 115719-100239

Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted

      **iii.**    **Application for Designation as Complex Chapter 11 Cases (the "Complex Chapter 11 Application")**

57.      By the Complex Chapter 11 Application, the Debtors request entry of an order designating the Debtors' Chapter 11 Cases as a complex chapter 11 case pursuant to Exhibit F to the Court's *General Order Governing Procedures for Complex Chapter 11 Cases* (the "**Complex Case Procedures**").

58.      I believe that the Debtors satisfy the requirements for their cases to be designated as complex chapter 11 cases under the Complex Case Procedures as there are eleven Debtors in these cases, with approximately $98 million in liabilities, assets in excess of $177 million, and without counting employees, there are more than 1,070 creditors in these Chapter 11 Cases.

59.      I believe that the relief requested in the Complex Chapter 11 Application is in the best interest of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the Debtors to implement an orderly liquidation in a streamlined fashion, while allowing the U.S. Trustee and other parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency. Accordingly, on behalf of the Debtors, I respectfully submit that the Complex Chapter 11 Application should be approved.

      **iv.**    **Debtors' Motion for Entry of an Order Extending Debtors' Time to File Their Schedules and Statements (the "Schedules and Statements Motion")**

60.      The Debtors request entry of an order granting a 30-day extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") for a total of 44 days after the Petition Date, without prejudice to seek further extensions if necessary. There are eleven (11) Debtors and approximately 1,070

2710881.3 115719-100239

creditors, approximately 3,450 employees and hundreds of other parties in interest in the Chapter 11 Cases, and the breadth of the Debtors' businesses require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size, complexity, and geographic scope of the Debtors' businesses, as well as the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements, and the many employee and advisor hours required to complete them, would be unnecessarily burdensome to the Debtors during the first 14 days following the Petition Date and unreasonably impede the Debtors' ability to implement an immediate wind-down of the core NEMF business (and eight additional business entities), which is the crux of these Chapter 11 Cases.  The Debtors are sensitive to the need to complete the Schedules and Statements as soon as possible, and they intend to complete the Schedules and Statements before the proposed 44-day deadline, if possible.

61.    I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient manner possible. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be granted.

> **v.    Debtors' Motion for an Order: (I) Granting the Debtors an Extension of Time to File Their List of Creditors; (II) Authorizing the Debtors and/or Their Agent to (A) Prepare a Consolidated List of Creditors in Lieu of a Mailing List and (B) Mail Initial Notices; and (III) Granting Related Relief (the "<u>Creditor Matrix Motion</u>")**

62.    Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order granting them an extension of time to file their list of all creditors for 30 days after the Petition Date.  The Debtors also propose to prepare a consolidated list of creditors and interest holders available to all parties-in-interest in lieu of submitting a mailing matrix.  Additionally, the Debtors seek authority to file a consolidated list of the Debtors' creditors holding the 35 largest unsecured

20

claims.  Finally, the Debtors request that Donlin, Recano & Company, Inc., their proposed notice and claims agent, undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the notice of commencement of the Chapter 11 Cases.

63.    As previously stated, the Debtors have approximately 1,070 creditors, approximately 3,450 employees and hundreds of other parties in interest in the Chapter 11 Cases, and the breadth of the Debtors' businesses require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size and scope of the Debtors' businesses and the number of creditors, I submit that the large amount of information that must be assembled to prepare the list of creditors, and the many employee and advisor hours required to complete it, would be unnecessarily burdensome to the Debtors at the beginning of the Chapter 11 Cases, which is a critical time for the Debtors' orderly liquidation plan.  The Debtors are sensitive to the need to complete the list of creditors as soon as possible, and they intend to complete the list of creditors before the proposed 30-day deadline, if possible.

64.    I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all parties-in interest, and will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient manner possible.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be granted.

      **vi.**      **Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of Donlin, Recano & Company, Inc.  as Claims and Noticing Agent Effective as of the Petition Date (the "Claims Agent Application")**

65.    Pursuant to the Claims Agent Application, the Debtors seek to retain Donlin, Recano & Company, Inc.  (**"Donlin"**) as claims and noticing agent in the Chapter 11 Cases.  I believe that by retaining Donlin the Debtors' estates, and particularly their creditors, will benefit from Donlin's services.  Donlin specializes in noticing, claims processing, and other

2710881.3 115719-100239

administrative tasks necessary to operate chapter 11 cases effectively.  It is my understanding that Donlin is fully equipped to manage claims issues and provide notice to creditors and other interested parties in the Chapter 11 Cases.

