**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
           mconlan@gibbonslaw.com
           btheisen@gibbonslaw.com

*Proposed Counsel to the Debtors
and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Jointly Administered) |

## DEBTORS' MOTION FOR ORDER APPROVING GLOBAL EMPLOYEE SETTLEMENTS PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND BANKRUPTCY RULE 9019

The above-captioned debtors and debtors in possession (the "**Debtors**"), by and through their undersigned proposed counsel, hereby submit this motion (the "**Motion**") for entry of an order, substantially in the form submitted herewith, approving and authorizing the Debtors to enter into, pursuant to sections 105(a) and 363(b) of the United States Bankruptcy Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

"**Bankruptcy Rules**"): (i) the Plant Closing Agreement, attached to the *Supplemental Declaration of Vincent Colistra* filed concurrently herewith (the "**Supplemental Colistra Declaration**") as **Exhibit A** (the "**Union Plant Closing Agreement**") by and between Debtor New England Motor Freight, Inc. ("**NEMF**") and the International Association of Machinists and Aerospace Workers, including its affiliated District Lodge 15 and Local Lodge 447 (the "**Union**"); (ii) that certain letter agreement dated February 21, 2019 attached hereto as **Exhibit B** (the "**Union Letter Agreement**" and with the Union Plant Closing Agreement, the "**Plant Closing Agreements**") and (iii) the Debtors' entry into the same or substantially similar severance and benefit settlements with the Debtors' non-union employees substantially in the form attached to the *Supplemental Colistra Declaration* as **Exhibit D** (the "**Non-Union Severance Agreements**", and collectively with the Union Plant Closing Agreement and the Union Letter Agreement, the proposed "**Global Settlements**"). In support of the Motion, the Debtors rely upon, and incorporate by reference, the *Declaration of Vincent Colistra in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**")[2] [Dkt. No. 22], as well as the *Supplemental Colistra Declaration*. In further support of this Motion, the Debtors respectfully represent as follows:

## I.    PRELIMINARY STATEMENT

As of February 11, 2019 (the "**Petition Date**"), NEMF employed approximately 3,300 employees. Approximately 1,900 of those employees are members of the Union ("**Union Employees**") and are covered by a series of collective bargaining agreements (each a "**CBA**," and collectively, the "**CBAs**"). NEMF is the only Debtor with Union Employees. Shortly after the filing of the Debtors' chapter 11 petitions, the Debtors provided notice to all (or substantially all) of the employees that their jobs would be terminated as a result of the Debtors' intent to effectuate

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

an orderly liquidation of most of their businesses.  On Friday, February 15, 2019, approximately

2,600 of the Debtors' employees were laid off, including approximately 1,540 Union Employees.

February 22, 2019 will be the last day worked for an additional 410 of the Debtors employees.

Thus, approximately 3,010 of the Debtors' employees, representing more than 90% of Debtors'

workforce, both Union and non-Union have been terminated within the first two weeks of these

Chapter 11 Cases.

        Prior to the Petition Date, the Debtors formulated a global employee severance package.

As set forth in the First Day Declaration, on the morning of February 11, 2019, prior to filing the

Debtors' chapter 11 petitions, NEMF reached an agreement in principle with the Union with

respect to severance and other related benefits for the terminated Union Employees.   That

agreement was memorialized in the Union Plant Closing Agreement that will, among other things,

provide for NEMF to make total severance payments to Union Employees equal to the greater of

(i) two weeks' salary, or (ii) each Union Employee's accrued and unused vacation (which in no case

exceeds three weeks) and personal days, and, under either option, the Union Employees will also

receive an extension of current medical benefits up through and including April 13, 2019 at no

expense to the terminated Union Employees following termination of their employment.[3]   The

continuation of health insurance benefits was an important element of the settlement as negotiated

by the Union.  No proposed payee under the Union Plant Closing Agreement is an insider of the

Debtors.

        In exchange for the proposed severance payments and medical benefits described in the

Union Plant Closing Agreement, the Union, as the collective bargaining agent for the Union

---

[3] Although the Union Plant Closing Agreement states that current medical benefits will be extended to April 11, 2019,
a Thursday¸ the intent of the parties was to provide 60 days of additional medical benefits, which would run through
the Saturday end of the payroll week on April 13, 2019.  All other references herein to the extension of medical
benefits will therefore be until April 13, 2019.

Employees, agreed to release, discharge and not sue NEMF (or its affiliated entities) based on any

and all claims, demands, suits or grievances of whatever kind or sort, including, but not limited to,

claims arising under Worker Adjustment and Retraining Act, 29 U.S.C. §§ 2101 *et seq.* (the

"**WARN Act**") or any similar state or local law.  Under the terms of the Union Plant Closing

Agreement, NEMF will not be obligated to continue to provide medical plan coverage to any

Union Employee for claims incurred after April 13, 2019.[4]

In order to reach a global resolution with all employees, and because the Debtors did not

want to treat their Union and non-union employees differently, the Debtors then extended a similar

severance offer to their non-union employees (the "**Non-Union Employees**") whose employment

is being terminated.  In exchange, the Debtors will request in the proposed form of Non-Union

Severance Agreements that each accepting Non-Union Employee release the Debtors from any

further liability under any federal, state or local law, including a release of any potential WARN

Act claims.  As noted above, the Union provided the same release under the Plant Closing

Agreement.  By this Motion, the Debtors also seek authorization to offer each Non-Union

Employee a similar severance package consisting of, among other things, payment of the greater

of (i) two weeks' salary, or (ii) their accrued and unused vacation (which in no case exceeds three

weeks) and sick days, and an extension of current medical benefits up to April 13, 2019 at no

expense to the employee following termination of their employment.   In exchange for the

foregoing, the Non-Union Employee will be required to release any and all claims against the

Debtors, including WARN Act claims.  The decision of whether to enter into a Non-Union

Severance Agreement with the Debtors is voluntary and is in the sole discretion of each Non-

Union Employee.  The Debtors do not believe that the Non-Union Severance Agreement will be

---

[4] The Debtors anticipate that it may take up to approximately eight additional weeks for accrued medical claims to
be processed through the Debtors' third-party claims administrator and be paid.

accepted by the Non-Union Employees without providing the continued medical benefits component.

