**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:   (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
            mconlan@gibbonslaw.com
            btheisen@gibbonslaw.com

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW ENGLAND MOTOR FREIGHT, INC., *et al.*, | Case No. 19-12809 (JKS) |
| Debtors.[1] | (Jointly Administered) |

**MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND (f)
FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO SELL AT
AUCTION SUBSTANTIALLY ALL OF DEBTOR NEMF'S PERSONAL
PROPERTY ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
INTERESTS, AND ENCUMBRANCES, (B) APPROVING AUCTION
PROCEDURES RELATING TO SUCH AUCTION SALES, AND (C)
GRANTING RELATED RELIEF**

New England Motor Freight, Inc. and its affiliated debtors in the above-captioned chapter

11 cases (collectively, the "**Chapter 11 Cases**"), as debtors and debtors in possession (the

"**Debtors**"), hereby file this motion (the "**Motion**") for entry of an order pursuant to 11 U.S.C. §

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

§ 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the

"**Bankruptcy Code**") for entry of an order substantially in the form of the proposed order (the

"**Proposed Order**") attached hereto, (a) authorizing Debtor, NEMF (defined below) to sell at

auction substantially all of its vehicle/equipment/personal property assets as more fully set forth

in that certain Multiple Sale Auction Engagement Agreement (the "**Engagement Agreement**"), a

copy of which is attached as **Exhibit A** hereto, between Debtor, NEMF and Taylor & Martin, Inc.

("**T&M**") free and clear of all liens, claims, interests, and encumbrances; (b) approving the auction

procedures relating to such auction sales; and (c) granting related relief.  In further support of the

Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and

the *Amended Standing Order of Reference* from the United States District Court for the District of

New Jersey, dated September 18, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105(a) and 363(b) and (f) of

the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6004.

## BACKGROUND

3.      On February 11, 2019 (the "**Petition Date**"), each of the above-captioned Debtors

filed voluntary petitions for relief under chapter 11of the Bankruptcy Code with the intent to

commence an orderly wind-down and liquidation of their businesses and assets through the

Chapter 11 Cases.  The Debtors are in possession of their assets as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of

a trustee or examiner.

4.      The Debtors offer a broad range of transportation services.  Debtor New England Motor Freight, Inc. ("**NEMF**") was founded in 1918 in Elizabeth, New Jersey and is a leading less-than-truckload ("**LTL**") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United States. NEMF also offers LTL services to its customers across the United States and Canada through a number of partnerships and interline carrier arrangements with other LTL providers.  In addition to the LTL business, the Debtors provide truckload ("**TL**") services through Debtor Eastern Freight Ways, Inc. ("**Eastern**").  Debtor Jans Leasing Corp. ("**Jans Leasing**") is a trucking equipment lessor; Debtor Carrier Industries, Inc. ("**Carrier**") offers dedicated third party logistics services; Debtor Apex Logistics, Inc. ("**Apex**") offers transportation brokerage services, and Debtor NEMF World Transport, Inc. ("**NEWT**") provides non-vessel operation common carrier operations between the United States and Puerto Rico.  Debtor NEMF Logistics, LLC ("**Logistics**") is a third-party logistics company specializing in logistics management services, including warehousing, software, brokerage and support.  Debtors Myar, LLC ("**Myar**") and MyJon, LLC ("**MyJon**") are both dormant and had no economic actively in 2018.  Debtors Hollywood Avenue Solar, LLC ("**Hollywood Solar**") and United Express Solar, LLC ("**United Solar**") were formed to acquire solar arrays for terminals in South Plainfield and Pennsauken, New Jersey, respectively, at which the Debtors operate.

5.      MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of NEMF.  Myar is a wholly-owned subsidiary of Eastern.  The remaining Debtors are all sister entities owned solely by The Shevell Dynasty Trust, or by the Shevell Dynasty Trust and Myron P. Shevell.

6.      As of the Petition Date, the Debtors employ approximately 3,450 full-time and part-time employees.  Approximately 1,900 of the employees are members of International Association

of Machinists and Aerospace Workers, AFL-CIO (the "**Union**") and are covered by a series of

collective bargaining agreements with the Union.

