**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
           mconlan@gibbonslaw.com
           btheisen@gibbonslaw.com

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Jointly Administered) |

**CERTIFICATION OF VINCENT COLISTRA IN SUPPORT OF MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND (f) FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO SELL AT AUCTION SUBSTANTIALLY ALL OF DEBTOR NEMF'S PERSONAL PROPERTY ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING AUCTION PROCEDURES RELATING TO SUCH AUCTION SALES, AND (C) <u>GRANTING RELATED RELIEF</u>**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

Vincent J. Colistra, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Chief Restructuring Officer for the above-captioned Debtors and debtors-in-possession (the "Debtors"). In my capacity as CRO for the Debtors, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records and have first-hand knowledge of the same, including of the facts set forth in this Certification.

2. This Certification is submitted in support of the Debtors' motion (the "Motion") for entry of an order (a) authorizing the Debtors to sell at auction substantially all of Debtor, NEMF's personal property assets free and clear of all liens, claims, interests, and encumbrances, (b) approving auction procedures relating to such auction sales, and (c) granting related relief (capitalized terms used herein and not defined herein having the meanings ascribed to such terms in the Motion), and to respond to the objections raised by various lenders to the sale process. This Certification is also submitted to clarify certain facts for the equipment lenders and the Court.

3. First, as a clarification and/or correction to statements in the Motion, not all of the Debtors' "non-rolling stock" (including forklifts and other shop/dock equipment, and miscellaneous "shop/dock/office" items), which the Debtors seek authority to sell in the Motion, is unencumbered. Pursuant to the Court's orders authorizing the Debtors to use—on an interim basis to date—cash collateral of TD Bank and JP Morgan Chase, the Debtors provided replacement liens to TD and Chase, as adequate protection to protect Chase and TD from any diminution in the value of their pre-petition cash collateral, on all of the Debtors' right, title and interest in, to and under any and all presently owned and thereafter acquired unencumbered assets of the Debtors and, as to assets upon which there were existing liens, a junior lien on such encumbered assets. In addition, some of the non-rolling stock was encumbered on the Petition Date by other lenders, for example Fifth Third Bank (which held liens on including, without limitation, certain truck scales and pallet dimensioners).

4. Second, if any lender is authorized to remove its collateral from the Debtors' 12 auction sites, the Debtors' estates are not in a position to assist such lender with the extraction of its equipment. The Debtors, pursuant to the wind-down and liquidation plan that I outlined in my First Day Declaration and in testimony before the Court, have let go almost all of their truck drivers; moreover some of the drivers we did retain subsequently found new employment and have now left the company. At present, the Debtors are left with approximately nine union drivers located primarily at the Elizabeth, New Jersey terminal. It is simply impossible for those nine drivers to re-shuffle hundreds of tractors and trailers at multiple sites in order to remove a certain lender's collateral. Nor do the Debtors have personnel to dig out maintenance records, user manuals, keys, specifications, or other information that certain lenders have indicated that they need in order to get the equipment ready for a private sale sooner than the proposed T&M process. Thus, the costs of any such removal—including liability and indemnity for any damage incurred in the removal—would have to be borne by the lender and result in creating a larger potential "deficiency" as a result of these "one-off" proposed sales.

5. Further, when the Debtors consolidated the rolling stock from thirty six terminals in fifteen states to twelve locations in seven states, they utilized certain trailers to temporarily relocate non-rolling stock equipment and property. All of that would need to be unpacked and removed prior to the removal of a trailer by a lender. Again, the Debtors are not in a position to help in these efforts. T&M would be handling that process in the normal course of staging the auctions and is included in their 10% Buyers Premium fee.

6. The entirety of my efforts so far as the Debtors' CRO have been taken with an eye toward keeping the costs of the orderly liquidation as low as possible. As noted above, we started by letting go of the drivers four days into the bankruptcy case. Then, we attempted to consolidate

3

all of the rolling stock in as few terminals as possible, so that we could reject leases at the other terminals as soon as possible. We determined that the most practical, cost-effective method of consolidation was to select twelve regional terminals that were centrally located within the fifteen states that the Debtor had terminals. Thus, the Debtors' equipment was not isolated on a lender by lender basis, but rather by strategic geographic location and consequently, many lenders have equipment spread out among multiple (and in some cases all 12) auction sites. To the extent a lender is undersecured, the lender benefitted from this approach because it cut down on the estates' costs. Consolidating the equipment by lender would have been completely impractical because that is not how the equipment was tracked or operated in the ordinary course of business. It would have taken much more time, effort and costs and would have required the Debtors to keep large numbers of drivers on the payroll much longer. As a practical matter, the Debtors concede that the equipment at some of the auction sites is quite condensed. But that was an unavoidable consequence of the method of consolidation. And, it is also one of the reasons we selected T&M to conduct the auctions, because they were able to commit to handle, prep, and stage the equipment in that state.

