**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:   (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
         mconlan@gibbonslaw.com
         btheisen@gibbonslaw.com

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THEIR**
**KEY EMPLOYEE RETENTION PLAN**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**"), by and through their undersigned counsel, hereby file this motion (the "**Motion**"), for the entry of an order substantially in the form attached hereto as Exhibit A (the "**Proposed Order**") pursuant to sections 363(b), 363(c) and 503(c)(3) of title 11of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), authorizing and approving the Debtors' (i) Key

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

Employee Retention Plan (the "**KERP**") In support of the Motion, the Debtors rely upon, and incorporate by reference, the statements contained in the *Declaration of Vincent Colistra* (the "**Colistra Declaration**") attached hereto as Exhibit B.[2] In further support of this Motion, the Debtors respectfully represent as follows:

### JURISDICTION, VENUE, AND STATUTORY PREDICATES

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code.

### BACKGROUND

**A.    General**

4. On February 11, 2019 (the "**Petition Date**"), each of the above-captioned Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the intent to commence an orderly wind-down and liquidation of certain of their assets and to conduct a 363 auction process for certain of their operations as a going concern through the Chapter 11 Cases. The Debtors continue in possession of their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner.

---

[2] The Colistra Declaration (including the Schedules thereto) is being filed under seal.

2

5.	The Debtors offer a broad range of transportation services. Debtor New England Motor Freight, Inc. ("**NEMF**") was founded in 1918 in Elizabeth, New Jersey and is a leading less than truckload ("**LTL**") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United States. NEMF also offers LTL services to its customers across the United States and Canada through a number of partnerships and interline carrier arrangements with other LTL providers. In addition to the LTL business, the Debtors provide truckload ("**TL**") services through Debtor Eastern Freight Ways, Inc. ("**Eastern**"). Debtor Jans Leasing Corp. ("**Jans Leasing**") is a trucking equipment lessor, Debtor Carrier Industries, Inc. ("**Carrier**") offers dedicated third party logistics services, Debtor Apex Logistics ("**Apex**") offers transportation brokerage services, and Debtor NEMF World Transport, Inc. ("**NEWT**") provides non-vessel operation common carrier operations between the United States and Puerto Rico. Debtor NEMF Logistics, LLC ("**Logistics**") is a third-party logistics company specializing in logistics management services, including warehousing, software, brokerage and support. Debtors Myar, LLC ("**Myar**") and MyJon, LLC ("**MyJon**") are both dormant and had no economic actively in 2018. Debtors Hollywood Avenue Solar, LLC ("**Hollywood Solar**") and United Express Solar, LLC ("**United Solar**") were formed to acquire solar arrays for terminals in South Plainfield and Pennsauken, New Jersey, respectively, at which the Debtors operate.

6.	MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of NEMF. Myar is a wholly-owned subsidiary of Eastern. The remaining Debtors are all sister entities owned solely by The Shevell Dynasty Trust, or by the Shevell Dynasty Trust and Myron P. Shevell.

7. On February 21, 2019, Region 3 of the Office of the United States Trustee (the "U.S. Trustee") appointed a seven-member Official Committee of Unsecured Creditors (the "Committee").

8. Additional information regarding the Debtors' business operations, their capital and debt structure, the events leading to the Chapter 11 Cases, and the facts and circumstances supporting the relief requested herein are set forth in the Declaration of Vincent Colistra in Support of Debtors' Chapter 11 Petitions and First Day Motions [Dkt. No. 22, the "**First Day Declaration**"].

**B.    The Sale Process**

9. As set forth in detail in the First Day Declaration, the Debtors commenced the Chapter 11 Cases with the goal of liquidating all of their assets and maximizing value for all constituents. Specifically, the Debtors, in their business judgment, have determined that a sale (the "**Liquidating Sale**") of substantially all of NEMF's vehicle/equipment/personal property assets (the "**Liquidating Assets**") and the going concern sale (each a "**Business Sale**" and with the Liquidating Sale, collectively, the "**Sale**") of Debtors Eastern's and Carrier's assets (collectively, the "**Business Assets,**" and with the Liquidating Assets, collectively, the "**Assets**") through open bidding and auction processes (collectively, the "**Sale Process**") is the best way to maximize the value of the Assets and distributions to the Debtors' stakeholders.

