# EXHIBIT A

**Temporary Injunction Motion [Adv. Proc. No. 19-01119]**

- Motion [Dkt. No. 3]
- Declaration of Ernest Hardy [Dkt. 3-1]
- Declaration of Brett S. Theisen [Dkt. 3-2]
- Response [Dkt. 14]
- Response, Ex. A [Dkt. 14-1]
- Response, Ex. B [Dkt. 14-2]

**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
           mconlan@gibbonslaw.com
           btheisen@gibbonslaw.com
*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC., *et al*.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Jointly Administered) |
| NEW ENGLAND MOTOR FREIGHT, INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PARTIES LISTED ON EXHIBIT A TO THE COMPLAINT and JOHN DOES 1-100,<br><br>Defendants. | Adv. Pro. No. 19-__1119____ (JKS) |

**DEBTORS' MOTION FOR AN ORDER**
**(I) PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS,**
**OR (II) IN THE ALTERNATIVE, DECLARING THAT THE AUTOMATIC STAY**
**APPLIES TO SUCH ACTIONS AND (III) GRANTING A TEMPORARY**
**RESTRAINING ORDER PENDING A FULL HEARING ON THE MOTION**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

The above-captioned debtors and debtors in possession (the "Debtors" or the "Company"),

by and through their undersigned counsel, incorporate the statements contained in (i) the

*Declaration of Vincent Colistra in Support of Debtors' Chapter 11 Petitions and First Day*

*Motions* (the "First Day Declaration")[2] [Case No. 19-12809, Dkt. No. 22], (ii) the *Declaration of*

*Ernest Hardy* (the "Hardy Decl.") and (iii) the *Declaration of Brett S. Theisen,* filed

contemporaneously herewith, and further states as follows:

## PRELIMINARY STATEMENT

The Debtors commenced the above-captioned chapter 11 cases to conduct an orderly

liquidation of their assets and wind-down of their businesses, toward the goal of preserving and

maximizing the value of their assets for all creditors.   The relief sought in this adversary

proceeding—enjoining and/or applying the automatic stay to the commencement or continuation

of certain civil actions seeking liability against the Debtors' truck drivers for actions taken in the

course of their employment with the Debtors—is critical to the Debtors' ability to proceed with

and achieve the purpose for which it commenced the chapter 11 cases.

The Debtors are the real parties in interest in any such actions against the drivers because

of the Debtors' liability under *respondeat superior* and/or other agency doctrines and/or laws, such

that a judgment against a driver is akin to judgment against the Debtors.   The Debtors would be

severely prejudiced if an action can proceed against a driver (who may be left *pro se* because the

Debtors have historically provided counsel[3] and indemnity to their drivers in tort actions) because

the likely result would be a default judgment against the driver—and ultimately against the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

[3] Notably, the Debtors' own in-house counsel is presently counsel of record to the individual drivers (along with counsel to the Debtors) in approximately 41 active lawsuits.   The attorney cannot unilaterally withdraw from those representations, and as such his involvement is an ongoing strain on the estates' resources.

2715194.1 115719-100281

Debtors—for the full amount sought in the complaint.  The Debtors do not believe that their drivers have the financial wherewithal to satisfy any material liability absent contribution, indemnity, or other reimbursement from the Debtors themselves.

Moreover, to the extent plaintiffs in the underlying actions against the Debtors seek to lift the automatic stay solely as to "insurance" proceeds, such relief should also be denied because, under the provisions of the Debtors' self-retention and excess indemnity contracts, the Debtors would likely be forced to continue funding the defense costs in such actions unless and until a claim was reduced to judgment or settled above the self-retention amount.  Thus, unlike many cases where the stay can be lifted as to insurance, with the insurer assuming defense costs, that option is simply not available here.  For the foregoing reasons, broad injunctive relief is necessary.

In particular, the Debtors seek a preliminary injunction under 11 U.S.C. §§ 105(a) and 362(a) enjoining the continuation or commencement of any action by the defendants in this adversary proceeding (listed on Exhibit A[4] to the Complaint and, collectively, the "Defendants") seeking to (i) hold the Debtors' employees and/or former employees listed on Exhibit A[5] to the Complaint, filed contemporaneously herewith (collectively, the "Protected Drivers")[6] liable for certain automobile-related claims committed in the course of their employment with the Debtors (the "Auto Liability Claims"), and/or (ii) lift the stay to proceed solely against excess coverage that may be available pursuant to the Debtors' Excess Indemnity Contracts (as defined and described below).  In the alternative, the Debtors seek a declaration that 11 U.S.C. § 362(a) applies to prohibit the commencement or continuation of Auto Liability Claims against the Protected

---

[4] The Defendants' names appear as the plaintiffs in the actions listed in the "Case Name" column to Exhibit A.

[5] The Protected Drivers' names appear as co-defendants (along with one or more of the Debtors) in the actions listed in the "Case Name" column to Exhibit A.

[6] The Debtors reserve the right to seek to amend the list of Protected Drivers, and in particular, to request that additional parties be included as Protected Drivers.

3

Drivers and/or against the excess coverage.  The Debtors also seek a temporary restraining order to immediately effectuate the requested injunctive or declaratory relief pending a full hearing on the request for a preliminary injunction.

### JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are sections 105(a) and 362 of title 11 of the United States Code (the "**Bankruptcy Code**").

### FACTUAL BACKGROUND

**A.      OVERVIEW OF THE CHAPTER 11 CASES AND THE DEBTORS' BUSINESSES**

4.      On February 11, 2019 (the "**Petition Date**"), each of the above-captioned Debtors filed voluntary petitions for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**") with the intent to commence an orderly wind-down and liquidation of their business and assets through the Chapter 11 Cases.  The Debtors continue in possession of their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner.

5.      The Debtors offer a broad range of transportation services.  Debtor New England Motor Freight, Inc. ("**NEMF**") was founded in 1918 in Elizabeth, New Jersey and is a leading less than truckload ("**LTL**") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United

4

States.  NEMF also offers LTL services to its customers across the United States and Canada

through a number of partnerships and interline carrier arrangements with other LTL providers.  In

addition to the LTL business, the Debtors provide truckload ("**TL**") services through Debtor

Eastern Freight Ways, Inc. ("**Eastern**").  Debtor Jans Leasing Corp. ("**Jans Leasing**") is a trucking

equipment lessor, Debtor Carrier Industries, Inc. ("**Carrier**") offers dedicated third party logistics

services, Debtor Apex Logistics ("**Apex**") offers transportation brokerage services, and Debtor

NEMF World Transport, Inc. ("**NEWT**") provides non-vessel operation common carrier

operations between the United States and Puerto Rico.  Debtor NEMF Logistics, LLC

("**Logistics**") is a third-party logistics company specializing in logistics management services,

including warehousing, software, brokerage and support. Debtors Myar, LLC ("**Myar**") and

MyJon, LLC ("**MyJon**") are both dormant and had no economic actively in 2018.  Debtors

Hollywood Avenue Solar, LLC ("**Hollywood Solar**") and United Express Solar, LLC ("**United**

**Solar**") were formed to acquire solar arrays for terminals in South Plainfield and Pennsauken, New

Jersey, respectively, at which the Debtors operate.

6.    MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of

NEMF.  Myar is a wholly-owned subsidiary of Eastern.  The remaining Debtors are all sister

entities owned solely by The Shevell Dynasty Trust, or by the Shevell Dynasty Trust and Myron

P. Shevell.

7.    As of the Petition Date, the Debtors employ approximately 3,450 full-time and part-

time employees.  Approximately 1,900 of the employees are members of International Association

of Machinists and Aerospace Workers, AFL-CIO (the "**Union**") and are covered by a series of

collective bargaining agreements with the Union.

2715194.1 115719-100281

8.      In 2017, the Debtors' businesses generated consolidated gross revenues of approximately $373 million.  For 2018, the Debtors estimate that their businesses will generate consolidated revenues of approximately $370 million.[7]

9.      The Debtors' principal place of business and corporate headquarters is located at 1-71 North Avenue East, Elizabeth, New Jersey, 07201-2859.  The Debtors operate from 36 trucking terminals located throughout the Mid-Atlantic, the Northeast and Midwest, and two additional locations in New Brunswick, NJ and Jordan, NY, which are used primarily for administrative staff and for Eastern operations. The only real property owned by the Debtors is located in Miami, Florida, and is leased to an unrelated third-party trucking company.

10.     Additional information regarding the Debtors' businesses, the events leading to the Chapter 11 Cases, and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration of Vincent Colista (the "**First Day Declaration**"), which was filed contemporaneously on the Petition Date and is incorporated herein by reference.

### B.      THE DEBTORS' TRUCKING FLEET EXCESS INDEMNITY CONTRACTS

11.     The Debtors have a self-retention with respect to Auto Liability Claims for their trucking fleet up to the first $500,000 per occurrence under certain excess indemnity contracts.

12.     The Debtors are party to an Excess Indemnity Contract with United States Fire Insurance Company ("United Fire") covering the period April 10, 2018 through April 10, 2019 related to Auto Liability Claims (the "United Fire Contract").

13.     The Debtors are party to a Large Fleet Trucking Excess Contract with Protective Insurance Company ("Protective," and together with United Fire, the "Carriers") covering the period April 10, 2017 to April 10, 2018 (the "2017-2018 Protective Contract").

---

[7] The Debtors' books for fiscal year ending December 29, 2018 are not yet final.  All references to 2018 financials herein are based on the Debtors' preliminary results and remain subject to change.

2715194.1 115719-100281

14.     The Debtors are party to a Large Fleet Trucking Excess Contract with Protective covering the period April 10, 2016 to April 10, 2017 (the "2016-2017 Protective Contract").

15.     The Debtors are party to a Large Fleet Trucking Excess Contract with Protective covering the period April 1, 2015 to April 11, 2017 (the "2015-2017 Protective Contract").

16.     The Debtors are party to a Large Fleet Trucking Excess Contract with Protective covering the period April 10, 2014 to April 10, 2016 (the "2014-2016 Protective Contract," and collectively with the 2015-2017 Protective Contract, the 2016-2017 Protective Contract, the 2017-2018 Protective Contract, and the United Fire Contract, the "Excess Indemnity Contracts"). [See Hardy Decl., ¶¶ 11-15, Exhibits B-F].

17.     The terms and provisions contained in each of the Excess Indemnity Contracts are materially the same across all of the Excess Indemnity Contracts.

18.     The Excess Indemnity Contracts are not insurance policies.

19.     Under the Excess Indemnity Contracts' self-retention provisions, the Debtors are obligated to pay the first $500,000 in damages, fees and costs (the "Self-Retention"). The Carriers are only obligated to reimburse a Debtor after the Debtor has paid out any settlement or verdict, and then only for payments, fees, including attorneys' fees, and costs that exceed the $500,000 Self-Retention.

20.     Under the Excess Indemnity Contracts, the Debtors—not the Carriers—are responsible to manage and administer claims, subject to the Carriers' right, at their sole discretion, to assume administration of claims involving amounts in excess of the Self-Retention.

C.     THE PENDING CIVIL ACTIONS

21.     There are approximately 73 active lawsuits involving Auto Liability Claims with loss dates since 2014 pending against the Debtors (with approximately 63 of those lawsuits having

2715194.1 115719-100281

a Protected Driver named as a co-defendant) in state and federal courts across multiple states (the "Civil Actions"). The Civil Actions are identified on Exhibit A to the Complaint. [See also Hardy Decl., ¶ 6, Ex. A].

22.     The Debtors manage Auto Liability Claims primarily through the efforts of Ernest Hardy, the Debtors' Vice President of Risk Management, and Todd Rubenstein, the Debtors' General Counsel. Mr. Hardy's responsibilities begin at the first instance when a claim is asserted against one of the Debtors, and continue through the pre-litigation phase. Once litigation is commenced on a claim, the matter is then actively managed either by Mr. Rubenstein or an outside law firm, depending on the state in which the case is filed. In some instances, Mr. Hardy will continue to monitor the litigation along with outside counsel, and in some cases Mr. Rubenstein oversees and monitors outside counsel. [Hardy Decl., ¶¶ 3-9].

23.     In the vast majority of Auto Liability Claims that reach the litigation stage, plaintiffs name the Debtors' truck drivers as individual defendants, in addition to suing the Debtors. Historically, the Debtors' attorneys have also appeared on behalf of the drivers. The only exception to this practice has been in cases where a driver is accused of some criminal activity connected to the Auto Liability Claims. [Hardy Decl., ¶ 5].

24.     Mr. Rubenstein is presently counsel of record for the Debtors and their drivers in approximately 36 active lawsuits involving Auto Liability Claims where the Debtors and their drivers are co-defendants, and approximately 5 active lawsuits against the Debtors wherein a Protected Driver is not a named co-defendant. In addition, Mr. Rubenstein oversees and monitors outside counsel in approximately 12 active lawsuits involving Auto Liability Claims where the Debtors and their drivers are co-defendants. Mr. Hardy is personally overseeing and managing outside counsel in approximately 15 active lawsuits involving Auto Liability Claims where the

2715194.1 115719-100281

Debtors and their drivers are co-defendants, and approximately 2 active lawsuits against the Debtors wherein a Protected Driver is not a named co-defendant.  There are 9 outside law firms and Mr. Rubenstein representing the Debtors and/or their drivers involving Auto Liability Claims. [Hardy Decl., ¶ 7].

25.     Mr. Rubenstein handles all aspects of his cases from commencement to conclusion, including pleadings, discovery, motions, court appearances, trial and appeal, and settlement negotiations.  He spends approximately 50-plus hours per week in the course of managing his own case load and monitoring outside counsel with respect to the Auto Liability Claims.  [Hardy Decl., ¶ 8].

26.     Mr. Hardy spends approximately 30-35 hours per week in the course of managing and administering the Auto Liability Claims (including oversight and management of cases handled by outside counsel).  [Hardy Decl., ¶ 9].

27.     The Debtors are also responsible for paying the outside law firms' attorneys' fees, costs, and expenses incurred in defending the Auto Liability Claims.  [Hardy Decl., ¶ 10].

## RELIEF REQUESTED AND THE NEED THEREFORE

28.     To guard against the severe and irreparable harm that the Debtors would suffer in the event that Defendants are permitted to continue or commence civil actions against the Protected Drivers during the Debtors' bankruptcy proceeding, the Debtors seek a preliminary injunction under 11 U.S.C. §§ 105(a) and 362(a) enjoining the continuation or commencement of any action by the Defendants seeking to (i) hold the Protected Drivers liable for Auto Liability Claims, and/or (ii) lift the stay to proceed solely against excess coverage that may be available pursuant to the Excess Indemnity Contracts.   In the alternative, the Debtors seek a declaration that 11 U.S.C. § 362(a) applies to prohibit the commencement or continuation of Auto Liability Claims against

9

the Protected Drivers and/or against the excess coverage.  The Debtors also seek a temporary

restraining order to immediately effectuate the requested injunctive or declaratory relief pending

a full hearing on the request for a preliminary injunction.

29.    Here, allowing the Civil Actions against the Protected Drivers to continue is

effectively allowing the actions to continue against the Debtors—in violation of the automatic

stay—because the Debtors are liable for the driver's actions taken in the course of his employment

under the doctrine of *respondeat superior*. *Turman v. Ameritruck Refrigerated Transp., Inc.*, 2001

U.S. Dist. LEXIS 1744, at *7-9 (D. Kan. Feb. 6, 2001) (extending automatic stay to non-debtor

truck driver employed by the debtor); *Graziani v. Randolph*, 887 A.2d 1244 (Pa. Sup. Ct. 2005).[8]

30.    As such, continuation of the Civil Actions even without the Debtors is still an attack

on the bankruptcy estate.  Moreover, because of the sheer number of active tort actions currently

pending against the Debtors and the Protected Drivers, the cumulative effect, if all of this litigation

is allowed to proceed even against non-debtors, amounts to a massive drain on the bankruptcy

estates' time and resources because it will be necessary for the Debtors to monitor all of the Civil

Actions.  In effect, the Debtors and the Protected Drivers "enjoy such an identity of interests that

[a] suit against the non-debtor is essentially a suit against the debtor," such that the Protected

Drivers are entitled to the protection of the automatic stay.  *McCartney v. Integra National Bank

North*, 106 F.3d 506, 509 (3d Cir. 1997).

31.    Further, the continuation of the Civil Actions even without the Debtors will have

an adverse impact on the Debtors' ability to effectively and efficiently manage the Chapter 11

Cases, to the detriment of all creditors and parties-in-interest because it will divert resources away

from the Chapter 11 Cases.  This fact independently warrants extension of the automatic stay to

---

[8] Further, the Debtors, as vehicle owners, may also be responsible for a Protected Driver's negligent acts under
certain states' laws.  *See, e.g.*, N.Y. Vehicle and Traffic Law § 388.

2715194.1 115719-100281

the Protected Drivers. *Id.*; *In re Phila. Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009).

32.     Specifically, the following facts, *inter alia*, trigger extension of the automatic stay

and preclude the Civil Actions from going forward even Protected Drivers—

- The Debtors are the real party in interest in the Civil Actions because of their liability under *respondeat superior* and/or other agency doctrines and/or laws, such that a judgment against a Protected Driver is akin to judgment against the Debtors;

- The Debtors do not have any evidence that any of the Protected Drivers have the financial wherewithal to satisfy any material liability to Defendants absent contribution, indemnity, or other reimbursement from the Debtors themselves;

- The Debtors would be severely prejudiced if an action can proceed against a Protected Driver (who may be left without counsel) because the likely result would be a default judgment against the Protected Driver—and ultimately against the Debtors—for the full amount sought in the complaint;

- The Debtors have historically provided counsel and indemnity to the Protected Drivers in these types of tort actions;

- The Debtors do not maintain a "traditional" insurance policy covering the Auto Liability Claims—rather, they are party to the Excess Indemnity Contracts, which go into effect only for claims above the Debtors' $500,000 Self-Retention, and even then the excess Carriers are only obligated to reimburse the Debtors <u>after entry of a final judgment or a settlement</u>—thus, for practical purposes, there may not be any coverage at all in certain Civil Actions separate and apart from the Debtor's Self-Retention, and the Carriers have no obligation to defend the Civil Actions; and

- The Debtors are contractually obligated to defend any claims up to the Self-Retention, even if Defendants try to waive their right to collect from the Self-Retention. Thus, continuation of a Civil Action even against a Protected Driver will impact the Debtors' ability to successfully manage and administer the Chapter 11 Cases because the Debtors have the obligation under the self-retention provisions of the Excess Indemnity Contracts to manage and defend the Civil Actions, such that even if a Defendant sought to limit any recovery to "insurance proceeds," the continuation of a Civil Action is still a direct cost to the bankruptcy estates because the Debtors would be forced to assume the costs of defense.

33.     All of those facts weigh heavily in favor of staying the Civil Actions against the

Protected Drivers.  Indeed, a refusal to extend the application of the automatic stay to the Protected

Drivers under these circumstances would defeat the very purpose and intent of the Bankruptcy

11

Code.  *See A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F.2d 994, 999 (4th Cir. 1986).

## BASIS FOR RELIEF REQUESTED

34.    The statutory bases for the relief requested herein are sections 105(a) and 362(a) of the Bankruptcy Code.

35.    The Debtors have commenced this adversary proceeding pursuant to Rules 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**I.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER 11 U.S.C. § 105(a) TO ENJOIN THE CONTINUATION OR COMMENCEMENT OF AUTO LIABILITY CLAIMS AGAINST THE PROTECTED DRIVERS.**

**A.  Section 105(a) Grants this Court Broad Injunctive Authority to Enjoin the Pursuit of the Auto Liability Claims Against the Protected Drivers.**

36.    The filing of the Chapter 11 Cases triggered an automatic stay of the Civil Actions against the Debtors, pursuant to 11 U.S.C. § 362(a), which provides that the automatic stay prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). The purpose of the automatic stay is to:

> protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor.

*A.H. Robins,* 788 F.2d at 998.   Where an action would adversely affect a debtor's estate, frustrate the statutory scheme embodied in the Bankruptcy Code or interfere with the debtor's efforts to administer its bankruptcy case, bankruptcy courts will extend the stay and enjoin such acts against

non-debtors. *See, e.g., Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. Feb. 25, 2003); *McCartney,* 106 F.3d at 509. As this Court has previously noted, the stay may be applied to non-debtors "when it is ascertained that a claim against a third party 'will have an immediate adverse economic consequence for the debtor's estate.'" *In re: Hanjin Shipping Co.*, 2016 Bankr. LEXIS 3986, at *18 (Bankr. D.N.J. Sep. 20, 2016) (citing *Queenie,* 321 F.3d at 287, and *McCartney,* 106 F.3d at 510-511). That is exactly the case here.

37.     Congress enacted 11 U.S.C. § 105(a) to, among other things, enable a bankruptcy court "to do whatever is 'necessary and appropriate' in order to carry out the provisions of title 11," including the automatic stay. *In re Johns-Manville Corp.*, 26 B.R. 420, 425 (Bankr. S.D.N.Y. 1983) (quoting 11 U.S.C. § 105). Under section 105(a), courts have broad authority "to enjoin parties other than the bankrupt from commencing or continuing litigation" *A.H. Robins*, 788 F.2d at 1002 (internal quotation marks and citation omitted).[9] An injunction as to third-party litigation is appropriate where, among other things, the "failure to enjoin would [a]ffect the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor through those third parties." *Id*. at 1003 (citation omitted); accord *In re Am. Film Techs., Inc.*, 175 B.R. 847, 855 (Bankr. D. Del. 1994).

