**GREENBERG TRAURIG, LLP**
Alan J. Brody, Esq.
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
(973) 443-3543 (Telephone)
(973) 295-1333 (Facsimile)

*-and-*

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
Mark F. Liscio, Esq.
Scott D. Talmadge, Esq.
601 Lexington Avenue, 31st Floor
New York, New York 10022
(212) 277-4000 (Telephone)

*Co-Counsel to JPMorgan Chase, N.A.*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW ENGLAND MOTOR FREIGHT, INC., *et al.*, | Case No. 19-12809 (JKS) |
| | (Jointly Administered) |
| Debtors.[1] | |
| | **Hearing Date and Time:** May 16, 2019 at 10:00 a.m. |

## LIMITED OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER TO SELL SUBSTANTIALLY ALL ASSETS OF DEBTORS EASTERN FREIGHT WAYS, INC., CARRIER INDUSTRIES, INC. AND CERTAIN ROLLING STOCK OWNED BY DEBTOR NEW ENGLAND MOTOR FREIGHT, INC. FREE AND CLEAR OF LIENS UNDER SECTION 363(F) OF THE BANKRUPTCY CODE

JPMorgan Chase Bank, N.A. ("**Chase**"), a secured creditor of the debtors in the above-

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

captioned cases (the "**Debtors**"), by and through its undersigned co-counsel, Greenberg Traurig, LLP and Freshfields Bruckhaus Deringer US LLP, hereby files this limited objection (the "**Objection**") in accordance with the Order entered herein on April 8, 2019 [Dkt. No. 427], to the proposed sale (the "**Sale**") of the assets of Debtors Eastern Freight Ways, Inc. ("**Eastern**"), Carrier Industries, Inc. ("**Carrier**") and New England Motor Freight ("**NEMF**") and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Chase is supportive of the Debtors' efforts to maximize the value of its estates through the Sale so long as the final Sale order provides for the following:

- Chase is paid at closing the outstanding principal amount on each item of Chase rolling stock to be sold in the Sale, with all additional amounts due to Chase from the sale proceeds preserved;

- the "Allocation Methodology," attached as Exhibit A to the Stalking Horse Asset Purchase Agreement [Dkt. No. 481], shall not be used to allocate the Sale proceeds for purposes of resolving any claims creditors may have against the Debtors; and

- all excess Sale proceeds—after the Debtors have paid the outstanding principal amount of the sold rolling stock and/or equipment—must be held in escrow pending agreement among the various creditors asserting claims against the undistributed proceeds or upon an order of this Court.

2. Absent the inclusion of these provisions in the final Sale order, Chase objects to the Sale.

## BACKGROUND

3. These Chapter 11 cases were commencing by the filing of voluntary Chapter 11

petitions on February 11, 2019 (the "**Petition Date**").

**A.    Term Loans**

4.    Prior to the Petition Date, NEMF and Chase entered into that certain Master Lease Agreement effectively dated April 23, 2014 ("**Master Lease Agreement**") pursuant to which Chase extended eight (8) separate term loans to NEMF ("**NEMF Term Loans**"). Each of the NEMF Term Loans is evidenced by a separate financing lease agreement (the "**NEMF Schedules**" and collectively with the Master Lease Agreement, the "**Term Loan Documents**").[2]

5.    NEMF utilized the proceeds of the NEMF Term Loans to finance NEMF's acquisition of various freightliners, tractors, trailers and forklifts used by NEMF and its affiliate Debtors in their day-to-day business operations (the "**NEMF Collateral**"). To secure NEMF's obligations under the Term Loan Documents, NEMF granted to Chase, a first-priority security interest in and to the NEMF Collateral. Most of the NEMF Collateral is comprised of vehicles for which Chase perfected its security interest by noting its lien on the vehicle titles. *See* N.J.S.A. 12A:9-311(a)(2); N.J.S.A. 39:10-11(J) (stating that security interest in vehicle is perfected by notation on title). The NEMF Collateral is also comprised of forklifts for which Chase perfected its security interest by filing a UCC-1 financing statement in the appropriate jurisdiction.

