# EXHIBIT A



NYT
The New York Times
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

May 6 2019

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

MAY 06 2019 B6 NATIONAL

Alice Weber

Sworn before me the 6th day of May 2019

Michelle M. S.

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified In Nassau County
Commission Expires May 13, 2021

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| In re: NEW ENGLAND MOTOR FREIGHT, INC., et al., Debtors.[1] | Chapter 11<br>Case No. 19-12809 (JKS)<br>(Jointly Administered) |
|---|---|

**NOTICE OF BAR DATES FOR FILING CLAIMS**

**TO ALL KNOWN CREDITORS OF THE ABOVE-CAPTIONED ENTITIES (COLLECTIVELY, THE "DEBTORS"):**

On February 11 2019 (the "**Petition Date**"), the above captioned debtors and debtors in possession (the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Jersey (the "**Court**"). On May 1, 2019, the Court entered an order (the "**Bar Date Order**") establishing certain claims bar dates in the chapter 11 cases. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bar Date Order. By the Bar Date Order, the Court established **June 18, 2019 at 5:00 p.m. (prevailing Eastern Time)** as the general claims bar date (the "**General Bar Date**"). Except as described below, the Bar Date Order requires all entities that have or assert any pre-petition claims (a "**Claim**") against the Debtors and their estates to file proofs of claim with Donlin, Recano & Company, Inc. ("**DRC**"), the claims and noticing agent in the chapter 11 cases, so that their proofs of claim are **actually received** by DRC on or before 5:00 p.m. (prevailing Eastern Time) on the General Bar Date. The term "Claim" means, as to or against the Debtors and in accordance with section 101(5) of the Bankruptcy Code: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The Bar Date Order establishes the following bar dates for filing Proofs of Claim in the chapter 11 cases:

The General Bar Date: Pursuant to the Bar Date Order, the last date and time for all persons and entities, (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) that assert a Claim, including, without limitation, any claims under section 503(b)(9) of the Bankruptcy Code (each, a "**503(b)(9) Claim**"), secured claims, and priority claims, which arose on or prior to the Petition Date, to file Proofs of Claim on account of such Claim is **June 18, 2019 at 5:00 p.m. (prevailing Eastern Time)** (the "**General Bar Date**").

The Government Bar Date: Pursuant to the Bar Date Order, the last date and time for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Proofs of Claim against the Debtors and their estates is **August 12, 2019 at 5:00 p.m. (prevailing Eastern Time)** (the "**Government Bar Date**").

The Amended Schedules Bar Date: If the Debtors amend or supplement their Schedules subsequent to the service of this Notice, the Debtors will give notice of any such amendment or supplement to the holders of Claims affected thereby, and such holders shall be afforded **the later of (i) the applicable Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days from the date on which such notice is given, to file Proofs of Claim in respect of their affected Claims** (the "**Amended Schedules Bar Date**"). Any person or entity who files a Proof of Claim before the Schedules are amended shall not be required to file another Proof of Claim, unless the claimant disagrees with the scheduled claim, as amended, in which case, the claimant must file another Proof of Claim so as to be received by the Amended Schedules Bar Date.

The Rejection Bar Date: The last date and time for any person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) whose Claim arises out of the Court-approved rejection of an executory contract or unexpired lease in accordance with section 365 of the Bankruptcy Code (each, a "**Rejection Damages Claim**") to file a Proof of Claim on account of such Rejection Damages Claim is **the later of (i) the applicable Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the entry of the order approving the rejection of the executory contract or unexpired lease pursuant to which the entity asserting the Rejection Damages Claim is a party** (collectively with the General Bar Date, the Government Bar Date and the Amended Schedules Bar Date, each, a "**Bar Date**").

Entities That Must File Proofs of Claim by the Applicable Bar Date: Subject to the terms described above for holders of a Rejection Damages Claim, without limitation, each of the following entities that fails to file a Proof of Claim by the applicable Bar Date with respect to a Claim shall not be permitted to (a) vote to accept or reject any plan filed in the chapter 11 cases, (b) participate in any distribution in the chapter 11 cases on account of such Claim, or (c) receive further notices regarding such Claim: (i) any entity whose Claim against the Debtors is not listed in the Debtors' Schedules or whose Claim is listed in the Schedules but is listed therein as disputed, contingent, and/or unliquidated; (ii) any entity that believes that its Claim is improperly classified in the Schedules or is listed in an incorrect amount and that desires to have its Claim allowed in a classification or amount other than that identified in the Schedules; and (iii) any entity that believes that its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim allowed against a Debtor other than that identified in the Schedules.

