| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-1<br><br>**GIBBONS P.C.**<br>Karen A. Giannelli, Esq.<br>Mark B. Conlan, Esq.<br>Brett S. Theisen, Esq.<br>One Gateway Center<br>Newark, New Jersey   07102<br>Telephone:   (973) 596-4500<br>Facsimile:    (973) 596-0545<br>E-mail:  kgiannelli@gibbonslaw.com<br>            mconlan@gibbonslaw.com<br>            btheisen@gibbonslaw.com<br><br>*Counsel to the Debtors and Debtors-in-Possession* |
| In re:<br><br>**NEW ENGLAND MOTOR FREIGHT, INC.,** *et al.*,[1]<br>    Debtors. |

Chapter 11

Honorable John K. Sherwood

Case No. 19-12809

(Jointly Administered)

## DECLARATION OF VINCENT COLISTRA IN
## SUPPORT OF THE SALE

I, VINCENT COLISTRA, pursuant to 28 U.S.C. §1746, declare as follows:

1.    I am the Chief Restructuring Officer (the "CRO") for the above-captioned Debtors (the "Debtors" or "Company").

2.    My firm, Phoenix Management Services, LLC. ("Phoenix") was retained by the Debtors in December 2018 to assist in their debt consolidation and restructuring efforts.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  New England Motor Freight, Inc. (7697) ("NEMF"); Eastern Freight Ways, Inc. (3461)("Eastern"); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223) ("Carrier"); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

Subsequently, on February 6, 2019, the Debtors hired me as CRO to oversee the bankruptcy proceedings, through Phoenix's wholly owned subsidiary, Phoenix Executive Services LLC, which was approved by the Court on February 13, 2019. I am a Senior Managing Director of Phoenix, which I joined in 1997 and became a shareholder in 1998. I have managed and participated in over 60 engagements since joining Phoenix that involved developing and implementing solutions in complex corporate restructurings and reorganizations (both out of Court and through Bankruptcy proceedings), operational and financial turnarounds, re-financing, the raising of senior debt, second lien debt, subordinated debt with warrants, as well as representing strategic and financial buyers and sellers of businesses in both the public and private sector.

3. Throughout the duration of these chapter 11 cases, I has been working with my colleagues at Phoenix Capital Resources, which is the investment banking arm of Phoenix that has experience in marketing middle market companies encountering distress and special situations, to market the Assets (defined below). Phoenix Capital Resources and its professionals have significant experience working with financially troubled companies in complex financial restructurings, both in and out of court.

4. Additionally, in my capacity as CRO for the Debtors, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records and have first-hand knowledge of the same. In reaching certain of the opinions set forth herein, I have relied also on the advice, analysis, and facts provided to me by my staff, the Debtors' employees, and my legal advisors. In my experience as a CRO, I ordinarily rely on all of the foregoing sources of information in the course of managing a company's affairs and in forming opinions necessary to make determinations in furtherance of such management obligations.

5. I submit this Declaration in support of the *Debtors' Motion For Orders (I)(A) Approving*

2

*Bidding Procedures And Auction And (B) Scheduling Sale Hearing And Approving Notice Thereof; (II) Authorizing The Sale Of Substantially All Of Debtors' Eastern Freight Ways, Inc. And Carrier Industries, Inc.'s Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests; (III) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (IV) Granting Related Relief* (the "Sale Motion") [Docket No. 335].

6. On April 8, 2019, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered the *Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All Assets of Debtors' Eastern Freight Ways, Inc. and Carrier Industries, Inc.; (II) Scheduling an Auction and Hearing to Consider the Sale of Assets; and (III) Approving Form and Manner of Notice Thereof* (the "Bidding Procedures Order") [Docket No. 427].

7. After entry of the Bidding Procedures Order, the Debtors were able to negotiate a stalking horse bid and certain of the Debtors entered into that certain Asset Purchase Agreement by and between among NEMF, Eastern, Carrier and Estes Express Lines (the "Stalking Horse Bidder" or "Estes") dated April 17, 2019 (the "Stalking Horse APA") providing for the going concern purchase of substantially all assets of Debtors' Eastern Freight Ways, Inc., Carrier Industries, Inc. and certain rolling stock owned by New England Motor Freight, Inc. (collectively, the "Assets").

8. On April 18, 2019, the Debtors filed their *Notice of (I) Stalking Horse Designation; (II) Filing of Stalking Horse APA with Bid Protections; and (III) Filing of Amended Bidding Procedures* [Docket No. 477] and related *Declaration of Vincent Colistra in Support of Designation of Estes Express Lines as Stalking Horse Bidder and Grant of Bid Protections* [Docket no. 479].

9. Due to the fact that the Debtors did not receive any bids by the bid deadline, on

3

May 10, 2019, the Debtors filed a *Notice Of Cancellation Of Auction And Selection Of Stalking Horse Bidder As The Successful Bidder* [Docket No. _].

