

**Joseph J. DiPasquale**
Partner

One Lowenstein Drive
Roseland, New Jersey 07068

**T**: 973.597.2528
**F**: 973.597.2529
**E**: jdipasquale@lowenstein.com

October 18, 2019

**VIA CM/ECF AND EMAIL**
Hon. John K. Sherwood, U.S.B.J.
United States Bankruptcy Court
District of New Jersey
50 Walnut Street
Courtroom 3D
Newark, NJ 07102

> Re:    *In re New England Motor Freight, Inc., et al.*
>        Case No. 19-12809 (JKS)
>        <u>The Debtors' Exclusivity Periods Motion</u>

Dear Judge Sherwood:

This firm is co-counsel to The Official Committee of Unsecured Creditors (the "**Committee**") appointed by the Office of the United States Trustee for the District of New Jersey in the Chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors in possession (the "**Debtors**").[1] On August 14, 2019, the Debtors filed their *Motion for Entry of an Order (A) Extending the Exclusive Periods within which to file a Chapter 11 Plan and Solicit Acceptance Thereof, and (B) for Authorization to file a Combined Chapter 11 Plan of Liquidation and Disclosure Statement* (the "**Motion**"), and seek a 90-day extension (the "**Extension**") of the exclusivity period for filing a plan (December 9, 2019) and for soliciting acceptances of and confirming a plan (February 6, 2020).

On October 1, 2019, T.D. Bank, N.A. and East West Bank (together, the "**Objecting Creditors**") filed their *Objection of T.D. Bank, N.A. and East West Bank to Extension of Exclusivity Period for Filing a Plan and Soliciting Acceptances Thereof* (the "**Objection**"). Although a finalized Chapter 11 liquidating joint plan and disclosure statement (the "**Plan**") has been prepared and will be filed on Monday, October 21, 2019, the Committee nevertheless believes it is necessary to address the misleading assertion of the Objecting Creditors that the Debtors' plan exclusivity period has been waived, that "cause" does not exist to warrant the Extension, and that these Chapter 11 Cases have been administered in a "dysfunctional and highly cost-inefficient manner." In short, these arguments are without merit.

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); Mylon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

Section 1121(b) of the Bankruptcy Code provides for an initial period of one hundred twenty (120) days after the commencement of a Chapter 11 case during which a debtor has the exclusive right to file a Chapter 11 plan (the "**Exclusive Filing Period**").  Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Filing Period, the debtor shall have an exclusive period of one hundred eighty (180) days from the commencement of the Chapter 11 case to solicit acceptances of and confirm such a plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Filing Period, the "**Exclusivity Periods**").

The initial Exclusive Filing Period in these Chapter 11 Cases ran through June 11, 2019, while the initial Exclusive Solicitation Period ran through August 10, 2019.  Court Orders dated June 7, 2019, September 9, 2019, September 19, 2019, and October 9, 2019 extended the Exclusivity Periods, such that the Exclusive Filing Period now expires on October 22, 2019, and the Exclusive Solicitation Period expires on December 21, 2019.[2]  These Orders also granted shared exclusivity to the Committee.

The Objecting Creditors oppose Extension and argue that the Exclusivity Periods were waived because the Committee was granted shared exclusivity.  Nothing in the Bankruptcy Code supports the Objecting Creditors' argument.  As the Objecting Creditors readily admit in their Objection, courts have approved shared exclusivity between a debtor and a committee without waiver of the Exclusivity Periods.  *See, e.g. In re Bi-Lo, LLC*, 2010 WL 5140036 (Bankr. D.S.C. 2010); *In re United Press Int'l, Inc.* 60 B.R. 265 n. 11-12 (Bankr. D.D.C. 1996).  Moreover, the Objecting Creditors themselves waived any right to challenge shared exclusivity by failing to raise the issue at any point before filing this Objection.