66.     The Debtors' selection of Donlin to act as the Claims and Noticing agent has satisfied this Court's requirements that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.

67.     Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed Donlin's rates are competitive and reasonable given its quality of service and expertise. The terms of Donlin's retention are set forth in the Engagement Agreement attached as an Exhibit to the Claims and Noticing Agent Application.

68.     Therefore, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

> **vii.    Application of Debtors (i) to Retain Phoenix Executive Services, LLC and (ii) Designate Vincent J. Colistra as Chief Restructuring Officer to the Debtors, *Nunc Pro Tunc* to the Petition Date (the "<u>CRO Application</u>")**

69.     Pursuant to the CRO Application, the Debtors seek to (i) retain PES to provide post-petition advisory services in connection with the Chapter 11 Cases and the Debtors' wind-down operations and orderly liquidation, and (ii) appoint myself as CRO to manage the Debtors' efforts. PES and I have considerable experience in providing interim management services and enjoy an excellent reputation for services rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.  The services we provide to the Debtors will complement, and not duplicate, the services to be rendered by other professionals retained in these

22

Chapter 11 Cases.  These services are necessary to preserve the value of the estates and conduct an efficient wind-down of the Debtors' operations.

70.    I believe that the relief requested in the CRO Application is in the best interests of the Debtors' estates, creditors, and all parties-in interest, and will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient manner possible.

71.    Therefore, on behalf of the Debtors, I respectfully submit that the CRO Application should be approved.

**B.    OPERATIONAL & CASH COLLATERAL MOTIONS**

      **i.    Debtors' Motion for Order: (I) Authorizing but not Directing the Debtors to (A) Pay Prepetition Wages, Salaries and Related Obligations, (B) Pay and Remit Prepetition Payroll Taxes and Other Deductions to Third Parties, and (C) Honor Employee Benefit Programs in the Ordinary Course of Business, (II) Authorizing and Directing Banks to Honor Checks and Transfers for Payment of Prepetition Employee Obligations; and (III) Granting Related Relief (the "<u>Wages Motion</u>")**

72.    By the Wages Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, benefits and related obligations, (b) pay and remit prepetition payroll taxes and other deductions to third parties, (c) honor employee benefit programs, including severance payments, in the ordinary course of business; and (d) authorizing and directing banks to honor checks and transfers for payment of prepetition employee obligations;.

73.    The Debtors employ approximately 3,450 full-time and part-time employees that conduct the Debtors' business, including executive, management, administrative, sales, repair shop and terminal workers, in addition to drivers.  In the ordinary course of business, employees are paid one week in arrears, weekly, on Thursdays for the week ending on the preceding Saturday. All required tax deductions and voluntary deductions are withheld automatically from paychecks.

2710881.3 115719-100239

Funds to cover the Debtors' payroll are transferred from Debtors' main operating account to three dedicated payroll accounts, which are used to make direct deposit, check, and executive payroll payments, respectively.  The Debtors use four separate dedicated ACH accounts to fund various employee benefit and tax withholdings.  The ACH accounts are funded weekly on Wednesday and Thursday, from the Debtors' main operating account,  in amounts necessary to meet such obligations.

74.      The Debtors seek authority to pay accrued pre-petition Employee Compensation and Expense Obligations and prepetition obligations arising under the Employee Benefits Programs (collectively, the "**Employee Obligations**") in the ordinary course of business.  The Debtors' average weekly employee-related payroll obligations total approximately $3.115 million. Only three of the Debtors have employees: (i) NEMF has approximately 3,100 employees with a gross weekly payroll of approximately $3.0 million; (ii) Eastern has approximately 140 employees and a weekly gross payroll of approximately $110,000; and (iii) NEWT has five employees with a weekly gross payroll of approximately $3,400.

75.      The Debtors' next payroll date, which covers amounts related to the pre-petition period, comes due on February 13, 2019.  The Debtors do not believe that any employee will receive a payment in excess of the $12,850 limit on priority claims for accrued but unpaid wages and contributions to employee benefit plans.