Approval of the Global Settlements is in the best interests of the Debtors' estates because it will provide a significant cost savings to the estates—which the Debtors estimate at approximately $15 million—and ensure the discharge of the Debtors' employees on terms and conditions that are mutually beneficial to the Debtors and the Debtors' employees, avoid future litigation between the parties. Together, the Global Settlements will, in large measure, establish with finality the amounts owed to the Debtors' employees and greatly reduce future disputes over the termination of the Debtors' employees. As such, if the Global Settlements are approved, the Debtors' anticipate that they may be in a position to make distributions to creditors in a matter of months, rather than years (which would be the case if WARN Act claims must be litigated). Finally, it is indisputable that extending health care coverage for these people is a paramount concern and responsibility of the Debtors and their estates.

For the reasons set forth herein, in the First Day Declaration and the Supplemental Colistra Declaration, the terms of the Union Plant Closing Agreement, the Union Letter Agreement and the Non-Union Severance Agreements are favorable for the Debtors and in the best interests of the Debtors' estates and should be approved by the Court.

## II.     JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

2.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

### III.    BACKGROUND

4.      On the Petition Date, the above-captioned Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby initiating the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  With the exception of Eastern Freight Ways, Inc. ("**Eastern**") and Carrier Industries, Inc. ("**Carrier**"), which will be sold as going-concerns, the Debtors, as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are engaged in an orderly liquidation of their assets and wind-down of their businesses, toward the goal of preserving and maximizing the value of their assets for all creditors.  On February 21, 2019 the Office of the United States Trustee  appointed an Official Committee of Unsecured Creditors.

5.      The Debtors offer a broad range of transportation services.  Debtor New England Motor Freight, Inc. ("**NEMF**") was founded in 1918 in Elizabeth, New Jersey and is a leading less than truckload ("**LTL**") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United States.  NEMF also offers LTL services to its customers across the United States and Canada through a number of partnerships and interline carrier arrangements with other LTL providers.  In addition to the LTL business the Debtors provide truckload ("**TL**") services through Eastern. Debtor Jans Leasing Corp. ("**Jans Leasing**") is a trucking equipment lessor, Debtor Carrier offers dedicated third party logistics services, Debtor Apex Logistics ("**Apex**") offers transportation brokerage services, and Debtor NEMF World Transport, Inc. ("**NEWT**") provides non-vessel operation common carrier operations between the United States and Puerto Rico.  Debtors Myar, LLC ("**Myar**") and MyJon, LLC ("**MyJon**") are both dormant and had no economic actively in 2018.  Debtors Hollywood Avenue Solar, LLC ("**Hollywood Solar**") and United Express Solar,

LLC ("**United Solar**") were formed to acquire solar arrays for terminals in South Plainfield and Pennsauken, New Jersey, respectively, at which the Debtors operate.

6.      MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of NEMF.  Myar is a wholly-owned subsidiary of Eastern.  The remaining Debtors are all sister entities owned solely by The Shevell Dynasty Trust, or by the Shevell Dynasty Trust and Myron P. Shevell.

7.      In 2017, the Debtors' businesses generated consolidated gross revenues of approximately $373 million.  For 2018, the Debtors estimate that their businesses have generated consolidated revenues of approximately $370 million.[5]

8.      The Debtors' principal place of business and corporate headquarters is located at 1-71 North Avenue East, Elizabeth, New Jersey, 07201-2859.  The Debtors operate from 36 trucking terminals located throughout the Mid-Atlantic, the Northeast and Midwest, and two additional locations in New Brunswick, NJ and Jordan, NY, which are used primarily for administrative staff and for Eastern operations.

9.      Additional information regarding the Debtors' businesses, the events leading to the Chapter 11 Cases, and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration [Dkt. No. 22], which is incorporated herein by reference.

10.      The Debtors commenced these Chapter 11 Cases to maximize the value of their assets and to effectuate an orderly liquidation process for the benefit of all creditors.  The orderly liquidation of the Debtors will involve: (i) the immediate wind-down of nine of the eleven Debtor entities; (ii) the orderly collection of the Debtors' accounts receivables; (iii) the sale of the Debtors' two most profitable entities, Eastern and Carrier, as going-concerns pursuant to a Court-approved

---

[5] The Debtors' books for fiscal year ending December 29, 2018 are not yet final.  All references to 2018 financials herein are based on the Debtors' preliminary results and remain subject to change.

Section 363 bidding and auction process; (iv) sales of the Debtors' remaining assets (primarily rolling stock, equipment, machinery and inventory), which are located across the Debtors' 36 terminals; and (v) the sale of unencumbered real property.

A.    THE EVENTS LEADING UP TO CHAPTER 11

11.    Several factors have severely impacted the profitability of the Debtors' businesses, ultimately prompting the current liquidity crisis that dictated the Debtors' decision to commence these Chapter 11 Cases in order to conduct an orderly liquidation of their assets.  While the company's operations were profitable for decades since the current ownership group acquired NEMF in 1977, the Debtors have suffered a downward trend over recent years, which was exacerbated in late 2018 by the unexpected loss of key accounts, the shortage of drivers, a new union contract with onerous driver overtime terms, and JPMorgan Chase, TD Bank, Santander Bank, East West Bank and Capital One's (collectively, the "**L/C Lenders**") ultimate unwillingness to restructure the Debtors' letters of credit obligations under terms acceptable to the Debtors.

12.    Changes and competition within the industry have had an ongoing negative impact on the Debtors' revenues.  As of the Petition Date, the Debtors' workforce was made up of approximately 3,450 full-time and part-time employees.  The Union workforce consisted of, approximately: 1,425 truck drivers, and 475 dock workers, for a total of approximately 1,900 Union employees.  The non-union workforce consisted of, approximately: 145 truck drivers at Eastern, 600 part-time workers (mostly dock workers), and 805 other employees, for a total of approximately 1,550 non-union employees.  Employee costs for the Debtors are, in the aggregate, substantially above industry norms.  Most of the LTL companies competing with the Debtors operate under non-unionized conditions.  At the same time, there has developed an industry-wide shortage of drivers, putting the Debtors, with an aging fleet of vehicles, at a severe disadvantage.