7.      In 2017, the Debtors' businesses generated consolidated gross revenues of

approximately $373 million.  For 2018, the Debtors estimate that their businesses will generate

consolidated revenues of approximately $370 million.[2]

**8.**      The Debtors' principal place of business and corporate headquarters is located at

1-71 North Avenue East, Elizabeth, New Jersey, 07201-2859.  The Debtors operate from 36

trucking terminals located throughout the Mid-Atlantic, the Northeast and Midwest, and two

additional locations in New Brunswick, NJ and Jordan, NY, which are used primarily for

administrative staff and for Eastern operations. The only real property owned by the Debtors is

located in Miami, Florida (the "**Miami Property**"), and is leased to an unrelated third-party

trucking company.

9.      The Debtors' primary secured debt is for vehicle and related equipment financing

related to its fleet of vehicles.  The Debtors believe that each of these vehicle financing transactions

is evidenced by a separate note and security agreement providing for liens on specific financed

fleet vehicles and related equipment (the "**Vehicle Financing Agreements**").   The Debtors

currently have outstanding obligations for vehicles and equipment with 12 separate lenders[3]

(together, the "**Vehicle Lenders**") in the outstanding principal aggregate amount of approximately

$57.1 million exclusive of interest and fees.  Of that amount, approximately $47.4 million is owed

by NEMF and approximately $9.7 million is owed by Eastern.  It is anticipated that the Vehicle

Lenders will assert that the entire amount of that debt is secured.

---

[2] The Debtors' books for fiscal year ending December 29, 2018 are not yet final.  All references to 2018 financials herein are based on the Debtors' preliminary results and remain subject to change.

[3]  The lenders under the Vehicle Financing Agreements are JPMorgan Chase, TD Bank, East West Bank, Santander Bank, Capital One, Wells Fargo, Fifth Third Bank, Daimler, IBM, Mercedes Benz, Webster Capital and Volvo.

**THE PROPOSED SALE OF NEMF'S EQUIPMENT**

10.     Commencing on the Petition Date, the Debtors have taken steps to wind-down their

operations (with the exception of Eastern and Carrier) and to collect all of their rolling stock at one

of twelve of the Debtors' leased terminal locations in anticipation of a sale process.

11.     As a consequence of the wind-down of the Debtors' business, the Debtors have

determined in their business judgment that they have no further use for certain personal property

assets, consisting of the Debtor, NEMF's owned trucks, storage trailers, yard hostlers, converter

dollies, personal vehicles, forklifts, pallet jacks, parts, shop supplies, tractors, and other equipment

and dock and office equipment (all as more fully set forth in the Engagement Agreement (the

"**Equipment**" or "**Personal Property**"). [4]

12.     In furtherance of their goal to maximize the value of their assets for all

creditors, the Debtors have determined in their business judgment that the sale of the

Equipment at auction at the earliest practicable time will maximize the value of the Equipment

while minimizing the storage, insurance, and other administrative carrying costs of

keeping and maintaining the Equipment.

13.     Due to the loss of NEMF's services, the northeast market pipeline will

create a void in service that remaining competitors will seek to fill and in doing so, will

need to increase the size of their fleets to meet demand.  The auction sales are designed

to maximize value in light of this increased demand.

14.     To the extent any item of the Equipment is sold piecemeal by any particular

lender and in a manner that is not designed to maximize value for the remaining

Equipment, the quality of the other sales will be diminished and overall value will not

---

[4] For the avoidance of doubt, the Debtors do not intend to retain T&M to auction any personal property or
equipment belonging to Eastern and Carrier since those entities maintain current operations.

5

be maximized.  Further, to the extent any particular item of Equipment is sold for sub-par value, the market will dictate that the remaining items of Equipment also be sold for sub-par value even in situations where the remaining items of Equipment could be sold for higher amounts.  Thus, it is critically important that the Debtors be allowed to auction all of the Equipment through the services of their expert auctioneer, T&M.  T&M, is the national leader in the  in the auctioning, remarketing, appraisal and consulting of over-the-road trucks and trailers.  T&M's statistics include the registration of over 363,000 bidders at auctions across the United States; over 149,500 tractors and 219,300 trailers have been consigned to T& M auctions from more than 52,900 consignors; and, T&M has conducted more than 1,370 absolute public auctions offering tractors, trailers, trucks and other miscellaneous vehicles for bid in its history. T&M auctions approximately 10,000 over-the-road trucks and trailers per year.   T&M has designed the auction sales of the Equipment in a manner that is designed to maximize value for both secured and unsecured creditors and avoid piecemeal liquidation at fire-sale prices.