7. Third, certain banks have objected that the proposed auction will not permit credit bidding. The reality is credit bidding would only work if we isolated the equipment as to each lender, and we sold each lender's equipment in bulk. But that is not consistent with a value-maximizing process, and, moreover, because of the nature of the lender's loans, credit bidding is not practically feasible. Additionally, the lenders' various types of cross-collateralization agreements preclude a uniform credit bidding process. And, in other cases, certain lenders' non-rolling stock collateral is affixed/installed on other lenders' rolling stock.

8. While each lender's credit arrangement with the Debtors has differences, generally

speaking each lender made a series of loans that the Debtors utilized to purchase a group of equipment; in other words, there were not individual loans made for each item. Thus, credit bidding is not feasible in an auction where bids will be solicited on an item by item basis, or on a group of like kind equipment (same make/model/year) where items in the group may have been financed by more than one lender. Furthermore, even if that hurdle could be overcome, it would be impossible to determine on an efficient basis the extent of a lender's liens after a successful credit bid was placed. For example, TD Bank's loan documents provide that when any loan is paid in full, then the bank's security interest in equipment financed with that loan is released. Thus, if TD Bank made three loans, but there was equity in the equipment acquired with Loan 1, then the excess proceeds on Loan 1 should not be available to secure Loans 2 and 3.

9.  Fifth, the Debtors intend to deposit the proceeds of the equipment auction into an escrow account at JP Morgan Chase. The Debtors will use 11 separate escrow sub-accounts to segregate the sale proceeds by each of the ten secured lenders, with another account for unencumbered proceeds of the Debtors. This will facilitate a clean accounting process for all parties, and make distributions more efficient. The Debtors will not use the net sale proceeds for any purpose without a lender's consent. Proceeds will be paid as promptly as possible, subject to any ongoing lien challenge rights of the Creditors' Committee, following the conclusion of the auctions.

10. Sixth, Eastern Freightways is currently using certain trucks and/or trailers that were financed by New England Motor Freight. Eastern intends to bring the loan balances current for all such collateral, and to continue making payments in the ordinary course going forward.

11. Seventh, in order to address the limited objection by the United States Trustee (and certain banks), Taylor & Martin has agreed to obtain a surety bond pursuant to D.N.J. LBR 2014-2(a)(6).

12. Finally, certain banks have complained about the lack of information concerning my due diligence and selection process in interviewing auctioneers. Initially, I had several auction firms in mind. However, after speaking with people that were either knowledgeable about rolling stock liquidations or had experience in participating in and with nationally known liquidators, it quickly became apparent to me that there were very few firms truly capable of handling an auction of this magnitude. Of those few, I interviewed T&M and Blackmon Auctions. T&M impressed not only me, but everyone else involved in the interview process, and to a person, were all impressed with T&M's past experience in similar situations—namely the Jevic and New Century bankruptcy auctions—and because they were confident that they could manage the auction under the circumstances, namely, on a tight time schedule and with the equipment tightly condensed at the consolidated terminals. Their results in New Century and Jevic, which delivered auction proceeds far above the estimated pre-auction values, spoke for themselves and, in my mind, there was no question T&M was best suited for the assignment.

13. If T&M's retention is not approved and the Debtors are not permitted to go forward with the proposed auction process in favor of the secured lenders' holding one-off private sales, the concept of an orderly liquidation will become a fiction. It will be a free for all, with the estates left only with the banks' unwanted equipment. The estates will be forced to consolidate yet again, likely to one or two locations in New Jersey (to the extent the added costs of moving that equipment and pressing forward with a smaller auction even outweigh the projected benefits – if not, the estates could be forced to abandon large quantities of equipment). And, if T&M cannot—or will

not—proceed with the auction given the state of the remaining equipment, the estates would be contractually obligated to compensate T&M for their time and expenses incurred, which as of March 11, 2019 totaled approximately $111,000. The banks offer no answer as to who will absorb these costs, but the answer in my mind is clear: the unsecured creditors. Simply stated, there is no viable alternative to the proposed auction conducted by T&M. If the process is undone at this point, it will have a significant detrimental effect on all parties in interest.

I declare under the penalty of perjury, that the foregoing facts are true and correct to the best of my information, knowledge and belief.

DATED THIS  /2  day of March, 2019.

_____
Vincent J. Colistra