10. Eastern is a truckload carrier, based in South Brunswick, New Jersey. Eastern was established in 1994 to provide premium truckload services to customers in the Northeast and Mid-Atlantic regions. The company has established a reputation for excellent response time, guaranteed equipment availability, and outstanding on-time performance. All of its vehicles are equipped with the latest satellite technology for enhanced communication, shipment, tracking and

increased efficiency.  Eastern operates principally within short-to-medium haul traffic lanes.  The majority of Eastern's dispatches are for overnight or same-day delivery.

11. Carrier is a dedicated third party logistics company, providing all aspects of supply chain management and logistical planning.  Carrier's business model has evolved to become more of a dedicated contract carriage model.  The company has formed an alliance with two national warehouse operators on an as needed basis.  It also provides dedicated trucking services to three customers.

12. The Debtors' cash on hand obtained in these cases is intended to provide the Debtors with the means to implement the Sale Process.

13. In furtherance of their sale efforts, on February 29, 2019, the Debtors filed their Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and (f) for an Order (A) Authorizing the Debtors to Sell at Auction Substantially all of Debtor NEMF's Personal Property Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving Auction Procedures Relating to Such Auction Sales, and (C) Granting Related Relief (the "**Liquidating Sale Motion**") [Dkt. No. 141].  A hearing on the Liquidating Sale Motion is currently scheduled before this Court for April 1, 2019.  In addition, the Debtors anticipate filing within the next few weeks a combined motion for entry of orders (i)(a) approving bidding procedures and related auction, and (b) scheduling a sale hearing and approving notice thereof; (ii) authorizing the sale of substantially all of Business Assets free and clear of all liens, claims, encumbrances, and other interests; and (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases and establishing procedures to determine cure amounts and establishing deadlines for objections with respect thereto (the "**Bid Procedures Motion**").

14. The Debtors continue to engage in active discussions with prospective bidders on the Liquidating Assets and the Business Assets in advance of the scheduled hearing on the Liquidating Sale Motion as well as the anticipated filing and approval of the Bid Procedures Motion and the conclusion of the Sale Process.

15. Regardless of whether the successful bid at auction is a liquidation or going concern bid, the Debtors' ability to preserve the value of the Business Assets, continue normal operations of Eastern and Carrier, and maximize recovery through the Sale Process hinges, in part, upon their ability to successfully retain key employees of Eastern and Carrier and incentivize executive performance. The dedicated assistance of the Debtors' executives, officers, and managers during the marketing and Sale Process is a critical component of the Debtors' ultimate objective: to continue business operations of Eastern and Carrier, obtain viable offers for the Assets that will generate maximum value through the auction process and, ultimately, position the Debtors to close on a winning bid in an efficient and expeditious manner.

16. In addition, NEMF continues to wind down its operations as it moves towards an auction of its Rolling Stock and other assets. The Debtor uses a centralized accounting and cash management system that services all of the Debtors in the case. Key employees are responsible for financial reporting, including the preparation of the SOFA, Schedules, MOR's, weekly Cash Scorecards, and other related bankruptcy reporting, sales processing, A/R collections, A/P processing and payment, payroll processing, along with related tax reporting, and other critical accounting, finance and operating processes and procedures for the Debtor.

17. Since filing for protection under the Bankruptcy Code on February 11, both Eastern and NEMF have experienced resignations from key employees.

18. Three of Eastern's key employees have been poached by one of Eastern's competitors who convinced these three "critical employees" to leave Eastern. All three have given their notice and will be leaving sometime in April.

19. NEMF has had resignations from its Manager of Accounts Payable, Director of Finance overseeing tax reporting and involved in various aspects of the accounting and finance functions for the Debtors, and Director of Finance for Eastern who among her other duties was also skilled in special database quires, which are critical to the Debtors abilities to produce the data needed for various Bankruptcy reporting requirements.