38.     The commencement or continuation of Auto Liability Claims against the Protected Drivers would deprive the Debtors of the benefits of the automatic stay, jeopardize the Debtors' efforts to administer an orderly liquidation process under the protection of chapter 11, and threaten the integrity of this Court's proceedings. The Court's action is needed to guard against these harms.

---

[9] This authority is bolstered by the inherent power of all courts "under their general equity powers and in the efficient management of [their] dockets to grant" appropriate injunctive relief. *A.H. Robins*, 788 F.2d at 1003 (citation omitted).

39.     The injunctive relief sought by the Debtors is necessary to provide the Debtors an unobstructed opportunity to obtain a global and fair determination of all current and future Auto Liability Claims, within the confines of the chapter 11 process.  This opportunity may evaporate if the Protected Drivers are left to defend the Civil Actions on their own.  Presently, the trial courts in the Civil Actions are not handling the application of the automatic stay uniformly.  Some courts have stayed the action in its entirety—even against third or fourth party defendants that are unrelated to the Debtors; other courts have stayed the action only as against the Debtors, but not against the Protected Drivers.  The lack of uniformity will create additional confusion, complexity, and risk for the Debtors, who will be forced to monitor and account for the varying procedural postures in each Civil Action.

### B.  The Preliminary Injunction Factors Weigh in Favor of Enjoining the Pursuit of Auto Liability Claims Against the Protected Drivers.

40.     Courts considering the propriety of an injunction under section 105(a) apply the traditional four-factor test for injunctions, tailored to the unique circumstances of bankruptcy.  *See, e.g., A.H. Robins*, 788 F.2d at 1008 (noting that the district court had applied the test for a grant of preliminary injunctive relief previously articulated by the Fourth Circuit and upholding the grant of a preliminary injunction); *Phila. Newspapers,* 407 B.R. at 616-18.  Accordingly, bankruptcy courts balance: (i) the debtor's reasonable likelihood of successful chapter 11 case; (ii) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (iii) the balance of harms between the debtor and its creditors; and (iv) whether the public interest weighs in favor of in an injunction. *Id.*

41.     "It is important to recognize that the four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied." *In re Eagle-*

2715194.1 115719-100281

*Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). "These factors simply guide the discretion

of the court; they are not meant to be rigid and unbending requirements." *Id.*

**The Debtors have made a good faith filing and there is—at the very least—a reasonable chance
for a successful plan of orderly liquidation in the Chapter 11 Cases.**

42.    In the context of a bankruptcy case, "success on the merits is to be evaluated in terms

of the likelihood of a successful reorganization." *Sudbury, Inc. v. Escott,* 140 B.R. 461, 466 (Bankr.

N.D. Ohio 1992). Measuring the odds of a debtor's likely success in in chapter 11 is not intended

to be a particularly high standard, especially where, as here, the chapter 11 case has just begun. *See*

*Eagle-Picher*, 963 F.2d at 860. Indeed, "at the early stages" of bankruptcy proceedings, the court

"must make at least a rebuttable presumption that the [debtors] have made a good faith filing and

are making a good faith effort to reorganize." *In re Gathering Rest., Inc.*, 79 B.R. 992, 1001 (Bankr.

N.D. Ind. 1986).

43.    Here, the Debtors' prospects for a successful conclusion to the Chapter 11 Cases are

high.  The Debtors commenced these Chapter 11 Cases to maximize the value of their assets and

to effectuate an orderly liquidation process for the benefit of all creditors.  The orderly liquidation

of the Debtors will involve: (i) the immediate wind-down of nine of the eleven Debtor entities;

(ii) the orderly collection of the Debtors' accounts receivables; (iii) the sale of the Debtors' two

most profitable entities, Eastern and Carrier, as going-concerns pursuant to a Court-approved

Section 363 bidding and auction process; (iv) sales of the Debtors' remaining assets (primarily

rolling stock, equipment, machinery and inventory), which are located across the Debtors' 36

terminals; and (v) the sale of unencumbered real property.

44.    At present, approximately three weeks into the Chapter 11 Cases, the orderly

liquidation process is proceeding according to schedule.  In the first two weeks, the Debtors were

able to reduce their workforce by approximately 90%, and have proposed a global settlement with

2715194.1 115719-100281

their employees that will result in an estimated $15 million savings to the estates. Additionally, the

Debtors have consolidated their rolling stock and other equipment at a small number of secured

terminals and have retained (subject to Court approval), a broker to conduct inventory, valuations,

and an auction, which the Debtors anticipate will be held in late May/early June. The Debtors are

currently preparing to file a motion to reject their leases. Further, the Debtors have received a

significant number of expressions of interest in both Eastern/Carrier and the real property. The

Debtors will begin the marketing process for Eastern/Carrier shortly, and anticipate a section 363

sale in late April/early May. Accordingly, at this early stage of the proceedings, the likelihood of

success factor weighs in favor of the requested injunction.

***Failure to Enjoin Litigation of Auto Liability Claims Would Irreparably Harm the Debtor.***

45.     The failure to grant the requested injunction would irreparably harm the Debtors'

efforts and effectively deprive the Debtors of the breathing spell afforded by the automatic stay.

Failure to enjoin litigation of Auto Liability Claims against the Protected Drivers would irreparably

harm the Debtors because, among other reasons listed above, (i) the Debtors may have indemnity

obligations that would make judgments against the Protected Drivers on the Auto Liability Claims

tantamount to judgments against the Debtor, and (ii) certain provisions of the Debtors' Self-

Retention and Excess Indemnity Contracts applicable to the Auto Liability Claims require the

Debtors to continue managing and administering Auto Liability Claims—including funding

defense costs—unless and until a claim is reduced to judgment or settled above the Self-Retention.

46.     Under these circumstances, an injunction is warranted because indemnification

obligations would make the Debtors the real-party defendants in any Civil Action against the

Protected Drivers and effectively eliminate the protections of the automatic stay. *Robins*, 788 F.2d

at 999. Courts have consistently enjoined actions against non-debtors where, as here, the debtor

16

has an obligation to indemnify the non-debtor for liability deriving from conduct for which the debtor is responsible. *See Phila. Newspapers,* 407 B.R. at 614-616; *In re W.R. Grace & Co.*, 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004); *Turman,* 2001 U.S. Dist. LEXIS 1744 at *7-9; *Am. Film Techs.,* 175 B.R. at 855. Permitting claimants to indirectly establish claims against the Debtors through actions against third parties with indemnity rights is wholly inconsistent with the Bankruptcy Code's policy and purpose. And, moreover, the Debtors' continued responsibility for managing, administering, and defending claims—even when such claims are above the Self-Retention—is an immediate adverse economic consequence to the estates which the automatic stay does not permit.

47.     Absent the requested injunction, Auto Liability Claims could effectively be liquidated outside of this Court through piecemeal litigation against the Protected Drivers in the tort system. The Civil Actions, if not stayed, would undermine the parties' and the Court's ability to a fair and equitable treatment of claims in chapter 11, and require the Debtors to continue spending time and money to manage and defend the actions. In sum, enjoining the prosecution of Auto Liability Claims is required to avoid the irreparable harm to the Debtors.

***Findings and Judgments in Litigation of the Auto Liability Claims Against the Protected Drivers Might Bind the Debtors, and Evidence Generated in Litigation Will Prejudice the Debtors***

48.     In addition to the risk of indirectly fixing Auto Liability Claims through the Civil Actions, if Auto Liability Claims against the Protected Drivers are permitted to proceed, the Debtors face the risk that findings and judgments against the Protected Drivers would bind the Debtors, and effectively establish Auto Liability Claims against it, including under the doctrines of *res judicata* and collateral estoppel. Accordingly, any rulings or findings regarding Auto Liability Claims would frustrate the Debtors' efforts to resolve claims globally and equitably in the Chapter 11 Cases.

17

49.     Courts have consistently concluded that the risks of collateral estoppel and *res judicata* warrant a stay of third-party litigation precisely because allowing that litigation to proceed would thwart the purposes of the automatic stay. *Sudbury*, 140 B.R. at 463 (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); *Manville*, 26 B.R. at 426-29 (concluding that risk of collateral estoppel would irreparably injure estates and thus issuance of a stay was warranted); *In re Am. Film Techs., Inc.*, 175 B.R. at 850 (staying claims against debtor's directors and holding that a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and, thus, would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions). The same concerns warrant a stay in this case.

50.     In addition, litigation of the Auto Liability Claims against the Protected Drivers would create the substantial risk that statements, testimony and other evidence generated in those proceedings could be used to establish Auto Liability Claims against the Debtor.  Consequently, the commencement or continuation of Auto Liability Claims could force the Debtor to defend its interest in other litigation, thereby defeating the "breathing spell" intended by the automatic stay. The Debtor will be required to actively involve itself in and defend the litigation of Auto Liability Claims, notwithstanding the ongoing liquidation and wind-down process being overseen by this Court.  These are consequences the Debtors should not be required to suffer (or be compelled to protect against). The risk of evidentiary prejudice presented by litigation of the Auto Liability Claims against the Protected Drivers further weighs in favor of injunctive relief.

2715194.1 115719-100281

**C. The Irreparable Harm that the Debtors Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to the Defendants.**

51.     The prejudice that the Debtors would suffer in the absence of an injunction—as described above—is substantial and, potentially, irreversible.  In contrast, prejudice, if any, to the Defendants from an injunction will be minimal. While an injunction might delay the efforts by certain Defendants to litigate Auto Liability Claims against the Protected Drivers, the Defendants will have the opportunity to assert proofs of claim directly against the real parties in interest, the Debtors, in these Chapter 11 Cases.

52.     The Defendants also cannot demonstrate harm based on the speculation that an injunction will deprive them of ultimate payment for their claims.  Many—if not all—of the Protected Drivers are likely judgment-proof with respect to the amounts sought in the Civil Actions. As such, as a practical matter—aside from agency liability—any judgment against a Protected Driver will ultimately be asserted against the Debtors.  The balance of harms clearly favors the injunctive relief requested by the Debtors.

**D. The Requested Injunctive Relief Will Further the Public Interest by Furthering the Debtors' Successful Administration of the Chapter 11 Cases.**

53.     Courts have consistently recognized the public interest in successful chapter 11 cases. *See, e.g., United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983); *Manville*, 26 B.R. at 428 ("[T]he goal of removing all obstacles to plan formulation [is] eminently praiseworthy and [I] support[ ] every lawful effort to foster this goal while protecting the due process rights of all constituencies.").  Permitting Auto Liability Claims against the Protected Drivers to continue would hinder the Debtors' ability to achieve a fair and equitable determination of the Auto Liability Claims vis a vis the rest of the creditor body.  The Defendants should not be afforded the opportunity to obtain default judgments for the full amount of claimed damages against unrepresented employees,

2715194.1 115719-100281

which would then be asserted against the Debtors at the expense of other general unsecured creditors.  Any other result would undermine the equitable goals underlying the Bankruptcy Code.

II.   **THE AUTOMATIC STAY APPLIES TO PROHIBIT PROSECUTION OF THE AUTO LIABILITY CLAIMS AGAINST THE PROTECTED DRIVERS AND/OR THE EXCESS INDEMNITY COVERAGE ABOVE THE SELF-RETENTION AT THIS TIME.**

54.   As demonstrated above, there is ample basis for this Court to enjoin commencement or continuation of Auto Liability Claims using the Court's section 105 powers, in furtherance of the automatic stay provisions under section 362(a).  In the alternative, the Debtors respectfully request that the Court enter a declaratory judgment that any commencement or continuation of Auto Liability Claims against Protected Drivers and/or coverage above the Self-Retention is automatically stayed because section 362(a) may apply of its own force to prohibit the continued prosecution of Auto Liability Claims.  Here, the continuation or commencement of Auto Liability Claims against Protected Drivers, are—as described above—unequivocally efforts to recover claims against the Debtors, are automatically stayed.  The commencement or continuation of Auto Liability Claims against Protected Drivers can have only one purpose: the liquidation and recovery of claims against the Debtors. Such actions are expressly enjoined by the automatic stay. *See In re Heating Oil Partners*, No. 3:08-CV-1976 CSH, 2009 WL 5110838, at *1 (D. Conn. Dec. 17, 2009) (holding, because any liability against a non-debtor successor of debtor would have a direct economic impact upon the debtor, that default judgement entered as to such entity was automatically stayed upon the debtor's chapter 11 filing and void *ab initio*), *aff'd sub nom. In re Heating Oil Partners, LP*, 422 F. App'x 15 (2d Cir. 2011).

55.   Additionally, Third Circuit precedent recognizes that the automatic stay under section 362(a)(1) may extend of its own force to enjoin actions against parties who share such an identity of interest with the debtor that the debtor is in effect the real-party defendant. <u>See</u>

*McCartney,* 106 F.3d at 510 (concluding that the automatic stay enjoined action against non-debtor third party where the debtor "was, in essence, the real party in interest" in the pursuit of a deficiency judgment action against the third party).

56.    Here, the Protected Drivers share such an identity of interest with the Debtors that the Debtors would be, in effect, the real-party defendants in Auto Liability Claims prosecuted against the Protected Drivers. As discussed above, litigation of the Auto Liability Claims against the Protected Drivers would effectively liquidate claims against the Debtors.

57.    And, of course, requiring the Debtors' to manage, administer, and defend the Civil Actions with respect to amounts above the Self-Retention—as required under the Excess Indemnity Contracts prior to settlement or judgment of a claim—is clearly not permitted under section 362. Accordingly, whether the Court relies on its broad powers under section 105 or looks to *McCartney* for precedent with respect to the application of the automatic stay, it is clear that the injunctive and/or declaratory relief sought by the Debtors in this motion is necessary to protect both the integrity of the bankruptcy proceeding and the Debtors' prospects to formulate a successful chapter 11 plan.

### III.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER TO EFFECTUATE THE RELIEF SOUGHT BY THE DEBTORS PENDING A FULL HEARING ON THIS MOTION.

58.    This Court should immediately and with shortened notice enter a temporary restraining order to preserve the effectiveness of the automatic stay until this Court has the opportunity to hold a full hearing on the Debtors' request for injunctive or declaratory relief.  Fed. R. Civ. P. 65(b), made applicable to this adversary proceeding by Bankruptcy Rule 7065 provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the

movant before the adverse party can be heard in opposition; and (B)
the movant's attorney certifies in writing any efforts made to give
notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b). A temporary restraining order is properly granted where it is necessary to

prevent immediate and irreparable injury pending a hearing upon a motion for an injunction. 7

Moore's Federal Practice ¶ 65.05, at 65-100 (2d ed. 1990).

59.     The facts presented here satisfy the requirements for a temporary restraining order

pending a full hearing on the injunctive or declaratory relief sought by the Debtors.   Absent a

temporary restraining order, the Debtors will be compelled to actively monitor, participate in and

defend, currently pending and additional threatened Auto Liability Claims against the Protected

Drivers, notwithstanding the automatic stay, to guard against, among other things, potential

indemnity claims, evidentiary prejudice and the risks of collateral estoppel and *res judicata*.

Moreover, the Debtors are also contractually obligated to defend any claims up to the Self-

Retention, even if Defendants try to waive any right to collect from the Self-Retention.

60.     Given the automatic stay as to claims against the Debtors, certain Defendants may

seek to accelerate their claims against the Protected Drivers as an end-run around the automatic

stay. Further, new claims against the Protected Drivers, by existing and new Auto Liability

claimants alike, may increase. Further, Defendants John Does 1-1000 are putative plaintiffs for

future Auto Liability Claims against the Protected Drivers and are unknown at this time.  Immediate

relief through a temporary restraining order is necessary to prevent the irreparable harm to the

Debtors that this would cause.

61.     Under the circumstances, a temporary restraining order is required to safeguard the

Debtors' ability to administer the Chapter 11 Cases without the unwarranted distraction of the Civil

Actions. Although temporary restraining orders are generally limited to 14 days, before that period

22

expires and for good cause, this Court may extend its order for an additional 14 days. Fed. R. Civ.

P. 65(b)(2).  To allow more parties in interest to participate in the hearing on the requested relief

and to conserve time and resources, the Debtors request that the Court, for good cause, enter a

temporary restraining order extending for the maximum period allowed under Civil Rule 65 — 28

days — and set a hearing on this Motion on or before that date. Alternatively, the Debtors

respectfully request that the Court enter a temporary restraining order for 14 days, subject to the

Debtors' right to seek a further 14-day extension of that period, and set a hearing on or before the

conclusion of the period as initially set or later extended.

## **WAIVER OF MEMORANDUM OF LAW**

Because the legal basis upon which the Debtors rely is incorporated herein and the Motion

does not raise any novel issues of law, the Debtors respectfully request that the Court waive the

requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3).

## **NO PRIOR REQUEST**

No previous motion for the relief sought herein has been made to this Court or to any other

court.

## **RESERVATION OF RIGHTS**

Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief

granted in the Order is intended or should be construed as: (a) an admission as to the validity of

any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any

particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an

implication or admission that any particular claim is of a type specified or defined in this Motion;

23

or (e) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

### NOTICE

Notice of this Motion has been given to the following parties, consistent with the requirements set forth in the Court's Order Shortening Time Period for Notice, Setting Hearing, and Limiting Notice, a proposed form of which has been submitted contemporaneously with this Motion:

a.   the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102;

b.   proposed counsel for the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068, Attn:   Joseph J. DiPasquale and Mary E. Seymour, Email: jdipasquale@lowenstein.com, mseymour@lowenstein.com and Elliott Greenleaf, 1105 N Market St, 17th Fl, Wilmington, DE 19801-1216, Attn: Rafael X. Zahralddin and Jonathan M. Stemerman, Email: rxza@elliottgreenleaf.com, jms@elliottgreenleaf.com;

c.   The Defendants listed on Exhibit A to the Complaint;

d.   Protective Insurance Company, Turner Law Firm, LLC, 76 South Orange Avenue - Suite 306, South Orange, NJ 07079, Attn: Andrew R. Turner;

e.   United States Fire Insurance Company, 305 Madison Avenue, Morristown, NJ 07960;

In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order substantially in the form submitted herewith, as well as granting such other and further relief that the Court may deem just and proper.

2715194.1 115719-100281

Dated:  March 14, 2019

Respectfully submitted,

**GIBBONS P.C.**

By: */s/ Karen A. Giannelli*
      Karen A. Giannelli, Esq.
      Mark B. Conlan, Esq.
      Brett S. Theisen, Esq.
      One Gateway Center
      Newark, New Jersey  07102
      Telephone:  (973) 596-4500
      Facsimile:  (973) 596-0545
      E-mail:  kgiannelli@gibbonslaw.com
             mconlan@gibbonslaw.com
              btheisen@gibbonslaw.com

      *Counsel to the Debtors*
      *and Debtors-in-Possession*

2715194.1 115719-100281

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW ENGLAND MOTOR FREIGHT, INC., *et al.*, | Case No. 19-12809 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| NEW ENGLAND MOTOR FREIGHT, INC. *et al.*, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 19- 1119 |
| PARTIES LISTED ON EXHIBIT A TO THE COMPLAINT and JOHN DOES 1-100, | (JKS) |
| Defendants. | |

## DECLARATION OF ERNEST HARDY
## IN SUPPORT OF PRELIMINARY INJUNCTION
## OR DECLARATORY JUDGMENT ON THE AUTOMATIC STAY

I, Ernest Hardy, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Vice President of Risk Management for the above-captioned debtors (the "Debtors"). I have held that position for over 25 years. In that capacity, I have first-hand knowledge of the facts set forth herein.

2.      I submit this declaration in support of the Debtors' *Complaint For Injunctive And Declaratory Relief (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, Or (II) In The Alternative, Declaring That The Automatic Stay Applies To Such Actions And (III) Granting*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

*A Temporary Restraining Order Pending A Full Hearing On The Motion* and the accompanying Motion for relief, each of which has been filed contemporaneously herewith.

3.  In the course of my employment, I am responsible for, among other things, managing various types of claims asserted against the Debtors, including for property damage, personal injuries, and other types of damages. Because the Debtors have a self-retention with respect to claims asserted against them arising out of the operation of their trucking fleet (the "Auto Liability Claims") up to the first $500,000 per occurrence under certain excess indemnity contracts (and are thus obligated to manage and administer claims up to the self-retention amount) my role is similar to that of a third-party claims administrator under a traditional insurance policy. As such, I work closely with the Debtors' various excess indemnity carriers to manage, administer, and settle such claims. I also work closely with the Debtors' General Counsel, Todd Rubenstein, on such claims.

4.  Generally, my responsibilities begin at the first instance when a claim is asserted against one of the Debtors, and continue through the pre-litigation phase. Once litigation is commenced on a claim, the matter is then actively managed either by Mr. Rubenstein or an outside law firm, depending on the state in which the case is filed. In some instances, I continue to monitor the litigation along with outside counsel, and in some cases Mr. Rubenstein oversees and monitors outside counsel.

5.  In the vast majority of Auto Liability Claims that reach the litigation stage, plaintiffs name the Debtors' truck drivers as individual defendants, in addition to suing the Debtors. Historically, the Debtors' attorneys have also appeared on behalf of the drivers. The only exception to this practice has been in cases where a driver is accused of some criminal activity connected to the Auto Liability Claims.

2

6.　　In total, there are approximately 73 active lawsuits involving Auto Liability Claims with loss dates since 2014, with approximately 63 of those lawsuits having a Protected Driver named as a co-defendant. A list of the active lawsuits with loss dates since 2014 is attached hereto as Exhibit A.