6.    Pursuant to each NEMF Schedule, the NEMF Collateral financed by the NEMF Term Loans cross-collateralized all of the NEMF's obligations owing to Chase. According to paragraph 7 of each NEMF Schedule, the NEMF Collateral served "[a]s collateral security for payment and performance of all Secured Obligations (defined in Paragraph 8 below) and to induce Lessor [Chase] to extend credit from time to time to Lessee [NEMF] (under the Lease or otherwise), Lessee hereby grants to Lessor a first priority security interest in all of Lessee's right,

---

[2] The Term Loan Documents are too voluminous to attach to this Limited Objection but have been provided to respective counsel for the Debtors, the Committee and are otherwise available upon request.

title and interest in the Equipment, whether now existing or hereafter acquired, and in all Proceeds...."

7. According to paragraph 8 of each NEMF Schedule, "Secured Obligations" is defined as:

(a) all payments and other obligations of Lessee [NEMF] under or in connection with this Schedule, and (b) all payments and other obligations of Lessee (whether now existing or hereafter incurred) under or in connection with the Master Lease and all presented and future Lease Schedules thereto, and (c) all other leases, indebtedness, liabilities and/or obligations of any kind arising under or from any note, open account, overdraft, credit card, lease, Rate Management Transaction, letter of credit application, endorsement, surety agreement, guaranty, acceptance, foreign exchange contract or any monetary obligation (whether now existing or hereafter incurred, absolute or contingent, direct or indirect) of Lessee to Lessor [Chase].

9. As of the Petition Date, NEMF was indebted to Chase for amounts in excess of $3.9 million in connection with the Term Loan Documents. By email dated May 1, 2019, the Official Committee of Unsecured Creditors (the "**Committee**"), by and through its counsel, Lowenstein Sandler LLP, confirmed that the Committee has no Challenge to Chase's liens on the rolling stock of NEMF.

**B.    The Letters of Credit.**

10. In addition to the Term Loan Documents, Chase previously issued three letters of credit on behalf of NEMF (collectively, the "**Letters of Credit**") pursuant to a Continuing Agreement for Standby Letters of Credit dated April 27, 2009 (the "**LC Agreement**") and an Advised Line of Credit Note dated April 11, 2013, as modified by the Note Modification

Agreement dated September 11, 2018 (the "**LC Note**" and together with the LC Agreement, the "**LC Documentation**" and collectively with the Term Loan Documents, the "**Loan Documents**"). All obligations due to Chase pursuant to the Loan Documents are secured by the NEMF Collateral and the Debtors' cash deposited at Chase.

11. On February 20, 2019, Chase received notice that the beneficiary under an issued Letter of Credit had requested a full draw under that Letter of Credit in the amount of $2,450,000.00. As required, Chase honored this draw request in full. On March 5, 2019, Chase received notice that the beneficiary under an issued Letter of Credit had requested a full draw in the amount of $7,850,000.00. As required, Chase honored this draw request in full.

12. To date, Chase has not received payment from NEMF with respect to the drawn Letters of Credit, resulting in an outstanding liability of $10,300,000 *plus* fees, costs and expenses owing to Chase.

C. **Eastern and Carrier Guaranty Agreements.**

13. Eastern, whose assets are to be sold as part of the Sale, is party to a Continuing Guaranty Agreement, dated June 12, 2009, pursuant to which Eastern guaranteed all of the debts, obligations, indebtedness and liabilities of every kind of NEMF owed to Chase (the "**Eastern Guaranty Agreement**"). Pursuant to the Eastern Guaranty Agreement, Eastern granted a security interest in its deposit accounts maintained at Chase and authorized Chase to setoff and apply all funds in the deposit accounts maintained at Chase with respect to all debts, obligations, indebtedness and liabilities of every kind and character of NEMF and Eastern due to Chase.

14. Carrier, whose assets are to be sold as part of the Sale, is party to a Continuing Guaranty Agreement, dated June 12, 2009, pursuant to which Carrier guaranteed all of the debts, obligations, indebtedness and liabilities of every kind of NEMF owed to Chase (the "**Carrier**

**Guaranty Agreement**" and together with the Eastern Guaranty Agreement, the "**Guaranty Agreements**"). Pursuant to the Carrier Guaranty Agreement, Carrier granted a security interest in its deposit accounts maintained at Chase and authorized Chase to setoff and apply all funds in the deposit accounts maintained at Chase with respect to all debts, obligations, indebtedness and liabilities of every kind and character of NEMF and Carrier due to Chase.