Entities Not Required to File Proofs of Claim by the Applicable Bar Date: **The Bar Date Order further provides that the following persons and entities need not file Proofs of Claim on or before the applicable Bar Date: (a) any person or entity that already has filed a signed proof of claim against the respective Debtor(s) with the Clerk of the Court or with DRC in a form substantially similar to Official Form 410; (b) any person or entity whose claim is listed on the Schedules if: (i) the claim is not scheduled as any of "disputed," "contingent," or "unliquidated;" (ii) such person or entity agrees with the amount, nature, and priority of the claim as set forth in the Schedules; and (iii) such person or entity does not dispute that its claim is an obligation only of the specific Debtor against which the claim is listed in the Schedules; (c) any person or entity whose claim has previously been allowed by order of the Court; (d) any person or entity whose claim has been paid in full by the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Court; (e) any Debtor having a claim against any other Debtor; (f) any person or entity whose claim is based on an equity interest in either of the Debtors; (g) any person or entity holding a claim for which a separate deadline is fixed by this Court; (h) any person or entity holding a claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of administration incurred in the ordinary course, *provided, however*, that any person or entity asserting a claim entitled to priority under section 503(b)(9) of the Bankruptcy Code must assert such claims by filing a request for payment or a proof of claim on or prior to the Claims Bar Date; (i) Professionals retained by the Debtors or any statutory committees (each a "Committee") pursuant to orders of the Court who assert administrative claims for fees and expenses subject to the Court's approval pursuant to sections 328, 330, 331, and 503(b) of the Bankruptcy Code or 28 U.S.C. § 156(c); and (j) Any person or entity holding a Claim payable to the Court or the United States Trustee Program pursuant to 28 U.S.C. § 1930.**

Consequences of Failure to File Proof of Claim: **Any person, entity, or governmental unit not excepted from filing a Proof of Claim pursuant to the Bar Date Order, that fails to do so by the applicable Bar Date and in the form and manner provided for in the Bar Date Order shall not be permitted to (a) vote to accept or reject any plan filed in the chapter 11 cases, (b) participate in any distribution in the chapter 11 cases on account of such Claim, or (c) receive further notices regarding such Claim. If it is unclear from the Schedules whether your Claim is disputed, contingent, and/or unliquidated or is otherwise properly listed and classified, you must file a Proof of Claim on or before the applicable Bar Date. Any person, entity, or governmental unit that relies on the information in the Schedules bears full and absolute responsibility for determining that its Claim is accurately listed therein.**

Procedures for Filing Proofs of Claim: A Proof of Claim will be deemed timely only if the original Proof of Claim is **actually received** by DRC on or before the applicable Bar Date (i) electronically through the website of the Debtors' claims and noticing agent, Donlin, Recano & Company, Inc., using the interface available on such website located at https://www.donlinrecano.com/Clients/nemf/FileClaim (the "***Electronic Filing System***") or (ii) by mail at the following address: Donlin, Recano & Company, Inc., Re: New England Motor Freight Inc., et al., P.O. Box 199043, Blythebourne Station, Brooklyn, NY 11219; or (iii) by courier, hand delivery, or overnight delivery at the following address: Donlin, Recano & Company, Inc., Re: New England Motor Freight, Inc., et al., 6201 15th Avenue, Brooklyn, NY 11219. Proofs of Claim may not be sent by facsimile, telecopy, or electronic mail. A claimant who wishes to receive acknowledgement of receipt of its Proof of Claim form may submit a copy of the Proof of Claim form and a self-addressed, stamped envelope to DRC along with the original Proof of Claim. If you file a Proof of Claim, your Proof of Claim must: (a) be written in the English language; (b) be denominated in lawful currency of the United States as of the Petition Date; (c) conform substantially to Official Bankruptcy Form No. 410; (d) set forth with specificity the legal and factual basis for the alleged Claim; (e) include supporting documentation (or, if such documentation is voluminous, a summary of such documentation) or an explanation as to why such documentation is not available; and (f) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant.