10. Although there was no structured prepetition marketing process with respect to the Assets on a standalone basis, since being engaged, Phoenix engaged in extensive financial evaluation of Eastern and Carrier's businesses, including their operations, assets, capital structure, contractual arrangements and liquidity to build a foundation for a restructuring strategy. I actively managed and coordinated this process on behalf of the Debtors and, as a result, developed a thorough understanding of the market for Debtors' Eastern and Carrier's businesses. My team also assisted the Debtors in the preparation and presentation of various sales and marketing materials, as well as assisted in facilitating due diligence efforts, in furtherance of the sale process. Further, we established a comprehensive electronic data room for potential bidders to conduct any required due diligence. Both myself and my team worked closely with the Official Committee of Unsecured Creditors and its advisors with respect to the marketing materials, sale strategy and development of bidding procedures in order to maximize the value of the Assets.

11. The extensive efforts by my team included outreach to approximately 215 potential bidders. Out of this universe of potential bidders, 21 executed Non-Disclosure Agreements and were granted access to the electronic data room. Despite my team's exhaustive efforts to garner as much interest as possible in the sale, aside from the Stalking Horse Bidder, no bids were submitted prior to the bid deadline of May 9, 2019 at 4:00 p.m. (E.T.) and the Debtors cancelled the auction.

12. I believe that the proposed sale timeline was reasonable and well within the range of market comparable sale timelines that are commonly approved. The sale process which was approximately 90 days from the Petition Date to bid deadline allowed a thorough marketing

process and gave potential bidders more than a sufficient opportunity to conduct due diligence/ None of the potential bidders declined to submit a bid due to a lack of time. Any further extension of the marketing process would unreasonably delay approval of the sale and would likely not lead to any further interest in the Assets in an amount sufficient to top the bid submitted by Estes. Any further delay in the sale process would result in additional costs to the Debtors' estates. Such additional costs would unlikely be recouped absent a significant increase in the purchase price based on the interest and feedback that was received from potential bidders to date.

13. Accordingly, to maximize value to the Debtors' estates, sale approval should occur as expeditiously as possible so the Debtors can avoid additional costs associated with delay beyond the proposed May 31, 2019 closing date and Estes can move forward with the closing of the sale. Based on the outcome of the sale process, I believe that the sooner Estes can close on the sale, the sooner the Debtors' estates can stop the administrative burn associated with these going concern operation of these businesses.

14. The Stalking Horse APA represents the highest or otherwise best (and only) transaction available to the Debtors at the present time. The sale is in the best interests and sound business judgment of the Debtors and their estates because it provides a greater recovery for the Debtors' estates than would be available by any other alternative.

15. I believe in the exercise of my business judgment that a sale to Estes on the terms set forth in the agreed upon Stalking Horse APA is in the best interests of the Debtors, their estates, creditors and parties in interest. Such business reasons include, but are not limited to, the facts that there is substantial risk of deterioration of the value of the purchased Assets if a sale is not consummated quickly, the Stalking Horse APA constitutes the highest or otherwise best offer the purchased Assets, the sale presents the best opportunity to realize the remaining value of Eastern

5

and Carrier on a going concern basis and to avoid further decline and devaluation of the Debtors' businesses, the sale will mean that the businesses are operated as a going concern which is very important to the employees, certain contract counterparties will have their contracts cured and assigned to Estes, and creditors will have the opportunity to work with Estes and have a customer going forward into the future.

16. In my business judgment and based upon a review of the desktop appraisal provided by Atkins Appraisal Corporation with respect to the Assets, the consideration provided for in the Stalking Horse APA constitutes more than reasonably equivalent value and fair consideration for the purchased Assets and represents a fair and reasonable offer to purchase the purchased Assets and assume or acquire liabilities under the circumstances of the Debtors' chapter 11 cases.

17. The proposed sale is not for the purpose of hindering, delaying or defrauding creditors. To the best of my knowledge and consistent with the representations made by Estes, neither Estes nor any of their principals, officers, directors or affiliates are an insider of the Debtors. I am not aware of any pre-existing relationships between the Debtors and Estes, nor do the Debtors have any ownership of financial stake in Estes. I am not aware of any insider of the Debtors trying to acquire the Assets, nor am I aware of any relationship between any insider of the Debtors and Estes.

18. I believe that at all times, these discussions and negotiations were conducted in good faith, at arms' length and by parties who were at all times represented by counsel and advisors. Further, I am not aware of any indication of fraud or collusion between any of the potential bidders (including Estes) and the Debtors or any other parties or any other similar conduct that would taint the sale process for the purchased Assets.

19. With respect to the Debtors ability to assume and assign certain contracts and leases

to Estes, the financial statements provided to the Debtors provide ample evidence of their financial wherewithal to cure and perform under any of the assigned contracts. Further, no contract counterparty has filed any objections on the docket with respect to adequate assurance of future performance.

20. Finally, I would testify that the sale and marketing process was, at all times, carried out by me and my team and the Debtors in compliance with the bidding procedures order and bidding procedures.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

*/s/ Vincent Colistra*_____
VINCENT COLISTRA
Chief Restructuring Officer

Dated: May 15, 2019