The Debtors and Committee sought to settle any potential claims with the Debtors' insiders and related entities on behalf of the Debtors' estates.  Due to the fact that the Debtors were a family owned business, the Debtors and the Committee agreed that the Committee was better suited to negotiate with the Shevell Dynasty Trust ("**Shevell Trust**") and Shevell family to avoid any appearance of impropriety or appearance of a conflict. The Committee negotiated with the Shevell Trust and related non-debtor entities, and the Debtors provided and facilitated the informal information exchange and discovery necessary to allow the Committee and its advisors to review, identify, and investigate potential claims and causes of action on behalf of the Debtors' estates.  This combined effort was overwhelmingly successful, resulting in a negotiated settlement which will include a cash payment of $6.1 million to resolve the potential disputes and the waiver of any right to distribution for approximately $11.827 million of rejection damages claims by non-debtor entities related or affiliated with the Shevell Trust.  Furthermore, $500,000 of the $6.1 million settlement funds were negotiated by the Committee with the Shevell Trust to fund a post-confirmation liquidating trust.  This proposed settlement shall be subject to notice of a Rule 9019 motion and Bankruptcy Court approval.

---

[2] [ECF No. 661, 837, 886, and 917].

From the very onset of these Chapter 11 Cases, the Debtors and the Committee have worked tirelessly to resolve a litany of material issues with secured creditors, including a WARN complaint, which was settled with the crucial cooperation of both the Debtors and the Committee, a rolling stock sale process and the going concern sales of the Eastern and Carrier estates, in addition to addressing these key issues the Committee was tasked with reviewing the validity of liens for ten (10) different secured lenders on a timeline which was both abbreviated and aggravated. To characterize the Debtors' cases as "simple" shows a disregard for facts, both recent and historical, and an apathy and ignorance of both the impact that this long running business had on its trade vendors, unions, as well as, the life work of a family who ran into economic misfortune.

Furthermore, the Committee and the Debtors have worked together to resolve the first WARN action, and continue to work together to find a solution to the second WARN dispute. The pending protocol to address liability claims resulting from the Debtors' transportation operations has been a joint effort between the counsel for the Debtors and the Committee. The Committee itself has time and time again reviewed, at a moment's notice, and approved and assisted in resolving all types of issues that have resulted from the wind-down of one of the largest less-than-truckload companies in United States.

In August 2019, the CRO held an update meeting following the conclusion of the rolling stock auctions and closing of the Eastern and Carrier estate sale with both the Committee and lenders with many of the business representatives of the lenders and Committee members in attendance. The CRO acknowledged that the focus of the Chapter 11 Cases and their direction should be navigated by its stakeholders. Following the meeting, the Committee professionals and lenders' counsel opened up a dialogue and both client constituencies agreed that expediting a plan process was crucial to the successful completion of these Chapter 11 Cases. This issue was discussed with the CRO by the Committee, who agreed with the strategy and began working with the financial advisor for the Committee to both prepare the necessary financial analysis for the joint plan of liquidation, but also identified necessary tasks to wind down the Debtors' estates. The Debtors and the Committee agreed that Committee counsel would prepare the first draft of a combined plan and disclosure statement, which was completed in early September 2019. Since that time, the Debtors and the Committee have worked together to update the combined joint plan and disclosure statement and related documents.

From the beginning of these Chapter 11 Cases, the CRO has engaged in weekly and other periodic reporting based on reaching certain milestones provided to the lenders and the Committee. He has also kept a budget, worked with the Committee professionals on a frequent basis to update the budget and receive projections. These budgets were included in the weekly reports to the lenders. The Committee also prepared an analysis of its fees and whether or not it had met the budget circulated by the CRO and has shared this with the lenders. *See* Exhibit A. On a go forward basis, the Committee reviewed the wind down task list and proposed a budget and project management plan which identified and assigned the bulk of the routine tasks to lower rate professionals between the Debtors and Committee and included resolving potential disputes with the Shevell Trust and the lenders as opposed to pursuing litigation. This project

management plan was shared with the lenders. Unfortunately, the Objecting Creditors have pursued a litigation pathway, and then complained about fees, to resolve open issues with the Debtors' estates as opposed to the Debtors, the Committee, several lenders, and the Shevell Trust who have chosen to resolve issues through a negotiated global settlement. As to be expected, the litigation pathway has unfortunately resulted in higher costs. Thus, not only did the Committee professionals continue to coordinate, plan, and properly staff these Chapter 11 Cases, as they have done from the beginning, the Debtors and Committee formalized their working relationship into a proposed joint plan in order to further report and communicate with the lenders, in addition to the CRO's consistent weekly financial reporting, on the pathway towards plan confirmation.