76.      The continued, uninterrupted service of the employees who are retained during the liquidation and wind-down period is essential to the Debtors' efforts.  I believe that the success of the Debtors' orderly liquidation is dependent, in no small part, upon the continued dedication, goodwill, and support of their employees.  I further believe that any delay in paying the Employee Obligations outstanding as of the Petition Date, or a failure by the Debtors to continue their

24

practices, programs, and policies with respect to employee benefits could severely disrupt the

Debtors' relationship with their workforce, impair morale at this critical juncture, and disrupt the

Debtors' wind-down efforts and ability to preserve and maximize the value of the estate for

creditors.  Absent payment of all accrued Employee Obligations and continuation of the Debtors'

benefits programs, I believe that Employees may quickly seek alternative employment, which

would hinder the Debtors' ability to implement their liquidation plan in an orderly manner.  I

believe that the relief requested in the Wages Motion is in the best interests of the Debtors, their

estates, and creditors, and all other parties-in-interest in the Chapter 11 Cases, and will enable the

Debtors to conduct an orderly liquidation in chapter 11 in the most efficient manner possible.

Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be

granted.

   **ii.**  **Debtors' Motion for Entry of Interim and Final Orders: (A) Authorizing the Debtors to (I) Continue Their Cash Management System, (II) Honor Certain Related Prepetition Obligations, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions; (B) Authorizing and Directing the Debtors' Banks to Honor All Related Payment Requests; (C) Granting Interim and Final Waivers of the Debtors' Compliance With Section 345(b) of the Bankruptcy Code; (D) Scheduling a Final Hearing; and (E) Granting Related Relief (the "<u>Cash Management Motion</u>")**

  77.  The Debtors request entry of an order authorizing them to: (i) continue their Cash

Management System; (ii) honor certain related prepetition obligations; (iii) maintain existing

Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany

Transactions in the ordinary course as necessary during the wind-down period.  The Debtors also

request the order provide additional relief, including:  (a) the authorizing and directing the Debtors'

Banks to honor all related payment requests; (b) granting interim and final waivers of the Debtors'

compliance with the deposit and investment guidelines set forth in section 345(b) of the

2710881.3 115719-100239

Bankruptcy Code, (c) scheduling a final hearing to consider entry of an order approving the relief requested in the Cash Management Motion on a final basis, and (d) granting related relief.

78.     In the ordinary course of business, the Debtors utilize and maintain an integrated and centralized cash management system to collect, manage, and disburse funds used in their operations.  The Cash Management System is essential to the efficient execution and achievement of the Debtors' objectives in these Chapter 11 Cases, and to maximize value of their estates.

79.     As of the Petition Date, the Debtors maintained 43 accounts (the "**Bank Accounts**") at several banks and financial institutions (the "**Banks**") in the United States.

### a.     The Cash Management System

80.     The Cash Management System is primarily centered around the Debtors' operational banking relationship with JP Morgan Chase. The following Debtors each maintain a primary, standalone operating account with JP Morgan Chase to receive deposits of customer receipts via electronic transfer or check, and also to disburse accounts payable checks to that entity's vendors: (i) NEMF (a/c 6365) (the "NEMF Main Operating Account"); (ii) Eastern (a/c 3262); (iii) NEWT (a/c 9183); (iv) Carrier (a/c 5861); (v) Apex (a/c 7814); and (vi) Jans Leasing (a/c 7911).[7]  The Debtors do not sweep cash from those six accounts into any consolidated account. NEMF also maintains an account which is used solely to receive payments of customer receipts via credit card (a/c 3180) (the "Credit Card Account").  These payments are primarily received from NEMF customers, but occasionally from customers of Eastern and NEWT.  At the discretion of the Debtors' management, balances in the Credit Card Account are generally transferred to the NEMF Main Operating Account.

---

[7] The Jans Leasing operating account has minimal activity and does not make disbursements.

2710881.3 115719-100239

81.    In addition to the NEMF Main Operating Account and the Credit Card Account, NEMF maintains four zero balance, or "ZBA" accounts at JPMorgan Chase, which are funded on an as-needed basis by the NEMF Main Operating Account (the "Chase ZBA Accounts").  The Debtors use the Chase ZBA Accounts to: (i) fund accounts payable disbursements (a/c 5726); (ii) fund employee payroll through direct deposit to certain employees of NEMF, Eastern, and NEWT (a/c 7245);[8] (iii) fund employee payroll through pay checks to certain employees of NEMF, Eastern, and NEWT (a/c 0671); and (iv) fund executive payroll (a/c 7600).