8

13.     While the Debtors have recently made extensive efforts to reduce costs and re-focus business, such efforts were not enough to effectively reduce losses and stave off a bankruptcy filing.  Due to the above-described factors, among others, the Debtors have experienced severe liquidity constraints.  As a result of the loss of liquidity, the Debtors were unable to successfully renew the Letters of Credit that support their various insurance programs.

14.     The Debtors engaged in negotiations with the L/C Lenders in an attempt to renew each of the thirteen Letters of Credit, ten of which have expiration dates in March and April of this year, with corresponding renewal deadlines in February and March of this year.  These negotiations were unsuccessful due to the ongoing losses and reduction in liquidity.

15.     Beginning in the second half of 2018, the Debtors entered into negotiations with JP Morgan Chase to consolidate all of the Letters of Credit.  These negotiations continued for several months and the Debtors believed they would ultimately be successful.

16.     On December 20, 2018, the Debtors retained Phoenix Management Services, LLC ("**Phoenix**") to assess the situation, analyze the Debtors' liquidity position, and take over the negotiations with the L/C Lenders to implement a debt consolidation and restructuring effort.

17.     Shortly thereafter, NEMF released its results for the third quarter of 2018. Unfortunately, after JP Morgan Chase reviewed those results, it determined not to proceed under the original terms it had proposed to the Debtors with respect to the debt consolidation and restructuring proposal that had been under negotiation.

18.     Thus, beginning in early January 2019, and continuing for approximately three weeks, Mr. Colistra attempted to negotiate renewals of the Debtors' 13 letters of credit with 5 different banks, 10 of which have expiration dates in March and April of 2019.

19.     On January 18, 2019, TD Bank advised Mr. Colistra that it would agree to hold off
on making a determination not to renew its Letters of Credit in order to give Phoenix time to
complete its cash flow analysis, but also advised that it would agree to renew its Letters of Credit
only if all the other L/C Lenders agreed to renew their respective Letters of Credit.  At that point,
Mr. Colistra had secured tentative commitments from three of the other four L/C Lenders to
renew.[6]

20.     The following week, however, one of the L/C Lenders informed Phoenix that it
would not proceed with the renewal commitment unless the Debtors agreed to (i) provide
additional collateral as security for the Letters of Credit, and (ii) obtain a commitment from the
Debtors' equity holders to put additional capital into the companies.

21.     On January 25, 2019, TD Bank declared a default under its Letters of Credit based
on an asserted (and entirely subjective) "insecure" position, and placed an administrative freeze
on Debtors' deposit accounts with TD Bank.  TD Bank took this action despite the fact that its
Letters of Credit had not been drawn upon and there was, accordingly, no payment default by the
Debtors. This action denied Debtors access to approximately $2.8 million in funds needed for
business operations.  TD Bank then proposed to modify the account freeze if the Debtors would
sign a release of liability related to the default notice.  The Debtors and Mr. Colistra determined
that a release of liability was not in the best interests of either the Debtors or their creditors, but as
a compromise the Debtors offered to provide $1.2 million to TD Bank as permanent security for
their $1 million letter of credit for the benefit of Arch Insurance Company.  TD turned down the
offer.

---

[6] Capital One advised Mr. Colistra that it would not renew, but due to the relatively small size of its letter of credit
($428,000), the Debtors had the ability to offer, and I did offer, to collateralize the Capital One debt with cash at
another one of the L/C Lenders.  At that point, the Capital One negotiations were effectively put on hold while I
focused on the more material negotiations with the other L/C Lenders.

22.    On January 29, 2019, TD Bank sent a notice to Arch Insurance Company of non-renewal of a $1.0 million Letter of Credit which was issued for the benefit of Arch Insurance Company in support of certain workers compensation insurance.  That Letter of Credit is due to expire on April 1, 2019.

23.    Shortly thereafter, Mr. Colistra reached out to Santander Bank and East West Bank, both of which also advised that they would not renew their Letters of Credit. JP Morgan Chase advised that because it had not received the additional collateral it requested, it did not plan to renew.

24.    Around this same time, several significant financial reports concerning the Debtors were completed.  First, Phoenix completed its 17-week consolidated cash flow projection for the Debtors, which showed that NEMF would burn approximately $18 million during that period; the Debtors overall would burn approximately $16 million during the same period.  Second, the Debtors' chief financial officer provided Phoenix with the Debtors' preliminary 4th quarter and year-end results for 2018.  The results showed NEMF had experienced a 4th quarter operating loss of $8.4 million; the Debtors overall experienced a 4th quarter operating loss of $7.3 million. NEMF's 12-month results for 2018 showed an aggregate operating loss of $20.9 million; the Debtors overall experienced an aggregate operating loss of $16.2 million in 2018.  Additionally, the Debtors' 2018 EBITDA was only $1.5 million.  Significantly, however, the Debtors were facing a projected debt service in 2019 of over $19 million.  At the same time, the Debtors' year-end cash position for 2018 was $7.8 million, representing a $16.4 million year over year reduction from year-end 2017.  Finally, the Debtors' management provided Phoenix with a preliminary 2019 budget showing a projected 12-month loss of $24 million.

25.     Armed with the foregoing financial analysis and projections, and in light of the anticipated non-renewal of the Letters of Credit, Mr. Colistra determined that the only viable option was to begin a process of orderly liquidation of all of the Debtors' assets.  On January 30, 2019, Mr. Colistra recommended to the Debtors' equity holders and board of directors that the Debtors had no choice but to commence an orderly liquidation process immediately.  Up until that point, the goal had been an out-of-court workout, or, at worst, a reorganization proceeding.

26.     The Debtors therefore determined to transition all of their focus and efforts immediately into wind-down operations and liquidation, under the protection of chapter 11, and immediately engaged debtors counsel.

27.     On February 6, 2019, the Debtors appointed Mr. Colistra, through Phoenix's wholly-owned affiliate Phoenix Executive Services, LLC, as their Chief Restructuring Officer, which was approved by the Court on February 13, 2019.