15.     Contemporaneous with the filing of this Motion, the Debtors have also filed their Application for Order Under 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014 and 6005 Authorizing Employment and Retention of Taylor & Martin, Inc. (the "**Retention Application**"), seeking to retain Taylor & Martin, Inc. as their auctioneer in the Chapter 11 Cases.  The terms of the retention of T&M are detailed in the Engagement Agreement.

## THE AUCTION PROCESS

16.     T&M is an experienced auctioneer and has conducted auction sales similar to those contemplated by the proposed auctions.

17.     As more fully described in the Engagement Agreement and related Certification of Stacy Tracy submitted in support of the T&M's Retention Application, T&M will provide the following services for the Debtors: (a) prepare the Equipment for sale one or more public auctions to be held at various locations as more fully set forth on Schedule B to the Engagement Agreement (each an "**Auction**," and, collectively, the "**Auctions**"); (b) provide promotional support for the sales prior to the Auctions in a manner consistent with T&M's past business experience and practice; (c) conduct the Auctions in a commercially reasonable manner, which shall be staffed by qualified auctioneers, informed sales personnel, ringmen, and transaction closing personnel in order to properly display, sell, close, and account for all transactions relating to the Equipment; (d) prepare financial settlements in connection with each sale at the Auctions; and (e) provide a dedicated coordinator to assist with equipment marshalling, delivered unit count, sales site security, contract labor and equipment preparation.

18.     The Engagement Agreement provides that T&M will collect and retain as compensation: (a) a ten (10%) percent buyer's premium from each buyer in connection with the sale of each item of Equipment (as defined in the Engagement Agreement); (b) a fifteen (15%) percent commission of the gross auction proceeds received from the sale of all other non-rolling stock Equipment (as defined in the Engagement Agreement); and (c)  if ten percent (10%) or more of like kind rolling stock Equipment is withdrawn after March 30, 2019 from any auction sale through no fault of T&M, then Debtor, NEMF shall pay T&M a ten percent (10%) commission for each item of withdrawn Equipment based upon the like kind value of the Equipment when compared to other Equipment being sold at the scheduled auction (the commissions collectively set forth in (a), (b) and (c), the "**Commissions**")

19.     After completion of the auctions, T&M shall remit the Net Auction Proceeds, as defined herein, received in connection with the sale together with an accounting of the sale of Equipment to the Debtors within ten (10) banking days after the auction.  Net Auction Proceeds represent gross auction proceeds that are received from the sale of Equipment less Commissions, sales tax, internet fees, Preparation Costs, Agreed Repairs, Transportation Costs, Withdrawal Commissions and any other out-of-pocket costs incurred by T&M as defined in and pursuant to the terms of the Engagement Agreement ("**Reimbursable Costs**").   All Commissions and Reimbursable Costs retained and paid to T&M by the Debtors in connection with the sale of the Equipment shall be free and clear of all liens or obligations.

20.     To initiate the process of the Auctions, the Debtors have filed this Motion, together with the Retention Application, which, as more fully described below, seeks, among other things, to have the Court approve the sale of the Equipment and the conduct of the Auctions by T&M in accordance with the Engagement Agreement after the hearings on the Retention Application and on this Motion, with the retention being effective as of February 26, 2019.

21.     The Debtors contemplate that T&M will begin promoting and advertising the Auctions and will continue transporting, marshalling, and preparing the Equipment for the Auctions immediately upon approval of the Retention Application and this Motion, if not sooner.

22.     Each Auction is to be without limit and without reserve.  Title to each item of Equipment will remain with the Debtors at all times during the Auction until sold.  Any unsold Equipment may be transported by the Debtors to an agreed storage facility. The Debtors will maintain reasonable property insurance on the Equipment through the date sold at each Auction.

23.     The Debtors contemplate that the Auctions will commence in May 2019 and will

be completed expeditiously, but in no event later than July 2019, all subject to approval of this

Motion.