20. The Debtors seek authority to implement the KERP to enable them to conduct and complete an orderly and value-maximizing Sale Process, liquidation and wind down of the Debtors business.

## **RELIFE REQUESTED**

21. By this Motion, the Debtors seek entry of the Proposed Order approving the KERP and authorizing the payments thereunder. The KERP aligns the interest of the KERP Participants with the Debtors' creditors and estate, thereby benefitting all stakeholders. This is consistent with the Bankruptcy Code and the Debtors' intended goal for the Chapter 11Cases.

*A.    The Eligible Employees*

22. The Debtors have identified certain non-insider employees to receive retention payments under the KERP (the "**KERP Participants**") The terms of the KERP are attached as Schedule 1 to the Colistra Declaration, which is being filed under seal.

23. In addition to responsibilities related to the Debtors' everyday operations, the Eligible Employees have undertaken and will be required to continue to perform considerable added responsibilities in connection with the Chapter 11 Cases and the Sale Process. Without the

7

KERP program, the Debtors have already lost and will likely continue to lose non-insider personnel who are critical to the success of the Chapter 11 Cases and the Sale Process.

24.  **B.**  *Development of the KERP*

25.  The Debtors enlisted the assistance of their Chief Restructuring Officer, Vincent J. Colistra (the "**CRO**"), and his firm, Phoenix Executive Services, LLC ("**Phoenix**"), to help develop the KERP.  The Debtors selected the CRO and Phoenix because, among other things, Phoenix has significant experience in designing executive and employee incentive, retention, and severance plans for companies in chapter 11 (particularly in construction, manufacturing, retail, engineering, utilities, automotive, and financial services) and have access to extensive industry compensation data.  The Debtors, their counsel, the CRO, and Phoenix reviewed the Debtors' employment requirements during the Chapter 11 Cases and the attendant necessary features of incentive and retention plans.  The Debtors, their counsel and the CRO also discussed and reviewed the need for and the terms of the KERP with the Unsecured Creditors Committee's counsel and financial advisor.  The CRO and Phoenix assisted the Debtors in designing the KERP, keeping in mind the Debtors' goals of maximizing the value of the Assets through the Sale Process and wind-down activities, enhancing the Debtors' financial condition, and ensuring effective management throughout the Chapter 11 Cases.

26.  The KERP was designed to promote appropriate and reasonable incentives and to retain personnel essential to the success of the Chapter 11 Cases.

27.  The terms of the KERP was negotiated with each KERP Participant.  The CRO and Phoenix also worked closely with the Debtors to ensure that the KERP were competitive within the industry, and that the incentives set for the executives participating in the KEIP were appropriate.

8

28. The KERP was also submitted for consideration to the Debtors' board of directors (the "**Board**") and was subsequently approved by the Board. The Debtors also allowed the Committee an opportunity to review the KERP prior to filing this Motion, and the Committee does not oppose the approval of the KERP.

C. *Proposed KERP*

29. The terms of the KERP are sent forth in the Colistra Declaration. It is essential to the Debtors that the KERP Participants remain employed through the KERP Retention Period to facilitate the Sale Process and the completion of tasks attendant to the Chapter 11 Cases. The KERP Participants include employees from various functions, including, but not limited to, sales, Finance and Accounting, IT, maintenance and security, insurance claims processing, scheduling, customer service, training and operations. Certain of the KERP Participants have the title of "Vice President", however, under the Debtors' by-laws, none of the KERP Participants are officers of the Debtors.

30. In the event that a KERP Participant's employment is terminated prior to the end of the KERP Retention by the Debtors without cause, the KERP Participant shall remain eligible for the KERP Payment. Participation in the KERP shall not affect any rights of KERP Participants, if any, under this Court's Order, dated March 1, 2019, Approving Global Employee Settlements [Dkt. No. 155].