7.　　Mr. Rubenstein is presently counsel of record for the Debtors and their drivers in approximately 36 active lawsuits involving Auto Liability Claims where the Debtors and their drivers are co-defendants, and approximately 5 active lawsuits against the Debtors wherein a Protected Driver is not a named co-defendant. In addition, Mr. Rubenstein oversees and monitors outside counsel in approximately 12 active lawsuits involving Auto Liability Claims where the Debtors and their drivers are co-defendants. I am personally overseeing and managing outside counsel in approximately 15 active lawsuits involving Auto Liability Claims where the Debtors and their drivers are co-defendants, and approximately 2 active lawsuits against the Debtors wherein a Protected Driver is not a named co-defendant. There are 9 outside law firms and Mr. Rubenstein representing the Debtors and/or their drivers involving Auto Liability Claims.

8.　　Mr. Rubenstein handles all aspects of his cases from commencement to conclusion, including pleadings, discovery, motions, court appearances, trial, and settlement negotiations. I estimate that Mr. Rubenstein spends approximately 50+ hours per week in the course of managing his own case load and monitoring outside counsel with respect to the Debtors' auto liability claims.

9.　　I estimate that I personally spend approximately 30-35 hours per week in the course of managing and administering the Debtors' auto liability claims (including oversight and management of cases handled by outside counsel).

10.　　The Debtors are also responsible for paying the outside law firms' attorneys' fees, costs, and expenses incurred in defending the Auto Liability Claims.

3

11. Attached hereto as Exhibit B is a true and correct copy of the declarations page from the Debtors' Excess Indemnity Contract with United States Fire Insurance Company ("United Fire") covering the period April 10, 2018 through April 10, 2019 related to Auto Liability Claims (the "United Fire Contract").

12. Attached hereto as Exhibit C is a true and correct copy of the declarations page from the Debtors' Large Fleet Trucking Excess Contract with Protective Insurance Company ("Protective") covering the period April 10, 2017 to April 10, 2018 (the "2017-2018 Protective Contract").

13. Attached hereto as Exhibit D is a true and correct copy of the declarations page from the Debtors' Large Fleet Trucking Excess Contract with Protective covering the period April 10, 2016 to April 10, 2017 (the "2016-2017 Protective Contract").

14. Attached hereto as Exhibit E is a true and correct copy of the declarations page from the Debtors' Large Fleet Trucking Excess Contract with Protective covering the period April 1, 2015 to April 11, 2017 (the "2015-2017 Protective Contract").

15. Attached hereto as Exhibit F is a true and correct copy of the declarations page from the Debtors' Large Fleet Trucking Excess Contract with Protective covering the period April 10, 2014 to April 10, 2016 (the "2014-2016 Protective Contract").

I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statement set forth in this Declaration are true and correct.

Dated: March 5, 2019                    By: _____
                                             Ernest Hardy

4

# EXHIBIT A

# EXHIBIT A

| Line | Case Name | Case Number | Court | Notes |
|---|---|---|---|---|
| 1 | State Farm Mutual Automobile Insurance Company, aso Riquet Simplice v. New England Motor Freight, Inc. and Aleksandr Ilin | 0786/2015 | Civil Court of the City of New York, County of Queens | |
| 2 | Varsik, Joseph, Jr. v. Roy Auble and New England Motor Freight, Inc. | 0786/2015 | Supreme Court of the State of New York County of Tompkins | |
| 3 | Esmeralda Ramirez v. Chad G. Greiner, Esq., as Administrator of The Estate of Charles D. Rathbun, Jr. and New England Motor Freight, Inc. | 60988/2014 | Supreme Court of the State of New York, Westchester County | |
| 4 | State Farm Mutual Automobile Insurance Co. a/s/o Lawrence Banks v. Aaron Lynn & New England Motor Freight, Inc. | 49D14-1901-CT-002932 | State of Indiana, County of Marion, Superior Court, Civil Division | |
| 5 | Susan Volpe and Raymond Volpe v. New England Motor Freight, Inc. and Daniel Otto | 18-cv-6505 | United States District Court, Southern District of New York | |
| 6 | Shauna Jones v. New England Motor Freight, Inc., Paul E. Smith, Nirmal Debnath., Paul E. Smith, Nirmal Debnath, Bethel Prayer Ministries International, USA, Inc. and Byron Baah-Williams | 20580/2017 | Supreme Court of the State of New York, Bronx County | |
| 7 | Ramon Romero-Reyes v. Steven Hapeman and New England Motor Freight, Inc. | 515683/17 | Supreme Court of the State of New York, Kings County | |
| 8 | Kareem A. Mills v. New England Motor Freight, Inc. and Wayne St. John | 28961/2017 | Supreme Court of the State of New York, Bronx County | *Defendant Wayne St. John drove for the Debtors through a temp agency and as such he was technically not an employee of the Debtors.* |
| 9 | Angela Evans, Individually and as Parent and Natural Guardian of Emily Evans, an Infant v. Michael Heffron and New England Motor Freight | EFCA2017-002139 | Supreme Court of the State of New York, Oneida County | |
| 10 | Geico Indemnity Company as subrogee of John Garzillo v. New England Motor Freight, Inc. and Eriberto Ramon | 026733/17 | Civil Court of the City of New York, County of Queens | |
| 11 | Rita Alvarado v. New England Motor Freight, Inc. and Javier Correafrance | 18-cv-2027 | United States District Court, Eastern District of New York | |
| 12 | Liberty Mutual Fire Ins-Personal v. New England Motor Freight | 601341/2018 | Supreme Court of the State of New York, Nassau County | *(Settled for $10,000 but not paid)* |
| 13 | Geico General Insurance Company as Subrogee of Courtney Dittmar v. New England Motor Freight, Inc. and Joseph Grandey | 005239/18 | Civil Court of the City of New York, Queens County | |
| 14 | Carlos Diaz v. New England Motor Freight, Inc. and Antonio Aprile | 607793/2018 | Supreme Court of the State of New York, Suffolk County | |
| 15 | Bentley Samuels v. New England Motor Freight, Inc., Cesar Correa-Mendirta | 508602/18 | Supreme Court of the State of New York, Kings County | |
| 16 | Geico General Insurance Company aso Anh Hue Diec v. New England Motor Freight, Inc. | 028654/18 | Civil Court of the City of New York, Queens County | |
| 17 | Richard Milerson v. David Frank, NW England Freight Inc. | 18-cv-6736 | United States District Court, Eastern District of New York | |
| 18 | State Farm Mutual Automobile Insurance Company a/s/o Derek Dowdell v. Jeffrey A. Courbat, New England Motor Freight, Inc. | 008828/2018 | Supreme Court of the State of New York, Onondaga Country | |
| 19 | Nelson Vasquez v. Edwin Torres and New England Motor Freight, Inc | 32016/18 | Supreme Court of the State of New York, Bronx County | |
| 20 | Rheudine Harris v. Michael A. Victorino, New England Motor Freight, Inc., John Doe (1-5), Mary Doe (1-5), ABC Partnerships, and XYZ Corporations, Jointly, severally, and in the alternative | ATL-L-2451-18 | Superior Court of New Jersey, Atlantic County | |
| 21 | Jose L. Ferrer v. New England Motor Freight, Inc. and "John Doe" | 17-cv-5463 | United States District Court Eastern District of New York | |
| 22 | Consolidated Edison Company of New York, Inc. v. New England Motor Freight, Inc. | 001220/18 | Civil Court of the City of New York Queens County | |
| 23 | Orange and Rockland Utilities, Inc. v. New England Motor Freight, Inc., Rafael Medina, John and Jane Does (1-5) and ABC Corps.(1-5) | BER-L-7866-18 | Superior Court of New Jersey Bergen County | |
| 24 | Tomas Arocho and Gloria Cosare, his wife v. Nicolas A. Wong, New England Motor Freight, Inc., John Doe 1-10 & Abc Corporations 1-10 | MID-L-7848-18 | Superior Court of New Jersey Middlesex County | |

| | | | |
|---|---|---|---|
| 25 | Cesar Uraga and Melivette Uraga v. Francois D. Serrano, New England Motor Freight, Inc., ABC, Inc. And Def, Inc., John Doe (1-10) And Jane Doe (1-10), Fictitious Names, Individually, Jointly, Severally and/or In The Alternative, Francois D. Serrano And New England Motor Freight, Inc. V. Andres Mosqueira And Fond Du Lac Cold Storage LLC | CAM-L-004767-18 | Superior Court of New Jersey Camden County | |
| 26 | GEICO Indemnity Company a/s/o Val Mayo v. Northeast Motor Freight and Ronald Schirrman | 037931/2018 | Civil Court of the City of New York Queens County | |
| 27 | Geico General Insurance Company as Subrogee of Annamaria Maiakis v. New England Motor Freight, Inc., Joseph Michauskas | 616064/2018 | Supreme Court of the State of New York County of Nassau | |
| 28 | GEICO Indemnity Company a/s/o Zoraida Miranda v. New England Motor Freight, Inc. | 038050/2018 | Civil Court of the City of New York Queens County | |
| 29 | Andres L. Mosqueira v. Francois D. Serrano, New England Motor Fright, Inc., Melivette Uraga, Cesar Uraga and John Does 1-5 | ESX-L-481-19 | Superior Court of the State of New York Essex County | |
| 30 | Michael Singley v. New England Motor Freight, Inc. David Wood, Jans Leasing Corp., John Does, Mary Does, ABC Partnerships and XYZ Corporations, jointly, severally and in the alternative | CPM-L-23_19 | Superior Court of the State of New Jersey Cape May County | |
| 31 | Geico v. David Wood, Jans Leasing Corp., New England Motor Freight, Inc., Protective Insurance Company, et al. | UNN-L-000451-19 | Superior Court of New Jersey Union County | |
| 32 | State Farm Mutual Automobile Insurance Company v. New England Motor Freight, Inc. | 100699/2019 | Supreme Court of the State of New York Washington County | |
| 33 | Daryl Martin & Kim Martin v. New England Motor Freight, Inc. & Robbie Layton | 345-6-17 | Superior Court, State of Vermont Washington Unit | |
| 34 | Henry Jaskulski v. New England Motor Freight, Inc. a/k/a NEMF, a subsidiary of the Shevell Group of Companies, LLC | 1431/17 | Court of Common Pleas Washington County, Pennsylvania | |
| 35 | Dominick Dalbo v. New England Motor Freight, Inc. | 27306-cv-0000188-2018 | Commonwealth of Pennsylvania County of Washington Magisterial District Court 27-3-06 Cecil | |
| 36 | Freddie Carroll v. Paul Hamilton, New England Motor Freight, Inc., Illinois National Insurance Company, AIG Assurance Company, AIG Property Casualty Company, Nationwide Affinity Insurance Company of America, Nationwide Assurance Company, Nationwide General Insurance Company, Nationwide Insurance Company of America, Nationwide Mutual Fire Insurance Company, Nationwide Mutual Insurance Company, Nationwide Property and Casualty Insurance Company, Hadish Medhin, Wabash National Corporation, Benedicto Sorto, Interpool, Inc., Interpool Ltd., Trac Intermodal LLC, Trac Intermodal Holding Corp., Trac Intermodal Corp., SCT Chassis, Inc., and Seacube Container Leasing | 180201444 | Court of Common Pleas Philadelphia County | |
| 37 | Jaclyn Pullum, as Administrator of the Estate of Johen Lestat Clavey, and S.L.C., a minor, by Jaclyn Pullum, as Guardian v. New England Motor Freight, Inc. d/b/a New England Motor Freight d/b/a New England Motor Freight, Inc. | 2018-01753 | Court of Common Pleas of Pennsylvania Cumberland County | |
| 38 | Jalil Walters and Rashida Carter v. New England Motor Freight, Inc., Eastern Freight Ways, Inc., The Shevell Group of Companies, LLC and Ronald Lamka | 18-003693 | Court of Common Pleas Philadelphia County | |
| 39 | Travelers Indemnity Company of Connecticut a/s/o L&D Safety Marking Corporation and L&D Safety Marking Corporation v. New England Motor Freight, Inc. and Robbie W. Layton | 480-8-18 | Superior Court, State of Vermont Washington Unit | |
| 40 | Joseph Carney v. Frank B. Lacovangelo, Esq., as Monroe County Public Administrator of the Estate of Bryant Phillips, deceased, New England Motor Freight, Inc. and Eastern Freight Ways, Inc. | 00256913/17 | Supreme Court of the State of New York County of Rensselaer | |

| | | | |
|---|---|---|---|
| 41 | Michaela Hughes, as parent, guardian and next friend of Arabella Hughes, Isaiah Hughes and Ara Hughes, Minors v. New England Motor Freight, Inc. and Christopher M. Slater | 19-C-37 | Circuit Court of Cabell County, West Virginia | |
| 42 | Daniel Rinaldi v. John W. Anderson, Eastern Freight Ways, Inc., Anthony D. McNeil and 24/7 Transporters, LLC | 16-1458 | Supreme Court of the State of New York Ulster County | |
| 43 | Oscar Valiente v. Ernesto Cabrera, Goya Foods Inc., Penske Truck Leasing Co. LP, Paul Donaghy, Eastern Freight Ways, Inc. | 450204/2019 | Supreme Court of the State of New York, New York County | |
| 44 | Melissa Walker, Individually and as Administrator of the Estate of Henry Walker, deceased, v. Ernesto Cabrera, Goys Enterprises Corp., Goya Foods Inc., Goya Marketing, Inc., Paul Donaghy and Eastern Freight Ways, Inc. | 152317/2017 | Supreme Court of the State of New York New York County | |
| 45 | Anthony McNeil v. Daniel Rinaldi, John Anderson and Eastern Freight Ways, Inc. | 17-3033 | Supreme Court of the State of New York Ulster County | |
| 46 | Melissa Walker, Individually And As Administrator Of The Estate Of Khalil Walker, Deceased V. Goya Enterprises Corp., Goya Foods Inc., Goya Marketing, Inc., Paul Donaghy, And Eastern Freight Ways, Inc. | 154688/2018 | Supreme Court of the State of New York New York County | |
| 47 | Winsome Martin v. Eastern Freight Ways, Inc. and John W. Anderson | 517508/2018 | Supreme Court of the State of New York Kings County | |
| 48 | Allstate Insurance Company a/s/o Angela M. Antonucci v. Scott Roland Narell and New England Motor Freight, Inc. | 67533/2018 | Supreme Court of the State of New York Westchester County | |
| 49 | Solid Waste Services of West Virginia, Inc. v. Eastern Freightway, Inc. | UNN-DC-014917-18 | Superior Court of the State of New Jersey Union County | |
| 50 | Lisa Hines v. Eastern Freight Ways, Inc. and Yira Y. Guzman | 19-cv-00800 | United States District Court Eastern District of New York | |
| 51 | Terrik Sparks v. Ernesto Cabrera, Goya Enterprises Corp., Goya Foods, Inc., Goya Marketing, Inc., Paul Donaghy, and Eastern Freight Ways, Inc. | 150823/19 | Supreme Court of the State of New York New York County | |
| 52 | Terrik Sparks v. Ernesto Cabrera, Goya Enterprises Corp., Goya Foods, Inc., Goya Marketing, Inc., Paul Donaghy, and Eastern Freight Ways, Inc. | 600697/19 | Supreme Court of the State of New York Nassau County | |
| 53 | John W. James v. Paul E. Smith and New England Motor Freight, Inc. | FBT-CV18-6074905-S | Superior Court J.D. of Fairfield at Bridgeport | |
| 54 | Rosa Mora-Reyna v. Alden Donaldson, New England Motor Freight, Inc. and National General Insurance Co., One West Nationwide Blvd., Columbus, OH 43215 | FBT-CV19-6083357-S | Superior Court J.D. of Fairfield at Bridgeport | |
| 55 | Catherine Darden and Mary Copeland v. Ralph D. Gallup and New England Motor Freight, Inc. | 20181301398 | Circuit Court of Cook County, Illinois Municipal Dept. First Division | |
| 56 | State Farm Mutual Automobile Insurance Company a/s/o Catherin Darden v. Ralph D. Gallup, New England Motor Freight | 20171014208 | | |
| 57 | Kenneth Fersch v. Ricky Commo & New England Motor Freight, Inc. | HHD-CV-18-6091894-S | Superior Court J.D. of Hartford at Hartford | |
| 58 | Geico a/s/o Kenneth J. Fersch v. Ricky Commo & New England Motor Freight, Inc. | HHD-CV17-6080832-S | | |
| 59 | Benedicto Sorto v. Freddie Theodore Carroll, Celadon Trucking Service, Inc., Paul Thomas Hamilton and New England Motor Freight, Inc. | NNH-CV17-6076079-S | Superior Court Judicial District of New Haven at New Haven | |
| 60 | Jenny Munson Andress, individually and as the Administratrix of the Estate of Herbert Andress v. Timmie Antonio Wilson & New England Motor Freight, Inc. | 2936 | Court of Common Pleas Philadelphia County, PA | |
| 61 | Nicole Boyd v. Jack C. Lindeman, New England Motor Freight, Inc. and Nationwide Insurance | CV18902795 | Court of Common Pleas Cuyahoga County, Ohio | |

| | | | |
|---|---|---|---|
| 62 | Richard Bryan Hill and Sheri L. Hill-Jackson, both Individually and as Co-Administrators of the Estate of Richard H. Hill, deceased v. Chester Pike Auto Sales, Inc. et al | 979 | Court of Common Pleas Philadelphia County | |
| 63 | Charles Miller and Maryann P. Miller v. Daniel J. Neiger and Eastern Freight Ways, Inc. | FBT-CV19-6082502-S | Superior Court J.D. of Fairfield at Bridgeport | |
| 64 | Jayson Vargas v. Eastern Freight Ways, Inc., Daniel J. Neiger, New England Motor Freight, Inc., Charles Miller and Maryann P. Miller | AAN-CV19-6031699-S | Superior Court Ansonia-Milford at Milford | |
| 65 | Jose A. Cruz v. Eastern Freight Ways, Inc. and Guillermo Jimenez Ortiz | 3:18-cv-02128-WWE | US District Ct, District of Connecticut | |
| 66 | Craig Bennet v. BP Watertown Retail LLC and Sarris Auto and Truck Equipment, The Gap, Inc. & New England Motor Freight, Inc. | 1784CV00606 | Commonwealth of Massachusetts Superior Court | |
| 67 | Thang Tran, and Yen Lam, His Wife v. New England Motor Freight Inc., et. al. | 190202690 | Court of Common Pleas Philadelphia County, PA | |
| 68 | Geico General Insurance Company as Subrogee of Martin Daly and Karen Daly, v. New Englad Motor Freight, Inc. and Rupert O. Dawson | CV-000041-19 | District Court of Nassau County First District: Hempstead Part | |
| 69 | New London Hospitality, LLC v. New England Motor Freight, Inc. | KNL-CV19-6039119-S | Superior Court J.D. of New London at New London | |
| 70 | Janice A. Goodall v. New England Motor Freight Inc., Arturo Paez | NNH-cv-17-6073538-S | Superior Court of J.D. of New Haven, New Haven County, Connecticut | |
| 71 | New Jersey Manufacturers Insurance Company a/s/o Phyllis A. Troy v. New England Motor Freight, Inc. Rowan Phillip | NNH-cv-17 6072920-S | Superior Court of J.D. of New Haven, New Haven County, Connecticut | |
| 72 | John Adams Bares, Jane Marie Marron and Eileen Marron v. Rowan A. Phillip, New England Motor Freight, Inc. | NNH-cv-17-6073150-S | Superior Court of J.D. of New Haven, New Haven County, Connecticut | |
| 73 | Kye Ja Park and Sam Nam Jung v. Joseph Grandey and New England Motor Freight Inc. | 703393/2019 | Supreme Court of the State of New York County of Queens | |

# EXHIBIT B


**CRUM&FORSTER®**

## COMMERCIAL EXCESS
## INDEMNITY CONTRACT – EXCESS OF SELF-RETENTION DECLARATIONS
## UNITED STATES FIRE INSURANCE COMPANY

"Named Insured" New England Motor Freight, Inc.

Agent Name DMC Insurance, Inc.