**D.    Debtors' Section 363 Sale of Eastern and Carrier.**

15.    On March 25, 2019, the Debtors filed the Motion [Dkt. No. 335] proposing a going concern sale of substantially all of the assets of Eastern, Carrier and of certain assets of NEMF used by Eastern, referred to herein as the Sale

16.    On April 18, 2019, the Debtors filed the Notice of (I) Stalking Horse Designation; (II) Filing of Staking Horse APA with Bid Protections; and (iii) Filing of Amended Bidding Procedures in respect to the Sale [Dkt. No. 477]. Pursuant to the notice, the Debtors designated Estes Express Lines as the Stalking Horse Bidder [Dkt. No. 477].

17.    The Stalking Horse Asset Purchase Agreement proposes to sell substantially all of the assets of Eastern and Carrier as well as certain rolling stock owned by NEMF but used by Eastern. Stalking Horse Asset Purchase Agreement, [Dkt. No. 477-1 (the "**Stalking Horse APA**"). Under the Stalking Horse APA, the Stalking Horse Bidder submitted a bid of $15,000,000 for all of the Specified Assets (as defined in the Stalking Horse APA) with no assumed liabilities and subject to a purchase price adjustment equal to the difference (if any) between the aggregate amount of receivables (whether billed or not) owed to Eastern and Carrier as at closing and a target receivable value of $2,000,000.[3] Stalking Horse APA, p. 11, § 2.5.

---

[3] In addition, the Debtors and the Stalking Horse Bidder agreed to a $450,000 break-up fee *plus* an expense reimbursement in an amount of $75,000. Stalking Horse APA, p. 16, § 6.4.

6

18. The Stalking Horse APA, however, did not designate what percentage of the aggregate purchase price is to be allocated to Eastern and Carrier, respectively. Nor did the Stalking Horse APA allocate the purchase price as to each individual asset to be sold, including the assets owned by NEMF. The "Allocation Schedule," attached as Exhibit A to the Stalking Horse APA, allocated a purchase price across vaguely-defined asset classes and for what appeared to be solely for allocating tax liabilities between the Debtor and the purchaser pursuant to the Internal Revenue Code.

19. Upon information and belief, on April 23, 2019, Vincent Colistra ("**Colistra**"), the Debtors' chief restructuring officer, convened a call with certain secured lenders affected by the Sale. On that call, Colistra indicated that, once the Sale purchase price has been paid at closing, the Debtors would pay the principal amount of all encumbered equipment and rolling stock sold in the Sale with the proceeds from the Sale. Colistra added that, after the Debtors pay in full the outstanding principal of the encumbered property, the remaining net cash proceeds would be retained in an escrow account. No further detail or information was provided as to that escrow account, including whether any disbursements would be made therefrom or the process by which the funds therein would be allocated across creditors and/or other parties.

20. The proposed Sale Order filed with the Sale motion fails to provide for the principal payment to Secured Lenders as promised by Mr. Colistra, the methodology for paying the balance of proceeds due to the Secured Lenders on account of their secured claims, or an allocation of the sale proceeds amongst the sale assets or the three (3) separate estates.

## OBJECTION

**I. The Proposed Sale Order Must Provide that the Outstanding Principal Amounts of any Collateral to be Sold in the Sale is Paid in Full at Closing.**

25. There is no language in the Proposed Sale Order [Dkt. No. 335-1] ("**Proposed Order**") that ensures the outstanding principal amounts of each item of rolling stock or equipment to be sold in the Sale, including certain NEMF Collateral, will be paid in full at closing. To the extent such language does not appear in the Sale order, Chase objects to the Sale and Proposed Order.

II. **The Purchase Price Allocation Provided for in the Stalking Horse Asset Purchase Agreement Cannot Bind the Debtors' Creditors.**

26. The Proposed Order must make clear that the allocation of the "Tax Purchase Price" in accordance with the "Allocation Methodology" found at Exhibit A to the Stalking Horse Asset Purchase Agreement [Dkt. No. 481] ("**Exhibit A to Stalking Horse APA**") is not binding on any creditors for any purpose.