Additional Information: Copies of the Schedules and the Bar Date Order are available for inspection during regular business hours at the Office of the Clerk of the Court. In addition, copies of the Schedules and the Bar Date Order may be viewed on the internet for a fee at the Court's website (http://www.njb.uscourts.gov/) by following directions for accessing the Court's electronic filing system on such website, or free of charge on DRC's website for the chapter 11 cases (https://www.donlinrecano.com/Clients/nemf/Index). Questions concerning the contents of this Notice and requests for additional Proof of Claim forms should be directed to DRC toll free at (866) 721-1211. **Please note that DRC's staff is not permitted to give legal advice. You should consult with your own attorney for assistance regarding any other inquiries, such as questions concerning the completion or filing of a Proof of Claim.**

**GIBBONS P.C.**, By: /s/ Karen A. Giannelli, Karen A. Giannelli, Esq., Mark B. Conlan, Esq., Brett S. Theisen, Esq., One Gateway Center, Newark, New Jersey 07102, Telephone: (973) 596-4500, Facsimile: (973) 596-0545, E-mail: kgiannelli@gibbonslaw.com, mconlan@gibbonslaw.com, btheisen@gibbonslaw.com, *Counsel to the Debtors and Debtors-in-Possession*

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

# If a Child Makes Joints, not Partner

By JULIE WEED

Manndie Tingler kept her secret from her parents, certain they would disapprove. And while most Americans have come around, she knew her mom and dad would still consider it "a horrible thing."

She eventually tired of hiding her affairs, so she began bringing up tidbits to "gauge their warmth." Finally, Ms. Tingler told them: She was helping to build a marijuana start-up.

Her mother's response was curt: "So, are you going to get arrested?"

Parents, at book clubs or block parties, love sharing news of their children's success. But making joints is a far cry from making partner.

Mom and Dad may abhor marijuana. They may fear their child will go to jail or be robbed in this cash-heavy marketplace, which is still illegal in the eyes of the federal government. And, of course, they may just be disappointed.

While legalization has thrown open the doors to entrepreneurs, women and minorities still face the typical biases and roadblocks when it comes to getting their ideas funded, and efforts to make recreational cannabis legal have stalled in states like New York and New Jersey. Lawmakers are struggling with how to right some of the wrongs from the war on drugs, which disproportionately targeted minorities, but consensus has been difficult.

Even so, there's no shortage of cannabis entrepreneurs. Most of the $8.5 billion industry has sprung up in recent years in the 33 states, plus Washington, D.C., that have legalized marijuana for medical or recreational purposes. That's about the size of the American yogurt market.

There are about 6,200 companies that "touch the plant," said Matt Karnes, a cannabis industry analyst and founder of GreenWave Advisors. He estimates that a typical company has 40 employees.

Ms. Tingler's parents were not only worried, but ashamed. "My parents are very conservative Christians, and they worried their church friends would think they raised a 'pothead,'" she said.

Before she decided to hang her cannabis shingle, Ms. Tingler, of Roseville, Calif., had run a nonprofit and worked in child and family counseling. "That was a noble job," she said. "This one was edgy."

Last year, Ms. Tingler helped found Khemia, a company that packages marijuana for sale and rolls it into joints. She is building a facility to make cannabis-infused topical lotions, edibles and concentrated marijuana.

Acceptance has been gradual over the last five years. Ms. Tingler's mother, Teri Moulton, has arthritis, and Ms. Tingler slowly introduced her to salves that have low levels of THC, the active compound in marijuana, for help with her pain without making her feel high. Now, Ms. Tingler said, her mother leaves these topicals out on the kitchen counter, "even though friends from church might see it."

In fact, Ms. Tingler speaks to some of her mother's friends on the topic, she said, and has become something of a "senior cannabis whisperer" in the last year, giving talks on how marijuana can ease some common complaints that come with age.

"It's not a cannabis-friendly community," she said of Roseville, a city near Sacramento, but her most recent presentation drew 150 people.

Rob Hendrix's mother-in-law burst into tears when she heard he was opening up Cannabis Central, the first legal pot shop in Ellensburg, Wash.

"She was so proud of the lives our family had led, our place in the community, it was an absolute shock and blow," Mr. Hendrix said.

**Parents struggle to accept a novel business choice.**

Before getting into cannabis, he had managed a car dealership in his city of about 20,000 people, about 100 miles southeast of Seattle. He was involved in the Rotary Club and had helped found the youth football league.