The Committee and the lenders also engaged in settlement discussions over claims reconciliation and, in particular, a $6,235,745 administrative claim which was being asserted by the NEMF estate against the Eastern and Carrier estates ("**NEMF Administrative Claim**"). Other disputes were discussed including the validity of the lenders' claims, the validity of ongoing administrative expenses, and other administrative claims. After several weeks of negotiation and the exchange of offers by the lenders and the Committee, the Committee was informed that a consensus could not be reached with all ten (10) lenders, so there would not be a global resolution of the issues as a group. The Debtors and the Committee have sought to balance the multiple competing interests in these Chapter 11 Cases and have done so in a good faith manner throughout the entire process.

Shortly thereafter, several lenders individually, and in good faith, approached the Committee and engaged in negotiations which resulted in global settlements, including resolving the dispute over the NEMF Administrative Claim so that 75% of the NEMF Administrative claim ($4,676,809) shall be paid from the escrow funds holding the remaining sale proceeds to NEMF and the Eastern and Carrier bankruptcy estates will retain the balance of the escrow funds $1,281,308.[3] The settlement reconciles the lenders' deficiency claims which have resulted in allowed claims for each settling lender, resolves all lien challenges, includes plan support, approves the post confirmation trust and Kevin Clancy as the liquidating trustee, and agreed to continue the allocation of professional fees at sixteen (16%) percent from the Eastern and Carrier estates until the effective date of the joint plan, and preserves the lenders' rights to object to any professional fees from October 1, 2019 to the effective date. One of the Objecting Creditors (T.D. Bank, NA) reached a partial settlement with the Committee and the Debtors regarding and accepting the NEMF Administrative Claim settlement as part of a resolution over the Committee's objection of a settlement between the estates and T.D. Bank, NA.

---

[3] After the sale of Eastern's assets was consummated, the CRO believed that the most efficient way to bring the Chapter 11 Cases to conclusion was with a joint liquidating plan whereby the Chapter 11 Cases would be substantively consolidated. The Committee wholeheartedly supported this approach especially in light of the substantial administrative claim in favor of the NEMF estate and against the Eastern estate. The substantive consolidation approach was rejected by most of the lenders so the Committee then engaged in good faith settlement discussions that has resulted in the 75/25 split.

The Committee and the Debtors have either signed a settlement or completed the final draft of settlement with Santander Bank, N.A., JPMorgan Chase Bank, N.A., Fifth Third Bank, Wells Fargo Equipment Finance, Inc., Webster Capital Finance, Inc., and VFS US LLC.  Capital One, N.A is in the process of reviewing the stipulation which has been approved by the Debtors and Committee. Mercedes-Benz Financial Services USA LLC is also reviewing the stipulation with its client. The Debtors and the Committee will be filing a motion to approve these settlements under Federal Rule of Bankruptcy Procedure 9019.

Throughout this process, the Committee believed that a global resolution with all ten (10) secured lenders was desirable to maximize creditor recoveries, reduce administrative costs, and swiftly bring these Chapter 11 Cases to a close.  In that vein, the Committee provided the Objecting Creditors with the general parameters of a settlement and requested feedback or counterproposals.  Counsel for the Committee called both of the Objecting Creditors as the Committee reached resolution with other lenders and as other issues had been completed by the estates' professionals, including progress on the negotiations with the Shevell Trust several times to date.  The Debtors and the Committee, as evidenced by the CRO's financial reporting, shared project management plan, cooperation, and results in reaching settlements with most of the lenders and the Shevell Trust, do not have competing proposals and are working to complete these Chapter 11 Cases in a responsible and professional manner.

To be clear, the Debtors and Committee actively sought to work constructively with the Objecting Creditors.  The Objecting Creditors requested a copy of the draft joint Plan weeks ago even though Committee counsel told them it would be a waste of time because it was a skeleton plan and disclosure statement.  The Committee's reservations about providing them with a draft joint plan have proven true, the Objecting Creditors now assert that it was missing material terms without providing substantive feedback.  The Objecting Creditors' contention that the Committee provided only a "take it or leave it" proposition is disingenuous and simply not true. The Committee and the lenders have worked together for example through arms'-length settlement discussions to reach a fair resolution of the NEMF Administrative Claim.  The Objecting Creditors have made no effort to constructively address any issues they had within the framework of the Committee's proposed settlement.