82.    NEMF also maintains four accounts at JPMorgan Chase that are used for specific ACH debit purposes, and which are also are funded on an as-needed basis by the NEMF Main Operating Account (the "Chase ACH Debit Accounts").  The Debtors use the Chase ACH Debit Accounts to: (i) fund employee 401k withholdings for employees of NEMF, Eastern, and NEWT (a/c 8770); (ii) fund payments for employees' workers compensation benefits to Liberty Mutual (a/c 5661); (iii) fund payments for employees' healthcare benefits to United Healthcare (a/c 7312); and (iv) fund payments to taxing authorities and certain vendors and lenders that have required that their invoices be paid by automatic ACH debit (a/c 7555).[9]

83.    The Debtors also maintain additional accounts at JPMorgan Chase and various other banks, including TD Bank.  To the extent those accounts remain active, however, the accounts are generally not significant to the Debtors' operations and contain *de minimis* balances. The total amount of cash held in accounts outside JPMorgan Chase is approximately $3.2 million, as of the Petition Date, and approximately $2.8 million to $3.1 million of those funds are at TD Bank.

---

[8] This account is also used to fund direct deposit disbursements to a very small group of vendors and lenders, including the Debtors fleet card providers, EFS and Comdata (as discussed in greater detail below).  As of the Petition Date, the Debtors intend to block all non-essential transfers from this account.
[9] As of the Petition Date, the Debtors intend to block all non-essential ACH debits from this account.

2710881.3 115719-100239

**b.  Bank and Investment Fees**

84.    The Debtors pay on average approximately $15,000 per month in bank and investment fees incurred in connection with maintaining the Bank Accounts (the "**Bank Fees**"). The Debtors pay the Bank Fees as they come due on a rolling basis over the course of each month, typically by direct debit.  The Debtors do not believe there are any outstanding Bank Fees as of the Petition Date.

**c.  Business Forms**

85.    In the ordinary course of their business and as part of the Cash Management System, the Debtors utilize numerous preprinted business forms, including, without limitation, letterhead, purchase orders, invoices, and preprinted checks (the "**Business Forms**").  The Debtors also maintain books and records to document, among other things, receipts and expenses.  To minimize expenses to the Debtors' estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of the Chapter 11 Cases, the Debtors request that the Court authorize the continued use of their Business Forms and other correspondence and documents as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

**d.  Fleet Cards and Fleet Payment Service**

86.    In the ordinary course of business, some of the Debtors' drivers utilize company-provided fleet cards and fleet payment services for the purchase of fuel, oil, repairs, towing and other related fleet expenses.  The Debtors' fleet card and payment services are obtained from two third-party providers, Comdata (used by NEMF) and EFS (used by Eastern).  Comdata is utilized as a payment system service and EFS is utilized as both a payment system and a fleet card

28

service.   The Debtors pay on average approximately $75,000 per week related to the use of fleet cards and fleet payments, and seek authority to continue this practice during wind-down operations.

### e.    Intercompany Transactions

87.    In connection with the daily operations of the Cash Management System, as funds are disbursed throughout the system, and as business is transacted among the Debtors, at any given time there may be intercompany claims owing by one Debtor to another.  The Debtors track all transfers of funds in their accounting system and can ascertain, trace and account for all intercompany transactions (the "**Intercompany Transactions**").  Under existing procedures for identifying and recording Intercompany Transactions, the Debtors will be able to track and segregate post-petition Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be unnecessarily disrupted, the detriment of the Debtors and their estates.

88.    I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls.  I believe that parties-in-interest will not be harmed by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, the Debtors and their advisors have implemented internal protocols that prohibit payments on account of pre-petition debts without the prior approval of appropriate managers.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

2710881.3 115719-100239

89.     Given the substantial economic scale and geographic reach of the Debtors' business operations, I believe that any disruption to the Cash Management System could impede the efficient execution and achievement of the Debtors' orderly liquidation plan in these Chapter 11 Cases.  Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient manner possible.  Therefore, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

> **iii.    Debtors' Motion For Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, (C) Establishing Procedures For Resolving Requests For Additional or Different Adequate Assurance of Payment, and (D) Scheduling a Final Hearing (the "Utilities Motion")**

90.     As of the Petition Date, the Debtors operate approximately 36 terminals and other facilities in 15 states (the "**Locations**"). Prior to the Petition Date, in the ordinary course of the Debtors' business, the Debtors spent an average monthly cost of approximately $280,479 to provide various Utility Services for the Locations.