**B.     THE DEBTORS' EMPLOYEE HEALTH CARE INSURANCE PLAN**

28.     Three of the Debtors have employees and combined, as of the Petition Date, employed approximately 3,450 employees (the "**Employees**") that conduct the Debtors' businesses, including executive, administrative, sales, repair shop and terminal workers, and drivers.  As of the Petition Date, NEMF employed approximately 3,300 employees, approximately 1,900 of whom are union employees under a series of CBAs, and 1,400 of whom are Non-Union Employees.[7]   Eastern employs approximately 150 employees, all of whom are Non-Union Employees, and NEWT employs 5 employees, all of which are Non-Union Employees.[8]   The Debtors' executive staff includes 28 Employees.

---

[7] Approximately 2,685 of NEMF's Employees are full-time and 637 are part-time.

[8] The number of Employees of NEMF and Eastern changes on a weekly basis.

29.    In the ordinary course of business, the Debtors pay and incur a number of obligations related to the Employees, including, but not limited to: (a) wages and salaries; (b) payroll servicing fees; (c) payment of certain amounts withheld from Employee's paychecks for tax and other obligations to third parties; (d) business expense allowances and reimbursements; (e); union dues; and (f) various additional Employee benefits, including health care insurance coverage.

30.    The Debtors' medical health insurance plans are self-insured with respect to the first $285,000 per plan member, with stop-loss insurance coverage for claims in excess of $285,000 per plan member.  Medical claims are administered on behalf of the Debtors by United Health Care Insurance Company and HPHC Insurance Company, Inc. ("**United**").  The stop-loss insurance for claims exceeding $285,000 is underwritten by Vista Underwriting Partners and the coverage is provided by Gerber Life Insurance Company.  As of the Petition Date, the Debtors' medical plans include the following:

   a.  New England Motor Freight, Inc. Choice Plus Milton Union Plan (eff. 7/1/2018);

   b.  New England Motor Freight, Inc. Choice Plus Union Plan (effective 7/1/2018);

   c.  New England Motor Freight, Inc. PPP1 Owner's Plan (effective 1/1/2017);

   d.  New England Motor Freight, Inc. Choice Plus Non-Union Bronze (effective 1/1/2017);

   e.  New England Motor Freight, Inc. Choice Plus Milton, PA Non-Union (effective 1/1/2017);

   f.  New England Motor Freight, Inc. Choice Plus Non-Union (effective 1/1/2017);

   g.  New England Motor Freight, Inc. Choice Plus Union Active (effective 1/1/2017);

   h.  New England Motor Freight Motor Freight, Inc. Choice Plus Union Plan 1 (effective 1/1/2017);

13

    i.   New England Motor Freight, Inc. Choice Plus Union New Hires 8/1/2013 (effective 1/1/2017);

    j.   New England Motor Freight, Inc. Choice Plus Union Plan 2 (effective 1/1/2017);

    k.   New England Motor Freight, Inc. Choice Plus Directors & Executives (effective 1/1/2017);

    l.   New England Motor Freight, Inc. Choice Plus (Milton Union 1) (effective 1/1/2017); and

    m.   New England Motor Freight, Inc. Choice Plus (Milton Union 2) (effective 1/1/2017), (collectively, the "**Employee Health Care Insurance Plan(s)**"). [Supplemental Colistra Declaration, ¶ 21].

31.    The employee's health insurance is funded by the Debtors, with the cost partially offset by Employee contributions through payroll deductions that collectively average about $115,000 per week.  Historically, the average weekly cost to the Debtors for the Employee Health Care Insurance Plan and covered claims has been approximately $800,000.

32.    The Debtors, in consultation with their legal and financial advisors, continue to refine their projected budget for orderly liquidation.  The Debtors estimate, based on all available information and analyses to date, that they will be obligated to pay approximately $6.0 million in additional medical claims pursuant to the Global Settlements.  It is expected to take approximately 16 weeks for those claims to flow through the Debtors third-party claims administrator and be paid.

### C.    EMPLOYEE LAYOFFS AND GLOBAL EMPLOYEE SETTLEMENT OFFER

33.    At the Debtors' First Day Hearing on February 13, 2019, the Debtors outlined a proposed orderly liquidation and wind-down plan to the Court and all parties-in-interest.  As set

forth above, as of the date of this Motion, more than 90% of the Debtors' workforce has been terminated.

34.    Like the Union Plant Closing Agreement, the Debtors propose to offer the Non-Union Severance Agreement to each terminated Non-Union Employee, which will consist of a severance payment equal to the greater of: (i) two weeks' salary, or (ii) their accrued and unused vacation (which in no case exceeds three weeks) and sick days, and an extension of current medical benefits up to April 13, 2019 at no expense to the Employee following termination of their employment.

35.    In exchange for the severance payments and benefits provided under the Non-Union Severance Agreements, the Debtors have requested or will request that each accepting terminated Non-Union Employee release the Debtors from any further liability related to their employment, including a release of any potential WARN Act claims under applicable federal, state or local law.  As set forth above, the Union provided the same release under the Union Plant Closing Agreement.

36.    By Order entered on February 21, 2019 (Dkt. No. 70], the Court approved the relief sought in the Debtors *Emergent Motion To Continue Paying Health Insurance Benefits To Terminated Employees, On An Interim Basis, Pending Approval Of Proposed Global Employee Settlement Under Rule 9019* [Dkt. No. 58] ("**Emergent Motion**") authorizing the Debtors to continue to pay, **through March 4, 2019**, all of their obligations under the Debtors' medical plan to those Employees who were or will be laid off in connection with the Debtors' wind-down and liquidation, subject to the rights of certain parties in interest to object at a later date and to challenge the Global Settlements.

37.     By this Motion the Debtors seek authority to continue providing their terminated

Union and Non-Union Employees with health care coverage through April 13, 2019 at no cost to

the terminated employees, the same date they would otherwise be required to provide medical

benefits to if the WARN Act applied.   The Debtors strongly believe that the proposed Global

Settlements with the Union and Non-Union Employees are in the best interests of the estate and

all parties-in-interest because the Global Settlements will greatly reduce—and hopefully eliminate

entirely—the risk to the estate of potential WARN Act claims which, in the aggregate, may

approach approximately $27.7 million.   The Debtors have estimated the cost of the Global

Settlements to be approximately $13.2 million.   As such, the Debtors have calculated that the

potential savings to the estate if the Global Settlements are approved would be approximately

$14.5 million.