## RELIEF REQUESTED

24.     The Debtors move the Court for entry of an order, effective and enforceable

immediately upon entry pursuant to Bankruptcy Rule 6004, (a) authorizing the sale of the

Equipment free and clear of all liens, claims, interests, and encumbrances, (b) authorizing auction

procedures and authorizing T&M to conduct the Auctions in accordance with the terms of the

Engagement Agreement and this Motion, and (c) granting related relief.

25.     Conducting the Auctions during the Chapter 11 Cases will benefit the Debtors'

estates and their creditors.  The Debtors have consulted various professionals with respect to

the alternatives for liquidation of the Equipment, and the Debtors believe that maximum value

can be obtained for the Equipment by conducting the Auctions as described above with the

assistance of T&M.

26.     The Debtors further believe that both secured and unsecured creditors also

would be benefited by the Debtors proceeding with the Auctions during the Chapter 11 Cases.

In light of the wind-down of the Debtors' business, the conduct of prompt and orderly

Auctions should prevent the accrual hereafter of substantial administrative claims for rent,

insurance, storage, and other charges (thus maximizing the likely return to unsecured creditors

from any avoidance recoveries and other potential assets).

### A. The Debtors' Decision to Conduct the Auctions is Supported by a Legitimate Business Justification.

27.     Sections 105(a) and 363(b) of the Bankruptcy Code authorize the sale of a debtor's

assets after notice and hearing. Section 105(a) states, in pertinent part, that "[t]he court may issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. 105(a). More specifically, section 363(b) of the Bankruptcy Code provides that a

debtor-in-possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate," 11 U.S.C. 363(6).  See In re  Ames Dept. Stores., Inc.

136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed

by section 363(b)). To obtain court approval to use property under section 363(b) of the

Bankruptcy Code for the purpose of a liquidation sale at auction, the Debtors need only show a

legitimate business justification for the proposed action. See, e.g., In re Martin, 91 F.3d 389, 395

(3d Cir. 1996) (citing In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of

Pa. Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1070 (7th Cir. 1983)

(same); In re Delaware and Hudson Ry. Co., 124 BR. 169 (D. Del. 1991) (noting that Third Circuit

has adopted "sound business judgment" test for section 363(b) asset sales).

28.     If a valid business justification exists, the law vests the debtor's decision to use

property out of the ordinary course of business with a strong presumption "that in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interests of the company." In re Integrated

Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting Smith v. Van Gorkom, 488 A.2d

858, 872 (Del. 1985)).  Accordingly, parties challenging a debtor's decision must mike a showing

of "bad faith, self-interest or gross negligence." Integrated Resources, 147 B.R. at 656 (citations

omitted).

29.     Courts examine four factors in determining whether a sound business purpose or

justification exists for a sale of assets under section 363(b) of the Bankruptcy Code; (i) whether a

sound  business  reason  exists  for  the  proposed  transaction;  (ii)  whether  fair  and  reasonable

10

consideration will be provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice has been provided. See Lionel, 722 F2d at 1071.

30.     The proposed sale of the Equipment by the Auctions is based on a sound business purpose and justification and is supported by the Debtors' sound business judgment. In light of the wind-down of the Debtor NEMF's business, the Debtors have no further use for the Equipment. As a result, the Debtors seek to derive value from the Equipment through a sale which will maximize their value.   Furthermore, the Debtors, by selling the Equipment at this time, will minimize insurance, storage, maintenance, and other administrative carrying costs. Fair and reasonable compensation will be received for the Equipment because the Auctions will be widely promoted by T&M and open to all interested parties.   T&M has over seventy-five years of auctioneer experience and, for the past fifty-four years, has been dedicated exclusively to the transportation industry.   T&M is a national leader in the auctioning, remarketing, appraisal and consulting of over-the-road trucks and trailers and has expertise in maximizing value in connections with conducting auctions in connection with chapter 11 cases. Moreover, T&M has incentive to sell the Equipment at the highest possible price because its commission is a percentage of the sales price.   Adequate notice of the Auctions will be provided by notice of this Motion and by T&M's marketing and advertising efforts. In light of these facts and circumstances, well-articulated business reasons strongly support the Debtors' decision to sell the Equipment through the Auctions.   Accordingly, the Debtors request that the Court authorize them to conduct the Auctions through the auspices of T&M in the manner set forth in this Motion.