**BASIS FOR RELIEF REQUESTED**

A. **Governing Law**

31. The Bankruptcy Code outlines two separate standards for approving compensation plans for employees, officers or directors, depending on whether plan is made in or outside of the ordinary course of business. *See* 11 U.S.C. §§ 363, 503(c). Transfers made in the ordinary course

9

of business are evaluated under section 363(c). Transfers to insiders, or transfers made outside the ordinary course of business, are subject to the requirements of sections 363(b) and 503(c).

32. Pursuant to section 363(b)(1) of the Bankruptcy Code, the debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363 (b); *see also The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153--55 (D. Del. 1999) (affirming a key employee retention program and stating that "[i]n determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions").

33. Section 503(c) of the Bankruptcy Code, which was added to the Bankruptcy Code as one of the BAPCPA amendments in 2005, to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process" (*In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007)), limits the scope of "key employee retention plans and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." *Id.*

34. Specifically, section 503(c)(1) of the Bankruptcy Code prohibits "a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business" unless certain strict and detailed criteria is satisfied. 11 U.S.C. § 503(c)(1). Similarly, section 503(c)(2) of the Bankruptcy Code, prohibits severance payments "to an insider of the debtor" absent strict criteria. 11 U.S.C. § 503(c)(2). Thus, both sections 503(c)(1) and (2) apply only to transfers made to an insider of a debtor. Section 503(c)(3) of the Bankruptcy Code, however, limits payments made to debtor's employees (whether

insider or not) outside the ordinary course of business unless such transfers are justified by "facts and circumstances of the case." 11 U.S.C. § 503(c)(3).

35. The term "insider" is defined as including "if the debtor is a corporation-(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B). It also includes "affiliate, or insider of an affiliate as if such affiliate were the debtor" and "managing agent of the debtor." 11 U.S.C. § 101(31)(B).

**B.    The Court Should Approve the KERP**

*a. The KERP applies only to non-Insiders, and thus, is not prohibited by sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code*

36. As noted above, no KERP Participant is an insider of the Debtors. As such, the KERP need not meet the requirements of sections 503(c)(1) or (2) of the Bankruptcy Code. *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 801 (Bankr. D. Del. 2007) (Bankruptcy Code section 503(c)(1) does not restrict incentive payments to non-insider employees).

37. Here, the KERP Participants do not take part in the overall management of the Debtors, participate in Board meetings, get involved in corporate governance, nor do they direct or implement company policy or is steering the Debtors through the Chapter 11 Cases. Instead, the KERP Participants continue to perform their normal duties under the direction of the Debtors' management and the CRO, in addition to extra responsibilities associated with the Sale Process. Thus, despite their titles, the KERP Participants are not insiders as contemplated by section 101(31)(B) of the Bankruptcy Code. Moreover, courts have declined to find insider status where the scope of authority is limited. *See In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (employees not insiders because none of them had authority to implement company policy,

11

did not report to board of directors and were subordinate to actual officers).  Courts look passed titles and instead look to the employees' individual functions and roles.  *See In re NMI Sys., Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995) (finding that vice president was not insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions."); *see In re Global Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of board, participated in corporate governance, attended board meetings or reported to board).  Accordingly, section 503(c)(1) of the Bankruptcy Code does not apply to the KERP.

38. Additionally, the KERP is not subject to the provisions of section 503(c)(2) of the Bankruptcy Code because it is not a severance program for insiders.  The KERP does not provide benefits to KERP Participants upon termination of their employment.  Rather, under the terms of the KERP, the KERP Participants will receive compensation by continuing to work for their respective Debtor employers through the closing of the Sale.  Therefore, section 503(c)(2) of the Bankruptcy Code likewise is not applicable.