Contract Period: 4/10/18 to 4/10/19
12:01 A.M., Local Time at the address of
"Named Insured"
Agent No. 02791

---

**Item 1.  Business Description:**

---

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY,
WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**Item 2.  Coverages Provided**

| | | Included | Not Included |
|---|---|:---:|:---:|
| Coverage **(A)** | "Personal Injury" Liability | X | |
| Coverage **(B)** | "Property Damage" Liability | X | |
| Coverage **(C)** | "Uninsured & Underinsured" Motorists | X | |
| Coverage **(D)** | "Personal Injury Protection" | X | |
| Coverage **(E)** | "Cargo Legal Liability" | | X |
| Coverage **(F)** | "Physical Damage – Comprehensive" | X | |
| Coverage **(G)** | "Physical Damage – Collision" | | X |
| Coverage **(H)** | "Workers' Compensation/Occupational Disease" (where qualified as a self-insured) | | X |
| Coverage **(I)** | "Employers Liability" | X | |
| Coverage **(J)** | "Garagekeepers Legal Liability" | | X |

**Item 3.**

| | | |
|---|---|---|
| Limit of Indemnity: | $ 5,000,000 | Per "occurrence" less "self-retention" for Coverages A, B, E, F, G, I, J and Coverages C and D only if these coverages have not been waived or rejected by the "Named Insured"; and if not waived or rejected, only to the limit selected by the "Named Insured", combined. |
| | $ | (Used only if any individual coverage has separate limits) |
| Subject to an Aggregate limit of: | $ 5,000,000 | As respects "general liability" and "employers liability" ("occupational disease" only) exposures less per "occurrence" "self-retentions". |

**Item 4.**

| | | |
|---|---|---|
| Self-Retention: | $ 500,000 | For all selected coverages combined, except as specified below: $250,000 "self-retention" for Coverage F |

**Item 5.  Payment of Costs (Put an X next to the option chosen)**

| | | |
|---|---|---|
| Option A | Pro Rata ("Costs" paid by us shall be in addition to our Limit of Indemnity) | |
| Option B | "Costs" as part of ultimate net loss ("Costs" paid by us shall not be in addition to our Limit of Indemnity) | |

ME 05 003 07 17

| Option C | "Costs" as part of ultimate net loss ("Costs" paid by us shall be in addition to our Limit of Indemnity) | X |
|---|---|---|
| Option D | Separate, additional self-retention for "Costs" ("Costs" paid by us shall be in addition to our Limit of Indemnity) | |
| | **Additional self-retention for costs:   $** | |

| **Item 6.** | |
|---|---|
| Deposit Premium: | $ 369,327 |

| **Item 7.** | | |
|---|---|---|
| Premium Rate: | $ 2.151 | Per **100** "miles" |
| | $ 0.07 | Per **$100** of "brokerage operations" "gross receipts" |

| **Item 8.** | |
|---|---|
| Estimated Annual "Miles" | 101,000,000 |
| Estimated Annual "Gross Receipts" | "If any" – "brokerage operations" |
| Estimated Annual Premium: | $ 2,172,510 |
| Minimum Premium: | 90% of Estimated Annual Premium |

| **Item 9.** | |
|---|---|
| Endorsements Attached at Contract Inception: | 1-9 |

# EXHIBIT C

 **Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No. ___X-1964-17___

___X-1964-16___
Renewal of Number

# DECLARATIONS

**ITEM 1**
(a) **NAMED INSURED:**     NEW ENGLAND MOTOR FREIGHT, INC.
(Also see Endt. No. 2 for **Related Insureds**)

(b) ADDRESS:     1-71 North Avenue East
Elizabeth, NJ 07201

**ITEM 2**
Contract Period:     April 10, 2017 to April 10, 2018,
12:01 A.M., Standard Time at the address
of the **Named Insured** as stated herein.

**ITEM 3**
Coverages Provided:

| | Included | Not Included |
|---|---|---|
| Coverage A **(Personal Injury Liability)** | X | |
| Coverage B **(Property Damage Liability)** | X | |
| Coverage C **(Uninsured & Underinsured Motorists)** | SEE ENDORSEMENT NO. 5 | |
| Coverage D **(Personal Injury Protection)** | SEE ENDORSEMENT NO. 5 | |
| Coverage E **(Cargo Legal Liability)** | | X |
| Coverage F **(Physical Damage-Comprehensive)** | X | |
| Coverage G **(Physical Damage-Collision)** | | X |
| Coverage H **(Workers' Compensation/ Occupational Disease** where qualified as a self-insured) | | X |
| Coverage I **(Employers Liability)** | X | |

**ITEM 4**
Limit of Indemnity:     Except for **general liability** and **employers liability** (as respects **occupational disease**) exposures arising from operations for Nucor Corporation, subsidiaries of Nucor Corporation and Nucor-Yamato Steel Company:

As respects **trucking operations** and **brokerage operations**:
$5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined; and,

As respects **fire legal liability**:
$500,000 combined single limit per **occurrence** less **self retention** for Coverages A and B; and,

As respects **leased property**:
$5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A and B; and,

PE-XS-101
Revision 9 (04/08)

# Protective
## Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No.____X-1964-17____

# DECLARATIONS (Page 2)

ITEM 4
Limit of Indemnity (continued):

But no more than:
$5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined.

Subject to an aggregate limit of
$4,500,000 as respects **general liability** and **employers liability** (as respects **occupational disease**) exposures.

For **general liability** and **employers liability** (as respects **occupational disease**) exposures arising from operations for Nucor Corporation, subsidiaries of Nucor Corporation and Nucor-Yamato Steel Company:

$1,000,000 combined single limit per **occurrence** less **self retention** for Coverages A and B, combined; the limit applies separately to each Nucor Corporation, subsidiaries of Nucor Corporation and Nucor-Yamato Steel Company location entered by New England Motor Freight, Inc.

Subject to an aggregate limit of:

$1,500,000 as respects **general liability** and **employers liability** (as respects **occupational disease**) exposures; the aggregate limit applies separately to each Nucor Corporation, subsidiaries of Nucor Corporation and Nucor-Yamato Steel Company location entered by New England Motor Freight, Inc.

ITEM 5
Self Retention:

As respects **trucking operations** and **brokerage operations**:
$500,000 per **occurrence** for Coverages A, B, C, D and I combined; and,

As respects **fire legal liability**:
$100,000 per **occurrence** for Coverage A and B combined; and,

As respects **leased property**:
$500,000 per **occurrence** for Coverages A and B combined; and,

As respects Coverage F:
$250,000 per **occurrence** for Coverage F

But no more than:
$500,000 per **occurrence** for Coverages A, B, C, D, F and I combined.

PE-XS-101
Revision 9 (04/08)

 **Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No. ___X-1964-17___

# DECLARATIONS (Page 3)

**ITEM 6**
Deposit:                                   $385,875

**ITEM 7**
Premium Rate:                       $2.246 per 100 **miles**
$0.080 per $100 of **brokerage operations gross receipts** - Redstone Logistics, LLC operations
$0.220 per $100 of **brokerage operations gross receipts** - All other **brokerage operations**

**ITEM 8**
Estimated Annual
Miles:                                        101,000,000
Gross Receipts:                        $1,471,610 - Redstone Logistics, LLC **brokerage operations**
$99,251 – All Other **brokerage operations**

**ITEM 9**
Endorsements at
Inception:                                  1-14


_Sally Wignall_
Secretary

_Wh d_
President

Countersigned at _____Carmel, IN_____ this __10th__ day of __April__, 20 17

_Wh d_
Authorized Agent

PE-XS-101
Revision 9 (04/08)

# **EXHIBIT D**



**Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No. __X-1964-16__

__X-1964-15__
Renewal of Number

# DECLARATIONS

ITEM 1
    (a) **NAMED INSURED:**        NEW ENGLAND MOTOR FREIGHT, INC.
                               (Also see Endt. No. 2 for **Related Insureds**)

    (b) ADDRESS:                   1-71 North Avenue East
                                 Elizabeth, NJ 07201

ITEM 2
    Contract Period:             April 10, 2016 to April 10, 2017,
                                12:01 A.M., Standard Time at the address
                                of the **Named Insured** as stated herein.

ITEM 3
    Coverages Provided:

| | Included | Not Included |
|---|---|---|
| Coverage A **(Personal Injury Liability)** | X | |
| Coverage B **(Property Damage Liability)** | X | |
| Coverage C **(Uninsured & Underinsured Motorists)** | SEE ENDORSEMENT NO. 5 | |
| Coverage D **(Personal Injury Protection)** | SEE ENDORSEMENT NO. 5 | |
| Coverage E **(Cargo Legal Liability)** | | X |
| Coverage F **(Physical Damage-Comprehensive)** | X | |
| Coverage G **(Physical Damage-Collision)** | | X |
| Coverage H **(Workers' Compensation/ Occupational Disease** where qualified as a self-insured**)** | | X |
| Coverage I  **(Employers Liability)** | X | |

ITEM 4
    Limit of Indemnity:

    As respects **trucking operations and brokerage operations**:
            $5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined; and

    As respects **fire legal liability**:
            $500,000 combined single limit per **occurrence** less **self retention** for Coverages A & B; and

    As respects **leased property**:
            $5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A & B,

 **Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No. __X-1964-16__

# DECLARATIONS (Page 2)

But no more than:
$5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined.

Subject to an aggregate limit of
$4,500,000 as respects **general liability** and **employers liability** (as respects **occupational disease**) exposures.

ITEM 5
Self Retention:

As respects **trucking operations** and **brokerage operations**:
$500,000 per **occurrence** for Coverages A, B, C, D and I combined; and

As respects **fire legal liability**:
$100,000 per **occurrence** for Coverages A and B combined; and

As respects Coverage F:
✓ $250,000 per **occurrence** for Coverage F; and

As respects **leased property**:
$500,000 per **occurrence** for Coverages A and B combined.

But no more than:
$500,000 per **occurrence** for Coverages A, B, C, D, F and I combined

ITEM 6
Deposit:

$366,894

ITEM 7
Premium Rate:

$2.18 per 100 **miles**
$0.08 per $100 of **brokerage operations gross receipts** – Redstone Logistics, LLC operations
$0.21 per $100 **brokerage operations gross receipts** – All Other **brokerage operations**

PE-XS-101
Revision 9 (04/08)

# DECLARATIONS (Page 3)

ITEM 8
Estimated Annual
Miles:                          99,000,000
Gross Receipts:                 "If Any" – Redstone Logistics, LLC **brokerage operations**
                                "If Any" – All Other – **brokerage operations**

ITEM 9
Endorsements at
Inception:                      1-12


_Michael J. ___          _Joseph J. DeVito_

Secretary                        President

Countersigned at _____Carmel, IN_____ this ___10th___ day of ___April___, 20_16_


_____
Authorized Agent

# <u>EXHIBIT E</u>

 **Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No.____X-1964-15____

____X-1964-14____
Renewal of Number

# DECLARATIONS

### ITEM 1

    (a) **NAMED INSURED**:          NEW ENGLAND MOTOR FREIGHT, INC.
                                  (Also see Endt. No. 2 for **Related Insureds**)

    (b) ADDRESS:               1-71 North Avenue East
                                  Elizabeth, NJ 07201

### ITEM 2

    Contract Period:           April 10, 2015 to April 10, 2017,
                                  12:01 A.M., Standard Time at the address
                                  of the **Named Insured** as stated herein.

### ITEM 3

    Coverages Provided:

| Coverage | Included | Not Included |
|---|---|---|
| Coverage A **(Personal Injury Liability)** | X | |
| Coverage B **(Property Damage Liability)** | X | |
| Coverage C **(Uninsured & Underinsured Motorists)** | SEE ENDORSEMENT NO. 5 | |
| Coverage D **(Personal Injury Protection)** | SEE ENDORSEMENT NO. 5 | |
| Coverage E **(Cargo Legal Liability)** | | X |
| Coverage F **(Physical Damage-Comprehensive)** | X | |
| Coverage G **(Physical Damage-Collision)** | | X |
| Coverage H **(Workers' Compensation/ Occupational Disease where qualified as a self-insured)** | | X |
| Coverage I **(Employers Liability)** | X | |

### ITEM 4

    Limit of Indemnity:

    As respects **trucking operations** and **brokerage operations**:
               $5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined,

    As respects **fire legal liability**:
               $500,000 combined single limit per **occurrence** less **self retention** for Coverages A & B,

    As respects **leased property**:
               $5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A & B,

 **Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No. ___X-1964-15___

# DECLARATIONS (Page 2)

But no more than:
$5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined.

Subject to an aggregate limit of
$4,500,000 as respects **general liability** and **employers liability** (as respects **occupational disease**) exposures.

**ITEM 5**

Self Retention:

As respects **trucking operations** and **brokerage operations**: $500,000 per **occurrence** for Coverages A, B, C, D and I combined; and

As respects **fire legal liability**: $100,000 per **occurrence** for Coverages A and B combined; and

As respects Coverage F: $250,000 per **occurrence** for Coverage F; and

As respects **leased property**: $500,000 per **occurrence** for Coverages A and B combined.

But no more than:
$500,000 per **occurrence** for Coverages A, B, C, D, F and I combined

**ITEM 6**
Deposit:

$326,832

**ITEM 7**
Premium Rate:

$1.982 per 100 **miles** (Contract Period 4/10/2015 - 4/10/2016)
$2.012 per 100 **miles** (Contract Period 4/10/2016 - 4/10/2017)
$0.080 per $100 of **brokerage operations gross receipts** – Redstone Logistics, LLC operations
$0.210 per $100 of **brokerage operations gross receipts** – All Other **brokerage operations**

PE-XS-101
Revision 9 (04/08)

# DECLARATIONS (Page 3)

ITEM 8
    Estimated Annual
    Miles:                     $97,000,000
    Gross Receipts:         $5,000,000 – Redstone Logistics, LLC **brokerage operations**
                          "If Any" – All Other **– brokerage operations**

ITEM 9
    Endorsements at
    Inception:             1-13

_(signature)_                           _(signature)_

Secretary                         CEO, COO & President

Countersigned at _____Carmel, IN_____ this ___10th___ day of___April__, 20_15_

_(signature)_

Authorized Agent

# **EXHIBIT F**

 **Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No. __X-1964-14__

__X-1964__
Renewal of Number

# DECLARATIONS

**ITEM 1**
    (a) **NAMED INSURED**:      NEW ENGLAND MOTOR FREIGHT, INC.
                               (Also see Endt. No. 2 for **Related Insureds**)

    (b) ADDRESS:      1-71 North Avenue East
                             Elizabeth, NJ 07201

**ITEM 2**
    Contract Period:      April 10, 2014 to April 10, 2016,
                               12:01 A.M., Standard Time at the address
                               of the **Named Insured** as stated herein.

**ITEM 3**

| Coverages Provided: | Included | Not Included |
|---|---|---|
| Coverage A **(Personal Injury Liability)** | X | |
| Coverage B **(Property Damage Liability)** | X | |
| Coverage C **(Uninsured & Underinsured Motorists)** | SEE ENDORSEMENT NO. 5 | |
| Coverage D **(Personal Injury Protection)** | SEE ENDORSEMENT NO. 5 | |
| Coverage E **(Cargo Legal Liability)** | | X |
| Coverage F **(Physical Damage-Comprehensive)** | X | |
| Coverage G **(Physical Damage-Collision)** | | X |
| Coverage H **(Workers' Compensation/ Occupational Disease** where qualified as a self-insured) | | X |
| Coverage I **(Employers Liability)** | X | |

**ITEM 4**
    Limit of Indemnity:

    As respects **trucking operations** and **brokerage operations**:
        $5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I, and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined,

    As respects **fire legal liability**:
        $500,000 combined single limit per **occurrence** less **self retention** for Coverages A & B,

    As respects **leased property**:
        $5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A & B,

    But no more than:
        $5,000,000 combined single limit per **occurrence** less **self retention** for Coverages A, B, F, I and Coverages C and D only if these coverages have not been waived or rejected by the **insured**; and if not waived or rejected, only to the limit selected by the **insured**, combined.

    Subject to an aggregate limit of
        $4,500,000 as respects **general liability** and **employers liability** (as respects **occupational disease**) exposures.

PE-XS-101
Revision 9 (04/08)



**Protective**
Insurance Company

111 Congressional Blvd., Suite 500 | Carmel, IN 46032

Subject to the Terms and Conditions attached to and forming a part hereof, hereby agrees to indemnify

No.   X-1964-14

# DECLARATIONS (Page 2)

**ITEM 5**
Self Retention:

As respects **trucking operations** and **brokerage operations:**
$500,000 per **occurrence** for Coverages A, B, C, D and I combined; and

As respects **fire legal liability:**
$100,000 per **occurrence** for Coverages A and B combined; and

As respects Coverage F:
$250,000 per **occurrence** for Coverage F; and

As respects **leased property:**
$500,000 per **occurrence** for Coverages A and B combined.

But no more than:
$500,000 per **occurrence** for Coverages A, B, C, D, F and I combined

**ITEM 6**
Deposit:

$312,769

**ITEM 7**
Premium Rate:

$1.953 per 100 **miles** (Contract Period 4/10/14-4/10/15)
$2.012 per 100 **miles** (Contract Period 4/10/15-4/10/16)
$0.080 per $100 of **brokerage operations gross receipts** – Restone Logistics, LLC operations
$0.210 per $100 of all other **brokerage operations gross receipts**

**ITEM 8**
Estimated Annual
Miles:
Gross Receipts:

94,000,000
"If Any" – Brokerage Operations

**ITEM 9**
Endorsements at
Inception:

1-12

Secretary

CEO, COO & President

Countersigned at ____Carmel, IN____ this __10th__ day of __April__, 20_14_

Authorized Agent

PE-XS-101
Revision 9 (04/08)

**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
         mconlan@gibbonslaw.com
         btheisen@gibbonslaw.com
*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW ENGLAND MOTOR FREIGHT, INC., *et al.*, | Case No. 19-12809 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| NEW ENGLAND MOTOR FREIGHT, INC. *et al.*, | |
| Plaintiffs, | Adv. Pro. No. 19- 1119 |
| v. | (JKS) |
| PARTIES LISTED ON EXHIBIT A TO THE COMPLAINT and JOHN DOES 1-100, | |
| Defendants. | |

**DECLARATION OF BRETT S. THEISEN, ESQ.**
**IN SUPPORT OF DEBTORS' MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

**BRETT S. THEISEN, ESQ.**, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.      I am a Director with the law firm of Gibbons P.C., proposed counsel for the Debtors and Debtors-in-Possession in the above-captioned chapter 11 cases and the above captioned adversary proceeding, and am admitted to this Court.  I am the attorney primarily responsible for managing the Debtors' automobile insurance-related issues in connection with the chapter 11 cases, and as such I have personal knowledge of the facts set forth herein.

2.      I submit this affidavit in support of the Debtors' *Complaint For Injunctive And Declaratory Relief (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, Or (II) In The Alternative, Declaring That The Automatic Stay Applies To Such Actions And (III) Granting A Temporary Restraining Order Pending A Full Hearing On The Motion* and the accompanying Motion for relief, each of which has been filed contemporaneously herewith.

3.      Notice of the Debtors' application for a temporary restraining order and preliminary injunction has been provided to the Defendants listed on Exhibit A to the Complaint (the plaintiffs appearing in the "Case Name" column to that exhibit)  by First Class Mail.

4.      A temporary restraining order, pending a full hearing on the injunctive relief sought in the Motion, will prevent the Debtors from having to continue defending auto liability lawsuits. I have been advised that the state and federal trial courts overseeing the underlying tort actions against the Debtors and the Protected Drivers (as that term is defined in the Motion and Complaint) are not applying the automatic stay in a uniform matter; some courts have ordered that cases are stayed in their entirety (even as to unrelated third or fourth parties), whereas other courts have ordered that the cases should proceed against the Protected Drivers, even without the Debtors' participation.

5.        As set forth in the Motion, this uneven treatment is causing the Debtors' estates to

incur ongoing costs for defense and administration of claims due to the mechanics of their self-

retention and excess indemnity contracts covering auto liability claims.  For example, in addition

to continued costs associated with the Debtors' outside and in-house counsel and employees

directly responsible for the auto liability litigation, Gibbons P.C. is receiving numerous calls and

emails from plaintiffs' counsel in the underlying actions seeking to information and documents

related to the claims and/or seeking consent orders to lift the automatic stay.  Absent the relief

sought in the Complaint and the Motion, which seeks to manage the litigation against the Debtors

and the Protected Drivers in an orderly manner consistent with the best interests of the estates and

the creditors, the Debtors anticipate that a flurry of stay relief motions may be filed (in fact, the

first such motion was filed yesterday, March 12, 2019 [See Dkt. No. 223]).  The result would be a

further—and unnecessary—drain on the Debtors' and the Court's resources.

6.        No prior request for the foregoing has been made to this or any other court.


I certify under penalty of perjury that, to the best of my knowledge, information and belief,

the statement set forth in this Declaration are true and correct.


Dated: March 13, 2019                              By:      _/s/ Brett S. Theisen_____
                                                                    Brett S. Theisen, Esq.

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY<br>**Caption in compliance with D.N.J. LBR 9004-1** | |
| **GIBBONS P.C.**<br>Karen A. Giannelli, Esq.<br>Mark B. Conlan, Esq.<br>Brett S. Theisen, Esq.<br>One Gateway Center<br>Newark, New Jersey 07102<br>Telephone: (973) 596-4500<br>Facsimile: (973) 596-0545<br>E-mail: kgiannelli@gibbonslaw.com<br>          mconlan@gibbonslaw.com<br>          btheisen@gibbonslaw.com<br><br>*Counsel to the Debtors*<br>*and Debtors-in-Possession* | |
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC., *et al.*,<br><br>          Debtors. [1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Jointly Administered) |
| NEW ENGLAND MOTOR FREIGHT, INC. *et al.*,<br><br>          Plaintiffs,<br>     v.<br><br>PARTIES LISTED ON EXHIBIT A TO THE COMPLAINT and JOHN DOES 1-100,<br><br>          Defendants. | Adv. Proc. No. 19-__1119___ (JKS) |

## **TEMPORARY RESTRAINING ORDER**

The relief set forth on the following pages, numbered two (2) through five (5) is hereby

**ORDERED**.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

Page 2

| | |
|---|---|
| Debtor: | New England Motor Freight, Inc., et al. |
| Case No.: | 19-12809-JKS |
| Adv. Proc. No: | 19-_____-JKS |

Caption of Order:   TEMPORARY RESTRAINING ORDER

---

Upon consideration of the Debtors' *Complaint for Injunctive and Declaratory Relief (i) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (ii) in the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (iii) Granting a Temporary Restraining Order Pending a Full Hearing on the Motion* (the "Complaint") and the Debtors' *Motion for an Order (i) Preliminarily Enjoining Certain Actions Against Non-Debtors or, (ii) in the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (iii) Granting a Temporary Restraining Order Pending a Full Hearing on the Motion* (the "Motion")[2]; and the Court having reviewed the Complaint and the Motion, which include a request for a temporary restraining order, as well as (i) the *Declaration of Vincent Colistra in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed in the Debtors' lead chapter 11 case [Case No. 19-12809, Dkt. No. 22], (ii) the *Declaration of Ernest Hardy* (the "Hardy Declaration"), and (iii) the *Declaration of Brett S. Theisen, Esq. in Support of Debtors' Motion for a Temporary Restraining Order and A Preliminary Injunction,* both filed contemporaneously with the Motion; and having considered the parties' arguments and objections (if any); and after due deliberation and sufficient cause appearing;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    The plaintiffs in this adversary proceeding are the above-captioned debtors and debtors-in-possession.  The Defendants in this adversary proceeding are those

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

2715302.1 115719-100281

Page 3

| | |
|---|---|
| Debtor: | New England Motor Freight, Inc., et al. |
| Case No.: | 19-12809-JKS |
| Adv. Proc. No: | 19-_____-JKS |

Caption of Order:     TEMPORARY RESTRAINING ORDER

---

plaintiffs set forth on Exhibit A[3] to the Complaint and the Motion, as well as John Does 1-100.