27. The Stalking Horse APA provides for the allocation of the "Tax Purchase Price" in accordance with the "Allocation Methodology," which in the case of rolling stock appears to be a "fair market value" methodology. See Stalking Horse APA, p. 19, § 6.9(b); Exhibit A to Stalking Horse APA, p. 1. While the Stalking Horse APA states that the allocation is not "determinative" of values or allocations for purposes of the Debtors' Chapter 11 Case,[4] the Debtors have

---

[4] The Stalking Horse APA states:

> Notwithstanding the allocation of the Tax Purchase Price in this Section 6.9(b), nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any proceeding in the Chapter 11 Case that may be proposed. Debtors reserve the right on their behalf and on behalf of Debtors' estates, to the extent not prohibited by applicable law and accounting rules, for purposes of any proceeding in connection with the Chapter 11 Case, to ascribe values to the Acquired Assets and to allocate the value of the Acquired Assets to Debtors in the event of, or in order to resolve, creditor disputes in the Chapter 11 Case.

Stalking Horse APA, p. 19, § 6.9(b).

simultaneously asked the Court to order, in a section of the Proposed Order addressing secured creditors' liens on Sale proceeds, that "[t]he purchase price shall be allocated to the Purchased Assets in the manner set forth in the Asset Purchase Agreement." Proposed Order, p. 23, ¶ 11. To the extent this language in the Proposed Order could be construed as binding all of the Debtors' secured creditors to an allocation made by Debtors and/or the purchaser under Exhibit A to the Stalking Horse APA, such language should be stricken from the Proposed Order. The Proposed Order should either provide for a proper allocation agreed upon by the parties in these cases or be clear that no allocation of the Sale purchase price between Debtors and the purchaser shall be determinative or binding on any other parties in this case.

### III. The Debtors Cannot Use Any Remaining Escrow Funds Without Either an Agreement Among the Parties Who Have Claims Against Such Funds or an Order for this Court.

28. There is no language in the Proposed Order that ensures that any excess funds—after the full outstanding principal is paid on each item of property to be sold—will be held in escrow. Nor is there language in the Proposed Order that ensures such funds will not be disbursed, for any reason, before an appropriate allocation of such funds is agreed to between all interested parties, whether by agreement or court order. Absent such assurances in the Sale order, Chase objects to the Sale and Proposed Order.

### RELIEF REQUESTED

29. Chase respectfully requests that the relief sought in the Debtor's Motion [Dkt. No. 335] and Proposed Order should be granted so long as the final Sale order specifically provides that: (a) the outstanding principal payments owed Chase and any other properly-secured creditor is made from the Sale proceeds at closing; (b) Exhibit A to the Stalking Horse APA shall not be binding on any creditor and a proper allocation between the assets and the various estates are

determined; and (c) that any excess Sale proceeds are placed in escrow and shall not be disbursed for any reason pending further agreement and/or further order of the Court as to the distribution of such proceeds.

## **RESERVATION OF RIGHTS**

30.  Chase is hopeful that its concerns outlined above will be resolved prior to the hearing on May 16, 2019. In the interim, however, Chase expressly reserves all rights relating to, among other things and without limitation, the sale of the NEMF Collateral, the allocation of the sale proceeds and any proceeds thereof generated through the Sale. Chase further reserves its right to amend, modify or supplement this Objection, including responding to the filing of any additional documents or exhibits by Debtors, the Committee and/or any party-in-interest, and to raise additional arguments at tor prior to the hearing on the Motion.

*[Remainder of this page intentionally left blank]*

## CONCLUSION

**WHEREFORE,** Chase respectfully requests that this Court (a) deny the relief requested in the Motion, at this time, without prejudice, (b) grant such other and further relief as this Court deems just and proper.

Dated: May 6, 2019

Respectfully submitted,

*/s/Alan J. Brody*
Alan J. Brody, Esq.
GREENBERG TAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
Telephone: (973) 443-3543
Facsimile: (973) 296-1333

FRESHFIELDS BRUCKHAUS DERINGER US LLP
Mark F. Liscio, Esq.
Scott D. Talmadge, Esq.
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000

Co-Counsel for JP Morgan Chase Bank, N.A.

*ACTIVE 43309993v1*