While Mr. Hendrix's mother-in-law has eased her stance over the past few years, asking him questions and clipping articles on the topic, some relatives still won't broach the matter.

"You know the usual chitchat, like 'How's your business going?' 'How's your work?' I don't get any of that," he said.

It has been stressful. "We know we entered a controversial world," Mr. Hendrix said, "and we're dealing with it the best we can."

While a typical entrepreneur's worst fear may be bankruptcy, the stakes are greater with cannabis. Despite growing acceptance, marijuana remains a Schedule 1 substance, like heroin, meaning the federal government regards it as having no currently accepted medical use and a high potential for abuse. If the Trump administration decided to prosecute cannabis businesses, entrepreneurs could go to jail and forfeit their property, said Allison Margolin, a lawyer in Beverly Hills, Calif., who has focused on cannabis law for the last 16 years.

AMY HARRITY FOR THE NEW YORK TIMES

Manndie Tingler, who helped start the cannabis company Khemia, and her mother, Teri Moulton.

The immediate response of Ms. Tingler's parents to her news was fear. "I was a single mother, and they thought I'd lose my kids," she said.

The Justice Department, however, has not gone down this path. Ms. Margolin said she knew of zero federal prosecutions of people conducting licensed marijuana activities in the last few years, unless they were also participating in illegal activities as well. In fact, her practice now focuses more on cannabis contracts and due diligence than criminal cases.

Some parents just wish their children would apply their talents elsewhere. A real estate agent in New York City whose son runs an organic marijuana farm did not want her name used in this article. She said the family was very upset and had tried to talk him out of it.

She had a long list of worries, including the company he would keep in the industry and the possibility that he would use marijuana more often.

Maggie Gonring, who is 62 and lives in the Chicago suburbs, used to tell friends that her son worked in software. She would leave out one key detail: that his company, Helix TCS, made "seed to sale" cannabis tracking software.

She worried that a job in cannabis would be such a severe black mark on his résumé that it would take him out of the running for future jobs. When Ms. Gonring's 88-year-old mother asked for medical marijuana at a doctor's appointment, however, she realized the substance had lost some of its stigma.

As legalization has spread, she has grown more comfortable with her son's work, even allowing herself some parental pride.

For some parents of pot entrepreneurs, acceptance has veered into partnership.

Ten years ago, when he was 19, Colin Cambern didn't want to go to school anymore, he said. His father, Sean, a business consultant, suggested that he start a company. The elder Mr. Cambern said he was "taken aback" when his son told him a few weeks later that he wanted to grow marijuana for the California medical market. Still, Mr. Cambern decided that he'd help his son, treating him like "any other client," and he dived into learning about the industry.

Colin Cambern got his business off the ground, baking THC-infused cupcakes and muffins with his girlfriend, while working at a local dispensary to gain experience. His father soon became head of sales, meeting with dispensary owners and managers who might stock the product. From there, he began taking orders and making deliveries.

Owners at some of the dispensaries started asking for business advice, and the elder Mr. Cambern ended up as an industry consultant with a raft of clients.

MICHELE CROWE/CBS

From left, John Dickerson, Gayle King and Norah O'Donnell, the current co-hosts of "CBS This Morning."

# *New Boss to Remake CBS News*

FROM FIRST BUSINESS PAGE

ers on May 15. The latest round of changes and tensions at CBS News were described by several people granted anonymity to describe sensitive internal discussions.

Gayle King — who has had a string of successes in recent months, including an interview with R. Kelly that went viral on social media — would be the centerpiece of Ms. Zirinsky's revamped "CBS This Morning." John Dickerson, an anchor since 2018, would slide over to "60 Minutes," according to four of the people familiar with the plans.

Norah O'Donnell, Ms. King's other co-anchor, is the likely contender to take over "CBS Evening News," replacing Jeff Glor, who has been in the job for 18 months, the people said.

If Ms. O'Donnell ascends to the job, she would join a short but exalted list of women who have served as solo evening news anchors at the three major networks, including Katie Couric at CBS and Diane Sawyer at ABC. Ms. O'Donnell's role remains under negotiation, and CBS declined to comment for this article.

The changes will bring a degree of certainty to a news operation besieged by speculation about who's in and who's out.