More importantly, the Committee's settlement proposal was confidential and subject to Federal Rule of Evidence 408.[4]  The Objecting Creditors' disclosure of the parameters of the Committee's settlement offer is wholly inappropriate and should not be taken lightly.  It is well settled that "the improper inclusion of obvious settlement communications constitutes bad faith, and is sufficient to warrant the imposition of attorney's fees" against the party disclosing such communications.  *The Bd. Of Managers of 823 Park Ave. Condominium v. 823 Park Ave, LLC*

---

[4] FRE 408 governs the admissibility of settlement negotiations and generally provides that courts will not receive compromise offers or negotiations as evidence. Courts have held that FRE 408 not only covers settlement agreements, but also a wide range of other materials including internal reports, memorandum, expert opinions, depositions, and more. *See, e.g. Blu-J, Inc. v. Kemper C.P.A. Grp.,* 916 F.2d. 637, 641 (11th Cir. 1990).

2016 WL 3756014, at *1 (N.Y. Sup. Ct. July 12, 2016).  It is true that the Debtors and the Committee worked diligently to deliver a joint liquidating plan that maximizes creditor recoveries which is supported by a vast majority of secured creditors, the Shevell Trust and its non-debtor affiliates.  In spite of the Objecting Creditors' inaccuracies and insidious language in the Objection, the Committee and the Debtors will continue their efforts to reach a settlement with the Objecting Creditors that will lead to a resolution of these Chapter 11 Cases.

Thanks very much for the Court's consideration.

Respectfully,

**Lowenstein Sandler LLP**

_s/ Joseph J. DiPasquale_
Mary E. Seymour, Esq.
Joseph J. DiPasquale, Esq.
John P. Schneider, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
mseymour@lowenstein.com
jdipasquale@lowenstein.com
jschneider@lowenstein.com
_Co-Counsel to the Official Committee of_
_Unsecured Creditors_

- and –

**Elliott Greenleaf, P.C.**
Rafael X. Zahralddin-Aravena, Esq.
Jonathan M. Stemerman, Esq.
Sarah Denis, Esq.
1105 Market Street, Suite 1700
Wilmington, DE 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
rxza@elliottgreenleaf.com
jms@elliottgreenleaf.com
sxd@elliottgreenleaf.com
_Co-Counsel to the Official_
_Committee of Unsecured Creditors_

cc:    Karen A. Giannelli, Esq. (via CM/ECF and email)
        Brett S. Theisen, Esq. (via CM/ECF and email)
        Peter J. D'Auria, Esq., Office of U.S. Trustee (via CM/ECF and email)
        All Counsel of Record (via CM/ECF)

# EXHIBIT A

**NEMF**
**Summary of Committee Fees**

| | Feb-May | | June Actual | | July Actual | | August Estimate | Total |
|---|---|---|---|---|---|---|---|---|
| Elliott Greenleaf | 434,046 | $ | 133,717 | $ | 100,464 | $ | *100,000* | 768,227 |
| Lowenstein Sandler | 668,407 | | 104,329 | | 105,957 | | *115,000* | 993,694 |
| CohnReznick | 417,000 | | 78,374 | | 70,162 | | *75,000* | 640,535 |
| | 1,519,453 | | 316,420 | | 276,583 | | *290,000* | *2,402,456* |
| | | | | | | | | |
| BUDGET: | | | | | | | | |
| Elliott Greenleaf | | $ | 150,000 | $ | 150,000 | $ | 150,000 | |
| Lowenstein Sandler | | | 150,000 | | 150,000 | | 150,000 | |
| CohnReznick | | | 100,000 | | 100,000 | | 100,000 | |
| | 1,600,000 | | 400,000 | | 400,000 | | 400,000 | *2,800,000* |
| | | | | | | | | |
| Monthly Variance | | $ | 83,580 | $ | 123,417 | $ | 110,000 | |
| | | | | | | | | |
| **Cumulative positive variance to budget** | **$ 80,547** | **$** | **164,127** | **$** | **287,544** | **$** | **397,544** | **$ 397,544** |