91.     By the Utilities Motion, the Debtors seek the entry of both interim and final orders: (i) prohibiting Utility Providers from altering, refusing, or discontinuing service to the Debtors merely because of the filing of bankruptcy or the failure to pay pre-petition amounts due; (ii) deeming Utility Providers adequately assured of future performance by the payment of the Debtors into a Debtor controlled segregated account an amount equal to ½ month's average bill (averaged over the previous twelve months) for each Utility Provider; (iii) establishing procedures for resolving requests for additional or different adequate assurance of payment should any Utility Provider timely make such a request; and (iv) scheduling a final hearing to consider the entry of an order approving the relief requested in the Utilities Motion on a final basis.  The Utilities Motion

2710881.3 115719-100239

also includes a request that the Debtors be authorized to add to their list of Utility Providers any Utility Provider that may be inadvertently omitted from the original list filed with the Utilities Motion, and to have the relief granted by the Court in any interim or final order entered apply to these additional Utility Providers as well.

92.     I believe that uninterrupted Utility Services for the Locations are essential to the Debtors' ability to conduct the wind-down operations in an orderly manner. Additionally, any interruption of Utility Services, even for a brief period of time, likely would negatively affect the Debtors' efforts to preserve and maximize the value of the estates.  I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient manner possible.  Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be granted.

> iv.     **Debtors' Motion for Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Programs, (B) Pay any Prepetition Premiums and Related Obligations, and (C) Renew or Enter Into New Insurance Arrangements; and (II) Granting Related Relief (the "Insurance Motion")**

93.     By the Insurance Motion, the Debtors seek entry of an order to continue various pre-petition insurance policies and premium financing agreements covering a variety of matters such as special form property damage, flood, general liability, freight forwarders liability, motor truck cargo insurance, shippers interest coverage, pollution liability, trucker liability, umbrella coverage, automobile liability, crime, cyber liability, workers' compensation liability, directors and officers coverage, and employed lawyers professional insurance (collectively, the "**Insurance Programs**"), and pay all pre-petition and post-petition obligations in respect thereof in the ordinary course of their business.

31

2710881.3 115719-100239

94.      In connection with the day-to-day operations of their business, the Debtors maintain various Insurance Programs and related insurance policies as set forth on a non- exhaustive list attached to the Insurance Motion through several different insurance providers (the "**Insurance Providers**").

95.      The Debtors are required to pay premiums under the Insurance Programs based on a fixed amount established and billed by each Insurance Provider.  Depending on the particular Insurance Policy, premiums are either: (i) paid in installments over the term of the policy; or (ii) pre-paid at a policy's inception or renewal.  As of the Petition Date, the Debtors are current on all of their Insurance Programs.  However, as set forth in the Insurance Motion, certain obligations under the Insurance Programs may have accrued prepetition that do not become due until after the Petition Date.

96.      The total annual premiums under the current Insurance Policies and PFAs are approximately $9,882,171, including all related fees and charges.  As of the Petition Date, the Debtors estimate that they currently owe approximately $1,106,225 under the Insurance Policies and PFAs, as follows:

| POLICY/PROGRAM | APPROXIMATE AMOUNT |
|---|---|
| Premium Financing | $437,625 |
| NJ Manufacturers (WC) | $258,600 |
| Ohio Bureau of WC | $150,000 |
| Maine Employers' (WC) | $100,000 |
| Fleet Auto Policy | $160,000 |
| **Total** | **$1,106,225** |

97.      Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Insurance Motion be granted to prevent any disruption of the Debtors' Insurance Policies and Insurance Programs and any attendant harm to the Debtors' orderly liquidation and wind-down operations that such disruption would cause.

2710881.3 115719-100239

v.    **Debtors' Motion for Entry of Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "Tax Motion")**

98.    In the Tax Motion, the Debtors request entry of an order authorizing them to pay (i) certain prepetition use, mileage/highway use, fuel, franchise, *ad valorem* and other taxes and (ii) certain prepetition tolls, fees, licenses and other similar charges and assessments, which accrued or arose in the ordinary course of business before the Petition Date.  The Debtors estimate that the following approximate amount of taxes and fees in each category, totaling approximately $755,000 in the aggregate, have accrued and remain owing as of the Petition Date:

| CATEGORY | APPROXIMATE AMOUNT |
|---|---|
| Mileage/Highway Use Taxes | $65,000 |
| Fuel Taxes | $50,000 |
| Use Taxes | $15,000 |
| Franchise and CAT Taxes | $150,000 |
| *Ad Valorum* Taxes | $15,000 |
| Tolls | $450,000 |
| Business License, Registration and Unclaimed Property Fees | $10,000 |
| Motor Vehicle Registration Fees | None Known |

99.    The Debtors must continue to pay all taxes and governmental fees when due to continue operating during their wind-down phase and pending the sale of Eastern and Carrier. Failure to pay all taxes and governmental fees (including taxes and fees that arose pre-petition) when due could result in taxing authorities suspending the Debtors' ability to operate, filing liens, and/or seeking relief from the automatic stay to take action against the Debtors.