38.     Specifically, based on all available information and analyses to date, the Debtors

estimate that the severance and medical expense arising from the Global Settlements for the period

through April 13, 2019 is as follows:

| Union Plant Closing Agreement | Amount |
|---|---|
| Two Weeks Wages | $3,303,045 |
| Additional Vacation & Personal Pay | $1,488,311 |
| Projected Medical Claims Coverage | $4,000,000 |
| **Union Subtotal** | **$8,791,356** |
| **Non-Union Severance Agreements** | |
| Two Weeks Wages | $1,643,822 |
| Additional Vacation & Sick Pay | $820,123 |
| Projected Medical Claims Coverage | $2,000,000 |
| **Non-Union Subtotal** | **$4,463,945** |
| **Total** | **$13,255,301** |

The Debtors are proposing that the first severance payments for wages under the terms of the

Global Settlements (which were originally intended to be paid on or about March 1, 2019) will be

paid as soon as possible following entry of an order approving the Global Settlements.

39.     The proposed Global Settlements were formulated by the Debtors in consultation with their advisors after a careful analysis of, *inter alia*, potential liability to Employees, the risks and costs associated with protracted litigation that may ensue absent settlement, and the proper medical protection for the labor force of the businesses.  In short, absent approval of the proposed Global Settlements, the Debtors have determined that the likelihood of a substantial recovery for unsecured creditors will be greatly reduced; the overall assets of the estate will be reduced; and extensive and costly litigation is guaranteed.  In addition, the proposed Global Settlements are also the right thing to do for the Debtors' Employees.

### D.     THE WARN ACT COMPLAINT

40.     On February 14, 2019, an adversary complaint was filed in this Court, captioned *Mary Carlin and Dan Webster, on their own behalf and on behalf of all other persons similarly situated* (collectively, the "**WARN Act Plaintiffs**")*, v. New England Motor Freight, Inc.* [Docket No. 51], commencing Adv. Proc. No. 19-01073 (JKS), seeking to certify a class with respect to certain current and former employees of the Debtors for alleged violations of, among other things, the WARN Act (the "**WARN Action**").

### E.     THE UNION PLANT CLOSING AGREEMENT

41.     The primary terms of the Union Plant Closing Agreement and the Union Letter Agreement[9] are as follows:

    a.     NEMF agrees to:

        i.   promptly pay in full to all Union Employees all existing obligations of wages;

        ii.  promptly pay Union Employees a severance benefit equal to the greater of two week's salary or their accrued and unused vacation (which in no

---

[9] While the summary of the principal terms herein is intended to be accurate, if there is any discrepancy between this summary and the Union Plant Closing Agreement and/or the Union Letter Agreement, the terms of the Union Plant Closing Agreement shall control.

case exceeds three weeks) and personal days, and an extension of current medical benefits up to April 13, 2019 at no expense to the Employees following the date of their termination;

iii.    provide any necessary assistance in helping the Employees secure unemployment benefits due to them;

iv.    promptly pay all Union dues and initiation fees collected, and medical benefits through the last day worked, including dental and vision coverage to the Union; and

v.    with the consent of the Union, send a "Notice," in substantially the form attached to the *Supplemental Colistra Declaration* as **Exhibit C** summarizing this Motion (the "**Motion Notice**"), to the Union Employees, which will be circulated by Donlin Recano, the Debtors' Bankruptcy Court appointed claims and noticing agent.

b.    In exchange, the Union agrees that:

i.    it releases, discharges, and covenants not to sue NEMF or any of its related entities based on any and all claims, demands, suits or grievances of whatever kind or sort, known or unknown, including, but not limited to, claims arising out of or in connection with any collective bargaining relationship with NEMF, the CBA, and any other connection between the Union and NEMF, including those claims arising out of any state, local or federal law, including in particular the WARN Act, and any similar state or local law.  This release is to be construed broadly and shall be inclusive of all claims, demands and rights of action that the Union has or may have.  The Union's release also releases the claims of its members.  *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 299 (6th Cir. 2009).

ii.    NEMF shall not be obligated to bargain collectively with respect to any matter not specifically referred to or covered in the Union Plant Closing Agreement even though such subject or matter may not have been within the knowledge or contemplation of the parties at the time they negotiated or signed the Union Plant Closing Agreement; and

iii.    effective as of the date that the last Union Employee is terminated, each CBA is terminated by mutual consent of NEMF and the Union per the Union Letter Agreement.

42.    The primary terms of the Non-Union Severance Agreements[10] are as follows:

---

[10] While the summary of the principal terms herein is intended to be accurate, if there is any discrepancy between this summary and the Non-Union Severance Agreement, the terms of the applicable Non-Union Severance Agreement shall control.

a.  The Debtors agree to:

i.  pay Non-Union Employees a severance benefit equal to the greater of two week's salary or their accrued and unused vacation (which in no case exceeds three weeks) and sick days, and to extend current medical benefits up to April 13, 2019 at no expense to the Employees following the date of their termination;

ii.  maintain such Non-Union Employees' current medical plan at no cost to the Non-Union Employees until April 13, 2019;

b.  In exchange for the foregoing, the Non-Union Employee must agree to:

i.  release NEMF and its affiliated companies and their current and former officers, directors, agents, employees, successors and assigns (as defined in the Non-Union Severance Agreement, collectively, the "**Released Parties**") from all claims, demands, actions and liabilities, whether known or unknown such Non-Union Employee may have against them or any one of them in any way related to their employment by the Debtors and/or the termination of that employment, including those claims arising under the WARN Act or any similar state or local law; and

ii.  never sue or otherwise institute a claim of any kind against any of the Released Parties for anything that has happened up to now, whether such claim is presently known or unknown, in any way related to such Employee's employment by the Debtors and/or the termination of that employment.