**B.  The Auction Sales Shall be Free and Clear of all Liens.**

31.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property

if (i) such a sale is permitted under applicable non-bankruptcy law, (ii) the party asserting such a

lien, claim, or interest consents to such sale, (iii) the interest is a lien and the purchase price for the

property is greater than the aggregate amount of all liens on the property, (iv) the interest is the

subject of a bona fide dispute, or (v) the party asserting the lien, claim, or interest could be

compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. See

11 U.S.C. 363(f); In re Elliot, 94 B.R. 343, 345 (E.D. Pa, 1988) (section 363(f) written in

disjunctive; court may approve sale "free and clear" provided at least one of the subsections is

met).

32.    To the extent that the Debtors' lenders assert a security interest in the Equipment,

the Debtors remain hopeful they will obtain the consent of such parties to the sale of the Equipment

free and clear of liens, claims, and encumbrances, with any such liens, claims, and encumbrances

to attach to the proceeds of the Auctions with the same force, validity, and priority as they attached

to the Equipment.  If such consent is not obtained and/or to the extent that any other parties may

assert or seek to assert a security interest in the Equipment, the Debtors request that the liens,

claims, and encumbrances asserted against the Equipment by any creditor purporting to be a

secured creditor be transferred and attached to the net proceeds from the Auctions received by the

Debtors, subject to the rights, claims, defenses, and objections, if any, of any and all interested

parties with respect thereto.

33.    Section 363(f)(5) the Bankruptcy Code authorizes a sale free and clear of any liens

securing the lenders' claims because such lenders could be compelled to accept a monetary

satisfaction of its claims either through a cram down plan of reorganization or pursuant to a state

law foreclosure action.  See 11 U.S.C. § 363(f)(5).  "Section 363(f)(5) does not require that the

sale price for the property must exceed the value of the interests, but rather, only that the

mechanism exists to address extinguishing the lien or interest without paying such interest in full."

In re Gulf States Steel, 285 B.R 497, 508 (Bankr. N.D. Ala. 2002).

34.     Under relevant Third Circuit law, if the lenders' interests are subject to monetary

valuation and distribution if this case were converted to a chapter 7 case, then section 363(f)(5) is

satisfied.  In re TWA, 322 F.3d 283, 290-91 (3d Cir. 2003); See also In re Kellstrom Industries,

Inc., 282 B.R. 787, 794 (Bankr. D. Del. 2002).  Here, if the Chapter 11 Cases were converted to

one under chapter 7, the lenders' interests are capable of monetary valuation and distribution.

35.     The ability to "cram down" the lenders' interests under a plan is also recognized as

another such a legal or equitable proceeding. See, e.g., In re Gulf States Steel, 285 B.R. at 508

(finding that, under Section 363(f)(5), creditors could be compelled to accept a money satisfaction

in a cram down plan in satisfaction of liens or interests); In re Grand Slam USA, Inc., 178 B.R.

460, 464 (E.D. Mich. 1995) (finding that, by analogy to a cram down under Section 1129(b)(2)(A),

Section 724(b)(2) also creates a mechanism by which lien creditors are compelled to receive a

money satisfaction that is less than full payment for their interest in fulfillment of Section

363(f)(5)); In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993); In re

Healthco Int'l, Inc., 174 B.R. 174,176 (Bankr. D. Mass. 1994) ("if Congress intended (f)(5) to

exclude bankruptcy law, Congress would presumably have used the same phrase" "applicable

nonbankruptcy law" as it used in subparagraph (f)(l)); In re Levitt & Sons, LLC, 384 B.R. 630

(Bankr. S.D. Fla. 2008).  Because the lenders could be compelled to receive less than full payment

for its interest in the Equipment and could be compelled to receive a monetary satisfaction for its

interests under a plan of reorganization, this provision of section 363(f)(5) is also satisfied.