### b. The KERP is authorized under section 503(c)(3) because it satisfies the business judgment rule

39. Section 503(c)(3) of the Bankruptcy Code likewise does not preclude approval of the KERP.  As noted above, section 503(c) of the Bankruptcy Code restricts transfers or payments by debtors for retention or severance, or to the extent that such payments are outside of the ordinary course and not justified by the facts and circumstances.  *See*, 11 U.S.C. § 503(c).  The majority of courts have held that the standard for approval under the "facts and circumstances" test of section 503(c)(3) is similar to the business judgment standard for approval under section 363(b)(1) of the Bankruptcy Code. *See, e.g., In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012)

12

(collecting cases); *In re Nobex Corp.*, 2006 Bank. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006) (the test for evaluation a compensation proposal under section 503(c)(3) of the Bankruptcy Code is the "sound business judgment" test); *In re Global Home Prods.*, LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *In re Nobex Corp.*, No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (section 503(c)(3) standard is that of the business judgment of the debtor); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program, stated that "in determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions").

40. As noted above, Section 363(b) provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). To approve a use, sale or lease of property out of the ordinary course of business, this Court must find "some articulated business justification." *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) of the Bankruptcy Code when there is a legitimate business justification). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

41. Here, the Debtors have a valid business justification supporting the KERP. First, the Debtors require the key, non-insider employees' specific knowledge and skill sets to adequately conduct the Sale Process relating to Eastern and Carrier as well as to ensure an orderly liquidation of the assets of the remaining Debtors and the success of the Chapter 11 Cases. The KERP Participants are intimately familiar with the Debtors' operations and many have skills that are unique and difficult to replace. The loss of such employees will negatively affect the Debtors because the Debtors will be required to incur costs associated with recruiting and training replacement workers at the same time they are operating under chapter 11.

42. Second, the cost of implementing the KERP is reasonable when considering the losses that the Debtors would suffer without the KERP Participants. The Debtors believe that the cost of the KERP is less than the cost of recruiting and training replacement employees to oversee the Sale of the Assets or to operate Eastern and Carrier businesses. Retaining the KERP Participants will maintain operational stability for Eastern and Carrier and allow the Debtors to focus their efforts on driving operational performance and conducting the relevant Sales, including the going concern sale of Eastern and Carrier.

43. Third, the KERP is reasonably related and necessary to the Debtors' operations. The KERP will ensure that the KERP Participants will continue to manage and help operate Eastern and Carrier while at this same time assisting the Debtors with the orderly liquidation of the remaining Debtors. The KERP Participants hold critical roles in the operations of the Debtors and the loss of these KERP Participant would have a detrimental impact on the Debtors and the Chapter 11 Cases. Further, there is no unfair discrimination among the participants in the KERP.

44. Finally, the Debtors exercised due diligence in creating the KERP. The Debtors, their legal counsel, CRO and Phoenix had a significant role in developing the KERP. In sum, the

14

Debtors believe that the KERP is vital to retaining the KERP Participants and protecting enterprise value for Eastern and Carrier as well for the orderly liquidation of the remaining Debtors. Accordingly, the KERP should be approved as a valid exercise of the Debtors' business judgment pursuant to section 363(b) of the Bankruptcy Code.

### WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

45. Because the relief requested herein is necessary to avoid immediate and irreparable harm, to the extent required for the immediate implementation of the relief requested herein, the Debtors seek a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a); and (ii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### WAIVER OF MEMORANDUM OF LAW

46. Because the legal bases upon which the Debtors rely is incorporated herein and the Motion does not raise any novel issues of law, the Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 90131(a)(3).

### NO PRIOR REQUEST

47. No previous request for the relief sought herein has been made to this or to any other court.

### CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter the order, substantially in the form submitted herewith, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: March 20, 2019  
Newark, New Jersey

Respectfully submitted,

**GIBBONS P.C.**

By: /s/ *Karen A. Giannelli*
    Karen A. Giannelli, Esq.
    Mark B. Conlan, Esq.
    Brett S. Theisen, Esq.
    One Gateway Center
    Newark, New Jersey 07102
    Telephone: (973) 596-4500
    Facsimile: (973) 596-0545
    E-mail: kgiannelli@gibbonslaw.com
           mconlan@gibbonslaw.com
           btheisen@gibbonslaw.com

*Counsel to the Debtors and Debtors-in-Possession*