The Defendants listed on Exhibit A are all plaintiffs in lawsuits that seek to hold or may seek

to hold the Protected Drivers liable for the Auto Liability Claims. The Protected Drivers are

also listed in Exhibit A  to the Complaint and the Motion.[4]  Defendants John Does 1-100 are

prospective plaintiffs who may at any time while the above-captioned chapter 11 case is

pending seek to hold the Protected Drivers liable for the Auto Liability Claims. A copy of

Exhibit A to the Complaint and the Motion will be affixed hereto upon the signing of this

Order.

    B.    The Debtors seek, pursuant to sections 105 and 362 of the Bankruptcy

Code, an order (i) prohibiting the Defendants from continuing or commencing against any of the

Protected Drivers any action or claim asserting, on any theory (whether direct, derivative, joint

and several, vicarious liability or otherwise), any Auto Liability Claims, and (ii) prohibiting the

Defendants from continuing or commencing any efforts to recover, on account of the Auto

Liability Claims, any amounts which may be available under the Debtors' Excess Indemnity

Contracts.

    C.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 29 U.S.C. § 157(b)(2).

---

[3] The Defendants' names appear as the plaintiffs in the actions listed in the "Case Name" column to Exhibit A.

[4] The Protected Drivers' names appear as co-defendants (along with one or more of the Debtors) in the actions listed
in the "Case Name" column to Exhibit A.

3

Page 4

| | |
|---|---|
| Debtor: | New England Motor Freight, Inc., et al. |
| Case No.: | 19-12809-JKS |
| Adv. Proc. No: | 19-_____-JKS |

Caption of Order:        TEMPORARY RESTRAINING ORDER

---

D.      The Debtors have provided effective notice to the named plaintiffs that have commenced or may commence Auto Liability Claims against the Protected Drivers and/or seek to recover from the Excess Indemnity Contracts in the short period of time in which this Court's action is needed.  Service on John Does 1-100, however, is impossible because these individuals are putative plaintiffs for future actions against the Protected Drivers and are unknown at this time.

E.      The Debtors will be irreparably injured should temporary restraints not issue; the public interest in fostering the Debtors' efforts to successfully administer the Chapter 11 Cases is served by restraining the Defendants pending a hearing on a preliminary injunction; any harm to Defendants by the entry of the temporary restraints is outweighed by the harm to the Debtors should such restraints not issue; and it is necessary to grant this order immediately because of the immediacy and irreparability of injury that Debtors will most likely suffer if the relief is not granted, and because Defendants will not be injured significantly as a result of the entry of this Order.

F.      Accordingly, this Court finds it appropriate to enter a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b)(l) and Federal Rule of Bankruptcy Procedure 7065.

G.      The legal and factual bases set forth in the Complaint, the Motion, the First Day Declaration, the Hardy Declaration, and the Theisen Declaration establish just cause for the relief granted herein.

4

Page 5

| | |
|---|---|
| Debtor: | New England Motor Freight, Inc., et al. |
| Case No.: | 19-12809-JKS |
| Adv. Proc. No: | 19-_____-JKS |

Caption of Order:    TEMPORARY RESTRAINING ORDER

---

Based on these findings, **IT IS HEREBY ORDERED** that:

H.    1.    The Defendants are prohibited and enjoined from (i) filing or continuing to prosecute any Auto Liability Claim against the Protected Drivers, and (ii) continuing or commencing any efforts to recover, on account of any Auto Liability Claims, any amounts which may be available under the Excess Indemnity Contracts, through 28 days from thedate of this Order, during which time the Court will hold a hearing on the Debtors' request for injunctive and/or declaratory relief on _____, **2019 at ____ a.m./p.m.**

2.    This Order is entered without prejudice to the Debtors' rights to request that this Court extend this Order to include other entities or persons not previously identified in Exhibit A or Exhibit B to the Complaint and the Motion.

3.    Any party subject to this Order may seek relief from any of the provisions of this Order for cause shown.

4.    Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, the Debtors are relieved from posting any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

5.    The Debtors shall serve a copy of this Order on counsel for the Defendants within 3 business days from entry of this Order.

6.    This Court retains jurisdiction over this Order and the relief granted herein.

2715302.1 115719-100281

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY<br>**Caption in compliance with D.N.J. LBR 9004-1** | |
| **GIBBONS P.C.**<br>Karen A. Giannelli, Esq.<br>Mark B. Conlan, Esq.<br>Brett S. Theisen, Esq.<br>One Gateway Center<br>Newark, New Jersey  07102<br>Telephone:  (973) 596-4500<br>Facsimile:  (973) 596-0545<br>E-mail:  kgiannelli@gibbonslaw.com<br>            mconlan@gibbonslaw.com<br>            btheisen@gibbonslaw.com<br><br>*Counsel to the Debtors*<br>*and Debtors-in-Possession* | |
| In re:<br><br>NEW ENGLAND MOTOR FREIGHT, INC., *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 19-12809 (JKS)<br><br>(Jointly Administered) |
| NEW ENGLAND MOTOR FREIGHT, INC. *et al.*,<br><br>Plaintiffs,<br><br>    v.<br><br>PARTIES LISTED ON EXHIBIT A TO THE COMPLAINT and JOHN DOES 1-100,<br><br>Defendants. | Adv. Proc. No. 19- 1119    (JKS) |

## ORDER REGARDING DEBTORS' REQUEST FOR EXTENSION OR APPLICATION OF THE AUTOMATIC STAY TO CERTAIN ACTIONS AGAINST NON-DEBTORS

The relief set forth on the following pages, numbered two (2) through five (5) is hereby

**ORDERED**.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

Page 2

| | |
|---|---|
| Debtor: | New England Motor Freight, Inc., et al. |
| Case No.: | 19-12809-JKS |
| Adv. Proc. No: | 19-_____-JKS |
| | |
| Caption of Order: | ORDER REGARDING DEBTORS' REQUEST FOR EXTENSION OR APPLICATION OF THE AUTOMATIC STAY TO CERTAIN ACTIONS AGAINST NON-DEBTORS |

---

Upon consideration of the Debtors' *Complaint for Injunctive and Declaratory Relief (i) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (ii) in the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (iii) Granting a Temporary Restraining Order Pending a Full Hearing on the Motion* (the "Complaint") and the Debtors' *Motion for an Order (i) Preliminarily Enjoining Certain Actions Against Non-Debtors or, (ii) in the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (iii) Granting a Temporary Restraining Order Pending a Full Hearing on the Motion* (the "Motion")[2]; and the Court having reviewed the Complaint and the Motion, which include a request for a temporary restraining order, as well as (i) the *Declaration of Vincent Colistra in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed in the Debtors' lead chapter 11 case [Case No. 19-12809, Dkt. No. 22], (ii) the *Declaration of Ernest Hardy* (the "Hardy Declaration"), and (iii) the *Declaration of Brett S. Theisen, Esq. in Support of Debtors' Motion for a Temporary Restraining Order and A Preliminary Injunction,* both filed contemporaneously with the Motion; and having considered the parties' arguments and objections (if any); and after due deliberation and sufficient cause appearing; and

**WHEREAS**, the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

Page 3

| | |
|---|---|
| Debtor: | New England Motor Freight, Inc., et al. |
| Case No.: | 19-12809-JKS |
| Adv. Proc. No: | 19-_____-JKS |

Caption of Order:    ORDER REGARDING DEBTORS' REQUEST FOR EXTENSION OR
APPLICATION OF THE AUTOMATIC STAY TO CERTAIN
ACTIONS AGAINST NON-DEBTORS

---

**WHEREAS**, on _____, 2019, the Court entered a temporary restraining order (the

"TRO") prohibiting and enjoining the Defendants from (i) filing or continuing to prosecute any

Auto Liability Claim against the Protected Drivers, and (ii) continuing or commencing any efforts

to recover, on account of any Auto Liability Claims, any amounts which may be available under

the Debtors' Excess Indemnity Contracts, and a copy of the TRO, which expires 28 days following

its entry (i.e. on _____, 2019), being attached hereto as Exhibit A and incorporated by

reference herein;

**IT IS HEREBY ORDERED THAT:**

1.      All findings of fact and conclusions of law in the TRO are incorporated by reference

herein, but shall remain expressly subject to the Defendants' right to object to such findings of fact

and conclusions of law in connection with consideration of any further extension of injunctive

relief in this Adversary Proceeding.

2.      Defendants are prohibited and enjoined from (i) filing or continuing to prosecute

any Auto Liability Claim against the Protected Drivers, and (ii) continuing or commencing any

efforts to recover, on account of any Auto Liability Claims, any amounts which may be available

under the Excess Indemnity Contracts through and including _____, 2019.

3.      The Court will hold a further hearing on the Debtors' request for injunctive and

declaratory relief, as set forth in the Motion, on _____, 2019 at _____ a.m./p.m.

Page 4

Debtor:              New England Motor Freight, Inc., et al.
Case No.:            19-12809-JKS
Adv. Proc. No:       19-_____-JKS

Caption of Order:    ORDER REGARDING DEBTORS' REQUEST FOR EXTENSION OR
                     APPLICATION OF THE AUTOMATIC STAY TO CERTAIN
                     ACTIONS AGAINST NON-DEBTORS

(prevailing Eastern Time). The Defendants shall file and serve any response or objection to the

Debtors' request no later than seven (7) days prior to the further hearing date, and the Debtors shall

have until three (3) days prior to the further hearing date to file a reply to any such response or

objection.

4.      This Order is entered without prejudice to the Debtors' right to request that this

Court extend this Order to include other entities or persons not previously identified in Exhibit A

to the Complaint and the Motion. This Order is also without prejudice to the rights of the parties

to agree to a further extension of the injunction without further order of the Court.

5.      Any party subject to this Order may seek relief from any of the provisions of this

Order for cause shown.

6.      Notwithstanding anything to the contrary in this Order, any party asserting Auto

Liability Claims may, without leave of the Court, take reasonable steps to perpetuate the testimony

of any person subject to this Order who is not expected to survive the duration of this Order or who

is otherwise expected to be unable to provide testimony if it is not perpetuated during the duration

of this Order.  Notice shall be provided to the Debtors by notifying Gibbons P.C., proposed counsel

for the Debtors, of the perpetuation of such testimony. The Debtors shall have the right to object to

the notice on any grounds it would have had if it were a party to the underlying proceeding and not

subject to the terms of this preliminary injunction, and the Debtors may raise any such objection

Page 5

| | |
|---|---|
| Debtor: | New England Motor Freight, Inc., et al. |
| Case No.: | 19-12809-JKS |
| Adv. Proc. No: | 19-_____-JKS |
| | |
| Caption of Order: | ORDER REGARDING DEBTORS' REQUEST FOR EXTENSION OR APPLICATION OF THE AUTOMATIC STAY TO CERTAIN ACTIONS AGAINST NON-DEBTORS |

---

with this Court. Defendants or other individuals asserting Auto Liability Claims may not seek to perpetuate the testimony of representatives, including directors, officers and employees, of the Debtors without the consent of the Debtors or an order of the Court.

7.      Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, the Debtors are relieved from posting any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

8.      The Debtors shall serve a copy of this Order on counsel for the Defendants within 3 business days after entry of this Order.

9.      The Court retains exclusive jurisdiction over this Order and the relief granted herein and any and all matters arising from or relating to the implementation, enforcement or interpretation of this Order.

**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, New Jersey  07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
E-mail:  kgiannelli@gibbonslaw.com
          mconlan@gibbonslaw.com
          btheisen@gibbonslaw.com

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW ENGLAND MOTOR FREIGHT, INC., *et al*., | Case No. 19-12809 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| NEW ENGLAND MOTOR FREIGHT, INC. *et al.*, | |
| Plaintiffs, | Adv. Pro. No. 19-01119 (JKS) |
| v. | |
| PARTIES LISTED ON EXHIBIT A TO THE COMPLAINT and JOHN DOES 1-100, | |
| Defendants. | |

**DEBTORS' REPLY IN FURTHER SUPPORT OF MOTION FOR AN ORDER**
**(I) PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS,**
**OR (II) IN THE ALTERNATIVE, DECLARING THAT THE AUTOMATIC STAY**
**APPLIES TO SUCH ACTIONS AND (III) GRANTING A TEMPORARY**
**RESTRAINING ORDER PENDING A FULL HEARING ON THE MOTION**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

In further support of the Debtors'[2] *Motion for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors or, (II) In the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a Temporary Restraining Order Pending a Full Hearing on the Motion* (the "Motion") [Dkt. 3], the Debtors respectfully state as follows:

1. The relief sought in the Motion is necessary to enable the Debtors to preserve and maximize the value of the estates for all creditors through an orderly liquidation and wind-down, and to minimize the exposure to additional liabilities. By this Motion, the Debtors do not seek to cut off any of the Defendants' rights to liquidate Auto Liability Claims. Rather, the Debtors simply seek a short "breathing spell" to formulate a uniform, fair and orderly process that will allow the Debtors to transition the defense of the Auto Liability Claims over to the excess indemnity Carriers, Protective and United Fire, in a manner that will not create additional obligations or liability for the estates.

2. Under the Excess Indemnity Contracts, the Debtors are obligated to pay the first $500,000 in damages, fees and costs (the "Self-Retention"). Moreover, the Debtors—not the Carriers—are responsible to manage, administer and defend all claims and litigation. The Carriers' only obligation is for reimbursement to the Debtors after (A) the Debtors have paid out a settlement or verdict, and then (B) only for payments, fees, including attorneys' fees, and costs that exceed the $500,000 Self-Retention. Thus, unless and until those two conditions have been met, the Carriers have no contractual obligation to make any payments whatsoever, much less to assume the burden of defending the Auto Liability Claims.

3. If—notwithstanding the contract terms—the Carriers deem it necessary to assume that burden, then it is critical to the Debtors' estates that there is an agreement between the Debtors

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and the Carriers on how that transition is to occur, and under what terms and conditions.  Absent

such agreement, the Debtors' estates may face additional—and unnecessary—liabilities.  The

Debtors' Self-Retention obligations are backed up by various letters of credit (as described in

greater detail in the First Day Declaration [Case No. 19-12809, Dkt. No. 22]).  If the Auto Liability

Claims exceed the letter of credit proceeds, the impact on the estate could be significant.  Thus, it

is imperative that the Carriers and the Debtors are in agreement on the procedure for handling (and

settling or otherwise resolving) the Auto Liability Claims going forward.

4.    A copy of the 2017-2018 Protective Contract, which is materially similar to each of the

other Excess Indemnity Contracts, is attached hereto as **Exhibit A**.

5.    Certain Defendants have opposed the Motion on the grounds that the Debtors operate under

a "Form 82 insurance registration" and are thus required to maintain a $1 million surety bond to

guaranty the payment of any judgments.  [See Dkt. 10, at 4-5].  The Debtors acknowledge the

existence of that requirement and the applicable surety bond, however, the bond is simply another

source of recovery for any successful plaintiff, not "dollar one" coverage with respect to defense

costs, as has been argued.  Critically, for purposes of this Motion, with or without the bond, the

Debtors still remain obligated for the defense of the Auto Liability Claims.  That issue—not the

source of any eventual recovery—is the primary hurdle to stay relief for the Defendants at this

time, and necessitates a temporary injunction.

6.    A copy of the current Form MCS-82 bond for New England Motor Freight, Inc. is attached

hereto as **Exhibit B**.

7.    Certain Defendants have also opposed the Motion based on the assertion—without any

support—that the Auto Liability Claims can proceed against the Protected Drivers because the

drivers could have their own insurance carriers pick up the defense burden.  This assertion has no

3

basis in fact.  First, the Debtors' policy was to defend their drivers in Auto Liability Claim lawsuits because those drivers' personal automobile insurance—if any—would never apply while the driver was operating a truck owned by the Debtors in the course of his employment and in the ordinary course of the Debtors' business.  Second, any assertion that the Protected Drivers would have an incentive to hire their own counsel is not realistic based on a truck driver's income and likely assets.  If any Defendant obtains a judgment against a Protected Driver in his individual capacity, it would likely drive that person into chapter 7 bankruptcy and result in a lawsuit by the driver against the Debtors' estate for indemnification.  Moreover, because the Debtors' historical policy was to provide insurance to their drivers, the Debtors' refusal to do so now could expose the estates to further liability.  Finally, if default is entered against a Protected Driver for failure to defend a suit, the plaintiff would be entitled to an inquest whereby the plaintiff would submit unopposed evidence of damages and injuries sustained.  The resulting verdicts would be far in excess of any defended case, as many of the open Auto Liability Claim lawsuits involve alleged exacerbations of pre-existing injuries, and in some instances, subsequent injuries unrelated to the subject accident.

8.    Without injunctive relief from this Court, there will be no uniform and equitable treatment of Auto Liability Claims, because—as Debtors have already seen—the trial courts are not interpreting and applying the automatic stay consistently.  Indeed, in multiple cases, the Debtors' in-house counsel, Mr. Rubenstein, and/or various outside counsel have been forced to continue actively litigating those lawsuits.  Defense costs and expenses for the Auto Liability Claim lawsuits (legal fees, experts, court reporter fees, court fees, medical record fees, defense medical examinations, etc.) are all part of the $500,000 Self-Retention per accident, which is a responsibility of the Debtors' estates under the Excess Indemnity Contracts.   Absent stay relief,

4

the Debtors simply should not be forced to expend such resources.  A temporary injunction will allow the Debtors to negotiate a consensual procedure with all parties in interest, including counsel to the Defendants, the Carriers, and the Creditors' Committee governing, *inter alia*, (A) the transition of litigation defense and administrative obligations from the Debtors to the Carriers, and (B) the terms on which the Defendants can go forward with litigation of their Auto Liability Claims or, if they prefer, have those claims liquidated in this Court.

9.  Further, a temporary injunction will also obviate the need for the Debtors and the Court to resolve dozens of individual lift stay motions.

10. For those reasons and the reasons set forth in the Motion, the Debtors respectfully request that the Court grant the Motion and temporarily enjoin the further prosecution of Auto Liability Claims for no less than 120 days.

Dated:  April 12, 2019                    Respectfully submitted,

                                          **GIBBONS P.C.**

                                          By: */s/ Brett S. Theisen*
                                               Karen A. Giannelli, Esq.
                                               Mark B. Conlan, Esq.
                                               Brett S. Theisen, Esq.
                                               One Gateway Center
                                               Newark, New Jersey  07102
                                               Telephone:  (973) 596-4500
                                               Facsimile:   (973) 596-0545
                                               E-mail:  kgiannelli@gibbonslaw.com
                                                        mconlan@gibbonslaw.com
                                                        btheisen@gibbonslaw.com

                                          *Counsel to the Debtors*
                                          *and Debtors-in-Possession*

                                                    2723672.1 115719-100281

# EXHIBIT A

**2017-2018 Protective Contract**

Client: _N E M F_
SubClient: _____
Coverage: _Auto - Truckers_
Associate: _J Perez_
Date: _6/13/18_

(P)

# EXCESS INDEMNITY CONTRACT

## PREPARED SPECIFICALLY FOR

# New England Motor Freight, Inc.

Contract Period
April 10, 2018 to April 10, 2019





Contract Number
595-100798-1

 **CRUM&FORSTER®**

## COMMERCIAL EXCESS
### INDEMNITY CONTRACT – EXCESS OF SELF-RETENTION DECLARATIONS
### UNITED STATES FIRE INSURANCE COMPANY

"Named Insured" New England Motor Freight, Inc.

Agent Name DMC Insurance, Inc.