It will also be a benchmark for Ms. Zirinsky, now 67, who had been reluctant in the past to accept the role of CBS News president, and in recent months has openly questioned if she should have accepted the role, two of the people said. Ms. Zirinsky told the journalist Yashar Ali, who previously reported her misgivings, that she had "ZERO regrets about taking this job."

A legend within the news division — she was the inspiration for Holly Hunter's character in the 1987 movie "Broadcast News" — Ms. Zirinsky is the first woman to serve as CBS News president, and her promotion was literally met with cheers. The longtime overseer of "48 Hours," she was a trusted consigliere to the network rank-and-file. She said in an interview in January that she took the job because, "I felt at this moment in my life and my career this was the time to step up."

But Ms. Zirinsky had little prior experience in the darker arts of managing a television news network: negotiating with rapacious agents, juggling multiple programs, weathering leaks to The New York Post.

Colleagues say they admire Ms. Zirinsky's resolve and journalistic instinct, and her approachable management style of consulting with staff members at all levels on a range of topics. But they say that her approach — more closely resembling that of a producer than a traditional tight-lipped media executive — has allowed uncertainty and fear to fester among some anchors and crew members.

She has not been shy about discussing potential changes to the anchor lineup with a variety of staff members, two of the people said, and several complained that her decision-making process has stretched too long.

Ms. Zirinsky has also been adamant about not letting news reports dictate her decisions. But speculation about new roles for Ms. O'Donnell and Ms. King has floated in the news media for months. As recently as Thursday, The Post reported on Ms. Zirinsky's ideas to change the morning show and the evening newscast.

The uncertainty has allowed other factions of the newsroom to assert themselves.

Within the last two months, some in the senior ranks lobbied for Scott Pelley to return to the anchor chair of "CBS Evening News," according to two people familiar with internal conversations.

Mr. Pelley anchored the newscast from 2011 to 2017, before leaving for "60 Minutes" amid falling ratings and a somewhat strained relationship with David Rhodes, Ms. Zirinsky's predecessor as CBS News president.

Ms. Zirinsky considered the Pelley idea before ultimately ruling it out, the people said.

Ms. O'Donnell's move to the evening shift may be accompanied by a bigger change inside CBS: uprooting the "Evening News" from its longtime Manhattan home and relocating the broadcast to Washington. The change is a bold and expensive risk for an evening newscast that has been mired in third place among the broadcast networks. A Washington-based crew would need to be hired, and the cost of shuttling staff between the two cities could prove costly.

Still, Ms. Zirinsky's changes to the morning show could be her most crucial bet.

"CBS This Morning," which trails NBC's "Today" and ABC's "Good Morning America" by a wide margin in the ratings, is a significant source of revenue, bringing in $253 million last year, according to Kantar Media. Until 2017, the program had been lapping at the heels of rivals, powered by the interplay between Mr. Rose, Ms. King and Ms. O'Donnell.

But Mr. Rose's firing set off a number of lineup changes that failed to resonate with viewers. Mr. Dickerson, a star political interviewer, was shifted from "Face the Nation," but was an awkward fit for the saccharine world of morning TV. A fourth anchor, Bianna Golodryga, was added in October; by April, she had left the network.

Ms. Zirinsky is expected to pair Ms. King on "CBS This Morning" with Anthony Mason, who currently hosts the show's Saturday edition, and Tony Dokoupil, a network correspondent who is married to the NBC News star Katy Tur.

Two of the people said that Mr. Glor, a relative unknown at the time he ascended to the anchor's chair, would probably be offered another job at the network; Mr. Mason's move to weekdays leaves open his Saturday morning slot. Although he landed two interviews with President Trump, Mr. Glor's run may prove the limits to the theory that big-name anchors are no longer necessary for an evening newscast.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| In re: NEW ENGLAND MOTOR FREIGHT, INC., et al., Debtors.[1] | Chapter 11<br>Case No. 19-12809 (JKS)<br>(Jointly Administered) |
|---|---|