100.    The relief the Debtors seek in the Tax Motion will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient and value-maximizing manner possible. Accordingly, to prevent immediate, irreparable harm to the Debtors' estates, I believe that the

2710881.3 115719-100239

relief requested in the Tax Motion is in the best interests of the Debtors and their estates and creditors and all other parties-in-interest in the Chapter 11 Cases and, therefore, should be granted.

> **vi.** **Debtors' Motion for Interim and Final Orders (I) Authorizing Use of JP Morgan Chase Bank, N.A.'s Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Chase Cash Collateral Motion")**

> **vii.** **Debtors' Motion for Interim and Final Orders (I) Authorizing Use of TD Bank N.A.'s Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "TD Cash Collateral Motion")**

101.    To transition into chapter 11 with as little disruption as possible and to enable the Debtors to effectuate wind-down operations and an orderly liquidation of their assets, including the pursuit of a value-maximizing sale of Eastern and Carrier, the Debtors require the ability to use cash collateral held by TD Bank and JP Morgan Chase ("Cash Collateral").  The Debtors are in discussions with TD Bank and JP Morgan Chase to use Cash Collateral in accordance with a budget (which incorporates other cash sources in addition to the Cash Collateral) that the Debtors believe will be sufficient to pay their administrative expenses that become due and payable during wind-down operations and before a sale of Eastern and Carrier can be consummated.  Specifically, the Debtors propose to use Cash Collateral for purposes of funding the wind-down operations, including payroll, employee severance, insurance, and ordinary expenses necessary to "clean out the system" of pending deliveries, which the Debtors anticipate will take 1 to 3 weeks at each terminal.

102.    As adequate protection to JPMorgan Chase and TD Bank, the Debtors will grant replacement liens upon all of the Debtors' property (not already subject to a lien of another secured creditor on the Petition Date) in the amount of any diminution in value of each bank's respective

2710881.3 115719-100239

cash collateral on the Petition Date (which we believe is in the range of less than $3 million each) and junior liens on all of the Debtors' assets.

103.    For the foregoing reasons, I believe that the terms and conditions of the use of Cash Collateral are fair, reasonable, and negotiated in good faith and at arms' length after extensive efforts to obtain the most advantageous post-petition financing.  I further believe that the relief requested in the Chase and TD Cash Collateral Motions is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to conduct an orderly liquidation in chapter 11 in the most efficient and value-maximizing manner possible.  On behalf of the Debtors, I respectfully submit that the Court should (a) approve the use of Cash Collateral on an interim basis pursuant to the proposed Interim Orders and (b) enter the Final Orders at the Final Hearing.

## V.    CONCLUSION

104.    The relief sought in the various First Day Pleadings would allow the Debtors to, among other things: (i) obtain certain operational relief and establish various administrative procedures to promote a seamless transition into bankruptcy and wind-down operations, and (ii) obtain use of cash collateral in order to fund the Debtors' wind-down operations, orderly liquidation and the administration of these Chapter 11 Cases.

105.    I have reviewed each of the First Day Pleadings, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their operations as sought in the First Day Pleadings during the orderly liquidation.  In my opinion, approval of the relief sought in the First Day Pleadings will be critical to maintaining the stability of the Debtors' business operations during the wind-down period, preserving value, minimizing further liabilities to the estates, and allowing the Debtors to focus their efforts on completing an orderly liquidation in the most efficient and value-maximizing manner possible.  Unless this "first day" relief is granted, I

35

believe the Debtors' estates will suffer significant adverse, immediate, and irreparable consequences.

106.    Several of the First Day Pleadings request authority to pay certain pre-petition claims.  I am told by the Company's advisors that Fed. R. Bankr. P. 6003 provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty-one days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors intentionally narrowly tailored their requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

107.    For the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.


I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statement set forth in this Declaration are true and correct.

Dated: February 10, 2019               By:    _____

                                               Vincent Colistra
                                               Chief Restructuring Officer

2710881.3 115719-100239