## IV.  **RELIEF REQUESTED**

43.  By this Motion, the Debtors request an order, substantially in the form submitted herewith, authorizing the Debtors' entry into the Union Plant Closing Agreement with respect to Union Employees and Non-Union Severance Agreements with respect to the Non-Union Employees and approving the terms set forth therein pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

44.  Specifically, the Debtors seek approval of the Global Settlements and the authority to consumate the Global Settlements by paying approximately $7,255,301 in severance payments to terminated Employees, including additional accrued vacation (which in no case exceeds three

weeks), personal or sick days (as set forth above) and paying approximately $6,000,000 in order to provide continued medical coverage for claims incurred by terminated employees through April 13, 2019 at no cost to the terminated employee.

45.     This relief is necessary to preserve the value of the Debtors' assets because, among other reasons, it will eliminate unnecessary and costly litigation in addition to potentially substantial administrative expense claims against the estates, including potential attorney's fees and expenses relating to the WARN Action, and to honor the Debtors' fiduciary and moral duties to their workforce, and obligations under applicable law.

46.     Approval of the Union Plant Closing Agreement and the Letter Agreement will also provide for the consensual termination of the CBAs and avoid any future disputes over the rights and benefits provided thereunder.

47.     The severance benefits provided to the Non-Union Employees will also incentivize the Non-Union Employees to cooperate with the Debtors' orderly liquidation and fix the amount that the estate will have to pay to the Non-Union Employees.

48.     Moreover, under the Affordable Care Act,[11] the Debtors are required to keep the Employee Health Care Insurance Plans in place so long as they remain operating and have employees—even in the current reduced capacity.  Debtors Eastern Freight Ways and Carrier Industries will continue to be fully operational throughout these bankruptcy cases, because those two entities can be sold as going concerns under Section 363 of the Bankruptcy Code. Consequently, because the employees of Eastern and Carrier are also covered by the Employee

---

[11] The Patient Protection and Affordable Care Act, Public Law 111-148 (2009), 42 U.S.C. §§18001, *et. seq.*.  The Act requires that health insurance remain in place as long as an applicable large employer—like NEMF and Eastern—continues in operations and continues to retain employees. *See, generally*, 26 U.S.C. § 4590H and 26 CFR § 54.4980H (respectively, the statute and regulation requiring applicable large employers to offer affordable health insurance providing benefits with "minimal value" to 95% of all full-time (working 30 hours or more per week) to employees).

Health Care Insurance Plans, the Debtors cannot yet terminate those self-funded plans, and so long

as those plans remain in effect, the Debtors must extend COBRA rights to terminated employees—

therefore incurring administrative expense claims until plan termination, in large part because the

plans are self-insured, meaning that the Debtors will have to cover most health claims asserted

under the Employee Health Care Insurance Plans during the COBRA period from the Debtors'

own assets. [12]  [*Supplemental Colistra Declaration*, ¶ 24].

## V.    BASIS FOR RELIEF AND REASONS THEREFOR

49.     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any

order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).  Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after

notice and a hearing, the court may approve a compromise or settlement."  "To minimize litigation

and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy."

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON

BANKRUPTCY 9019.03[1] (15th ed. 1993)).  Accordingly, when required, "courts are able to

craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the

result the [Bankruptcy] Code was designed to obtain."  *Official Comm. of Unsecured Creditors of*

*Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

50.     The decision to approve a compromise of a claim is within the sound discretion of

this Court.  *In re World Health Alt., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *In re Neshaminy*

*Office Bldg. Associates*, 62 B.R. 798, 803 (E.D. Pa. 1986) ("Approval of the settlement lies within

the sound discretion of the Bankruptcy Court.").  In approving a settlement, a bankruptcy court

need not be convinced that the settlement is the best possible compromise, but rather conclude that

---

[12] *See* Employee Health Insurance Plan, *e.g.*, <u>Exhibit E</u> to the *Supplemental Colistra Declaration*, New England Motor
Freight, Inc. Choice Plus Union Plan 2, p. 88.

the settlement falls within the reasonable range of litigation possibilities and is at least above "the lowest point in the range of reasonableness." *In re Capmark*, 438 B.R. 471, 515 (Bankr. D. Del. 2010). *See also Official Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993). In determining whether to approve a settlement, bankruptcy courts have determined that the ultimate inquiry is whether the compromise is fair, reasonable and in the best interest of the estate. *Key3Media Grp., Inc. v. Pulver. Corn, Inc. (In re Key3 Media Grp., Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005). *See also Protective Comm. for Indep. Stockholders of TIvIT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).

51.    Bankruptcy Code Section 363(b) empowers this Court to authorize a chapter 11 debtor to expend funds in its discretion outside the ordinary course of business.  11 U.S.C. § 363(b)(1) ("[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.").[13]

52.    Courts have interpreted Section 363(b) to mean that a transaction involving property of the estate generally should be approved so long as the debtor-in-possession can demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Filene's Basement*, 2014 WL 1713416, *12 (Bankr. D. Del. Apr. 29, 2014) (noting that under Section 363(b), "[w]here the debtor articulates a reasonable basis for its business decisions … courts will generally not entertain objections to the debtor's conduct") (quoting *In re*

---

[13] The authority exists with equal force in an orderly liquidation.  *See, e.g.,* 3 COLLIER ON BANKRUPTCY P 363.02 (16th 2018) ("The authorization to use, sell or lease property other than in the ordinary course of business applies both when the business is not authorized to be operated, for example because the debtor is being liquidated, [and when the business continues to be operated].").

*Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)); *In re Landsource Cmtys. Dev. LLC*, 2009 WL 4874670, ¶ 15 (Bankr. D. Del. Nov. 25, 2009) ("Where valid business justification exists, a presumption exists 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990)); *U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the Bankruptcy Court must find that there is a good business reason to allow the transaction"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("[A] § 363 application requires a showing that there is a 'good business reason to grant such an application.'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

53.     By analogy, in *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005), the Third Circuit discussed application of the business judgment rule[14] with respect to allegations that a debtor's management drove it into bankruptcy by irrational and egregious decision-making.  The Third Circuit stated, unequivocally, that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *Id*.  Thus, in order to deny the relief sought herein, the Court would need to find evidence of irrationality; in effect, a showing that "no reasonable business person could possibly authorize" the continuing payment of health insurance benefits to terminated employees as part of a larger severance package "in good faith." *Id*.  In other words, the Court would need to find that the "only explanation" for the Debtors'

---

[14] The business judgment rule is a presumption that directors and officers act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company.  *Tower Air*, 416 F.3d at 238 and n12 (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Arnold v. Soc'y for Savings Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996)).  The rule is the same under New Jersey law.  *See In re PSE & G S'holder Litig.*, 315 N.J. Super. 323, 327-28, 718 A.2d 254, 256-57 (Super. Ct. – Ch. Div. 1998).

proposed interim payment of such benefits pending a hearing on the full settlement proposal under

Fed. R. Bankr. P. 9019 is "bad faith." *Id.*

54.    On the facts *sub judice*, there can be no doubt that the relief sought herein is being

pursued in good faith, after a careful and strenuous analysis of the competing costs and benefits to

the estate, and that the cost for the proposed use of estate assets is reasonable in the context of the

overall assets and liabilities of the estate.  The Debtors' request is therefore authorized under the

business judgment standard.  *See generally In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y.

2006) (noting that two components of the "sound business judgment test" are whether the debtor

can show "a reasonable relationship between the [action] proposed and the results to be obtained,"

or that "the cost of the [action is] reasonable in the context of the debtor's assets, liabilities and

earning potential.") (citations omitted).

55.    For the reasons articulated throughout this Motion, it is clear that the present

circumstances are inapposite to those found by the bankruptcy court in *In re Mattress Discounters

Corp.*, Nos. 08-21642-TJC, 08-21644-TJC, 2008 Bankr. LEXIS 4547 (Bankr. D. Md. Oct. 10,

2008), where a debtor's motion to continue a severance package for terminated employees was

denied.  In *Mattress Discounters*, the debtors moved under Section 363(b) to "adopt their

prepetition severance plan covering eligible, nonunion employees, with certain modifications

intended to reflect various bankruptcy concerns," including for employees terminated from its

stores in the New England area, where the debtors intended to close all operations and exit the

market.  2008 Bankr. LEXIS 4547, at *1.  As stated by the bankruptcy court, "[t]he Debtors'

rationale for making the severance payments to the New England employees is that they need to

retain their Mid-Atlantic workforce to achieve a successful reorganization, and the Mid-Atlantic

employees will be comforted by the payment to the New England employees."  *Id.* at *2.  The

court concluded that there was "no reasonable relationship between paying severance benefits to

New England employees and the Debtors' objective of retaining the Mid-Atlantic employees," and

therefore determined that the motion did not satisfy the "sound business judgment test" under

Section 363(b).  *Id.* at \*15.  Here, by sharp contrast, the Debtors have elucidated compelling

economic incentives to their estates to continue making medical benefit payments to terminated

Employees because the continuation of employee health benefits is a part of the larger Global

Settlements that the Debtors believe will result in a savings to their estates of approximately $14.5

million.  The relief sought herein will reduce the estates' litigation risks and further the proposed

settlements, which if approved will significantly reduce and in large measure effectively cap

liability for potential wage and benefit-related claims against the estate.  The result will be a greater

asset pool for distribution to general unsecured creditors.

56.    Further, the Debtors have shown compelling practical reasons for continuing the

medical benefit payments, namely because they would still be required to provide COBRA

benefits if the ordinary benefits are terminated prior to the termination date of the Employee Health

Care Insurance Plans.  There is simply no reason to trade the existing scheme, with all of its built-

in efficiency, for an entirely new benefits scheme (with which none of the Debtors' management

would be familiar) in the middle of these already complex bankruptcy cases.

57.    For all of the reasons herein, authorizing the Debtors to honor their obligations

under the Employee Health Care Insurance Plan for Employees' health benefits through April 13,

2019 for those Employees who were or will be are laid off in connection with the Debtors' wind-

down and liquidation, serves the sound business purpose of maximizing the value of the Debtors'

estates and preserving the value of the Debtors while they seek to conduct an orderly wind-down

and liquidation under chapter 11, a large component of which is the settlement of potentially

significant administrative expense claims.  In the absence of such health benefit payments, the Debtors believe that many terminated Employees will commence immediate litigation (as proved by the already-filed WARN Action), which would be a time-consuming and costly distraction at a time when the Debtors should be focusing on stabilizing and winding down their operations.

58.    The terms of the Union Plant Closing Agreement and Non-Union Severance Agreements were agreed upon after a careful analysis by the Debtors of their potential liability to the Union Employees and Non-Union Employees under the WARN Act, the Affordable Care Act and COBRA.  The Debtors have also carefully considered the risks and costs associated with protracted litigation that may ensue regarding WARN Act claims absent a settlement, and the proper medical protection for the labor force of the businesses.  The Union Plant Closing Agreement was, and each accepted Non-Union Severance Agreement will be, executed following good faith, arm's-length negotiations between NEMF and the Union and/or the Non-Union Employees, and reflects the parties' evaluation of the risks and costs of litigation and the merits of the parties' respective positions.

59.    The Third Circuit has held that, in determining whether to approve a settlement or controversy, a Court should consider the following four factors: (a) the probability of success in the litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of creditors.  *Martin*, 91 F.3d at 393.  The Debtors submit that the proposed Global Settlements are fair and reasonable and in the best interests of the Debtors' estates.  The following application of the *Martin* factors demonstrates that the proposed Global Settlements fall within the "range of reasonableness" and, therefore, the Global Settlements should be approved.  Specifically, the Debtors submit the following:

a.   **Probability of Success on the Merits.**

60.    In the event the Global Settlements are not approved, it is likely that the Debtors,

the Union and the bulk of the Non-Union Employees will continue to litigate WARN Act claims.

While the Debtors believe that they have meritorious defenses to WARN Act liability under

applicable law, and are prepared to aggressively litigate those defenses if necessary, the Debtors

also believe that the avoidance of such costly and protracted litigation is in the best interests of

their estates, creditors, and all other parties in interest, including their former employees.  And, as

is the case with any litigation, there are uncertainties and risks.  The uncertainty weighs in favor

of compromise under these circumstances.  *Moren v. Ray & Bergman, et. al.,* 2007 WL 953115

(9th Cir. Jan. 29, 2007) ("Given the tremendous uncertainty of success at trial, this factor weighs

heavily in favor of approval of the compromise").  *See also In re Capmark Fin. Grp. Inc.*, 438

B.R. 471, 518 (Bankr. D. Del. 2010) (finding uncertainty weights in favor of settlement).

b.   **Collection Difficulties**.