### C. The Auction Procedures Should be Approved.

36.     The Debtors propose to sell the Equipment at the Auctions through the auspices of

T&M substantially in accordance with the terms of the Engagement Agreement, which terms are

described in the Retention Application and the Engagement Agreement and are summarized in this Motion. In the exercise of their business judgment, the Debtors believe they can expedite the sale process and maximize the return from the Equipment by conducting the open, public Auctions. Accordingly, the Debtors seek authority to sell the Equipment at the Auctions conducted by T&M in accordance with this Motion, the Engagement Agreement, and the Retention Application.

37.     The Auctions will be conducted by T&M by public auction at the locations set forth on Schedule B to the Engagement Agreement.  T&M will provide marketing for the Auctions prior to the Auctions in a manner consistent with its past experience and practice, which may include advertisements in local, state, and/or national trade journals, mailings to potential buyers from T&M's customer lists, posting of advertisements on the World Wide Web and/or other advertisements to promote the Auctions in a commercially reasonable manner. T&M estimates that between three and four weeks advance notice of the Auctions post-approval of same will be necessary for effective directed mailings to its customer lists. Moreover, the advertisements that T&M will run in journals require advance notice.

38.     The Auctions will be conducted by T&M in a commercially reasonable manner, which will include staffing by qualified auctioneers, informed sales personnel, ringmen, and transaction closing personnel in order to display, sell, close, and account for all the Equipment. In the Debtors' business judgment, the relief sought will maximize the Debtors' recovery on their assets and, therefore, is in the best interests of the estates and their creditors.

39.     To facilitate the Auctions, T&M has requested that it receive the certificates of title for the Equipment in order to properly prepare for the Auctions and the transfer of ownership to successful bidders at the Auctions. Thirty (30) days prior to the first auction, the Debtors must also deliver to T&M properly executed and endorsed certificates of title, free and clear of all liens,

claims and encumbrances of third parties or the Debtors shall be responsible to coordinate and

structure payoffs of the Equipment with the lessors and creditors no later than the date of the final

advertising deadline specified by T&M.

### D. Good Faith Under Section 363(m).

40.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

41.    While the Bankruptcy Code does not define "good faith," the Third Circuit in In re

Abbotts Dairies, 788 F.2d at 147, has held that:

> [t]he requirement that a purchaser act in good faith... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

42.    The sale of the Equipment will be conducted through the Auctions. The Auctions

will be advertised, promoted, and open to the public. In most instances, there will be one or more

buyers at the Auctions, and the Equipment will be sold to the party submitting the highest and best

offer. Accordingly, the Debtors submit the sale of the Equipment at the Auctions represents an

arms-length transaction in which the buyers will have acted at all times in good faith under the

Abbotts Dairy, standards. The Debtors thus request that the Court make a finding that the buyers

at the Auctions will have purchased the Equipment in good faith within the meaning of section

363(m) of the Bankruptcy Code.

## **REQUEST FOR BANKRUPTCY RULE 6004(g) WAIVER**

43.     The Debtors request the stay of the effectiveness of the Order approving the Motion

under Bankruptcy Rule 6004(g) be waived so that the Order will be effective immediately upon

its entry to allow the Auction sales to move forward without delay.  Based on the lead time needed

of forty-five (45) to sixty (60) days after entry of an Order for T&M to market and have the

Equipment ready for auction, the waiver of any stay is appropriate under the circumstances of the

Chapter 11 Cases.

## **NOTICE**

44.      Notice of this Motion will be provided in accordance with the Court's Order

Shortening Notice for which application is being made simultaneously herewith.

## **NO PRIOR REQUEST**

45.     No previous application for the relief sought herein has been made to this or any

other Court.

WHEREFORE, the Debtors respectfully request that the Court enter the annexed Proposed

Order (a) granting the relief requested in the Motion and (b) granting such other and further relief

as the Court deems just and proper.

Dated:  February 28, 2019                    Respectfully submitted,

                                   **GIBBONS P.C.**

                                   By:/s/ Karen A. Giannelli
                                        Karen A. Giannelli, Esq.
                                        Mark B. Conlan, Esq.
                                        Brett S. Theisen, Esq.
                                        One Gateway Center

16

Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:   (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
         mconlan@gibbonslaw.com
         btheisen@gibbonslaw.com

*Proposed Counsel to the Debtors
and Debtors-in-Possession*