Contract Period: 4/10/18 to 4/10/19
12:01 A.M., Local Time at the address of "Named Insured"
Agent No. 02791

**Item 1. Business Description:**

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**Item 2. Coverages Provided**

|  |  | Included | Not Included |
|---|---|:---:|:---:|
| Coverage (A) | "Personal Injury" Liability | X | |
| Coverage (B) | "Property Damage" Liability | X | |
| Coverage (C) | "Uninsured & Underinsured" Motorists | X | |
| Coverage (D) | "Personal Injury Protection" | X | |
| Coverage (E) | "Cargo Legal Liability" | | X |
| Coverage (F) | "Physical Damage – Comprehensive" | X | |
| Coverage (G) | "Physical Damage – Collision" | | X |
| Coverage (H) | "Workers' Compensation/Occupational Disease" (where qualified as a self-insured) | | X |
| Coverage (I) | "Employers Liability" | X | |
| Coverage (J) | "Garagekeepers Legal Liability" | | X |

**Item 3.**

| Limit of Indemnity: | $ 5,000,000 | Per "occurrence" less "self-retention" for Coverages A, B, E, F, G, I, J and Coverages C and D only if these coverages have not been waived or rejected by the "Named Insured"; and if not waived or rejected, only to the limit selected by the "Named Insured", combined. |
|---|---|---|
| | $ | (Used only if any individual coverage has separate limits) |
| Subject to an Aggregate limit of: | $ 5,000,000 | As respects "general liability" and "employers liability" ("occupational disease" only) exposures less per "occurrence" "self-retentions". |

**Item 4.**

| Self-Retention: | $ 500,000 | For all selected coverages combined, except as specified below: $250,000 "self-retention" for Coverage F |
|---|---|---|

**Item 5. Payment of Costs (Put an X next to the option chosen)**

| Option A | Pro Rata ("Costs" paid by us shall be in addition to our Limit of Indemnity) | |
|---|---|---|
| Option B | "Costs" as part of ultimate net loss ("Costs" paid by us shall not be in addition to our Limit of Indemnity) | |

| Option C | "Costs" as part of ultimate net loss ("Costs" paid by us shall be in addition to our Limit of Indemnity) | X |
|---|---|---|
| Option D | Separate, additional self-retention for "Costs" ("Costs" paid by us shall be in addition to our Limit of Indemnity) | |
| | **Additional self-retention for costs:   $** | |

**Item 6.**

| Deposit Premium: | $ 369,327 |
|---|---|

**Item 7.**

| Premium Rate: | $ 2.151 | Per **100** "miles" |
|---|---|---|
| | $ 0.07 | Per **$100** of "brokerage operations" "gross receipts" |

**Item 8.**

| Estimated Annual "Miles" | 101,000,000 |
|---|---|
| Estimated Annual "Gross Receipts" | "If any" – "brokerage operations" |
| Estimated Annual Premium: | $ 2,172,510 |
| Minimum Premium: | 90% of Estimated Annual Premium |

**Item 9.**

| Endorsements Attached at Contract Inception: | 1-9 |
|---|---|

# INDEMNITY CONTRACT – EXCESS OF SELF-RETENTION

This is an excess indemnity contract. It is excess of the "Self-retention", as set forth in the Declarations. United States Fire Insurance Company is the Company and agrees with the "Named Insured", named in the Declarations and made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Declarations and subject to the Limits of Indemnity, Exclusions, Conditions and other terms of this contract, as follows:

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section IV – Definitions.**

## SECTION I – INDEMNITY AGREEMENTS

### A. Coverages

We hereby agree to indemnify the "Named Insured" or "Affiliated Insured" for "ultimate net loss", less the "Self-retention", and subject to the Limits of Indemnity, which the "Named Insured" or "Affiliated Insured" has or may by law become liable to pay and has paid to any person or persons as "damages", or for which loss has been incurred under **Coverages (F)** and **(G)**, as the result of an "occurrence" taking place during the contract period and arising out of "trucking operations" or "brokerage operations":

**COVERAGE (A)** for "personal injury" liability;

**COVERAGE (B)** for "property damage" liability;

**COVERAGE (C)** for "uninsured motorists" and "underinsured motorists";

**COVERAGE (D)** for "personal injury protection";

**COVERAGE (E)** for "cargo legal liability";

**COVERAGE (F)** for "physical damage comprehensive" loss to "covered vehicles";

**COVERAGE (G)** for "physical damage collision" loss to "covered vehicles";

**COVERAGE (H)** for "workers' compensation" and "occupational disease" in those states where the "Named Insured" has qualified and remains qualified as a Self-Insured;

**COVERAGE (I)** for "Employers Liability";

PROVIDED ALWAYS THAT it is expressly agreed that no liability shall attach to us, except under **Coverages (F)** and **(G)**, until the "Named Insured" or "Affiliated Insured" has paid the "ultimate net loss".

Regardless of the number of persons and organizations who are "Insureds" under this contract and regardless of the number of coverages involved and/or the number of claims made and suits brought in connection therewith, the total limit of our indemnity as a result of an "occurrence" for all "Insureds" combined and for all coverages combined shall not exceed the Limits of Indemnity as stated in Item 3 of the Declarations.

Further, the total limit of our indemnity as a result of all "occurrences" arising out of "general liability" and "employers' liability" (as respects "occupational disease") exposures shall not exceed the aggregate limit stated in Item 4 of the Declarations. This coverage shall apply separately to each "Insured", except with respect to our Limits of Indemnity as stated in the Declarations. More than one "Insured" shall not serve to increase our Limits of Indemnity for all "Insureds" combined over that stated in Item 3 of the Declarations.

**SECTION II – EXCLUSIONS**

**A. All Coverages under this contract shall not apply:**

1. To punitive or exemplary "damages" where insurance thereof or indemnity therefore is prohibited by law;

2. To any liability or loss for which the "Insured" is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages" assumed in a contract or agreement that is a "covered contract";

3. To any liability or loss as a result of or arising out of discrimination in any form, whether intentional or unintentional, including but not limited to discrimination based on a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition or mental capabilities or condition;

4. To "personal injury" arising out of:

   a. Harassment, humiliation, mental injury or mental anguish directly or indirectly related to employment of any person or persons by any "Insured";

   b. Refusal or failure to employ any person(s);

   c. Termination of employment including actual or alleged constructive dismissal;

   d. Coercion demotion, evaluation, reassignment, discipline, defamation, discrimination, employment related misrepresentation, employment related emotional distress or other employment related practices, policies, acts or omissions; or

   e. Consequential "personal injury" causing liability, damage, loss cost or expense as a result of **a.** through **d.** above.

   This exclusion applies whether the "Insured" may be held liable as an employer or in any other capacity and to any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury;

5. To any liability of or loss to the "Insured" directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or naturalization or requisition or destruction or damage to property by or under the order of any government or public or local authority;

6. To any liability or loss arising out of any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity;

7. To loss of use of tangible property which has not been physically injured or destroyed resulting from a delay in or lack of performance by or on behalf of the "Insured" of any contract or agreement;

8. To any liability or loss which the "Insured" has assumed under any contract; if such injury, damage or loss occurred prior to the effective date of the contract;

9. For claims, suits, actions, or proceedings brought by the "Named Insured", or any "Affiliated Insured", against the "Named Insured", "Affiliated Insured" or "Additional Insured";

10. To any liability of the "Named Insured" or "Affiliated Insured" or officers or directors of the "Named Insured" or "Affiliated Insured" for loss, damages, claims or suits by stockholders or their representatives for:

    a. Actual or alleged errors of omission or commission;

    b. Fraudulent acts;

    c. Errors of judgment; or

    d. Breach of fiduciary duty;

    Committed or alleged to have been committed by said "Named Insured" or "Affiliated Insured" or officers or directors of the "Named Insured" or "Affiliated Insured" in their performance or failure to perform duties, obligations and responsibilities as officers and directors;

11. To "personal injury" or "property damage", or to economic loss, diminution of property, abatement costs, or any other loss, cost of exposure including equitable relief, in any way or to any extent arising out of or involving asbestos, asbestos fibers, or any product containing asbestos or asbestos fibers;

12. To liability arising out of "advertising injury" or "personal injury" caused by advertising;

13. To "damages" arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data, and/or out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of non-public information;

B. **All Coverages, except as provided under Coverages (E), (F) and (G), under this contract shall also not apply to injury to, destruction of or loss of:**

1. Property owned, occupied by, leased to, rented to or loaned to the "Insured"; or

2. Property in the care, custody or control of the "Insured";

C. **Coverages (A) and (B) under this contract shall also not apply:**

1. To any liability arising out of the existence, ownership, maintenance, operation, use, loading or unloading of aircraft owned by, loaned to, leased to, rented to or chartered by or on behalf of the "Insured", or watercraft owned by the" Insured";

2. To:

   a. Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, spillage, release, migration or escape of smoke, vapors, soot, fumes, acids, alkalis, asbestos, toxic or non-toxic chemicals, solids, liquids, or gasses, "waste" materials, irritants, contaminants or "pollutants" of any kind, nature or description into or upon the "environment"; This exclusion further applies to:

   b. Any loss, cost, or expense arising out of any court-ordered, governmental or private direction or request that the "Insured" test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any of the above;

3. To "personal injury" or "property damage" arising from the manufacture, sale, or providing of alcoholic beverages for which any "Insured" may be held liability by reason of:

   a. Causing or contributing to the intoxication of any person; or

   b. The furnishing or alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

   c. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

4. To "personal injury" or "property damage;

   a. For which an "Insured" is an "Insured" under a nuclear energy liability policy of the:

      (1) Nuclear Energy Liability Insurance Association; and/or

      (2) Mutual Atomic Energy Liability Underwriters; and/or

      (3) Nuclear Insurance Association of Canada;

      Or would be an "Insured" under that policy except for its termination due to its exhaustion of its limit of liability;

   b. Resulting from the "hazardous properties" of "nuclear material" and as respects which:

      (1) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any amendatory law thereof; or

      (2) The "Insured" is, or had this contract not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, which any person or organization;

   c. Resulting from the "hazardous properties" of "nuclear material" if:

      (1) The material:

         (a) Is at any "facility" owned by, or operated by or on behalf of, an "Insured"; or

         (b) Has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "Insured"; or

**(3)** The "personal injury" or "property damage" arises out of the furnishing by an "Insured" of services, material, parts or equipment in connection with the planning, construction, maintenance, operation or use of a "nuclear facility", but if such facility is located in the United States of America, its territories, or possessions or Canada, this exclusion, **C.4.c.**, applies only to "property damage" to any such "nuclear facility" and any property thereat.

**D. Coverages (A) under this contract shall also not apply:**

1. To any obligation for which the "Insured" or any of its insurers or Companies may be held liable under any "workers' compensation", unemployment compensation, disability benefits or similar law including The Employees' Retirement Income Security Act (E.R.I.S.A) of 1974 as amended provided, however, that this exclusion does not apply to liability of others assumed by the "Insured" under a "covered contract";

2. To bodily injury (including death resulting therefrom) to any employee of the "Insured" arising out of and in the course of employment by the "Insured";

**E. Coverages (F) and (G) under this contract shall also not apply to** any liability or loss resulting from manufacturer's defects or to damage which is due and confined to:

1. Wear and tear;

2. Freezing; or

3. Mechanical or electrical breakdown or failure, unless such damage is the result of other loss covered by this contract;

**F. Coverages (I) under this contract shall also not apply to** "personal injury" (including death resulting therefrom) to an employee where the "Insured" has abrogated its common law defense under any "Workers' Compensation" or "Occupational Disease" law by rejection thereof, or by failure to purchase "Workers' Compensation" insurance or indemnity, or otherwise;


## SECTION III – CONDITIONS


**A. Payment of "Costs"**

All "costs" shall be paid by the "Insured". After payment of the "ultimate net loss", the "costs" incurred by the "Insured" shall be apportioned according to the option selected by the" Named Insured" in Item 5 of the Declarations as follows:

1. **Option A: Pro Rata –** "Costs" reimbursed by us under this Option A shall be in addition to and not part of our maximum Limit of Indemnity, as stated in Item 3 of the declarations.

   If the "ultimate net loss", excluding "costs", exceeds the "Insured's" "Self-retention", then we shall reimburse the "Insured" for "costs" paid by the "insured" in the ratio that our reimbursement of loss, excluding "costs", bears to the total amount of loss, excluding "costs". For purposes of this Option, the total amount of loss shall be defined as the sum of the "Insured's" "Self-Retention", our reimbursement of loss, and any amount of loss, excluding "costs" in excess of our "Limit of Indemnity", whether insured or uninsured.

2. **Option B: "Costs" as part of "ultimate net loss"** - "Costs" reimbursed by us under this Option B shall not be in addition to and shall be included as part of our maximum Limit of Indemnity, as stated in Item 3 of the Declarations.

   All "costs" shall be paid by the "Insured" and such payments shall be included in the "ultimate net loss".

3. **Option C: "Costs" not included as part of "ultimate net loss"** – "Costs" reimbursed by us under this Option C shall be in addition to and not part of our maximum Limit of Indemnity, as stated in Item 3 of the Declarations.

   All "costs" shall be paid by the "Insured" and such payments shall be included in the "ultimate net loss". If the total amount of loss, excluding "costs", is in excess of our Limit of Indemnity, then we shall reimburse the "Insured" for "costs" paid by the "Insured" in the ratio that our Limit of Indemnity bears to the total amount of loss, excluding "costs" . For purposes of this Option, the total amount of loss, shall be defined as the sum of our Limit of Indemnity plus any amount of loss, excluding "costs", in excess of our "Limit of Indemnity", whether insured or uninsured.

4. **Option D: Separate, additional "Self-retention"** - "Costs" reimbursed by us under this Option D shall be in addition to and not part of our maximum Limit of Indemnity, as stated in Item 3 of the Declarations.

   All "costs" shall be paid by the "Insured" and such payments shall be included in the "ultimate net loss". If the total amount of loss, excluding "costs", is in excess of our Limit of Indemnity, then we shall reimburse the "Insured" for "costs" paid by the "Insured" in the ratio that our Limit of Indemnity bears to the total amount of loss, excluding "costs", after deduction for the "Insured's" separate, additional "Self-retention", as selected in Item 5 of the Declarations. For purposes of this Option, the total amount of loss, shall be defined as the sum of our Limit of Indemnity plus any amount of loss, excluding "costs", in excess of our "Limit of Indemnity", whether insured or uninsured.

## B. Premium

All premiums for this contract are computed in accordance with our rules, rates, rating plans, premiums and minimum premiums applicable to the coverages afforded.

No later than twenty (20) days past the end of each month or other reporting period approved by us throughout the duration of this contract, the "Insured" shall report the total gross receipts or "miles", depending upon the selected exposure unit, recorded during that month or period and pay the premium earned thereon at the premium rate prevailing during that month or period.

The deposit premium stated in the Declarations is an advance premium only and may not be applied to monthly reports. Upon termination of this contract, the final earned premium shall be computed and the deposit premium returned to the "Insured" less any earned premium due us. Should the estimated annual premium under the contract increase or decrease during the contract term, we shall have the right to increase or decrease the deposit premium consistent therewith at any time during the term of this contract. The "Insured" agrees that any increase in deposit premium requested by us will be paid within 30 days of billing.

## C. Inspection and Audit

We shall be permitted but not obligated to inspect the "Insured's" property and operations at any time. Neither the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the "Insured" or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

We may examine and audit the "Insured's" books and records at any time during the contract period and extensions thereof and within three years after the final termination of this contract, as far as they relate to the subject matter of this contract.

We may audit and inspect all claims against the "Insured" occurring during the contract period so long as there is potential exposure to us from such claims, but such audit and inspection shall not relieve the "Insured" from the Notice Conditions of the contract.

## D. Payment of Claims – Comprehensive or Collision

Under **Coverages (F)** and **(G)**, the maximum amount that may be included in "ultimate net loss" shall be the lesser of the actual cash value of the damaged or stolen property at the time of the loss or the cost of repairing or replacing the damaged or stolen property with other of like kind and quality. At our option, we may pay for, repair or replace damaged or stolen property; or return the stolen property at its expense.

### E. Notice of Occurrence

The "Insured" shall immediately give written notice to the attention of the Excess Claims Supervisor of the Company, or its authorized representative, following any "occurrence" which might cause liability to the "Insured" for claims, "damages" or loss in an aggregate amount in excess of 50% of the "Insured's" "Self-retention", including but not limited to claims involving fatality, amputation, spinal cord damage, brain damage, blindness, extensive burns or multiple fractures. Solely for the purpose of reporting "occurrences", claims, "damages", or losses, the "Insured" shall consider itself fully and completely liable and solely responsible for such claims, "damages", or losses which might arise from any occurrence. The "Insured" acknowledges that immediate notice is a material condition of this contract and that we are prejudiced by delay in receipt of the "Insured's" notice.

### F. Administration of Claims

The "Insured" shall maintain personnel, or shall engage independent third party administrators, who are trained, experienced and competent to administer claims against it which might involve amounts in excess of its "Self-retention". Such personnel shall be approved by and be satisfactory to us. Fees charged by independent third party administrators whether by the hour, by the claim or otherwise are the responsibility of the "Insured" and shall not be included in "Costs".

The "Insured" shall fully investigate, settle or defend all claims and shall conduct the defense and appeal in all actions, suits and proceedings commenced against it or us if we are named as a defendant.

After giving notice of any "occurrence" which might involve amounts in excess of its "Self-retention", the "Insured" shall give periodic reports of the status of any and all claims or losses and any litigation in connection therewith and shall provide complete copies of all investigation reports, correspondence, legal pleadings and reports of counsel and all other pertinent claim material. In all matters which might involve an amount in excess of the "Insured's" "Self-retention", the "Insured" has the duty to act in good faith and with due care with equal considerations for both its own interests and our interests. The "Insured" shall not commit us to any obligation or course of action likely to involve payment by us without our consent. Any payment, agreement or other commitment to pay by the "Insured" in excess of its "Self-retention" without our consent shall render our obligation under this contract to reimburse the "Insured" null and void.

### G. Assumption of Administration

At any time after any "occurrence" which in our opinion might involve amounts in excess of the "Insured's" "Self-retention", we may, at our sole discretion, assume the administration of any claim or any litigation resulting therefrom in whole or in part. The assumption of administration shall allow us to solely control the investigation, defense (including selection of counsel and all matters involving trial preparation) negotiations and settlement or trial of the claim or litigation.

The "Insured" shall cooperate in all matters with us following our assumption of administration in whole or in part and the assumption shall be deemed to be with the consent and agreement of the "Insured". All "costs" incurred by us shall be payable by the "Insured" and subject to reimbursement as otherwise provided by this contract. Following our assumption of administration in whole or in part, we are fully authorized by the "Insured" to act on the "Insured's" behalf without limitation including the full authority to authorize, commit or otherwise obligate the "Insured" to payment of its "Self-retention" whether or not payment by us in excess of the Insured's Self-retention is involved. Any such payment shall be deemed to be with the consent of the "Insured". The "Insured" shall pay all amounts authorized, committed or otherwise obligated by us and shall be entitled to reimbursement for "ultimate net loss" in excess of its "Self-retention" as provided by this contract.

### H. Action Against Us

No action shall lie against us unless, as a condition precedent thereto, the "Insured" shall have fully complied with all terms of this contract. Nothing contained in this contract shall give any person or organization any right to join us as a party or otherwise bring us into a lawsuit or legal proceeding asking for "damages" from an "Insured" under this contract.

### I. Bankruptcy and Insolvency

In the event of the bankruptcy or insolvency of the "Insured" or any entity comprising the "Insured", we shall not be relieved of our indemnification obligations under this contract. However, if after the bankruptcy or insolvency of the "Insured", we pay to a third party any "damages" or "ultimate net loss" because of claims(s)

made against or loss incurred by the "Insured" then such payment shall satisfy our indemnification obligations for that payment under this contract.

## J. Insurance

If insurance with any Company is available to the "Insured" covering a loss covered hereunder, except insurance or indemnity purchased to apply in excess of the sum of the "Insured's" "Self-retention" and Limit of Indemnity hereunder, the indemnity hereunder shall be in excess of, and not contribute with, such other insurance or indemnity. If insurance or indemnity under any other contract(s) of ours is available to the "Insured", covering a loss also covered hereunder, our total liability shall in no event exceed the greater or greatest Limit of Indemnity applicable to such loss under this or any other such contract(s).

## K. Subrogation and Salvage

The "Insured" shall prosecute all claims the "Insured" may have against any person, firm or corporation growing out of any "occurrence" resulting in payment of loss by us hereunder, and should the "Insured" recover any reimbursement from any source whatsoever on account of such loss, the net amount (gross amount of recovery less the "costs" incurred in effecting such recovery) of the recovery as does not exceed our loss shall be paid to us.

Should the "Insured" have such a claim against any person, firm or corporation growing out of any "occurrence" resulting in the payment of loss by us hereunder, which, in our opinion, the "Insured" fails or neglects to enforce within reasonable time, we shall be subrogated to all the "Insured's" right of recovery against any person or organization, and the "Insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The net amount of any recovery shall first be used by us to reimburse our loss, and any excess shall be paid to the "Insured".

## L. Changes

Notice to or knowledge possessed by any person shall not effect a waiver or change, in any part, of this contract or stop us from asserting any rights under the terms of this contract; nor shall the terms of this contract be waived or changed, except by endorsement issued to form a part hereof, signed by any of our authorized representatives.

## M. Assignment

Assignment of interest under this contract shall not bind us until its consent is endorsed hereon; if however, the "Insured" shall be adjudged bankrupt or insolvent, this contract shall cover the "Insured's" legal representative as "Insured"; provided that notice of cancellation addressed to the "Insured" named in the Declarations and mailed to the address shown in this contract shall be sufficient notice to effect cancellation of this contract.

## N. Cancellation

This contract may be canceled by the "Insured" by surrender thereof to us, or by mailing us written notice stating when thereafter such cancellation shall be effective. This contract may be canceled or non-renewed by us by mailing to the "Insured" at the address shown in the Declarations of this contract, written notice stating when, not less than thirty (30) days thereafter, or ten (10) days thereafter if cancellation is because of non-payment of premium or deposit premium, as provided in Section III(B), such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the contract period. Delivery of such written notice either by the "Insured" or by us shall be equivalent to mailing. If the "Insured" cancels or if we cancel for non-payment of premium, earned premium shall consist of the premium earned for the period of coverage plus 10% (ten percent) of the anticipated premium for the unexpired term of the contract, calculated by averaging the daily earned premium for the contract term prior to cancellation and applying that daily average to the remaining contract term. If we cancel for any reason other than non-payment of premium, earned premium shall be computed pro rata.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter. The return of unearned premium is not a condition precedent to the cancellation of this contract. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due the "Insured".