**NOTICE OF BAR DATES FOR FILING CLAIMS**

**TO ALL KNOWN CREDITORS OF THE ABOVE-CAPTIONED ENTITIES (COLLECTIVELY, THE "DEBTORS"):**

On February 11 2019 (the "**Petition Date**"), the above captioned debtors and debtors in possession (the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of New Jersey (the "**Court**"). On May 1, 2019, the Court entered an order (the "**Bar Date Order**") establishing certain claims bar dates in the chapter 11 cases. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bar Date Order. By the Bar Date Order, the Court established **June 18, 2019 at 5:00 p.m. (prevailing Eastern Time)** as the general claims bar date (the "**General Bar Date**"). Except as described below, the Bar Date Order requires all entities that have or assert any pre-petition claims (a "**Claim**") against the Debtors and their estates to file proofs of claim with Donlin, Recano & Company, Inc. ("**DRC**"), the claims and noticing agent in the chapter 11 cases, so that their proofs of claim are **actually received** by DRC on or before 5:00 p.m. (prevailing Eastern Time) on the General Bar Date. The term "Claim" means, as to or against the Debtors and in accordance with section 101(5) of the Bankruptcy Code: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The Bar Date Order establishes the following bar dates for filing Proofs of Claim in the chapter 11 cases:

The General Bar Date: Pursuant to the Bar Date Order, the last date and time for all persons and entities, (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) that assert a Claim, including, without limitation, any claims under section 503(b)(9) of the Bankruptcy Code (each, a "**503(b)(9) Claim**"), secured claims, and priority claims, which arose on or prior to the Petition Date, to file Proofs of Claim on account of such Claim is **June 18, 2019 at 5:00 p.m. (prevailing Eastern Time)** (the "**General Bar Date**").

The Government Bar Date: Pursuant to the Bar Date Order, the last date and time for governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Proofs of Claim against the Debtors and their estates is **August 12, 2019 at 5:00 p.m. (prevailing Eastern Time)** (the "**Government Bar Date**").

The Amended Schedules Bar Date: If the Debtors amend or supplement their Schedules subsequent to the service of this Notice, the Debtors will give notice of any such amendment or supplement to the holders of Claims affected thereby, and such holders shall be afforded **the later of (i) the applicable Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days from the date on which such notice is given, to file Proofs of Claim in respect of their affected Claims** (the "**Amended Schedules Bar Date**"). Any person or entity who files a Proof of Claim before the Schedules are amended shall not be required to file another Proof of Claim, unless the claimant disagrees with the scheduled claim, as amended, in which case, the claimant must file another Proof of Claim so as to be received by the Amended Schedules Bar Date.

The Rejection Bar Date: The last date and time for any person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) whose Claim arises out of the Court-approved rejection of an executory contract or unexpired lease in accordance with section 365 of the Bankruptcy Code (each, a "**Rejection Damages Claim**") to file a Proof of Claim on account of such Rejection Damages Claim is **the later of (i) the applicable Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the entry of the order approving the rejection of the executory contract or unexpired lease pursuant to which the entity asserting the Rejection Damages Claim is a party** (collectively with the General Bar Date, the Government Bar Date and the Amended Schedules Bar Date, each, a "**Bar Date**").

Entities That Must File Proofs of Claim by the Applicable Bar Date: Subject to the terms described above for holders of a Rejection Damages Claim, without limitation, each of the following entities that fails to file a Proof of Claim by the applicable Bar Date with respect to a Claim shall not be permitted to (a) vote to accept or reject any plan filed in the chapter 11 cases, (b) participate in any distribution in the chapter 11 cases on account of such Claim, or (c) receive further notices regarding such Claim: (i) any entity whose Claim against the Debtors is not listed in the Debtors' Schedules or whose Claim is listed in the Schedules but is listed therein as disputed, contingent, and/or unliquidated; (ii) any entity that believes that its Claim is improperly classified in the Schedules or is listed in an incorrect amount and that desires to have its Claim allowed in a classification or amount other than that identified in the Schedules; and (iii) any entity that believes that its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim allowed against a Debtor other than that identified in the Schedules.