61.    The Debtors are not currently seeking any monetary relief against the Union or any

terminated Employees, so collection difficulties are not at issue in this case.

c.   **Complexity, Expense and Delay**.

62.    In the event that the Global Settlements are not approved, it is likely that the Union

and additional terminated employees will commence or join the WARN Act litigation.  The

Debtors believe that the issues between the Debtors and the current WARN Act Plaintiffs are fact-

intensive and complex.  If the Global Settlements are not approved, the Debtors could face WARN

Act liabilities of approximately $27.7 million.  While the proposed Global Settlements will not

necessarily resolve all of the WARN Act claims, they will timely resolve the majority of those

claims, including those held by approximately 1,900 Union Employees that are being settled under

27

the Union Plant Closing Agreement, as well as the claims of each Non-Union Employee that signs

a Non-Union Employee Severance Agreement.  Simply put, the Global Settlements will save the

Debtors and their estates the costs and expenses of litigating various employee-related disputes,

which could otherwise consume substantial resources of the Debtors' estates and require

substantial time to adjudicate.

> d. **<u>Interest of Creditors</u>**.

63.    The approval of the Global Agreements is in the paramount interest of the creditors

of the Debtors' estates.  The Debtors' analysis of the risks and benefits of the Global Settlements

warrants this Court's approval.  The Global Settlements will greatly reduce—and perhaps

hopefully eliminate entirely—the risk to the Debtors' estates of potential claims under applicable

law, including the WARN Act, the Affordable Care Act and COBRA which, in the aggregate,

could be approximately $27.7 million (not including potential class action counsel fees and

expenses), as opposed to the projected cost of $13.2 million of the Global Settlements, which, if

approved, will result in savings to the estate of approximately $14.5 million.

64.    The Union has agreed on behalf of its 1,900 members to provide NEMF and its

affiliated entities with a full release and waiver of all claims relating to the CBAs.  With respect to

the Non-Union Employees, entry into the Non-Union Severance Agreements will provide those

terminated employees payment of severance and medical benefits that would likely not be

available absent entry into the Non-Union Severance Agreements.  Approval of the Non-Union

Severance Agreements allows terminated Non-Union Employees to voluntarily decide whether to

avoid the time and uncertainty associated with litigation and obtain an immediate severance

payment and continued medical benefits through April 13, 2019 at no cost to such Non-Union

Employee.  At the same time, the Debtors benefit from the release provisions set forth in the Non-Union Severance Agreements.

65.      The consideration to be extended by the Debtors, including severance payments and eight weeks of continued medical coverage, will in large measure fix the final amount that the Debtors' estates will have to pay to settle with their former employees, which in turn eliminates any uncertainties regarding the Debtors' obligations under the CBAs and applicable law if these Global Settlements were not achieved.

66.      Moreover, the loss of health insurance coverage now when the Debtors are attempting to secure approval for a global employee settlement package already agreed to with the Union and extended to the Non-Union Employees is simply unfair and hugely prejudicial—and in some cases could be life-threatening—to the Employees.  There is no reason to place such a harsh burden on those innocent people when the Bankruptcy Code expressly authorizes the prophylactic relief sought herein, and when the Debtors are contractually and legally obligated to maintain corresponding coverage under COBRA and the Affordable Care Act, respectively, even absent a settlement.  Accordingly, the Debtors respectfully submit the Court should grant the relief requested herein pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.

67.      Finally, as the proposed payments to be made under the Union Plant Closing Agreement and Non-Union Severance Agreements are all to non-insiders, the requested relief is in conformance with section 502(c)(2) of the Bankruptcy Code.  Accordingly, the Debtors respectfully submit that the *Martin* factors are met, the settlement falls within the lowest "range of reasonableness" and, therefore, the Union Plant Closing Agreement and entry into the Non-Union Severance Agreements should be approved.

## VI.      WAIVER OF MEMORANDUM OF LAW

68.      Because the legal basis upon which the Debtors rely is incorporated herein and the Motion does not raise any novel issues of law, the Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3).  No previous motion for the relief sought herein has been made to this or any other Court.

## VII.     NO PRIOR REQUEST

69.      Except for the interim relief sought under the Emergent Motion, no other motion for the relief sought herein has been made to this Court or to any other court.

## VIII.    NOTICE

70.      Notice of this Motion has been provided to the following parties, consistent with the requirements set forth in the Court's Order Shortening Time Period for Notice, Setting Hearing, and Limiting Notice; a proposed form of which has been submitted contemporaneously herewith:

     a.   the Union;

     b.   the Union and Non-Union Employees

     c.   the Office of the United States Trustee for Region Three;

     d.   all secured creditors;

     e.   Vista Underwriting Partners and Gerber Life Insurance Company;

     f.   proposed co-counsel for the Official Committee of Unsecured Creditors; and

     g.   all parties that have requested to receive notice pursuant to Bankruptcy Rule 2002.

In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request the entry of an order substantially in the form submitted herewith, granting the relief request in the Motion, approving the Union Plant Closing Agreement and entry into the Non-Union Severance Agreements for Non-Union Employees, and granting such other and further relief as may be just and proper.

Dated:  February 22, 2019                    Respectfully submitted,

                                             **GIBBONS P.C.**


                                             By:   /s/ *Karen A. Giannelli*
                                             _____
                                                   Karen A. Giannelli, Esq.
                                                   Mark B. Conlan, Esq.
                                                   Brett S. Theisen, Esq.
                                                   One Gateway Center
                                                   Newark, New Jersey  07102
                                                   Telephone:  (973) 596-4500
                                                   Facsimile:  (973) 596-0545
                                                   E-mail:  kgiannelli@gibbonslaw.com
                                                            mconlan@gibbonslaw.com
                                                            btheisen@gibbonslaw.com

                                                   *Proposed Counsel to the Debtors*
                                                   *and Debtors-in-Possession*