If this contract includes more than one "Insured", cancellation may be effected by the "Named Insured" for the account of all "Insureds"; and notice of cancellation by us to such "Named Insured" shall be notice to all

"Insureds". Payment of any unearned premium to such "Named Insured" shall be for the account of all interests therein.

**O. Non-Renewal**

If we decide to not renew this contract at the expiration of the contract term, we will mail or deliver to the "Named Insured" written notice of the non-renewal not less than 30 days before the contract's expiration date.

## SECTION IV – DEFINITIONS

A. "Advertising Injury" means injury arising out of one or more of the following offenses:

1. Oral or written publication of material that slander or libels a person or organization or disparages a person or organization's goods, products or services;

2. Oral or written publication or material that violates a person's right of privacy;

3. Misappropriation of advertising ideas or style of doing business; or

4. Infringement of copyright, patent, trademark, trade secret, title, slogan or other intellectual property rights;

B. "Brokerage operations" means those activities necessary to the business of arranging for the transportation of property by vehicle for hire when such transportation is done by others at the direction of the "Insured"; that are operating under their own federal and/or state permits or authority.

C. "Cargo legal liability" means liability for loss of, or damage to, property of others accepted for transportation by the "Insured" pursuant to a bill of lading, shipping contract, shipping receipt or transportation agreement;

D. "Costs" means court costs, post judgment interest upon awards and judgments, and investigation, adjustment and legal expenses incurred by the "Insured", but does not include pre judgment interest, fines or statutory penalties, office expenses of the "Insured", salaries and expenses of the "Insured's" employees or fees of counsel, except defense counsel, of the "Insured";

E. "Covered contract" means:

1. A lease of premises;

2. A sidetrack agreement;

3. An easement or license agreement in connection with vehicle or pedestrian private railroad crossing at grade;

4. Any other easement agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

5. An indemnification of a municipality as required by ordinance, except in connection with work for a municipality;

6. An elevator maintenance agreement;

7. That part of any other contract or agreement pertaining to the "Insured's" "trucking operations" under which any "Insured" assumes the tort liability of another to pay "damages" because of "personal injury" or "property damage" to a third person or organization, if the contract or agreement is made prior to the "personal injury" or "property damage". Tort liability means a liability that would be imposed by law in absence of any contract or agreement; or

8. Under **Coverage (E)**, "cargo legal liability", if provided under this contract, then the definition of "covered contract" shall also include that part of any other contract or agreement pertaining to the "Insured's business" under which any "Insured" assumes the liability of another to pay "damages" because of "cargo legal liability" if the contract or agreement is made prior to the "occurrence" resulting in "cargo legal liability";

F. "Covered vehicle" means a land motor vehicle, trailer or semi-trailer, designed for use on public roads, including its equipment and other equipment permanently attached thereto, which is either:

1. Owned by the "Insured"; or

2. Not owned by the "Insured" while in his possession under a written agreement wherein he assumes liability for loss or damage thereto while in possession;

G. "Damages" means a monetary judgment or settlement paid by the Insured and does not include fines, statutory penalties or post-judgment interest;

**H.** "Employers liability" means liability by law other than liability applicable under "Workers' Compensation" or "Occupational Disease" laws for "damages" on account of "personal injuries" and "occupational diseases" sustained by employees of the "Insured" and engaged in "trucking operations" of the "Insured";

**I.** "Environment" means the land, atmosphere or any water course or body of water, including aquifers and ground water;

**J.** "General liability" means all "personal injury" and/or "property damage", which does not arise from the operation or use of one or more "licensed motor vehicles";

**K.** "Gross receipts" means the total amount which the "Named Insured" and "Affiliated Insured(s)" receive or are entitled to receive for their "trucking operations" and "brokerage operations" during the contract period regardless of whether the "Insured" or any other carrier originates the shipment or transportation. "Gross receipts" includes the total amount received from renting equipment, with or without drivers, to anyone. "Gross receipts" does not include:

1. Amounts the "Insured" pays (other than for "brokerage operations") to railroads, steamship lines, airlines and other motor carriers operating under their own ICC or PUC permits;

2. Advertising revenue;

3. Taxes which the "Insured" collects as a separate item and remits directly to a governmental division;

4. C.O.D. collections for cost of mail or merchandise including collection fees;

5. Warehouses storage fees; or

6. Fuel surcharges;

**L.** "Hazardous properties" means include radioactive, toxic or explosive properties;

**M.** "Insured"

Each of the following in an "Insured" to the extent set forth below:

1. The "Named Insured" as designated in the Declarations;

2. The "Affiliated Insured(s)", which shall include, if listed in the endorsements, the parent company or other company owning a controlling interest in the "Named Insured" and any subsidiary company of or company otherwise controlled by the "Named Insured's" ownership. If the "Affiliated Insured" is a parent or other company owning a controlling interest in the "Named Insured", then such "Affiliated Insured" shall be indemnified only if its liability is solely caused by its ownership interest in the "Named Insured". All other "Affiliated Insureds", if listed in the endorsements, shall be indemnified for their "trucking operations" as if a "Named Insured" under this contract;

Only for their "trucking operations", "Affiliated Insured(s)" shall also include:

Any subsidiary or owned or controlled company of the "Named Insured" or "Affiliated Insured" created or acquired subsequent to the inception date of this contract, but coverage hereunder will not apply:

a. To liability which is as a result of an "occurrence" including continuous or repeated exposure to the same general harmful conditions happening prior to the date of such creation or acquisition.

b. For a period greater than ninety days from the date of such creation of acquisition unless endorsed heron;

3. If the "Named Insured" or "Affiliated Insured" is a partnership or joint venture, any partner or member thereof, but only with respect to his/her liability as such;

4. If the "Named Insured" or "Affiliated Insured" is a corporation or limited liability corporation, the board of directors and the officers appointed by the board of directors while acting within the scope of their duties as such;

5. "Additional Insured(s)" may also be called "Additional Interests" as designated in the endorsements and/or certificates issued by us or our agents. The usage of the term "Additional Insured" is only for industry convenience and shall not cause this contract to be considered a policy of insurance. The "Additional Insured(s)" shall be indemnified under this contract only to the extent that the "Named Insured" or "Affiliated Insured" is obligated by a "covered contract" to reimburse, hold harmless or indemnify the "Additional Insured(s)". Indemnification under this contract for such "Additional Insured(s)" shall also be subject to all terms, definitions, conditions, and exclusions of this contract. The "Named Insured" or "Affiliated Insured" as designated by us shall pay all amounts payable to or on behalf of the "Additional Insured(s)" as and when requested by us and shall be entitled to reimbursement for "ultimate net loss" in excess of its "Self-retention" as provided by this contract;

**N.** "Licensed motor vehicle" means a truck, truck-tractor, trailer, semi-trailer, service vehicle or private passenger vehicle, licensed for road use, which is used in the "Insured's" "trucking operations".

**O.** "Miles" means all miles driven during the contract period by all vehicles owned, leased or hired by the "Insured" and used in the "Insured's" "trucking operations" and shall include "miles" driven by all vehicles when empty and "miles" driven by all vehicles when not under dispatch, but shall not include "miles" driven by the "Insured's" private passenger vehicles.

**P.** "Nuclear facility" means:

    **1.** Any nuclear reactor;

    **2.** Any equipment or device designed or used for:

        **a.** Separating the isotopes of uranium or plutonium;

        **b.** Processing or utilizing "spent fuel"; or

        **c.** Handling, processing or packaging "waste";

    **3.** Any equipment or device used for the processing, fabricating or alloying of special "nuclear material" if at any time the total amount of such material in the custody of the "Insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

    **4.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste", and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**Q.** "Nuclear material" means source material, special "nuclear material" or byproduct material;

**R.** "Occupational disease" is any abnormal condition that fulfills all of the following conditions:

    **1.** It is not traceable to a definite compensable accident occurring during the employee's present or past employment;

    **2.** It has been caused by exposure to a disease producing agent or agents present in the worker's workplace; and

    **3.** It has resulted in disability or death;

**S.** "Occurrence":

Under **Coverages (A)**, **(B)**, **(C)**, **(D)**, **(E)**, **(F)**, **(G)**, and **(I)**, "occurrence" means an accident, including injurious exposure to conditions, which results, during the contract period, in "personal injury", or "property damage", including damage to or loss of cargo transported by the "Insured" or damage to or loss of "covered vehicles", neither expected or intended from the standpoint of the "Insured". All "personal injury" and "property damage" arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one "occurrence";

Under **Coverage (H)**, as applied to bodily injuries, "occurrence" shall mean accident. "Occupational disease" sustained by each employee shall be deemed to be a separate "occurrence". As respects "occupational disease", the "occurrence" shall be deemed to take place on the date upon which the employee ceases work as a result of such "occupational disease";

**T.** "Personal injury" means:

    **1.** Bodily injury, sickness or disease sustained by a person, including death at any time resulting therefrom;

    **2.** False arrest, detention, imprisonment, malicious prosecution;

    **3.** The wrongful entry or eviction, or other invasion of the right of private occupancy;

    **4.** The oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    **5.** Oral or written publication of material that violates a person's right of privacy;

**U.** "Personal injury protection" means liability for various prescribed benefits under applicable no-fault laws as required by such laws and as specified in the endorsements;

**V.** "Physical damage - collision" means:

    **1.** Collision of a "covered vehicle" with another object; or

    **2.** Upset of a "covered vehicle";

**W.** "Physical damage - comprehensive" means loss to a "covered vehicle" from any cause except collision; but for the purpose of this coverage, breakage of glass and loss cause by missiles, falling objects, fire, theft or larceny, windstorm, hail, earthquake, explosion, riot or civil commotion, malicious mischief or vandalism, water, flood, or colliding with a bird or animal, shall not be deemed loss caused by collision;

**X.** "Pollutants" means smoke, vapors, fumes, alkalis, toxic or non-toxic chemicals, solids, liquids or gases, "waste" materials, irritants, contaminants, "pollutants" or any other substance which by itself or in combination with other substances can cause injury to persons, property or the "environment";

**Y.** "Property damage" means:

    **1.** Physical injury to or destruction of tangible property which occurs during the contract period, including the loss of use thereof at any time resulting therefrom; and

    **2.** Loss of use of tangible property which has not been physically injured or destroyed, provided such loss is cause by an "occurrence" during the contract period;

**Z.** "Self-retention" means the amount, as specified in the Declarations, of the "ultimate net loss" to be paid solely by the "Insured" and not subject to reimbursement by us. The "Insured's" "Self-retention" shall not be reduced or eliminated by other insurance, indemnity, salvage, contribution, recoveries or reimbursements of any type from any source except "Employers Liability" insurance purchased by the "Insured";

**AA.** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

**BB.** "Trucking operations" means those activities necessary to the business of transporting property by vehicle for hire;

**CC.** "Ultimate net loss" means the total sums paid as "damages" in settlement of a claim or in satisfaction of a judgment, including pre-judgment interest, for which the "Insured" is legally liable, and for losses otherwise incurred for which coverage is provided under this contract after making deductions for all other recoveries, salvages and insurance (whether recoverable or not), contributions and reimbursement. However, no deduction shall be made for recoveries by or reimbursements to the" Insured" from other "Employers Liability" insurance purchased by the "Insured". "Ultimate net loss" may include costs according to the Option selected by the "Named Insured" in Item 5 of the Declarations;

**DD.** "Uninsured motorist" and "underinsured motorists" means liability for bodily injury or "property damage" caused by an "uninsured motorist" or "underinsured motorist" as required by law, unless rejected, and as defined and specified in the endorsements;

**EE.** "Waste" means any waste material:

    **1.** Containing byproduct material; and

    **2.** Resulting from the operation by any person or organization of any nuclear facility included within the definition of "nuclear facility" under paragraph **P.2.a. or P.2.b.** thereof.

**FF.** "Workers' compensation" means benefits payable under the Workers' Compensation Act or Occupational Disease Act of any state where the "Insured" has duly qualified and remains qualified as a Self-Insured.



**CRUM & FORSTER**
A FAIRFAX COMPANY

# SCHEDULE OF FORMS – INDEMNITY CONTRACT

| Named Insured: New England Motor Freight, Inc. |
|---|
| Contract Number: 595-100798-1 |

| Form Number | Form Title |
|---|---|
| ME 05 003 07 17 | Indemnity Contract – Excess of Self-Retention Declarations |
| ME 00 004 01 17 | Indemnity Contract – Excess of Self-Retention |
| ME 06 003 01 17 | Schedule of Forms – Indemnity Contract |
| ME 04 001 01 17 | Indemnification for Employee Benefits Liability |
| ME 04 002 01 17 | Pollution or Contamination |
| ME 04 004 01 17 | Fire Legal Liability Coverage |
| ME 04 006 05 18 | Advertising Injury or Personal Injury Coverage |
| ME 06 002 01 17 | Schedule of Affiliated Insured(s) |
| ME 21 013 01 17 | Cyber Liability Exclusion |
| ME 22 007 01 17 | Uninsured or Underinsured Motorists/Personal Injury Protection |
| ME 43 003 01 17 | Additional Insured Definition |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INDEMNIFICATION FOR EMPLOYEE BENEFITS LIABILITY

This endorsement modifies insurance provided under the following:

INDEMNITY CONTRACT – EXCESS OF SELF RETENTION

With respect to coverage provided by this endorsement, the provisions of the Indemnity Contract apply unless modified by this endorsement.

| | |
|---|---|
| **Named Insured: New England Motor Freight, Inc.** | |
| **Endorsement Effective Date: April 10, 2018** | |
| **Contract Number: 595-100798-1** | |

**SCHEDULE**

| | | |
|---|---|---|
| **Coverage** | For purposes of Employee Benefits Liability Coverage provided by this endorsement, **Item 3.** of the Declarations is amended as follows: | |
| **Employee Benefits Liability Coverage** | **Limits of Indemnity** | |
| | $ 1,000,000 | **Each Employee** |
| | $ 2,000,000 | **Aggregate** |
| **Self-Retention:** | For purposes of Employee Benefits Liability Coverage provided by this endorsement, **Item 4.** of the Declarations is amended as follows: | |
| | $ 500,000 | Applicable to each Employee Benefits Liability "claim". |
| **Retroactive Date:** | April 10, 2016 | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**A. Employee Benefits Liability Coverage**

  **1. Coverage**

   **a.** We agree to indemnify the "insured" those sums in excess of the "self-retention" that the "insured" becomes legally obligated to pay as "damages" because of any act, error or omission, of the "insured", or of any other person for whose acts the "insured" is legally liable, to which this insurance applies. But:

   **(1)** The amount we will pay for "damages" is limited as described in Paragraph **B.** Limits Of Indemnity; and

   **(2)** Our right to defend or settle ends when we have used up the applicable Limit of Indemnity in the payment of judgments or settlements.

   **b.** This insurance applies to "damages" only if:

   **(1)** The act, error or omission is negligently committed in the "administration" of the "Named Insured's" "employee benefit program";

   **(2)** The act, error or omission did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the contract period; and

   **(3)** A "claim" for "damages", because of an act, error or omission, is first made against any "insured", in accordance with Paragraph **c.** below.

   **c.** A "claim" seeking "damages" will be deemed to have been made at the earlier of the following times:

   **(1)** When notice of such "claim" is received and recorded by any "insured" or by us, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **a.** above.

A "claim" received and recorded by the "insured" within 60 days after the end of the contract period will be considered to have been received within the contract period, if no subsequent contract is available to cover the claim.

**d.** All "claims" for "damages" made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including "damages" claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any "insured".

## 2. Exclusions

For coverages provided by this endorsement, the following exclusions are added to **Section II – Exclusions**:

**a. Dishonest, Fraudulent, Criminal or Malicious Act**

"Damages" arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any "insured", including the willful or reckless violation of any statute including such acts committed by others under any contract or agreement, verbal or written, with any "insured".

**b. Bodily Injury, Property Damage or Personal and Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**c. Failure to Perform a Contract**

"Damages" arising out of failure of performance of contract by any insurer.

**d. Insufficiency of Funds**

"Damages" arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy of Performance of Investment/Advice Given with Respect to Participation**

Any "claim" based upon:

**(1)** Failure of any investment to perform;

**(2)** Errors in providing information on past performance of investment vehicles; or

**(3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f. Workers' Compensation and Similar Laws**

Any "claim" arising out of the "Named Insured's" failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**

"Damages" for which any "insured" is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the "insured", from the applicable funds accrued or other collectible insurance.

**i. Taxes, Fines or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j. Employment-related Practices**

"Damages" arising out of wrongful termination of employment, discrimination, or other employment-related practices.

## B. Limits of Indemnity

**1.** The Limits of Indemnity shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

**a.** "Insureds";

**b.** "Claims" made or "suits" brought;

**c.** Persons or organizations making "claims" or bringing "suits";

**d.** Acts, errors or omissions; or

**e.** Benefits included in the "Named Insured's" "employee benefit program".

**2.** The Each Employee Limit is the most we will pay in excess of the amount of the "self-retention", as shown in the Schedule, for all "damages" sustained by any one "employee", including "damages" sustained by such "employee's" dependents and beneficiaries, as a result of:

**a.** An act, error or omission; or

**b.** A series of related acts, errors or omissions

negligently committed in the "administration" of the "Named Insured's" "employee benefit program".

**3.** Subject to Paragraph **B.2.**, the total indemnification we pay shall not exceed the Aggregate Limit, as shown in the Schedule, as a result of all "claims" first made and reported to us during the contract period or within sixty (60) days after the expiration of the contract period.

However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Indemnity of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the contract period shown in the Declarations of the contract to which this endorsement is attached, unless the contract period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Indemnity.

**C. Changes in Conditions**

For the purposes of the coverage provided by this endorsement, **Section III – Conditions** is amended by the addition of the following conditions:

**1. Duties in the Event of an Act, Error or Omission, or Claim or Suit**

We have no duty to provide coverage under this contract unless there has been full compliance with the following duties:

**a.** The "Named Insured" must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

**(1)** What the act, error or omission was and when it occurred; and

**(2)** The names and addresses of anyone who may suffer "damages" as a result of the act, error or omission.

**b.** If a "claim" is made or "suit" is brought against any "insured", the "Named Insured" must:

**(1)** Immediately record the specifics of the "claim" or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

The "Named Insured" must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.** The "Named Insured" and any other involved "insured" must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of an act, error or omission to which this insurance may also apply.

**d.** No "insured" will, except at that "insured's" own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**2. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for "damages" from an "Insured"; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an "insured"; but we will not be liable for "damages" that are not payable under the terms of this Coverage Part or that are in excess of the applicable Limit of Indemnity. An agreed settlement means a settlement and release of liability signed by us, the "insured", and the claimant or the claimant's legal representative.

## D. Definitions

1. For the purposes of the coverage provided by this endorsement, **Section IV – Definitions** is amended by the addition of the following:

    **a.** "Administration" means:

    **(1)** Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    **(2)** Handling records in connection with the "employee benefit program"; or

    **(3)** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

    However, "administration" does not include handling payroll deductions.

    **b.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pretax dollars.

    **c.** "Claim" means any written demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for "damages" as the result of an act, error or omission.

    **d.** "Coverage territory" means the United States of America (including its territories and possessions), Puerto Rico and Canada.

    **e.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

    **e.** "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

    **(1)** Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

    **(2)** "Profit sharing plans", employee savings plans, employee stock ownership plans, pension plans and "stock subscription plans", provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

    **(3)** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

    **(4)** Vacation plans, including buy-and-sell programs; leave of absence programs, including military, maternity, family and civil leave; tuition assistance plans; transportation and health club subsidies; and

    **(5)** Any other similar benefits designated in the Schedule or added thereto by endorsement.

    **f.** "Insured event" means any negligent act, error or omission of the "Insured" or any other person for whose acts the "Insured" is legally liable. The negligent act, error or omission must be committed in the administration of the "Insured's" "employee benefit" program, provided always that no portion of any event took place prior to the Retroactive Date stated in this endorsement; and that no portion of any event took place subsequent to the termination of the Contract; and that no portion of any event took place outside of the "coverage territory".

    **g.** "Profit sharing plan" means only such plans that are equally available to all full time employees.

    **h.** "Stock subscription plan" means only such plans that are equally available to all full time employees.

    **i.** "Suit" means a civil proceeding in which "damages" because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

    **(1)** An arbitration proceeding in which such "damages" are claimed and to which the "insured" must submit or does submit with our consent; or

    **(2)** Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the "insured" submits with our consent.

2. For the purposes of the coverage provided by this endorsement, **Section IV – Definitions** is amended as follows:

    a. The "Damages" definition is replaced by the following:

    "Damages" means monetary compensation for a claimant's economic or non-economic loss that is directly related to a "claim", but does not include loss of use or destruction of tangible or intangible business or personal property or medical expenses for physical injury to a person's body. "Damages" shall not include "costs".