Entities Not Required to File Proofs of Claim by the Applicable Bar Date: **The Bar Date Order further provides that the following persons and entities need not file Proofs of Claim on or before the applicable Bar Date: (a) any person or entity that already has filed a signed proof of claim against the respective Debtor(s) with the Clerk of the Court or with DRC in a form substantially similar to Official Form 410; (b) any person or entity whose claim is listed on the Schedules if: (i) the claim is *not* scheduled as any of "disputed," "contingent," or "unliquidated;" (ii) such person or entity agrees with the amount, nature, and priority of the claim as set forth in the Schedules; and (iii) such person or entity does not dispute that its claim is an obligation only of the specific Debtor against which the claim is listed in the Schedules; (c) any person or entity whose claim has previously been allowed by order of the Court; (d) any person or entity whose claim has been paid in full by the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Court; (e) any Debtor having a claim against any other Debtor; (f) any person or entity whose claim is based on an equity interest in either of the Debtors; (g) any person or entity holding a claim for which a separate deadline is fixed by this Court; (h) any person or entity holding a claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of administration incurred in the ordinary course, *provided*, *however*, that any person or entity asserting a claim entitled to priority under section 503(b)(9) of the Bankruptcy Code must assert such claims by filing a request for payment or a proof of claim on or prior to the Claims Bar Date; (i) Professionals retained by the Debtors or any statutory committees (each a "Committee") pursuant to orders of the Court who assert administrative claims for fees and expenses subject to the Court's approval pursuant to sections 328, 330, 331, and 503(b) of the Bankruptcy Code or 28 U.S.C. § 156(c); and (j) Any person or entity holding a Claim payable to the Court or the United States Trustee Program pursuant to 28 U.S.C. § 1930.**

Consequences of Failure to File Proof of Claim: **Any person, entity, or governmental unit not excepted from filing a Proof of Claim pursuant to the Bar Date Order, that fails to do so by the applicable Bar Date and in the form and manner provided for in the Bar Date Order shall not be permitted to (a) vote to accept or reject any plan filed in the chapter 11 cases, (b) participate in any distribution in the chapter 11 cases on account of such Claim, or (c) receive further notices regarding such Claim. If it is unclear from the Schedules whether your Claim is disputed, contingent, and/or unliquidated or is otherwise properly listed and classified, you must file a Proof of Claim on or before the applicable Bar Date. Any person, entity, or governmental unit that relies on the information in the Schedules bears full and absolute responsibility for determining that its Claim is accurately listed therein.**

Procedures for Filing Proofs of Claim: A Proof of Claim will be deemed timely only if the original Proof of Claim is **actually received** by DRC on or before the applicable Bar Date (i) electronically through the website of the Debtors' claims and noticing agent, Donlin, Recano & Company, Inc., using the interface available on such website located at https://www.donlinrecano.com/Clients/nemf/FileClaim (the "***Electronic Filing System***") or (ii) by mail at the following address: Donlin, Recano & Company, Inc., Re: New England Motor Freight Inc., et al., P.O. Box 199043, Blythebourne Station, Brooklyn, NY 11219; or (ii) by courier, hand delivery, or overnight delivery at the following address: Donlin, Recano & Company, Inc., Re: New England Motor Freight, Inc., et al., 6201 15th Avenue, Brooklyn, NY 11219. Proofs of Claim may not be sent by facsimile, telecopy, or electronic mail. A claimant who wishes to receive acknowledgement of receipt of its Proof of Claim form may submit a copy of the Proof of Claim form and a self-addressed, stamped envelope to DRC along with the original Proof of Claim. If you file a Proof of Claim, your Proof of Claim must: (a) be written in the English language; (b) be denominated in lawful currency of the United States as of the Petition Date; (c) conform substantially to Official Bankruptcy Form No. 410; (d) set forth with specificity the legal and factual basis for the alleged Claim; (e) include supporting documentation (or, if such documentation is voluminous, a summary of such documentation) or an explanation as to why such documentation is not available; and (f) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant.

Additional Information: Copies of the Schedules and the Bar Date Order are available for inspection during regular business hours at the Office of the Clerk of the Court. In addition, copies of the Schedules and the Bar Date Order may be viewed on the internet for a fee at the Court's website (http://www.njb.uscourts.gov/) by following directions for accessing the Court's electronic filing system on such website, or free of charge on DRC's website for the chapter 11 cases (https://www.donlinrecano.com/Clients/nemf/Index). Questions concerning the contents of this Notice and requests for additional Proof of Claim forms should be directed to DRC toll free at (866) 721-1211. **Please note that DRC's staff is not permitted to give legal advice. You should consult with your own attorney for assistance regarding any other inquiries, such as questions concerning the completion or filing of a Proof of Claim.**