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLLUTION OR CONTAMINATION

This endorsement modifies insurance provided under the following:

INDEMNITY CONTRACT – EXCESS OF SELF RETENTION

With respect to coverage provided by this endorsement, the provisions of the Indemnity Contract apply unless modified by this endorsement.

| |
|---|
| **Named Insured:   New England Motor Freight, Inc.** |
| **Endorsement Effective Date:    April 10, 2018** |
| **Contract Number:   595-100798-1** |

**A. Limited Coverage for Liability Arising from "Pollution or Contamination"**

We agree to indemnify the "Insured" for sums in excess of its "self retention" which the "Insured" shall become liable to pay and has paid as "damages" for "personal injury" or "property damage" caused by "pollution or contamination" which has been caused by an "accident", but only if:

1. The "accident" and the resulting "personal injury" or "property damage" occur after the effective date of this endorsement but before the expiration date or cancellation date of the contract to which it is attached; and

2. The "personal injury" or "property damage" is a direct result of "pollution or contamination" under one of the following circumstances:

   a. Caused by an "accident" that results in an immediate spill or discharge of "pollutants" in or from the "vehicle" in which a substance is being transported or from the container used to transport a substance;

   b. Caused by an "accident" that results in a spill or release of "pollutants" during the loading or unloading process thereof from a receptacle or storage facility to a "vehicle" or from a "vehicle" to a receptacle or storage facility. The loading or unloading process shall be deemed complete when the transfer of a substance being loaded or unloaded stops, or the equipment used for the loading or unloading is removed or disconnected, or the "vehicle" is moved from the exact location of the loading or unloading;

   c. Caused by delivery by unintentional mistake of any substance or liquid into the wrong receptacle or container or to the wrong address or of one product for another; or

   d. Caused by heat, smoke or fumes from a "hostile fire".

   Coverage under **a., b., c.** and/or **d.** above shall not apply for any discharge, loading or unloading at any dumpsite, landfill, or other site used as a depository for waste materials.

   Coverage under **a., b., c.** and/or **d.** above shall only apply for liability arising from claims first made against the "Insured" and reported to us within two years after the expiration date or cancellation date of the contract to which this endorsement is attached.

   Coverage under **a., b., c.** and/or **d.** above shall not apply to any claim for non-pecuniary relief or for non-compensatory damages nor for fines or penalties imposed by any local, state or federal agency. Coverage shall not apply to claims for punitive or exemplary damages whether or not insurance thereof is allowed or prohibited by applicable law.

## B. Indemnification, Hold Harmless and Reimbursement by the "Insured"

If we issue any filing, bond, surety agreement, endorsement, certificate or other undertaking for or on behalf of the "Insured" to any local, state or federal government or governmental agency or department or to any other person or organization relating to "pollution or contamination" liability, and if we may or shall become obligated to pay any amounts or sums or if we receive claims, demands or suits for any sums by reason of said filing, bond, surety agreement, endorsement or other undertaking for which coverage is excluded and not provided by this endorsement, then the "Insured" shall indemnify, reimburse and otherwise save the Company harmless from and against any and all liability, losses, "costs", "damages", attorney and counsel fees and any expense of whatever kind or nature. Our issuance of said filing, bond, surety agreement, endorsement or other undertaking regardless of the terms of such instrument shall not extend coverage to the "Insured" for "pollution or contamination" liability beyond that provided by this endorsement.

## C. Definitions

1. The Definitions section is amended as follows:

   a. Only for purposes of coverage under this endorsement, the word "accident" replaces the word "occurrence" as used in the contract.

   "Accident" means an instantaneous event that is both unintended and unexpected from the standpoint of the "Insured" and refers to only the event that results in the "pollution or contamination" and not to any resulting "personal injury" or "property damage".

2. The Definitions section is amended by the addition of the following terms:

   a. "Pollution or contamination" means the discharge, dispersal, release or escape of any "pollutant(s)" into or upon the "environment".

   b. "Vehicle" means a land motor vehicle, trailer or semi-trailer designed for use on public roads.

   c. "Hostile fire" means a fire which becomes uncontrollable or breaks out from where it was intended to be.

## D. Acceptance by the "Named Insured"

On behalf of all "Insureds" under the contract to which this endorsement is attached, the "Named Insured" carefully read and understands the contents of this endorsement and is aware that:

1. All "pollution or contamination" coverage, except that provided by this endorsement, is excluded from coverage by us;

2. That there is a limited period of time in which claims that may be filed against the "Insured(s)" may be filed against us; and

3. That the "Insured(s)" may be obligated to defend, reimburse and otherwise hold us harmless for undertakings issued by us in accordance with Paragraph **B.** hereof.

| | New England Motor Freight, | | |
|---|---|---|---|
| **Named Insured:** | Inc. | **By:** | |
| **Effective Date:** | April 10, 2018 | **Title:** | |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# FIRE LEGAL LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

INDEMNITY CONTRACT – EXCESS OF SELF RETENTION

With respect to coverage provided by this endorsement, the provisions of the Indemnity Contract apply unless modified by this endorsement.

| | |
|---|---|
| **Named Insured:   New England Motor Freight, Inc.** | |
| **Endorsement Effective Date:    April 10, 2018** | |
| **Contract  Number:    595-100798-1** | |

## SCHEDULE

| Coverage | Limit of Indemnity |
|---|---|
| Fire Legal Liability | $  5,000,000 |

## A. Coverage

For purposes of this endorsement:

1. "Fire legal liability" means "property damage" caused by fire to premises, not including contents, while rented to the "Named Insured" or temporarily occupied by the "Named Insured" with the permission of the owner.

2. For "Fire legal liability", we will pay no more than the Limit of Indemnity shown in the Schedule of this endorsement less "self-retention".

3. This coverage is excess over any collectible property insurance that is available to the "Named Insured".

THIS ENDORSEMENT CHANGES THE CONTRACT.  PLEASE READ IT CAREFULLY.

# ADVERTISING INJURY OR PERSONAL INJURY COVERAGE

This endorsement modifies insurance provided under the following:

INDEMNITY CONTRACT – EXCESS OF SELF RETENTION

With respect to coverage provided by this endorsement, the provisions of the Indemnity Contract apply unless modified by this endorsement.

| | |
|---|---|
| **Named Insured:   New England Motor Freight, Inc.** | |
| **Endorsement Effective Date:    April 10, 2018** | |
| **Contract Number:   595-100798-1** | |

Paragraph **12.** of **Section II – Exclusions** does not apply.


**CRUM & FORSTER**
A FAIRFAX COMPANY

# SCHEDULE OF AFFILIATED INSURED(S)

| | |
|---|---|
| **Named Insured:   New England Motor Freight, Inc.** | |
| **Contract Number:   595-100798-1** | |

The following are hereby included as "Affiliated Insured(s)":

| | Name |
|---|---|
| 1 | Concord Terminal, LLC. |
| 2 | Myron Shevell 1990 Trust |
| 3 | Arlen Blakeman 1996 Trust |
| 4 | Zachary Cohen 1996 Trust |
| 5 | Merissa Cohen 1996 Trust |
| 6 | North Avenue East, LLC |
| 7 | Blanchard Street LLC |
| 8 | The New England Motor Freight Inc. 401K Profit Sharing Trust. |
| 9 | Apex Express Corp.(In Md. A/K/A The New Group Express Corp.) |
| 10 | Apex Logistics, Inc. |
| 11 | 12731 RTE 30 CORP. |
| 12 | 15 Middletown Ave Corp. |
| 13 | 3600 Georgetown Corp. |
| 14 | Arlen Farm Corp. |
| 15 | Camionnage New England Inc, |
| 16 | Carrier Industries, Inc., |
| 17 | JPS Hawks, Inc. |
| 18 | Concord Terminal Corp, |
| 19 | Eastern Freight Ways Inc. |
| 20 | The Eastern Group |
| 21 | Fair Terminal Corp. |
| 22 | Hollywood Corp. |
| 23 | International  Distribution Centers Inc. |
| 24 | James Truck Corp. |
| 25 | Jans Leasing Corp. |
| 26 | Jon Shevell |
| 27 | Jon S. Corp. |
| 28 | Lease Services Inc. |
| 29 | Mercohen Corp. |
| 30 | Nancy S B Corp. |
| 31 | Nancy Shevell |
| 32 | NEMF World Transport Inc. |
| 33 | New Terminal Corp. |
| 34 | North Red Truck Corp. |

| | |
|---|---|
| 35 | North Turbo Corp. |
| 36 | Orange Truck Corp |
| 37 | Pennsa Corp. |
| 38 | Phoenix Motor Express, Inc. |
| 39 | Spring Terminal Corp. |
| 40 | Susan Cohen |
| 41 | United Express Lines, Inc. |
| 42 | Zach Corp. |
| 43 | Susan Cohen Grantor Trust |
| 44 | Jon Shevell Grantor Trust |
| 45 | Nancy Blakeman Grantor Trust |
| 46 | Myron P. Shevell |
| 47 | NSB,LLC |
| 48 | 55 DELTA DRIVE, LLC |
| 49 | CARLL'S PATH, LLC |
| 50 | AZM, LLC |
| 51 | NEMF Local 447 District 15 401-K Plan |
| 52 | 9 DUNHAM ROAD LLC |
| 53 | 6867 SCHUYLER ROAD LLC |
| 54 | WORK STREET LLC |
| 55 | LATHCO LLC |
| 56 | 1362 CLOVER LEAF ROAD, L.P. |
| 57 | LEHCO, L.P. |
| 58 | ARMERACH LP |
| 59 | 36th AVENUE, LLC |
| 60 | BABCO, LLC |
| 61 | THRU VIEW, LLC |
| 62 | 345 WALCOTT STREET, LLC |
| 63 | NANCY BLAKEMAN 2000 TRUST |
| 64 | JON SHEVELL 2000 TRUST |
| 65 | SUSAN COHEN 2000 TRUST |
| 66 | OLD BETH, LLC |
| 67 | MERI PROPERTIES, LLC |
| 68 | Perry Road, LLC |
| 69 | Pleasant Hill Road, LLC |
| 70 | NANCY BLAKEMAN 2002 TRUST |
| 71 | JON SHEVELL 2002 TRUST |
| 72 | SUSAN COHEN 2002 TRUST |
| 73 | MYAR, LLC |
| 74 | SCHUYLER ROAD CORP. |
| 75 | ELK EAST, LLC |
| 76 | MILTON PROPERTIES, LP |
| 77 | HAGLAND, LLC |
| 78 | SCHUYLER ROAD, LLC |
| 79 | MPS PALACE, LLC |
| 80 | Northeast Commerce Center I, LLC |

| 81 | Northeast Commerce Center II, LLC |
|-----|------|
| 82 | BURMONT, LLC |
| 83 | BURVER, LLC |
| 84 | COLUMBUS TERMINAL LLC |
| 85 | BUCOLIC FARM, LP |
| 86 | OLD BETH II, LLC |
| 87 | SHEVELL GROUP OF COMPANIES, LLC |
| 88 | BELTWAY RIVER LLC |
| 89 | MPS Investments, L.L.C. |
| 90 | HOLLYWOOD AVENUE SOLAR, L.L.C. |
| 91 | UNITED EXPRESS SOLAR, L.L.C. |
| 92 | TOLEDO TERMINAL LLC |
| 93 | ALBANY TERMINAL LLC |
| 94 | MYDAN LLC. |
| 95 | Merissa Cohen |
| 96 | Zachery Cohen |
| 97 | Arlen Blakeman |
| 98 | SHEVELL INVESTMENT ASSOCIATES INC. |
| 99 | SHEVELL LONG BRANCH LLC |
| 100 | NEMF LOGISTICS, LLC |
| 101 | Arlen W. Blakeman 2000 Subtrust u/w/o Jon Shevell |
| 102 | Merissa L. Cohen 2000 Subtrust u/w/o Jon Shevell |
| 103 | Zachary W. Cohen 2000 Subtrust u/w/o Jon Shevell |
| 104 | Richmond Terminal, LLC |
| 105 | Shevell Family 2016 Dynasty Trust |
| 106 | Nancy Shevell NcCartney 2016 Non GST Exempt IRR Trust |
| 107 | Susan S. Cohen 2016 Non GST Exempt IRR Trust |
| 108 | MyJon LLC |
| 109 | Camp Hill Terminal, LLC |
| 110 | Fort Wayne Terminal LLC |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CYBER LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

INDEMNITY CONTRACT – EXCESS OF SELF RETENTION

With respect to coverage provided by this endorsement, the provisions of the Indemnity Contract apply unless modified by this endorsement.

| | |
|---|---|
| **Named Insured:   New England Motor Freight, Inc.** | |
| **Endorsement Effective Date:     April 10, 2018** | |
| **Contract Number:   595-100798-1** | |

**A.** The following exclusion is added to **SECTION II – Exclusions:**

All Coverages under this contract shall not apply to:

**1.** "Personal injury" or "property damage" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information. This exclusion applies even if "damages" are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense paid by the "Insured" arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**2.** "Personal injury" or "property damage" arising out of the loss of, damage to, corruption of, inability to access, or inability to manipulate "electronic data". This exclusion applies even if "damages" are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense paid by the "Insured" arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**3.** "Personal injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

   **a.** The Telephone Consumer Protection Act, including any amendment of or addition to such law;

   **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

   **c.** The Fair Credit Reporting Act, and amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act; or

   **d.** Any federal, state or local statute, ordinance or regulation that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B. Additional Definitions**

**1.** The following definition is added to **Section IV – Definitions**:

"Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment. With respect to "property damage", "electronic data" is not tangible property.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# UNINSURED OR UNDERINSURED MOTORISTS/ PERSONAL INJURY PROTECTION

This endorsement modifies insurance provided under the following:

INDEMNITY CONTRACT – EXCESS OF SELF RETENTION

With respect to coverage provided by this endorsement, the provisions of the Indemnity Contract apply unless modified by this endorsement.

| |
|---|
| **Named Insured:   New England Motor Freight, Inc.** |
| **Endorsement Effective Date:    April 10, 2018** |
| **Contract Number:   595-100798-1** |

**SCHEDULE**

| |
|---|
| **Policy Number:    133-743566-7** |

1. All coverage to be provided for **Coverage (C)** "Uninsured" or "Underinsured Motorists" and/or **Coverage (D)** "Personal Injury Protection" under this contract shall be provided by the form of the Policy Number described in the Schedule of this endorsement and issued by us.

2. The Policy Number in the Schedule and all endorsements thereto now or hereafter issued are and shall be an endorsement to this contract, but only as respects **Coverage (C)** "Uninsured" or "Underinsured Motorists" and/or **Coverage (D)** "Personal Injury Protection".

3. All elections of coverage or rejections of coverage under or to the Policy Number in the Schedule shall be elections and/or rejections of and to this contract.

4. All amounts paid, payable or otherwise authorized, committed or obligated by us under **Coverage (C)** and **Coverage (D)** by the form of the Policy Number in the Schedule, an endorsement to this contract, and any and all attendant "costs" shall be the full and complete responsibility of the "Insured" and all such amounts or "costs" shall be paid or reimbursed to us by the "Insured."

   The "Insured" shall be entitled to reimbursement for "ultimate net loss" in excess of its "self-retention" and for payment of "costs" as provided by this contract.

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR CONTRACT FOR INFORMATIONAL PURPOSES ONLY.**

# ADDITIONAL INSURED DEFINITION

This endorsement modifies insurance provided under the following:

INDEMNITY CONTRACT – EXCESS OF SELF RETENTION

With respect to coverage provided by this endorsement, the provisions of the Indemnity Contract apply unless modified by this endorsement.

This endorsement changes the contract effective on the inception date of the policy unless another date is indicated below.

| | |
|---|---|
| **Named Insured:   New England Motor Freight, Inc.** | |
| **Endorsement Effective Date:     April 10, 2018** | |
| **Contract Number:   595-100798-1** | |

A. "Additional Insured(s)" is defined in Paragraph **M.5.** of the contract under **SECTION IV – DEFINITIONS.** Paragraph **M.5.** reads as follows:

"Additional Insured(s)" may also be called "Additional Interests" as designated in the endorsements and/or certificates issued by us or our agents.   The usage of the term "Additional Insured" is only for industry convenience and shall not cause this contract to be considered a policy of insurance.   The "Additional Insured(s)" shall be indemnified under this contract only to the extent that the "Named Insured" or "Affiliated Insured" is obligated by a "covered contract" to reimburse, hold harmless or indemnify the "Additional Insured(s)".   Indemnification under this contract for such "Additional Insured(s)" shall also be subject to all terms, definitions, conditions, and exclusions of this contract.   The "Named Insured" or "Affiliated Insured" as designated by us shall pay all amounts payable to or on behalf of the "Additional Insured(s)" as and when requested by us and shall be entitled to reimbursement for "ultimate net loss" in excess of its "Self-retention" as provided by this contract.

# EXHIBIT B

**Form MCS-82 bond for New England Motor Freight, Inc.**

**FORM MCS-82**  Revised 01/05/2017

OMB No.: 2126-0008    Expiration: 01/31/2020

| USDOT Number: 31120 | Date Received: 04/10/2018 |

A Federal Agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0008. Public reporting for this collection of information is estimated to be approximately 2 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, Washington, D.C. 20590.

 United States Department of Transportation
**Federal Motor Carrier Safety Administration**

**Motor Carrier Public Liability Surety Bond**

**under Sections 29 and 30 of the Motor Carrier Act of 1980**

# FORM MCS-82

## PARTIES

**SURETY COMPANY**

United States Fire Insurance Co.
COMPANY NAME

305 Madison Avenue
STREET ADDRESS

Morristown
CITY

New Jersey    07960    317-436-4900
STATE    ZIP CODE    TELEPHONE NUMBER

Jeremy Zottneck  - SEVP - Underwriting
*(type or print Principal Officer's name and title)*

**MOTOR CARRIER**

NEW ENGLAND MOTOR FREIGHT, INC.
COMPANY NAME

1-71 NORTH AVENUE EAST
STREET ADDRESS

ELIZABETH
CITY

New Jersey    07201-2936    (201) 965-0100
STATE    ZIP CODE    TELEPHONE NUMBER

*(type or print Principal Officer's name and title)*

## PURPOSE

This is an agreement between the Surety and the Principal under which the Surety, its successors and assignees, agree to be responsible for the payment of any final judgment or judgments against the Principal for public liability, property damage, and environmental restoration liability claims in the sums prescribed herein; subject to the governing provisions and the following conditions.

## GOVERNING PROVISIONS

1. Sections 29 and 30 of the Motor Carrier Act of 1980 (49 U.S.C. 13906).
2. Rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).

## CONDITIONS

The Principal is or intends to become a motor carrier of property subject to the applicable governing provisions relating to financial responsibility for the protection of the public.

This bond assures compliance by the Principal with the applicable governing provisions, and shall insure to the benefit of any person or persons who shall recover a final judgment or judgments against the Principal for public liability, property damage, or environmental

*(continued on next page)*

**FORM MCS-82**    Revised 01/05/2017                                                                 **OMB No.: 2126-0008    Expiration: 01/31/2020**

restoration liability claims (excluding injury to or death of the Principal's employees while engaged in the course of their employment, and loss of or damage to property of the principal, and the cargo transported by the Principal). If every final judgment shall be paid for such claims resulting from the negligent operation, maintenance, or use of motor vehicles in transportation subject to the applicable governing provisions, then this obligation shall be void, otherwise it will remain in full effect.

Within the limits described herein, the Surety extends to such losses regardless of whether such motor vehicles are specifically described herein and whether occurring on the route or in the territory authorized to be served by the Principal or elsewhere.

The liability of the Surety on each motor vehicle subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 for each accident shall not exceed $ 1,000,000_____, and shall be a continuing one notwithstanding any recovery hereunder.

The surety agrees, upon telephone request by an authorized representative of the FMCSA, to verify that the surety bond is in force as of a particular date. The telephone number to call is (317) 436-4900_____.

This bond is effective from 4/10/2018_____ (12:01 a.m., standard time, at the address of the Principal as stated herein) and shall continue in force until terminated as described herein. The principal or the Surety may at any time terminate this bond by giving (1) thirty–five (35) days notice in writing to the other party (said 35 day notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the Principal is subject to the FMCSA's registration requirements, by providing thirty (30) days notice to the FMCSA (said 30 days notice to commence from the date notice is received by the FMCSA at its office in Washington, D.C.). The Surety shall not be liable for the payment of any judgment or judgments against the Principal for public liability, property damage, or environmental restoration claims resulting from accidents which occur after the termination of this bond as described herein, but such termination shall not affect the liability of the Surety for the payment of any such judgment or judgments resulting from accidents which occur during the time the bond is in effect.

*(affix Motor Carrier corporate seal)*

United States Fire Insurance Co._____ 4/10/2018_____
SURETY                                                           DATE

Indianapolis_____                                    Indiana_____
CITY                                                              STATE

*(Principal Officer's signature)*

## ACKNOWLEDGMENT OF SURETY

Hamilton_____                                         Indiana_____
COUNTY OF                                                  STATE OF

On this 10th day of April_____, 2018____, before me personally came Jeremy Zottneck_____, who, being by me duly sworn, did depose and say the he resides in Indiana_____; that he/she is SEVP - Underwriting_____ of the United States Fire Insurance Co._____, the corporation described in and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the board of directors of said corporation; that he/she signed his/her name thereto by like order, and he/she duly acknowledged to me that he/she executed the same for and on behalf of the said corporation.

MEGAN L. HOFF
Notary Public, State of Indiana
Hamilton County
Commission #656465
My Commission Expires
August 28, 2022
*(affix Surety)*

Megan L. Hoff - Notary_____
*(type or print Surety Officer's name and title)*

*(Surety Officer's signature)*

603-1006011_____
*(Surety Company File Number)*

**Filings must be transmitted online via the Internet at http://www.fmcsa.dot.gov/urs.**