**GIBBONS P.C.,** By: */s/ Karen A. Giannelli* , Karen A. Giannelli, Esq., Mark B. Conlan, Esq., Brett S. Theisen, Esq., One Gateway Center, Newark, New Jersey 07102, Telephone: (973) 596-4500, Facsimile: (973) 596-0545, E-mail: kgiannelli@gibbonslaw.com, mconlan@gibbonslaw.com, btheisen@gibbonslaw.com, *Counsel to the Debtors and Debtors-in-Possession*

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

**IF YOU ARE OR WERE A HOLDER OF OR OTHERWISE CLAIM ENTITLEMENT TO A PAYMENT IN CONNECTION WITH CERTAIN SECURITIES FOR WHICH JPMORGAN CHASE BANK, N.A. ("JPM") SERVED AS DEPOSITARY, YOUR RIGHTS MAY BE AFFECTED.**

Pursuant to Federal Rule of Civil Procedure 23 and Court Order, *Merryman, et al. v. JPMorgan Chase Bank, N.A.*, No. 1:15-cv-09188-VEC (S.D.N.Y.) has been provisionally certified as a class action for settlement purposes and a $9,500,000 settlement has been proposed, which, if approved, will resolve all claims in the litigation. **This notice provides basic information. It is important that you review the detailed notice ("Notice") found at the website below.**

**What is this lawsuit about:**

Plaintiffs claim that JPM, as depositary bank for the American Depositary Receipts or securities covered by the litigation ( ADRs ), assigned foreign exchange rates ( FX ) to the conversion of non-U.S. dollar-based cash distributions, which reflected a spread that was added to the FX rate JPM actually received at the time of the conversion, and thereby improperly retained class member dollars from such distributions. JPM has denied, and continues to deny, any wrongdoing or liability whatsoever.

**Who is a Settlement Class Member:**

Persons or entities who are or were holders (directly or indirectly, registered or beneficially) of or otherwise claim any entitlement to any payment (dividend, rights offering, interest on capital, sale of shares or other distribution) in connection with (i) securities listed on Appendix 1 to the Notice (including any predecessor or successor) from November 21, 2010 to July 18, 2018; or (ii) securities listed on Appendix 2 to the Notice (including any predecessor or successor) from November 21, 2012 to July 18, 2018.

**What are the benefits:**

If the Court approves the settlement, the proceeds, after deduction of Court-approved notice and administration costs, attorneys fees and expenses, will be distributed pursuant to the Plan of Allocation in the Notice, or other plan approved by the Court.

**What are my rights:**

If you hold (or held) your ADRs directly and are listed on JPM s transfer agent records, you are a Registered Holder Settlement Class Member and do not have to take any action to be eligible for a settlement payment. However, if you hold (or held) your ADRs through a bank, broker or nominee and are not listed on JPM s transfer agent records, you are a Non-Registered Holder Settlement Class Member and you must submit a Claim Form, ***postmarked by September 19, 2019***, to be eligible for a settlement payment. Non-Registered Holder Settlement Class Members who do nothing will not receive a payment, and will be bound by all Court decisions.

If you are a Settlement Class Member and do not want to remain in the Settlement Class, you may exclude yourself by request, ***received by July 3, 2019***, in accordance with the Notice. If you exclude yourself, you will not be bound by any Court decisions in this litigation and you will not receive a payment, but you will retain any right you may have to pursue your own litigation at your own expense concerning the settled claims. Objections to the settlement, Plan of Allocation, or request for attorneys fees and expenses must be ***received by July 3, 2019***, in accordance with the Notice.

A hearing will be held on **August 8, 2019 at 11:00 a.m.**, before the Honorable Valerie E. Caproni, at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, NY, NY 10007, to determine if the settlement, Plan of Allocation, and/or request for fees and expenses should be approved. Supporting papers will be posted on the website once filed.

**For more information visit www.JPMorganADRFXSettlement.com**
**email info@JPMorganADRFXSettlement.com or call 1.866.637.9457**

COMMERCIAL
REAL ESTATE
BUSINESS
OPPORTUNITIES
COMMERCIAL &
INDUSTRIAL
PROPERTIES
(300)
Manhattan 305
335 West 39 ST
UNIQUE OPPORTUNITY
Hudson Yards District Development site for sale total buildable approx 45000 sqft. call today! 718-677-6500

The New York Times
Support
brighter futures.
Learn how you can sponsor classroom subscriptions at nytimes.com/sponsor.