# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW ENGLAND MOTOR FREIGHT, INC, | : | Case No.: 19-12809 (JKS) |
| *et al.*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

## DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' JOINT COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT

**GIBBONS P.C.**
Karen A. Giannelli, Esq.
Mark B. Conlan, Esq.
Brett S. Theisen, Esq.
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
Email:  kgiannelli@gibbonslaw.com
         mconlan@gibbonslaw.com
         btheisen@gibbonslaw.com

*Counsel to the Debtors*
*and Debtors-in-Possession*

**LOWENSTEIN SANDLER LLP**
Mary E. Seymour, Esq.
Joseph J. DiPasquale, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400
Email:  mseymour@lowenstein.com
         jdipasquale@lowenstein.com

-and-

**ELLIOTT GREENLEAF, P.C.**
Rafael X. Zahralddin-Aravena, Esq. *(pro hac vice)*
Jonathan M. Stemerman, Esq. *(pro hac vice)*
Sarah Denis, Esq. *(pro hac vice)*
1105 North Market Street, Suite 1700
Wilmington, DE 19801
Telephone:  (302) 384-9400
Facsimile:  (302) 384-9399
Email:  rxza@elliottgreenleaf.com
         jms@elliottgreenleaf.com
         sxd@elliottgreenleaf.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

Dated:  October 21, 2019

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: New England Motor Freight, Inc. (7697); Eastern Freight Ways, Inc. (3461); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Carrier Industries, Inc. (9223); Myar, LLC (4357); MyJon, LLC (7305); Hollywood Avenue Solar, LLC (2206); United Express Solar, LLC (1126); and NEMF Logistics, LLC (4666).

# TABLE OF CONTENTS

**Page**

NOTICE ...................................................................................................... 1

INTRODUCTION ...................................................................................... 3

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ................................. 4

    A.    Rules of Interpretation and Construction .................................... 4

    B.    Defined Terms ............................................................................. 4

ARTICLE II. BACKGROUND ................................................................... 16

    A.    General Background ................................................................... 16

        1.    Overview of the Debtors ..................................................... 16

            (a)    NEMF:  LTL Business .............................................. 17

            (b)    Eastern:  TL Business ............................................... 18

            (c)    Carrier:  Third Party Logistics Business ................... 18

            (d)    Apex:  Brokerage Business ....................................... 18

            (e)    NEWT:  Puerto Rico Business .................................. 19

            (f)    Jans Leasing:  Equipment Rental Business ............... 19

            (g)    Hollywood Solar, United Solar, NEMF Logistics, MyJon and Myar .................................................. 19

        2.    Prepetition Capital Structure ............................................... 19

            (a)    Secured Debt ............................................................. 19

                 i.    Vehicle Financing ........................................... 19

                 ii.    Letters of Credit (Partially Secured Up to Deposit Amounts) .............................. 20

                iii.    Insurance Premium Financing .......................... 22

            (b)    Unsecured Debt .......................................................... 22

                i.    Letters of Credit ............................................. 22

2747149.15 115719-100281

| | | ii. | Trade and Other Debt | 22 |
| | (c) | | Equity Holders | 23 |
| B. | | | Events Leading to the Chapter 11 Filing | 23 |
| C. | | | The Chapter 11 Cases | 27 |
| | 1. | | "First Day" and Related Motions | 28 |
| | 2. | | Appointment of the Committee | 31 |
| | 3. | | Employment of Professionals and Advisors by Debtors and the Committee | 31 |
| | 4. | | Sale Processes | 32 |
| | | (a) | Eastern and Carrier | 32 |
| | | (b) | Auction Motion | 33 |
| | | (c) | Rolling Stock Auctions | 33 |
| | | (d) | 11700 NW 36th Avenue, Miami, Florida | 35 |
| | | (e) | Company Vehicle Sale to Mr. Shevell | 35 |
| | 5. | | Financial Summary of Chapter 11 Operations and Asset Sales | 36 |
| | 6. | | Rejection of Executory Contracts and Leases | 37 |
| | 7. | | WARN Act Litigation | 38 |
| | | (a) | Adversary Proceeding No. 19-01073 | 38 |
| | | (b) | Adversary Proceeding No. 19-01163 | 39 |
| | 8. | | Life Insurance Note Receivable | 40 |
| | 9. | | Settlement with Certain Prepetition Lenders | 40 |
| | 10. | | Settlement with Equity Holders and Affiliates | 43 |
| | 11. | | Claims Process and Bar Date | 49 |
| | | (a) | Section 341(a) Meeting of Creditors | 49 |
| | | (b) | Schedules and Statements | 49 |
| | | (c) | Bar Dates | 49 |

ii

(d)    Special Administrative Claims Bar Date for Auto Liability Claims ........................................................................... 50

(e)    Post-Petition Health Care Claims Bar Date ................................. 50

12.    Auto Liability Claims Protocol ............................................................ 50

ARTICLE III. DISCLOSURES AND RISK FACTORS .............................................. 56

A.    Financial Information; Disclaimer ....................................................... 56

B.    Certain Federal Income Tax Consequences ........................................ 57

C.    Certain U.S. Federal Income Tax Consequences to the Debtors .......... 60

D.    Consequences of the Liquidating Trust ............................................... 62

E.    Backup Withholding Tax ................................................................... 65

F.    Alternate Plan ................................................................................... 66

G.    Best Interests Test ............................................................................ 67

H.    Liquidation Analysis ......................................................................... 67

I.    Feasibility ......................................................................................... 68

J.    Certain Risk Factors to be Considered ................................................ 68

1.    Risk Factors that May Affect the Debtors' Ability to Consummate the Plan ............................................................ 69

(a)    The Debtors May Not Be Able to Secure Confirmation of the Plan ....................................................................... 69

(b)    Risk of Non-Occurrence of the Effective Date ............................. 69

(c)    Parties May Object to the Classification of Claims and Equity Interests ......................................................... 69

(d)    No Duty to Update ...................................................................... 69

ARTICLE IV. SUMMARY OF DEBTORS' ASSETS AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................................................... 70

A.    Summary of Assets ........................................................................... 70

B.    Summary of Treatment of Claims and Equity Interests ....................... 70

iii

C.      Analysis of Potential Distribution under the Proposed Plan ................................ 81

D.      Confirmation Procedure ...................................................................................... 84

        1.      Confirmation Hearing ................................................................................ 84

        2.      Procedure for Objections .......................................................................... 84

        3.      Requirements for Confirmation ................................................................. 85

        4.      Classification of Claims and Equity Interests ........................................... 85

        5.      Impaired Claims or Equity Interests ......................................................... 85

        6.      Eligibility to Vote on the Plan .................................................................. 86

        7.      Solicitation Notice .................................................................................... 86

        8.      Procedure/Voting Deadline ....................................................................... 86

        9.      Acceptance of the Plan .............................................................................. 88

        10.     Elimination of Vacant Classes .................................................................. 88

ARTICLE V. TREATMENT OF UNCLASSIFIED CLAIMS ................................................... 88

A.      Administrative Expense Claims ........................................................................... 88

        1.      General Administrative Expense Claims ................................................... 88

        2.      Post-Petition Health Care-Related Claims ................................................ 89

        3.      Professional Fee Claims ............................................................................ 89

                (a)     Pre-Effective Date Fees and Expenses ......................................... 89

                (b)     Post-Effective Date Fees and Expenses ........................................ 90

        4.      Statutory Fees ........................................................................................... 90

B.      Priority Tax Claims ............................................................................................. 90

ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
        INTERESTS ........................................................................................................ 91

A.      Classification of Claims ...................................................................................... 91

        1.      Consolidated NEMF Debtors .................................................................... 91

        2.      Consolidated Eastern Debtors ................................................................... 92

iv

B.    Treatment of Claims and Equity Interests ........................................................... 93

    1.    Consolidated NEMF Debtors................................................................... 93

        (a)    Class 1:  Priority Non-Tax Claims................................................. 93

        (b)    Classes 2A through 2J:  Lender Secured Claims – Prepetition Lenders ...................................................................... 94

        (c)    Classes 3A and 3B:  Insurer Secured Claims............................... 94

        (d)    Class 4: Other Secured Claims .................................................... 94

        (e)    Class 5A:  General Unsecured Claims Other than Lender Deficiency Claims.......................................................................... 95

        (f)    Class 5B: Auto Liability Claims.................................................... 95

        (g)    Class 5C: Auto Insurer Unsecured Indemnity Claims.................. 95

        (h)    Class 5D: General Unsecured Claims- Lender Deficiency Claims ........................................................................................ 96

        (i)    Class 6:  Intercompany Claims .................................................... 96

        (j)    Class 7:  Equity Interests.............................................................. 97

    2.    Consolidated Eastern Debtors................................................................... 97

        (a)    Class 1:  Priority Non-Tax Claims................................................. 97

        (b)    Classes 2A through 2J:  Lender Secured Claims – Prepetition Lenders ...................................................................... 97

        (c)    Classes 3A and 3B:  Insurer Secured Claims............................... 97

        (d)    Class 4: Other Secured Claims .................................................... 98

        (e)    Class 5A:  General Unsecured Claims Other than Lender Deficiency Claims.......................................................................... 98

        (f)    Class 5B: Auto Liability Claims.................................................... 99

        (g)    Class 5C: Auto Insurer Unsecured Indemnity Claims.................. 99

        (h)    Class 5D: General Unsecured Claims – Lender Deficiency Claims ........................................................................................ 99

        (i)    Class 6:  Intercompany Claims .................................................. 100

2747149.15 115719-100281

        (j)     Class 7:  Equity Interests........................................................... 100

C.     Modification of Treatment of Claims and Equity Interests ................................ 100

D.     Cramdown and No Unfair Discrimination........................................................... 100

ARTICLE VII. POST-CONFIRMATION LIQUIDATING TRUST ...................................... 101

A.     The Liquidating Trust. ....................................................................................... 101

     1.     Plan Administration ................................................................................ 101

     2.     Appointment of the Liquidating Trustee................................................. 102

     3.     Powers and Duties of the Liquidating Trustee....................................... 102

     4.     Establishment of a Liquidating Trust..................................................... 104

     5.     Liquidating Trust Assets ........................................................................ 105

     6.     Treatment of Liquidating Trust for Federal Income Tax Purposes;
          No Successor in-Interest ........................................................................ 105

     7.     Expenses of Liquidating Trustee ........................................................... 107

     8.     Bonding of Liquidating Trustee ............................................................. 107

     9.     Fiduciary Duties of the Liquidating Trustee .......................................... 107

     10.    Dissolution of the Liquidating Trust...................................................... 107

     11.    Liability, Indemnification of the Liquidating Trust Protected
          Parties.................................................................................................... 108

     12.    Full and Final Satisfaction of Claims against Liquidating Trust ............ 109

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE
COMBINED PLAN AND DISCLOSURE STATEMENT.................................................. 109

A.     Method of Payment........................................................................................... 109

B.     No Interest......................................................................................................... 110

C.     Claims Objection Deadline; Prosecution of Claims Objections........................ 110

D.     Estimation of Claims......................................................................................... 110

E.     Claims Reserve ................................................................................................. 111

2747149.15 115719-100281

F.      Distribution After Allowance ........................................................... 111

G.      Adjustments to Claims Without Objection ........................................ 112

H.      Late Claims and Amendments to Claims After Confirmation Date .................. 112

I.      Distribution Record Date ................................................................. 112

J.      Delivery of Distributions ................................................................. 113

K.      Unclaimed Distributions ................................................................. 113

L.      *De Minimis* Distributions ................................................................ 114

M.      Setoff and Recoupment .................................................................. 114

N.      Allocation of Distributions Between Principal and Interest ............... 114

O.      Privileges as to Causes of Action ..................................................... 114

P.      Books and Records ......................................................................... 115

Q.      Withholding and Reporting Requirements ......................................... 115

ARTICLE IX. IMPLEMENTATION AND EFFECT OF CONFIRMATION OF
COMBINED PLAN AND DISCLOSURE STATEMENT ................................. 116

A.      Means for Implementation of the Plan ............................................... 116

        1.      Substantive Consolidation ..................................................... 116

        2.      Automatic Dissolution of the Debtors ..................................... 118

        3.      Funding of the Plan ............................................................... 118

        4.      Preservation of Causes of Action ............................................ 119

        5.      Corporate Action; Effectuating Documents; Further Transactions ........ 119

        6.      Good Faith ........................................................................... 119

ARTICLE X. EXCULPATION, RELEASES AND INJUNCTIONS ..................... 120

A.      Exculpation .................................................................................... 120

B.      Releases ......................................................................................... 121

        1.      Releases by the Debtors ........................................................ 121

        2.      Releases Pursuant to the Auto Liability Claims Protocol ............. 122

2747149.15 115719-100281

3. Release of Equity Holders and Affiliates .................................................. 122

4. Release of Debtors, Debtors' Estates and the Committee ..................... 123

5. Release of Liens ................................................................................... 124

C. Injunction ...................................................................................................... 124

D. Auto Liability Claims Injunction ................................................................. 125

E. Reservation of Rights .................................................................................... 126

ARTICLE XI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......................... 127

A. Executory Contracts and Unexpired Leases Deemed Rejected ..................... 127

B. Insurance Policies ......................................................................................... 128

C. Bar Date For Rejection Damages .................................................................. 128

ARTICLE XII. CONDITIONS PRECEDENT TO AND OCCURRENCE OF
CONFIRMATION AND THE EFFECTIVE DATE ............................................................ 129

A. Conditions Precedent to Confirmation .......................................................... 129

B. Conditions Precedent to the Effective Date .................................................. 129

C. Establishing the Effective Date ..................................................................... 129

ARTICLE XIII. RETENTION OF JURISDICTION ........................................................... 130

ARTICLE XIV. MISCELLANEOUS PROVISIONS ........................................................... 133

A. Transfer of Debtors' Assets .......................................................................... 133

B. Termination of Injunctions or Stays ............................................................. 133

C. Exemption from Transfer Taxes .................................................................... 133

D. Amendment or Modification of the Plan ....................................................... 134

E. Severability ................................................................................................... 134

F. Revocation or Withdrawal of the Plan .......................................................... 134

G. Binding Effect ............................................................................................... 135

H. Notices .......................................................................................................... 135

I. Revised Bankruptcy Rule 2002 Service List ................................................. 135

2747149.15 115719-100281

J.      Governing Law ................................................................................................ 135

K.      Headings ........................................................................................................ 136

L.      Exhibits/Schedules ........................................................................................ 136

M.      Filing of Additional Documents .................................................................... 136

N.      No Admissions ............................................................................................... 136

O.      Successors and Assigns .................................................................................. 136

P.      Return of Deposits ......................................................................................... 136

Q.      Implementation .............................................................................................. 137

R.      Inconsistency .................................................................................................. 137

S.      Cancellation of Equity Interests .................................................................... 137

T.      Dismissal of Hollywood Solar and United Solar ........................................... 137

U.      Dissolution of the Remaining Debtors ........................................................... 137

V.      Request for Expedited Determination of Taxes .............................................. 138

ARTICLE XV. CONFIRMATION REQUEST ........................................................................ 138

## EXHIBITS

A      Liquidating Trust Agreement
B      Liquidation Analysis
C      Auto Liability Claims Protocol Settlement Agreement
D      Equity Holders and Affiliates Settlement Agreement
E      Liquidating Trustee's Curriculum Vitae

2747149.15 115719-100281

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT.  THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT WAS SUBSTANTIALLY COMPILED FROM THE DEBTORS' BOOKS AND RECORDS TO THE BEST OF THE DEBTORS' AND COMMITTEE'S KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF.  THE DELIVERY OF THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

**THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT PROVIDES FOR THE SUBSTANTIVE CONSOLIDATION OF THE ASSETS AND LIABILITIES OF CERTAIN DEBTORS FOR LIMITED PURPOSES AND CONTEMPLATES THE APPOINTMENT OF A LIQUIDATING TRUSTEE TO WIND-DOWN THE DEBTORS' ESTATES.**

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS AND COMMITTEE ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN

ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.  HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**FOR EASE OF REFERENCE ONLY, AND WITH CERTAIN EXCEPTIONS, ARTICLES I, II AND III HEREIN GENERALLY CONTAIN THE DISCLOSURE STATEMENT PROVISIONS AND ARTICLES IV THROUGH XIV HEREIN GENERALLY CONTAIN THE PLAN PROVISIONS OF THE COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT.**

2747149.15 115719-100281

# INTRODUCTION

The Debtors and the Official Committee of Unsecured Creditors propose a joint plan of liquidation for the resolution of all outstanding Claims against and Equity Interests in the Debtors as of the Petition Date.  Capitalized terms used and not otherwise defined herein have the meanings ascribed to such terms in Article I.B hereof.

The Combined Plan and Disclosure Statement constitutes a liquidating Chapter 11 plan for the Debtors and provides for Distribution of the Debtors' assets already liquidated or to be liquidated over time to Holders of Allowed Claims in accordance with the terms of the Combined Plan and Disclosure Statement and the priority provisions of the Bankruptcy Code.  The Combined Plan and Disclosure Statement contemplates the appointment of a Liquidating Trustee, *inter alia*, to implement the terms of the Combined Plan and Disclosure Statement and make Distributions in accordance therewith.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will likely occur at various intervals after the Effective Date.

**The Joint Combined Plan and Disclosure Statement provides for limited substantive consolidation of the assets and liabilities of the Debtors.  Accordingly, for Plan purposes only, the assets and liabilities of the Debtors are deemed the assets and liabilities of two substantively consolidated entities, as set forth herein.  Claims filed against multiple Debtors seeking recovery of the same debt shall be treated as a single, non-aggregated Claim against one or both of the consolidated Estates, as applicable, to the extent that such Claim is an Allowed Claim.**

The Debtors and the Committee are proponents of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors and Committee expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement one or more times before substantial consummation thereof.

2747149.15 115719-100281

# ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

### A.    Rules of Interpretation and Construction

1.    For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) any reference to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified, all references to "Articles" or "Sections" are references to Articles or Sections hereof; (v) the words ''herein,'' "hereof" and ''hereto'' refer to the Combined Plan and Disclosure Statement in its entirety rather than to a particular portion of the Combined Plan and Disclosure Statement; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (viii) any term used in capitalized form herein that is not otherwise defined shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

### B.    Defined Terms

Unless the context otherwise requires, the following capitalized terms used in this Combined Plan and Disclosure Statement shall have the meanings set forth below:

1.    "Accrued Professional Compensation" means, at any date, all accrued fees and reimbursable expenses for services rendered by Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been filed for such fees and expenses.  To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

2.    "Administrative Claims Bar Date" means that date which is thirty (30) days from the entry of the Confirmation Order, unless otherwise fixed by prior order of the Court.

3.    "Administrative Expense Claim" means a Claim for costs and expenses of administration under sections 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors, (b) Professional Fee Claims (to the extent Allowed by the Bankruptcy Court), and (c) Statutory Fee Claims.

4

4.    "<u>Affiliate</u>" means, with respect to any Entity, "affiliate" as defined in section 101(2) of the Bankruptcy Code.

5.    "<u>Allowed</u>" means, with reference to any Claim (a) any Claim against the Debtors which has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been Filed; (b) any Claim or Equity Interest arising on or before the Effective Date for which a Proof of Claim has been timely Filed before the applicable Bar Date (x) as to which no objection to allowance has been interposed or (y) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder, (c) any Claim or Equity Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court and for which a Proof of Claim has been timely Filed before the applicable Bar Date, or (d) any Claim expressly Allowed hereunder or pursuant to an Order of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that Claims allowed solely for the purpose of voting to accept or reject the Combined Plan and Disclosure Statement pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Combined Plan and Disclosure Statement, include interest, punitive damages or any fine or penalty on such Administrative Expense Claim or Allowed Claim from and after the Petition Date.  Unless otherwise provided in an Order of the Bankruptcy Court, for purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any claim which the Debtors may hold or assert against the Holder thereof, to the extent such claim may be set off pursuant to sections 502(d) or 553 of the Bankruptcy Code.

6.

7.    "<u>Amended Schedules</u>" means the amended schedules of assets and liabilities and statement of financial affairs filed by New England Motor Freight, Inc. and Eastern Freight Ways, Inc. on May 7, 2019 [Dkt. 550-1], and any and all amendments and modifications thereto, including Dkt. 822-1, and any subsequent amendments and/or modifications.

8.    "<u>Amended Schedules Bar Date</u>" means the later of (a) the General Bar Date and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is 60 days after the Debtors or Liquidating Trustee provides notice to the Holder of an amendment to the Debtors' Amended Schedules of Assets and Liabilities.

9.    "<u>Avoidance Actions</u>" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Effective Date to prosecute such Claims or Causes of Action.

10.    "<u>Auto Insurer</u>" means one or more of Protective Insurance Company and/or United States Fire Insurance Company and each of their predecessors, successor(s) and/or assigns.

5

11.    "<u>Auto Insurer Secured Claim</u>" means any and all claims held by an Auto Insurer relating to and/or arising under one or more Excess Indemnity Contracts (as such term is defined in Article II(C)(12)(e) of this Combined Plan and Disclosure Statement), Surety Bonds (including MCS-82 surety bonds) as defined in Article I(12) herein), and/or any collateral and/or indemnity agreements between one or more of the Debtors and/or an Auto Insurer relating to in any way one or more Excess Indemnity Contracts or Surety Bonds, including, but not limited to, any claim held by an Auto Insurer for the settlement and payment of Auto Liability Claims and for amounts within the Debtors' self-retention obligation as set forth in any Excess Indemnity Contract and/or Surety Bond, which Claim shall be secured up to the amount of the Auto Liability LC Proceeds (as such term is defined in Article II(C)(12) herein) held by such Auto Insurer.

12.    "<u>Auto Insurer Unsecured Indemnity Claim</u>" means a claim, whether arising before or after the Petition Date, other than an Auto Insurer Secured Claim, if any, held by an Auto Insurer relating to and/or arising in any Excess Indemnity Contracts, any Surety Bonds and certificates issued and/or filed by an Auto Insurer with any federal and/or state regulatory agencies and others guaranteeing the Debtors' payment of Auto Liability Claims (collectively, the "<u>Surety Bonds</u>"), and/or any collateral and/or indemnity agreements relating to in any way one or more Excess Indemnity Contracts or Surety Bonds.

13.    "<u>Auto Liability Claims</u>" means all claims against the Debtors for personal injury or property damage, whether arising before or after the Petition Date, relating to or arising out of the Debtors' trucking and transportation operations, which are covered by or subject to the Excess Indemnity Contracts (as defined in Article II(C)(12) of this Combined Plan and Disclosure Statement).

14.    "<u>Auto Liability Claims Protocol</u>" means the procedure described in this Combined Plan and Disclosure Statement, the terms of which are set forth in Exhibit C hereto, which shall provide for the orderly determination and resolution of all Auto Liability Claims and determination of the Auto Insurer Secured Claims and Auto Insurer Unsecured Indemnity Claims.

15.    "<u>Auto Liability Claims Released Parties</u>" means the Debtors, the Drivers, the Debtors' Estates, all Estate representatives, the Exculpated Parties, the Released Parties and the Liquidating Trust.

16.    "<u>Ballot</u>" means the ballot forms distributed with the Combined Plan and Disclosure Statement to Holders of Impaired Claims entitled to vote in connection with the solicitation of acceptances of the Combined Plan and Disclosure Statement.

17.    "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

18.    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over these Chapter 11 Cases.

19.    "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure.

20.     "Bar Date Order" means the *Order Establishing Bar Dates and Procedures and Approving the Form and Manner of Notice Thereof* entered in the Chapter 11 Cases by the Bankruptcy Court on May 1, 2019 [Docket No. 519].

21.     "Bar Dates" means those dates and times defined as the Bar Dates in Article II(C)(11)(c) hereof or in the Bar Date Order.

22.     "Books and Records" means those books, records and financial systems of the Debtors, including any and all documents and any and all computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in the possession of third parties, wherever located.

23.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)), which commercial banks in New York, New York are required or authorized to close by law or executive order, and the Friday after Thanksgiving.

24.     "Cash" means the legal tender of the United States of America or the equivalent thereof.

25.     "Causes of Action" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtors, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, whether direct, indirect, derivative, or otherwise, and any and all commercial tort claims against any party, including, the Debtors' current and former directors and officers, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date, or during the course of the Chapter 11 Cases through the Effective Date.

26.     "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the Chapter 11 case filed for that Debtor under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered Chapter 11 Cases for all Debtors.

27.     "Claim" means any claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

28.     "Claims Objection Deadline" means the first Business Day that is three hundred sixty-five (365) days after the Effective Date or such later date as may be approved by Order of the Bankruptcy Court upon motion of the Liquidating Trustee.

29.     "Class" means a category of Holders of Claims or Equity Interests as set forth in Article VI hereof pursuant to section 1122(a) of the Bankruptcy Code.

30.     "Clerk" means the clerk of the Bankruptcy Court.

7

31.     "Combined Plan and Disclosure Statement" means this joint combined disclosure statement and Chapter 11 plan of liquidation, including, without limitation, all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time and is referred to herein as (the "Plan"). *See also* paragraph 90 for a more comprehensive definition of the "Plan".

32.     "Committee" shall mean the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases on February 21, 2019.

33.     "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the Docket of the Chapter 11 Cases.

34.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Cases.

35.     "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

36.     "Confirmation Order" means the Order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

37.     "Confirmation Notice" means the notice to be provided to all Creditors and parties in interest regarding the Confirmation Hearing and which shall contain instructions for obtaining a copy of the Combined Plan and Disclosure Statement.

38.     "Consolidated Eastern Debtor(s)" shall mean Eastern Freight Ways, Inc. and Carrier Industries, Inc., individually or collectively.

39.     "Consolidated NEMF Debtor(s)" shall mean New England Motor Freight, Inc.; NEMF World Transport, Inc.; Apex Logistics, Inc.; Jans Leasing Corp.; Myar, LLC; MyJon, LLC; and NEMF Logistics, LLC, individually or collectively.

40.     "Contingent" shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

41.     "Creditor" means any Entity that is the Holder of a Claim against any of the Debtors.

42.     "Debtor(s)" means New England Motor Freight, Inc.; Eastern Freight Ways, Inc.; NEMF World Transport, Inc.; Apex Logistics, Inc.; Jans Leasing Corp.; Carrier Industries, Inc.; Myar, LLC; MyJon, LLC; Hollywood Avenue Solar, LLC; United Express Solar, LLC; and NEMF Logistics, LLC, individually or collectively.

43.     "Disbursing Agent" means the Liquidating Trustee.

8

44.    "Disputed" means every Claim, or any portion thereof, that has not been Allowed pursuant to the Combined Plan and Disclosure Statement or a Final Order of the Bankruptcy Court and:

(a)    if a Proof of Claim has been timely Filed by the applicable Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent, or disputed, or in zero or unknown amount, and has not been resolved by written agreement of the parties or a Final Order of the Bankruptcy Court;

(b)    if either (1) a Proof of Claim has been timely Filed by the applicable Bar Date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which any Debtor has timely filed an objection or request for estimation in accordance with the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a Final Order;

(c)    that is the subject of an objection or request for estimation Filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved, or overruled by Final Order of the Bankruptcy Court; or

(d)    that is otherwise disputed by any Debtor in accordance with the provisions of the Combined Plan and Disclosure Statement or applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order.

45.    "Distribution" means any distribution to the Holders of Allowed Claims.

46.    "Distribution Record Date" means the date of the Confirmation Hearing or such other date as designated in an Order of the Bankruptcy Court.

47.    "Docket" means the docket in the Chapter 11 Cases maintained by the Clerk.

48.    "Drivers" means any of the Debtors' employees and/or former employees who may be individually liable for Auto Liability Claims.

49.    "Effective Date" means the first Business Day after all conditions specified in Article XII(B) have been satisfied or waived.

50.    "Entity" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

51.    "Equity Interest" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership interest or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, together with any warrants, equity-based awards

9

or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date.

52. "Equity Holders and Affiliates" means all Persons and Entities identified on Schedule 1 to the Settlement Agreement and Mutual Release attached to this Combined Plan and Disclosure Statement and incorporated herein as Exhibit D.

53. "Estate" or "Estates" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

54. "Estate Assets" shall mean assets of the Estate, including claims arising under Chapter 5 of the Bankruptcy Code.

55. "Eastern Distribution Reserve" shall mean the funds available for Distribution to creditors of the Consolidated Eastern Debtors from which any Prepetition Lender holding an Allowed Claim against Eastern and/or Carrier shall share in the Distribution pro rata with other Creditors holding Allowed Claims against the Consolidated Eastern Debtors. The Eastern Distribution Reserve shall be funded with Eastern's Cash on hand on the Effective Date, plus $1,281,308 retained from the Eastern Escrow Account after the satisfaction of 75% of the NEMF Administrative Claim.

56. "Eastern Sale Motion" means the Debtors' Motion for Order (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially All of the Debtors' Eastern Freight Ways, Inc. and Carrier Industries, Inc.'s Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [Docket No. 335].

57. "Exculpated Parties" means, collectively, (i) the Debtors, (ii) the Committee; (iii) the Settling Lenders, and with respect to each of (i), (ii), and (iii), each of their respective current and former officers, directors, managers, employees, agents, attorneys, financial advisors, accountants, investment bankers, investment advisors, consultants, agents, representatives and other professionals, specifically including, Chief Restructuring Officer (Vincent J. Colistra and Phoenix Executive Services, LLC); Counsel for the Debtor (Gibbons P.C.); Claims Agent, Noticing Agent and Administrative Agent to the Debtors (Donlin Recano & Company, Inc.); Conflicts Counsel to the Debtors (Wasserman Jurista & Stolz);  Special Counsel for the Debtors (Whiteford Taylor & Preston LLP and Akerman LLP); Accountants to the Debtors (WithumSmith+Brown PC); Consultants to the Debtors (Deloitte Consulting LLP); Real Estate Brokers to the Debtors (Cushman & Wakefield of Florida, LLC); Appraiser to the Debtors (A. Atkins Appraisal Corp.); Counsel to the Official Committee of Unsecured Creditors (the "Committee") (Lowenstein Sandler LLP and Elliott Greenleaf P.C.); Financial Advisor to the Committee (CohnReznick LLP); and Investment Banker to the Committee CohnReznick Capital Market Securities, LLC).

58. "Executory Contract" means a contract, as it may have been amended, restated or otherwise modified and including any codicils, amendments, exhibits or annexes thereto, if any,

10

to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

59.     "File," "Filed" or "Filing" means filed, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

60.     "Final Fee Application" means an application for final allowance of Accrued Professional Compensation.

61.     "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Cases or the docket of any court of competent jurisdiction, and as to which the time to appeal, seek reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument, or rehearing and, where applicable, petition for certiorari has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

62.     "General Administrative Expense Claim" means any Administrative Expense Claim, other than a Professional Fee Claim or a Statutory Fee Claim.

63.     "General Bar Date" means June 18, 2019 at 5:00 p.m. (prevailing Eastern Time).

64.     "General Unsecured Claims" means any unsecured Claim (other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Intercompany Claim, an Auto Liability Claim, or an Auto Insurer Unsecured Indemnity Claim) against one or more of the Debtors including, but not limited to Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto.

65.     "Governmental Unit" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

66.     "Holder" means the beneficial holder of a Claim or Equity Interest.

67.     "Impaired" means, with reference to any Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

68.     "Insider" has the meaning set forth in Section 101(31) of the Bankruptcy Code.

2747149.15 115719-100281

69.    "Insurance Policies" means all insurance policies of the Debtors including, but not limited to, the Excess Indemnity Contracts and Surety Bonds and any other collateral and/or indemnity agreements related thereto, as such terms are defined in Article II(C)(12).

70.    "Insurer Secured Claim (WC)" means a claim held by an Insurer arising under one or more workers compensation policies, which claim is secured by possession of letter of credit proceeds.

71.    "Intercompany Claims" means, collectively, any Claim held by a Debtor against another Debtor.

72.    "Lender Deficiency Claim" means any portion of a Claim held by a Prepetition Lender (a) to the extent the value of the Holder's interest in the Estate Property securing such Claim is less than the amount of such Claim, or (b) to the extent the amount of a Claim subject to setoff is less than the amount of the Claim, each as determined by the Bankruptcy Court under Bankruptcy Code section 506(a).

73.    "Lender Secured Claim(s)" means all Class 2A through 2J Claims held by Prepetition Lenders, individually or collectively.

74.    "Lien" has the meaning ascribed to that term in section 101(37) of the Bankruptcy Code.

75.    "Liquidating Trust" shall mean the liquidating trust established by the Plan and described in Article VII of the Plan and in the Liquidating Trust Agreement.

76.    "Liquidating Trust Agreement" shall mean the agreement establishing and delineating the terms and conditions of the Liquidating Trust, a copy of which shall be provided in a supplement to the Plan.

77.    "Liquidating Trust Assets" shall mean all of the Assets of the Consolidated NEMF Debtors, which shall be transferred to the Liquidating Trust pursuant to the Plan.  For the avoidance of doubt, the Assets of the Consolidated Eastern Debtors shall not be transferred to the Liquidating Trust.

78.    "Liquidating Trust Beneficiaries" shall mean the Holders of Allowed Claims under the Plan.

79.    "Liquidating Trust Expense Reserve" shall mean the reserve established by the Confirmation Order or other order of the Bankruptcy Court, pursuant to Article VII of the Plan.

80.    "Liquidating Trust Expenses" shall mean all actual and necessary costs and expenses incurred on or after the Effective Date in connection with the administration of the Plan, including, but not limited to, (i) the Liquidating Trustee's costs, expenses and legal fees incurred related to filing and prosecuting objections to Claims, (ii) the Liquidating Trustee's costs, expenses and legal fees incurred to litigate or settle Causes of Action, including, but not limited to attorneys' fees, accounting fees, expert witness fees, and all costs related to obtaining and distributing such recoveries, (iii) all fees, costs or expenses of the Liquidating Trustee incurred pursuant to the

12

Liquidating Trust Agreement, including, but not limited to, any professional retained by the Liquidating Trustee and (iv) all fees payable pursuant to Section 1930 of Title 28 of the United States Code.

81.    "Liquidating Trust Protected Parties" shall mean, collectively, the Liquidating Trust, the Liquidating Trustee, and their respective members, designees, agents, professionals, employees, managers, partners, actuaries, financial advisors, and attorneys.

82.    "Liquidating Trustee" shall mean the Person designated pursuant to Article VII of the Plan to act in accordance with the terms and authority granted under the Plan and Confirmation Order; provided, however, that the Liquidating Trustee shall not have served as a member of the Committee.  The initial Liquidating Trustee will be Kevin P. Clancy.  A copy of the Liquidating Trustee's curriculum vitae is attached hereto as Exhibit E.

83.    "Local Bankruptcy Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey, and the general and chambers rules of the Bankruptcy Court.

84.    "NEMF Administrative Claim" shall mean the Administrative Claim asserted by the NEMF Estate against the Estates of Eastern and Carrier in the amount of $6,235,745 relating to post-petition expenses of Eastern and Carrier that were funded by NEMF during the administration of these Chapter 11 Cases.

85.    "Order" means an order or judgment of the Bankruptcy Court, as entered on the Docket.

86.    "Other Secured Claim" means any Claim other than a Claim held by the Prepetition Lenders or by Holders of Auto Insurer Secured Claims and/or Insurer Secured Claims (WC) that is secured by a Lien on property in which the Estates have an interest, to the extent of the value of the Holder's interest in the Estates' interest in such property, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

87.    "Permissible Investments" has the same meaning as set forth in the Liquidating Trust Agreement.

88.    "Person" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

89.    "Petition Date" means February 11, 2019, the date on which the Debtors Filed their respective petitions for relief commencing the Chapter 11 Cases.

90.    "Plan" shall mean this Combined Plan of Liquidation and Disclosure Statement under Chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.  Depending on the context of the reference "Plan" may mean either or both the Plan of Liquidation contained therein and/or the Disclosure Statement.

13

91.      "Plan Documents" means the Plan and all of the exhibits and schedules and other documents attached hereto or Filed in connection herewith.

92.      "Post-Petition Health Care-Related Claim" shall mean any Claim for incurred but not paid health care-related liabilities, including but not necessarily limited to medical and dental care, asserted against the Debtors, which Claim arose after the Petition Date through the termination of the Debtors' health care plan(s) effective July 31, 2019.

93.      "Prepetition Lender Parties" or "Prepetition Lenders" shall mean, collectively, JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), TD Bank, N.A. ("TD Bank"), East West Bank, Santander Bank, N.A. ("Santander"), Capital One, N.A. ("Capital One"), Wells Fargo Equipment Finance, Inc. ("Wells Fargo"), Fifth Third Bank ("Fifth Third"), Mercedes Benz Financial Services USA LLC ("Mercedes Benz"), Webster Capital Finance, Inc. ("Webster Capital") and VFS US LLC ("Volvo").

94.      "Priority Claims" means, collectively, Priority Non-Tax and Priority Tax Claims.

95.      "Priority Non-Tax Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

96.      "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

97.      "Privilege" means the attorney client privilege, work product protections or other immunities (including those related to common interests or joint defenses with other parties), or protections from disclosure of any kind held by the Debtors or their Estates.

98.      "Proof of Claim" means a timely proof of Claim Filed against any Debtor in the Chapter 11 Cases.

99.      "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion of a particular recovery that a Class is entitled to share with other Classes entitled to the same recovery under the Plan.

100.      "Professional" or collectively "Professionals," shall mean a Person or Entity employed pursuant to a Final Order in accordance with Sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

101.      "Professional Fee Claims" means Claims of Retained Professionals for services rendered and expenses incurred in the Chapter 11 Cases.

102.      "Real Property Motion" means *Debtors' Motion for Order (I)(A) Authorizing the Private Sale of Certain Real Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Purchase Agreement; and (III) Granting Related Relief* [Docket No. 701].

14

103.    "Real Property Sale Order" means the *Order (I) Authorizing the Private Sale of Certain Real Property Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Purchase Agreement; and (III) Granting Related Relief* [Docket No. 761].

104.    "Rejection Claim" means a Claim arising out of the rejection of Unexpired Leases or Executory Contracts to which a Debtor is a party.

105.    "Rejection Claim Bar Date" means the later of (a) the General Bar Date, and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is 35 days following the entry of an Order approving the rejection of an Executory Contract or Unexpired Lease.

106.    "Released Parties" means, collectively, (i) the Debtors, (ii) the Committee; (iii) the Settling Lenders, and with respect to each of (i), (ii), and (iii), each of their respective current and former officers, directors, managers, employees, agents, attorneys, financial advisors, accountants, investment bankers, investment advisors, consultants, agents, representatives and other professionals.

107.    "Reserves" shall mean, collectively, the reserves, which shall be in one or more interest bearing accounts, which are established by the Liquidating Trustee as set forth herein and in accordance with Section 7.1 of the Plan, the amounts of which shall be set by the Bankruptcy Court in the Confirmation Order, or by another order of the Bankruptcy Court entered prior to the Effective Date, and which reserves can be modified by the Liquidating Trustee or by entry of an order by the Bankruptcy Court.

108.    "Retained Professional" means an Entity employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

109.    "Rolling Stock Sale Order" means the *Order (A) Authorizing the Debtors to Sell at Auction Substantially All of Debtor NEMF's Personal Property Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving Auction Procedures Relating to Such Auction Sales, and (C) Granting Related Relief* [Docket No. 434].

110.    "Rolling Stock Sale Motion" means *Debtors' Motion for Order (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 141].

111.    "Sale" means the sale of substantially all of the Debtors' assets as authorized by the Eastern Sale Order, Real Property Sale Order, and the Rolling Stock Sale Order.

112.    "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by each of the Debtors on April 5, 2019 and any and all amendments and modifications thereto.

113.    "<u>Statutory Fees</u>" means any and all fees payable to the United States Trustee pursuant to section 1930 of title 28 of the United States Code and any interest thereupon.

114.    "<u>Special Administrative Claims Bar Date</u>" means August 12, 2019 at 5:00 p.m. (prevailing Eastern Time).

115.    "<u>Special Administrative Claims Bar Date Order</u>" means the *Amended Order Establishing a Special Administrative Claims Bar Date for Filing Certain Post-Petition Auto-Related Claims and Approving the Form and Manner of Notice Thereof* entered in the Chapter 11 Cases by the Bankruptcy Court on June 26, 2019 [Docket No. 700].

116.    "<u>Unclaimed Distribution</u>" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

117.    "<u>Unclaimed Distribution Deadline</u>" means the date that is sixty (60) days from the date the Liquidating Trustee makes a Distribution under the Plan to a Holder of an Allowed Claim.

118.    "<u>Unexpired Lease</u>" means a lease, as it may have been amended, restated or otherwise modified and including any codicils, amendments, exhibits or annexes thereto, if any, to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

119.    "<u>Unimpaired</u>" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

120.    "<u>United States Trustee</u>" means the United States Trustee for Region 3.

121.    "<u>Voting Agent</u>" means Donlin Recano & Company, Inc., or any successor thereto.

122.    "<u>Voting Deadline</u>" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted.

## ARTICLE II.

## BACKGROUND

A.    **General Background**

1.    <u>Overview of the Debtors</u>

The Debtors offered a broad range of transportation services.  Debtor New England Motor Freight, Inc. ("<u>NEMF</u>") was founded in 1918 in Elizabeth, New Jersey and was a leading less-than-truckload ("<u>LTL</u>") carrier with a focus in the Mid-Atlantic, Midwest and Northeast United States. NEMF also offered LTL services to its customers across the United States and Canada

2747149.15 115719-100281

through a number of partnerships and interline carrier arrangements with other LTL providers.  In addition to the LTL business, the Debtors provided truckload ("TL") services through Debtor Eastern Freight Ways, Inc. ("Eastern").  Debtor Jans Leasing Corp. ("Jans Leasing") was a trucking equipment lessor; Debtor Carrier Industries, Inc. ("Carrier") offered dedicated third party logistics services; Debtor Apex Logistics, Inc. ("Apex") offered transportation brokerage services, and Debtor NEMF World Transport, Inc. ("NEWT") provided non-vessel operation common carrier operations between the United States and Puerto Rico.  Debtor NEMF Logistics, LLC ("Logistics") was a third-party logistics company specializing in logistics management services, including warehousing, software, brokerage and support.  Debtors Myar, LLC ("Myar") and MyJon, LLC ("MyJon") are both dormant and had no economic actively in 2018.  Debtors Hollywood Avenue Solar, LLC ("Hollywood Solar") and United Express Solar, LLC ("United Solar") were formed to acquire solar arrays for terminals in South Plainfield and Pennsauken, New Jersey, respectively, at which the Debtors formerly operated.

MyJon, Hollywood Solar and United Solar were wholly-owned subsidiaries of NEMF. Myar was a wholly-owned subsidiary of Eastern.  The remaining Debtors were all sister entities owned solely by The Shevell Dynasty Trust, or by the Shevell Dynasty Trust and Myron P. Shevell ("Mr. Shevell").

(a)   *NEMF:  LTL Business*

NEMF operated as a super-regional provider of LTL trucking services in fifteen (15) states, spanning from Maine to Chicago, and into northeastern Kentucky and all of Virginia.  This was the Debtors' core business segment.  NEMF had approximately $345 million in gross revenues in 2017, representing approximately 92% of combined total gross revenues for the Debtors in 2017. The Debtors estimated that NEMF generated gross revenues of approximately $343 million in 2018.  In addition to its operations through terminals located in fifteen (15) states in the Northeast,

17

Mid-Atlantic and Midwest, NEMF was able to reach an estimated 85% of the U.S. population through partnerships with other leading regional carriers. Likewise, through partnerships with Canadian carriers, NEMF was also able to reach the entire Canadian population.

(b)      *Eastern:  TL Business*

Eastern was based in South Brunswick, New Jersey and was established in 1994 to provide TL services within the Northeast and Mid-Atlantic.  Gross revenues for Eastern were approximately $30.2 million in 2017, representing approximately 8% of the combined total gross revenues for the Debtors in 2017.  The Debtors estimated that Eastern generated gross revenues of approximately $31.0 million in 2018.  Eastern principally provided overnight or same-day delivery with an average length of haul of about 400 miles.  Eastern used many of the same terminals and facilities as NEMF.

(c)      *Carrier:  Third Party Logistics Business*

Carrier was a third-party logistics company that provided supply chain management and logistical planning services.  Carrier's gross revenues represented less than 1% of the Debtors combined total gross revenues in 2017 and 2018.

(d)      *Apex:  Brokerage Business*

Apex was a brokerage company offering transportation solutions across the country.  Apex provided LTL and TL management services and parcel audit from origin to point of sale, including full track and trace systems, as well as partial and periodic reports to monitor shipping progress, service levels, cost effectiveness and other performance indicators.  Apex typically handled shipping assignments that NEMF and Eastern choose not to handle.  Gross revenues for Apex in 2017 and 2018 were *de minimis*.

18

(e)     *NEWT:  Puerto Rico Business*

NEWT was a non-vessel operation common carrier that provided service between the United States and Puerto Rico.  NEWT offered a barge service with a carrier out of the port of Pennsauken, New Jersey to San Juan, Puerto Rico.  NEWT also offered vessel services out of the ports of Jacksonville, Florida and Houston, Texas to Puerto Rico.  NEWT's gross revenues in 2017 and 2018 represented less than 1% of the Debtors' gross revenues.

(f)     *Jans Leasing:  Equipment Rental Business*

Jans Leasing was in the business of leasing trucking rigs, trailers and related equipment.  Jans Leasing's gross revenues in 2017 and 2018 represented less than 1% of the Debtors' gross revenues.

(g)     *Hollywood Solar, United Solar, NEMF Logistics, MyJon and Myar*

Hollywood Solar, United Solar, NEMF Logistics, MyJon and Myar were either dormant or generating *de minimis* revenues.  Collectively, they generated less than four-tenths of one percent of the Debtors' 2018 revenues.

2.     <u>Prepetition Capital Structure</u>

(a)     *Secured Debt*

i.     Vehicle Financing

The Debtors' primary secured debt is for vehicle and related equipment financing related to its fleet of vehicles.  The Debtors believe that each of these vehicle financing transactions is evidenced by a separate note and security agreement providing for liens on specific financed fleet vehicles and related equipment (the "<u>Vehicle Financing Agreements</u>").  As of the Petition Date, the Debtors had outstanding obligations for vehicles and equipment with 10 separate lenders[2]

---

[2] The lenders under the Vehicle Financing Agreements are JPMorgan Chase, TD Bank, East West Bank, Santander, Capital One, Wells Fargo, Fifth Third, Mercedes Benz, Webster Capital and Volvo.

19

(together, the "Vehicle Lenders") in the outstanding principal aggregate amount of approximately $57.1 million exclusive of interest and fees.  Of that amount, approximately $47.4 million was owed by NEMF and approximately $9.7 million was owed by Eastern.  Pursuant to ¶12(h) of the Rolling Stock Sale Order, the Committee was to conduct a review of the Vehicle Financing Agreements by June 17, 2019 (the "Initial Challenge Deadline").  The Initial Challenge Deadline was extended through and until August 9, 2019 (the "First Extended Challenge Deadline"). [Docket No. 688].  The First Extended Challenge Deadline was extended through and until September 9, 2019 (the "Second Extended Challenge Deadline").   [Docket No. 785].   In accordance with the Second Extended Challenge Deadline, the Committee reviewed approximately one hundred and sixty (160) Vehicle Financing Agreements and over 2,000 titles to vehicles and equipment.

ii.     Letters of Credit (Partially Secured Up to Deposit Amounts)

NEMF obtained various letters of credit to support workers compensation insurance and fleet vehicle and automobile insurance, in the aggregate amount of approximately $30.4 million (the "Letters of Credit").  As of the Petition Date, none of the Letters of Credit were drawn upon. However, because NEMF was unable to successfully renew or replace the existing Letters of Credit prior to the expiration of the current Letters of Credit, each insurance company beneficiary under each Letter of Credit drew upon its Letter of Credit, as explained more fully below.

The Letters of Credit lenders are JPMorgan Chase, TD Bank, Santander, East West Bank and Capital One (the "L/C Lenders"). The Letters of Credit, and the principal amount of claims based on the Letters of Credit, are as follows:

| Bank | L/C Amount | Beneficiary | Purpose | Exp. Date |
|------|-----------|-------------|---------|-----------|
| JPMorgan Chase | $    7,850,000 | Hartford | Work. Comp. | 4/1/19 |
| | $    2,450,000 | United Safety | Fleet | 4/10/19 |
| | $        46,000 | Travelers | Work. Comp. | 3/31/20 |

| Bank | L/C Amount | Beneficiary | Purpose | Exp. Date |
|------|-----------|-------------|---------|-----------|
| TD Bank | $  6,000,000 | Hartford | Work. Comp | 2/1/20 |
|  | $  1,585,000 | Fidelity | Work. Comp | 5/1/19 |
|  | $  1,000,000 | Arch | Work. Comp | 4/1/19 |
|  | $     573,000 | Liberty | Work. Comp | 3/31/19 |
|  | $     125,000 | Hartford | Personal Auto | 4/10/19 |
| East West Bank | $  5,951,656 | Protective | Fleet | 4/10/19 |
| Santander | $  1,419,907 | Protective | Fleet | 4/10/19 |
|  | $  2,167,437 | Protective | Fleet | 4/10/19 |
|  | $     800,000 | Hartford | Work. Comp. | 3/31/19 |
| Capital One | $     428,000 | Liberty | Work. Comp. | 3/31/19 |
| **Total:** | **$  30,396,000** |  |  |  |

The East West Bank Letters of Credit are supported by unsecured guarantees provided by Eastern and Carrier.  The JPMorgan Chase Letters of Credit are supported by unsecured guarantees provided by Eastern, Carrier and Apex.  The TD Bank Letters of Credit are also supported by unsecured guarantees provided by Eastern, Carrier and Apex, which entities guaranteed, inter alia, NEMF's obligations in connection with the TD Bank Letters of Credit in an amount up to but not exceeding $1 million pursuant to three (3) Limited Guaranty Agreements, each effectively dated April 5, 2013 (collectively, the TD Limited Guaranty Agreements"). In addition, Eastern, Carrier and Apex guaranteed, inter alia, NEMF's obligations in connection with the TD Bank Letters of Credit, among other obligations, pursuant to three (3) Guarantee Agreements executed by each for the benefit of TD, each dated May 27, 2015, each in an amount up to but not exceeding $12.5 million (plus interest, costs, expenses and such other items described therein).

Certain of the L/C Lenders held deposit accounts belonging to the Debtors which may give rise to liens or setoff rights. Prior to the Petition Date, TD Bank had frozen approximately $2.8 million of the Debtors' cash in deposit accounts with TD Bank.  As of the Petition Date, the Debtors also had cash in deposit accounts with JPMorgan Chase (approximately $6.45 million); East West Bank ($506.90); Capital One ($534.80); and Santander ($836.48).  None of those four (4) banks took action to freeze their deposit accounts.

21

### iii.   Insurance Premium Financing

The Debtors also had secured insurance premium financing debt with: (i) Bank Direct Capital Finance with regard to workers compensation insurance and umbrella insurance in the approximate outstanding amount of $968,728 (as of December 31, 2018); and (ii) Agile Premium Finance for cargo insurance in the outstanding approximate amount of $40,818 (as of December 31, 2018).[3]   The amounts owed are secured by the Debtors' reversionary interest in unearned premiums held by the relevant insurance companies.

### (b)   *Unsecured Debt*

### i.   Letters of Credit

As discussed above, the Debtors' obligations under the Letters of Credit on the Petition Date totaled approximately $30.4 million.   The claims of the L/C Lenders are only partially secured to the extent an L/C Lender had a deposit account holding the Debtors' cash, and only as to those L/C Lenders' rights to setoff.   In the aggregate, the L/C Lenders are substantially unsecured.

### ii.   Trade and Other Debt

The Debtors owed their trade creditors approximately $9.5 million as of the Petition Date. The Debtors also owed approximately $3.2 million in other unsecured liabilities as of the Petition Date, including approximately $1.7 million pursuant to a pension settlement agreement. Pursuant to the Bar Date Order, the deadline to file all or substantially all general unsecured claims against the Debtors' estates, including, without limitation, any claims arising under section 503(b)(9) of the Bankruptcy Code (each, a "503(b)(9) Claim") was June 18, 2019.   Certain trade creditors have asserted 503(b)(9) Claims in the total amount of approximately $2,684,349, which, if Allowed,

---

[3] These obligations were satisfied under the authority of the order entered at Dkt. No. 47

will constitute Allowed Administrative Expense Claims.  The Debtors estimate that, net of certain

credits and setoffs, the Estates' liability on 503(b)(9) Claims is approximately $1,970,523.

(c)    *Equity Holders*

The equity interest in each of the Debtors are owned as follows:

a.    NEMF's equity interests are owned by Shevell Dynasty Trust (97.3041%) and Myron P. Shevell (2.6959%);

b.    Apex's equity interests are owned by Shevell Dynasty Trust (90%) and Myron P. Shevell (10%);

c.    Carrier's equity interests are owned by Shevell Dynasty Trust (96.9%) and Myron P. Shevell (3.1%);

d.    Eastern's equity interests are owned by Shevell Dynasty Trust (96.9%) and Myron P. Shevell (3.1%);

e.    Jans Leasing's equity interests are owned by Shevell Dynasty Trust (100%);

f.    NEWT's equity interests are owned by Shevell Dynasty Trust (100%);

g.    MyJon, Hollywood Solar and United Solar are wholly-owned subsidiaries of NEMF; and

h.    Myar is a wholly-owned subsidiary of Eastern.

## B.    Events Leading to the Chapter 11 Filing

Prior to the Petition Date, several factors severely impacted the profitability of the Debtors'

businesses, ultimately prompting the liquidity crisis that dictated the Debtors' decision to

commence the Chapter 11 Cases in order to conduct an orderly liquidation of their assets.  While

the Debtors' operations were profitable for decades since the current ownership group acquired

NEMF in 1977, the Debtors suffered a downward trend over recent years, which was exacerbated

in late 2018 by the unexpected loss of key accounts, the shortage of drivers, a new Union contract

with onerous retroactive terms, and the L/C Lenders' ultimate unwillingness to restructure the

Debtors' letters of credit obligations under terms acceptable to the Debtors.

23

Changes and competition within the industry had an ongoing negative impact on the Debtors' revenues. Prior to the Petition Date, the Debtors' workforce comprised of approximately 3,450 full-time and part-time employees. The Union workforce consisted of approximately: 1,425 truck drivers, and 475 dock workers, for a total of approximately 1,900 Union employees. The non-union workforce consisted of, approximately: 145 truck drivers at Eastern, 600 part-time workers (primarily dock workers), and 805 other employees, for a total of approximately 1,550 non-union employees. Employee costs for the Debtors were, in the aggregate, substantially above industry norms. Most of the LTL companies competing with the Debtors operate under non-unionized conditions. At the same time, there has been an industry-wide shortage of drivers, which put the Debtors, with an aging fleet of vehicles, at a severe disadvantage.

Due to the above-described factors, among others, prior to the Petition Date, the Debtors experienced severe liquidity constraints. While the Debtors made extensive efforts to reduce costs and re-focus business, such efforts were not enough to effectively reduce losses and stave off a bankruptcy filing.

The Debtors engaged in negotiations with the L/C Lenders in an attempt to renew each of the thirteen (13) Letters of Credit, ten (10) of which had expiration dates in March and April of 2019, with corresponding renewal deadlines in February and March of 2019. These negotiations were ultimately unsuccessful.

Beginning in the second half of 2018, the Debtors entered into negotiations with JP Morgan Chase to consolidate all of the Letters of Credit. These negotiations continued for several months and the Debtors believed they would ultimately be successful. On December 20, 2018, the Debtors retained Phoenix Executive Services, LLC ("Phoenix") to assess the situation, analyze the Debtors' liquidity position, and take over the negotiations with the L/C Lenders to implement a

24

debt consolidation and restructuring plan.  Shortly thereafter, NEMF released its results for the third quarter of 2018.  Unfortunately, after JP Morgan Chase reviewed those results, it determined not to proceed under the original terms it had proposed to the Debtors with respect to the debt consolidation and restructuring proposal that had been under negotiation.

Beginning in early January 2019, and continuing for approximately three (3) weeks, the Debtors' Chief Restructuring Officer, Vincent Colistra (the "CRO"), (who was acting as the Debtors' Chief Restructuring Advisor ("CRA") until being appointed as CRO on February 7, 2019) attempted to negotiate renewals of the Debtors' thirteen (13) letters of credit with five (5) different banks, ten (10) of which had expiration dates in March and April of 2019.

On January 18, 2019, TD Bank advised it would agree to hold off on making a determination not to renew its Letters of Credit in order to give Phoenix time to complete its cash flow analysis, but also advised that it would agree to renew its Letters of Credit only if all the other L/C Lenders agreed to renew their respective Letters of Credit.  At that point, the CRA had secured tentative commitments from three (3) of the other four (4) L/C Lenders to renew.[4]  The following week, however, one of the L/C Lenders informed the CRA that it would not proceed with the renewal commitment unless the Debtors agreed to (i) provide additional collateral as security for the Letters of Credit, and (ii) obtain a commitment from the Debtors' equity holders to put additional capital into the companies.

On January 25, 2019, TD Bank declared a default under its Letters of Credit agreement and placed an administrative freeze on Debtors' deposit accounts with TD Bank, which held at that time approximately $2.8 million.  The Debtors disputed TD Bank's administrative freeze on their

---

[4] Capital One advised the CRA that it would not renew, but due to the relatively small size of its letter of credit ($428,000), the Debtors had the ability to offer, and the Debtors did offer, to collateralize the Capital One debt with cash at another one of the L/C Lenders.  At that point, the Capital One negotiations were effectively put on hold while the Debtors focused on the more material negotiations with the other L/C Lenders.

25

deposit accounts, and also disputed the defaults alleged by TD Bank. During the Chapter 11 cases, the Debtors, the Committee and TD Bank resolved these disputes pursuant to settlement agreement, which the Bankruptcy Court approved pursuant to Bankruptcy Rule 9019. [*See* Docket No. 882].

On January 29, 2019, on the last day to provide notice of non-renal under the applicable agreements, TD Bank sent a notice to Arch Insurance Company of non-renewal of a $1.0 million Letter of Credit which was issued for the benefit of Arch Insurance Company in support of certain workers compensation insurance. This Letter of Credit was due to expire on April 1, 2019.

Shortly thereafter, the CRA reached out to Santander Bank and East West Bank, both of which also advised that they would not renew their Letters of Credit. JPMorgan Chase advised that, because it had not received the additional collateral it requested, it did not plan to renew.

Around this same time, the CRA received several significant financial reports concerning the Debtors. First, Phoenix completed its seventeen (17) week cash flow projection for each of the eleven (11) Debtors individually, and on a consolidated basis, which showed that NEMF would burn approximately $18 million cash during that period; the Debtors overall would burn approximately $16 million cash during the same period. Second, the Debtors' chief financial officer provided Phoenix with the Debtors' preliminary 4th quarter and year-end results for 2018. The results showed NEMF had experienced a 4th quarter operating loss of $8.4 million; the Debtors overall experienced a 4th quarter operating loss of $7.3 million. NEMF's 12-month results for 2018 showed an aggregate operating loss of $20.9 million; the Debtors overall experienced an aggregate operating loss of $16.2 million in 2018. Additionally, the Debtors' 2018 EBITDA was only $1.5 million. Significantly, however, the Debtors were facing a projected debt service in 2019 of over $19 million, comprised primarily of principal payments on the rolling

26

stock, plus applicable interest on the overall debt. At the same time, the Debtors' year-end cash position for 2018 was $7.8 million, representing a $16.4 million year over year reduction from year-end 2017. Finally, the Debtors' management provided Phoenix with a preliminary 2019 budget showing a projected 12-month loss of $24 million.

Armed with the foregoing financial analysis and projections, and in light of the anticipated non-renewal of the Letters of Credit, the CRA determined that the only viable option was to begin a process of orderly liquidation of all of the Debtors' assets. On January 30, 2019, the CRA recommended to the Debtors' equity holders and board of directors that the Debtors commence an orderly liquidation process after considering an out-of-court workout and a reorganization proceeding.

The Debtors therefore determined to transition all of their focus and efforts immediately into wind-down operations and liquidation, under the protection of chapter 11, and immediately engaged Debtors' counsel.

## C.    The Chapter 11 Cases

On February 11, 2019, the Debtors commenced these Chapter 11 Cases. To minimize the adverse effects of the commencement of these Chapter 11 Cases, and to provide the Debtors with the liquidity necessary to implement their wind-down and liquidation plan, the Debtors requested a variety of relief in the "First Day" Pleadings. The relief sought therein was necessary to permit an effective transition into Chapter 11 and wind-down operations. In sum, the First Day Pleadings were intended to provide the Debtors with the infrastructure necessary to conduct an orderly liquidation.

Absent the ability to access cash and continue existing business processes to conduct an orderly liquidation, as sought in the First Day Pleadings, the Debtors' Estates would have suffered immediate and irreparable harm. Included in the First Day Pleadings was the retention of Vincent

27

Colistra as CRO.  In the CRO's opinion, approval of the relief requested in the First Day Pleadings would minimize disruptions to the Debtors' wind-down operations, thereby preserving and maximizing the value of the Debtors' Estates for the benefit of their creditors, employees and customers.

  1.  <u>"First Day" and Related Motions</u>

On or shortly after the Petition Date, the Debtors filed a number of motions and applications seeking certain relief, commonly referred to as "first day" motions, that were essential for the Debtors' transition to Chapter 11 and an orderly wind-down and liquidation of the Debtors.  A summary of the relief obtained pursuant to these motions is set forth below:

- *Debtors' Application for Expedited Consideration of First Day Matters*.  The Debtors sought entry of an Order designating their First Day Pleadings as requiring expedited consideration before this Court.  On February 11, 2019, the Bankruptcy Court entered an Order granting the relief requested in the application [Docket No. 24].

- *Debtors' Motion for an Order Pursuant to Bankruptcy Rule 1015 Directing Joint Administration of the Debtors' Chapter 11 Cases*.  The Debtors sought entry of an Order directing the joint administration of the Chapter 11 Cases and consolidation thereof for procedural purposes only.  On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 44].

- *Application for Designation as Complex Chapter 11 Cases*.  The Debtors sought entry of an Order designating the Debtors' Chapter 11 Cases as a complex Chapter 11 case pursuant to Exhibit F to the Court's *General Order Governing Procedures for Complex Chapter 11 Cases*.  On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 45].

- *Debtors' Motion for Entry of an Order Extending Debtors' Time to File Their Schedules and Statements*.  The Debtors sought authorization to extend their deadline for filing Schedules and Statements in connection with the Chapter 11 Cases.  On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 41].

- *Debtors' Motion for an Order: (I) Granting the Debtors an Extension of Time to File Their List of Creditors; (II) Authorizing the Debtors and/or Their Agent to (A) Prepare a Consolidated List of Creditors in Lieu of a Mailing List and (B) Mail Initial Notices; and (III) Granting Related Relief*.  The Debtors sought entry of an Order granting them an extension of time to file their list of all creditors, granting

2747149.15 115719-100281

them authorization to file a consolidated list of creditors and interest holders as well as filing a consolidated list of the Debtors' thirty five (35) largest unsecured creditors.  On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 40].

- *Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date*.  The Debtors sought authorization to retain DRC as their claims and noticing agent for the Chapter 11 Cases.  On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the application [Docket No. 48].

- *Application of Debtors (i) to Retain Phoenix Executive Services, LLC and (ii) Designate Vincent J. Colistra as Chief Restructuring Officer to the Debtors, Nunc Pro Tunc to the Petition Date*.  The Debtors sought authorization to retain Vincent J. Colistra and Phoenix as their CRO.  On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the application [Docket No. 42].

- *Debtors' Motion for Order: (I) Authorizing but not Directing the Debtors to (A) Pay Prepetition Wages, Salaries and Related Obligations, (B) Pay and Remit Prepetition Payroll Taxes and Other Deductions to Third Parties, and (C) Honor Employee Benefit Programs in the Ordinary Course of Business, (II) Authorizing and Directing Banks to Honor Checks and Transfers for Payment of Prepetition Employee Obligations; and (III) Granting Related Relief*.  The Debtors sought authorization to pay prepetition wages, salaries, benefits and related obligations, pay and remit prepetition payroll taxes and other deductions to third parties, honor employee benefit programs, including severance payments, in the ordinary course of business; and authorizing and directing banks to honor checks and transfers for payment of prepetition employee obligations.  On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 46].

- *Debtors' Motion for Entry of Interim and Final Orders: (A) Authorizing the Debtors to (I) Continue Their Cash Management System, (II) Honor Certain Related Prepetition Obligations, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions; (B) Authorizing and Directing the Debtors' Banks to Honor All Related Payment Requests; (C) Granting Interim and Final Waivers of the Debtors' Compliance With Section 345(b) of the Bankruptcy Code; (D) Scheduling a Final Hearing; and (E) Granting Related Relief*.  The Debtors sought entry of interim and final orders authorizing the Debtors to (i) continue their Cash Management System; (ii) honor certain related prepetition obligations; (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions in the ordinary course as necessary during the wind-down period.  The Debtors also request the order provide additional relief, including: (a) the authorizing and directing the Debtors' Banks to honor all related payment requests; (b) granting interim and final waivers of the Debtors' compliance with the deposit and investment guidelines set

forth in section 345(b) of the Bankruptcy Code, (c) scheduling a final hearing to consider entry of an order approving the relief requested in the Cash Management Motion on a final basis, and (d) granting related relief. On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis [Docket No. 39] and thereafter entered an Order granting the relief requested in the motion on a final basis on May 22, 2019 [Docket No. 603].

- *Debtors' Motion For Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, (C) Establishing Procedures For Resolving Requests For Additional or Different Adequate Assurance of Payment, and (D) Scheduling a Final Hearing.* The Debtors sought entry of interim and final orders (i) prohibiting utility providers from altering, refusing, or discontinuing service to the Debtors merely because of the filing of bankruptcy or the failure to pay pre-petition amounts due; (ii) deeming utility providers adequately assured of future performance; and (iii) establishing procedures for resolving requests for additional or different adequate assurance of payment. On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis [Docket No. 43] and thereafter entered an Order granting the relief requested in the motion on a final basis on March 6, 2019 [Docket No. 171].

- *Debtors' Motion for Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Programs, (B) Pay any Prepetition Premiums and Related Obligations, and (C) Renew or Enter Into New Insurance Arrangements; and (II) Granting Related Relief.* The Debtors sought entry of an order (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) continue various pre-petition insurance policies and premium financing agreements; and (b) pay all pre-petition and post-petition obligations in respect thereof in the ordinary course of their business. On February 13, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 47].

- *Debtors' Motion for Entry of Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.* The Debtors sought entry of an Order authorizing the Debtors to pay (i) certain prepetition use, mileage/highway use, fuel, franchise, *ad valorem* and other taxes and (ii) certain prepetition tolls, fees, licenses and other similar charges and assessments, which accrued or arose in the ordinary course of business before the Petition Date. On February 15, 2019, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 57].

- *Debtors' Motion for Interim and Final Orders (I) Authorizing Use of JP Morgan Chase Bank, N.A.'s Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "*Chase Cash Collateral Motion*"); and Debtors' Motion for Interim and*

30

*Final Orders (I) Authorizing Use of TD Bank N.A.'s Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "TD Cash Collateral Motion," and together with the "Chase Cash Collateral Motion," the "Cash Collateral Motions").  On February 24, 2019, the Bankruptcy Court entered the interim Order granting the relief requested in the Cash Collateral Motions [Docket No. 101] and thereafter entered the second interim order on March 9, 2019 [Docket No. 202].  On June 11, 2019, the Bankruptcy Court entered the third interim order [Docket No. 665].  As set forth in the interim, first interim, second interim, and third interim Orders, the Debtors were authorized to utilize the cash collateral during the interim periods.  The third interim order permitted the Debtors interim use of the cash collateral through September 3, 2019 in an amount not to exceed $2,943,100, which is funded by and apportioned between Chase and TD in the amounts of $2,043,100 from Chase and $900,000 from TD.  As of the date hereof, the Debtors have returned all cash collateral to Chase and TD, respectively.

2.   Appointment of the Committee

On February 26, 2019, the Office of the United States Trustee for the District of New Jersey notified the Court that, on February 21, 2019, it had appointed the Committee in accordance with section 1102 of the Bankruptcy Code.  The Committee consists of the following members: (a) Raymond E. Goad, Jr., IAM National Pension Fund; (b) Tiffany Engelhuber, AAA Cooper Transportation; (c) Spryte Kimmey, Landstar Transportation Logistics, Inc.; (d) Richard Klein, Superior Distributors Co., Inc., and (e) Gregory J. Creighan, Guttman Oil Co.  The Committee selected Dawn Bower, Landstar Global Logistics, Inc., as its Chairperson.

3.   Employment of Professionals and Advisors by Debtors and the Committee

The Bankruptcy Court entered Orders authorizing the Debtors to retain Gibbons P.C. as bankruptcy counsel [Docket No. 239] and to retain and compensate the following professionals and advisors:

(a)   Phoenix Executive Services, LLC, as Debtors' financial advisor, and Vince Colistra as Chief Restructuring Officer [Docket No. 42];

(b)   Wasserman, Jurista & Stolz, as conflicts counsel [Docket No. 240];

2747149.15 115719-100281

(c)     Donlin, Recano & Company, Inc., as administrative advisor [Docket Nos.102, 285];

(d)     Whiteford Taylor & Preston LLP, as special counsel [Docket No. 448];

(e)     Taylor & Martin, Inc., as auctioneers [Docket Nos. 288, 740];

(f)     WithumSmith+Brown PC, as accountant [Docket No. 299];

(g)     A. Atkins Appraisal Corp., as appraiser [Docket No. 531]; and

(h)     Akerman LLP, as special counsel [Docket No. 582].

In addition, the Bankruptcy Court entered Orders authorizing the Committee to retain Elliott Greenleaf, P.C. [Docket No. 398] and Lowenstein Sandler LLP, as its counsel [Docket No. 400] and to retain CohnReznick LLP as the Committee's financial advisor [Docket No. 399].

4.     Sale Processes

(a)     *Eastern and Carrier*

On March 25, 2019, the Debtors filed a motion to approve bidding procedures and auction in connection with the sale of substantially all of Debtors Eastern Freight Ways, Inc. and Carrier Industries, Inc.'s assets and certain rolling stock owned by NEMF (the "Eastern Sale Motion") [Docket No. 335].   The Eastern Sale Motion sought (i) approval of the bid procedures in connection with the sale and (ii) approval of the sale to the stalking horse purchaser or the highest or otherwise best bidder at an auction.

On April 8, 2019, the Bankruptcy Court held a hearing on the bid procedures portion of the relief requested in the Sale Motion and, that same day, entered an Order [Docket No. 427] approving such relief.   Pursuant to such Order, the Debtors were authorized to conduct an auction on May 14, 2019 if they received one or more qualified bids (other than the stalking horse bid) by May 9, 2019.

On April 18, 2019, the Debtors filed their notice of stalking horse designation with bid protections and amended bidding procedures [Docket No. 477].   In accordance with the bidding

32

procedures Order, the Debtors designated Estes Express Lines ("Estes") as the stalking horse purchaser.

On May 10, 2019, the Debtors filed a notice of cancellation of auction and selection of stalking horse bidder as the successful bidder [Docket No. 560]. The notice stated that the Debtors did not receive any qualified bids prior to the bid deadline and that the Debtors selected Estes, the stalking horse bidder, as the successful bidder.

The Bankruptcy Court approved the sale to Estes at the May 16, 2019 sale hearing and entered the Eastern Sale Order on May 16, 2019 [Docket No. 583]. The Order authorized the going concern sale (the "Going Concern Sale") of Eastern and Carrier to Estes.

The Going Concern Sale closed on May 31, 2019. As part of the sale, 500 items of trucking rolling stock were conveyed to Estes for a total purchase price of just over $15 million, and satisfied the principal amount of nine (9) secured loans.

(b)  *Auction Motion*

On February 28, 2019, the Debtors' filed a motion to authorize the sale of certain NEMF rolling stock through an auction process, see Dkt. 141 (the "Auction Motion") and sought to retain Taylor & Martin, Inc. ("Taylor & Martin") as auctioneer, see Dkt. 139. Certain of the lenders (including EastWest Bank, TD Bank, Santander Bank, Capital One and VFS US, LLC), filed objections to the proposed auction terms and procedures in the Auction Motion. Following several days of hearings, including live testimony, the Court ultimately approved both retention of Taylor & Martin and the auctions. [*See* Docket No. 434].

(c)  *Rolling Stock Auctions*

On May 30, 2019, the Debtors started a six-week auction process of selling off rolling stock, which was the largest bankruptcy auction of its kind, according to Taylor & Martin. Ultimately, the auctions brought in an aggregate total of $45.9 million to the Estates.

33

On July 30, 2019, Taylor & Martin filed its final expense report (the "Final Expense Report"). [Docket No. 767].  On August 5, 2019, VFS US LLC filed an objection to the Final Expense Report [Docket No. 773], arguing that it is owed $16,150 from Taylor & Martin under the 85% guaranty.  The following chart compares the auction results to the loan balances for each of the equipment lenders, and also sets forth the amounts of "guarantee" payments made by Taylor & Martin to certain lenders, pursuant to the Bankruptcy Court's sale order authorizing the auctions.

2747149.15 115719-100281

| Banks | Cum. Total Loan Balances | Cum. Auction Price | Cum. (Deficiency) | Cum. Equity | 85% of Cum. T&M Low Gty Am't. | Cum. Guarantee Am't |
|---|---|---|---|---|---|---|
| Fifth Third | $6,796,224 | $5,299,350 | ($1,496,874) | | | |
| Capital One | $1,913,407 | $1,416,500 | ($496,907) | | | |
| JPMorgan Chase | $3,638,974 | $3,737,900 | | $98,926 | | |
| Mercedes Benz | $6,026,263 | $3,914,000 | ($2,112,263) | | | |
| East West Bank | $8,381,905 | $6,326,850 | ($2,055.055) | | | |
| Santander | $5,345,072 | $4,106,550 | ($1,238,522) | | | |
| TD Bank | $6,728,262 | $5,304,500 | ($1,423,762) | | | |
| Volvo | $1,013,863 | $917,500 | ($96,363) | | $1,147,500 | $230,000 |
| Webster Capital | $802,304 | $729,450 | ($72,854) | | $880,600 | $151,150 |
| Wells Fargo | $3,159,000 | $2,538,050 | ($620,950) | | | |
| Total | $43,805,273 | $34,290,650 | ($9,613,549) | $98,926 | $2,028,100 | $381,150 |

(d)    *11700 NW 36th Avenue, Miami, Florida*

On June 28, 2019, the Debtors filed a motion seeking an entry of an order authorizing the private sale of certain commercial/industrial real property located at 11700 NW 36th Avenue, Miami, FL 33167 along with certain improvements and fixtures [Docket No. 701] (the "Real Property Motion").

On July 25, 2019, the Bankruptcy Court entered an order [Docket No. 761], which approved the Real Property Motion. Pursuant to the purchase and sale agreement with ATI Container Services, LLC, which was executed on June 12, 2019, the purchase price was $3,515,000.00. [Docket No. 761]. The sale closed on August 19, 2019.

(e)    *Company Vehicle Sale to Mr. Shevell*

On July 25, 2019, the Bankruptcy Court entered an order [Docket No. 762], which approved the private sale of certain vehicles owned by the Debtors. Pursuant to the asset purchase and sale agreement, the Debtors' former CEO, Myron P. Shevell, purchased nine (9) of the vehicles for a total purchase price of $282,000.00.

35

5.    Financial Summary of Chapter 11 Operations and Asset Sales

| Feb. 11, 2019 - Oct. 13, 2019<br>35 Weeks | Cumulative<br>Since Filing |
|---|---|
| NEMF, et al. | $30,248 |
| Eastern & Carrier | $7,367,099 |
| **Total Revenue** (New Sales Post-Filing) | **$7,397,347** |
| | |
| **Cash Flow Analysis** | |
| Collections: | |
| Accounts Receivables & Misc. Operating Receipts | $42,621,406 [Note 1] |
| Non-operating Collections (Unencumbered Asset Sales) | $16,655,700 [Note 2] |
| Misc. Non-Operating Receipts | $130,000 |
| **Total Collections** | **$59,407,106** |
| | |
| Disbursements: | |
| Vendor Payments | -$11,735,126 |
| Employee Related | -$39,829,482 |
| Employee Related | -$6,071,103 [Note 3] |
| Other Non-Op | -$1,025,016 |
| **Total Disbursements** | **-$58,660,727** |
| | |
| Other Collection & Disbursements: | |
| Repayment of Shareholder loan | $8,711,711 |
| TD Chase Cash Collateral Use | $1,848,750 |
| JP Morgan Chase Cash Collateral Use | $4,094,350 |
| TD Chase Cash Collateral Returned | -$1,848,750 |
| JP Morgan Chase Cash Collateral Returned | -$4,094,350 |
| **Total Other Collections & Disbursements** | **$8,711,711** |
| | |
| **Ending BOOK Cash Balance as of 10/13** | **$9,458,090** |
| *Float (Checks Outstanding)* | -$55,380.44 |
| **Ending BANK Cash Balance as of 10/13** | **$9,402,710** |

Note 1:  Reflects operating collections for both NEMF and Eastern/Carrier.
Note 2:  This amount includes all unencumbered asset sales: Unencumbered Rolling Stock, Unencumbered Misc. Shop Equipment, Private Car Sale, Miami Property Sale, Insurance Rebates, and TD's Final $900K transfer.
Note 3:  Reflects all **payments** made through week ending 10/13.

2747149.15 115719-100281

| Total Cash in Chase as of 10/13: | |
|---|---|
| NEMF | $5,399,783 |
| Eastern | $3,435,769 |
| Carrier | $316,706 |
| NEWT & NEMF Log | $250,452 |
| APEX, MYAR & JANS | $0 |
| **Total Available Bank Balance** | **$9,402,710** |
| *Float between Bank Balance and Book Balance* | *-$55,380* |
| | |
| Eastern/Carrier Sale ESCROW | $5,958,117 |
| Misc. Equipment ESCROW | $116,385 |
| Travelers (Claims Acct.) | $246 |
| Utility Deposit | $142,985 |
| **Total Blocked Bank Balances** | **$6,217,734** |
| | |
| **Total Bank Balance** | **$15,620,443** |

| Asset Sale | Gross Proceeds |
|---|---|
| **Rolling Stock & Equipment** | **$45.9M** |
| **Vendor Accounts Receivables** | **$42.6M** |
| **Miami Property** | **$3.3M** |
| **Sale of Eastern & Carrier (Net)** | **$12.8M** |
| *Sale of Eastern & Carrier* | *$15.2M* |
| *Eastern & Carrier AR* | *($2.4M)* |
| **Private Car Sale** | **$0.3M** |
| **Projected Life Insurance Note Receivable \*** | **$0.0M** |
| **Total Asset Sale Gross Procceds** | **$109.2M** |

**\*** This receivable is part of the global settlement between the UCC and Shevell family. The settlement was for $6.1M, of which $3.0M was associated with the Life Insurance Note Receivable.

6.    Rejection of Executory Contracts and Leases

On March 21, 2019, the Debtors filed a motion to reject certain non-residential real property leases of terminals used by the Debtors as part of their business operations, as of various lease surrender dates which conformed to the Debtors' projected wind-down of operations and/or

37

auction sales at such locations (the "Lease Rejection Motion"). [Docket No. 297]. The Lease Rejection Motion included staggered lease rejection dates in order to accommodate the Debtors' rolling stock auctions sales without disruptions, which took place at twelve (12) of the terminals used by the Debtors. No objections were filed as to the Lease Rejection Motion. The Court entered an Amended Order [Docket No. 478] approving such rejection motion on April 18, 2019.

On May 23, 2019, the Debtors filed a second motion to reject certain executory contracts and unexpired leases and establishing a claims bar date (the "Second Lease Rejection Motion"). [Docket No. 613]. The Second Lease Rejection Motion sought to reject certain service contracts between Eastern and various service providers, which Estes decided not to assume at closing. No objections were filed as to the Second Lease Rejection Motion. The Court entered an Order [Docket No. 691] approving the Second Lease Rejection Motion on June 20, 2019.

Except as otherwise provided for herein, this Plan shall be deemed a motion to reject all remaining executory contracts and unexpired leases that were not previously rejected, or were not previously assumed and assigned in connection with the sale transactions described herein. The bar date for rejection damages claims shall be set forth in the Confirmation Order. A non-exclusive list of certain executory contracts and unexpired leases resolved pursuant to this Plan shall be provided as a supplement to the Plan.

      7.     WARN Act Litigation

      (a)     *Adversary Proceeding No. 19-01073*

Shortly after the Petition Date, the Debtors terminated the vast majority of their 3,450 full and part-time employees, of which 1,900 were members of the International Association of Machinists and Aerospace Workers AFL-CIO (the "Union"). A severance and healthcare package for the terminated Union employees, negotiated with the Union on the eve of the Chapter 11 filings and thereafter offered to all terminated non-union employees, was approved by the Court on

March 1, 2019 (the "Global Settlement Order") [Docket No. 155].  This settlement was enhanced before being filed with the Court by further negotiations with attorneys who filed a WARN Act Class Action Complaint shortly after the Petition Date.  The potential risk to the Debtors' estates arising from employment-related claims, including the WARN Act Class Actions, could have potentially reached approximately $27.7 million.  As part of the settlement, the Debtors agreed to pay $13.2 million to the terminated employees, which the CRO believes resulted in approximately $14.5 million in savings to the Debtors' Estates.  In exchange, (i) the Union employees agreed to release, discharge, and covenant not to sue Debtors or any of its related entities based on any and all claims, demands, suits or grievances of whatever kind or sort, known or unknown, including, but not limited to, claims arising out of or in connection with any collective bargaining relationship with the Debtors, the collective bargaining agreement, and any other connection between the Union and the Debtors, including those claims arising out of any state, local or federal law, including in particular the federal WARN Act, and any similar state or local law and (ii) the non-Union employees agreed to release the Debtors and its affiliated companies and their current and former officers, directors, agents, employees, successors and assigns from all claims, demands, actions and liabilities, whether known or unknown such non-union employee may have against them or any one of them in any way related to their employment by the Debtors and/or the termination of that employment, including those claims arising under the federal WARN Act or any similar state or local law.

(b)    *Adversary Proceeding No. 19-01163*

On April 9, 2019, the law firm of Outten & Golden LLP filed a second WARN Act complaint, seeking to certify a class that includes those employees who neither accepted anything in exchange for their WARN Act claims nor executed valid releases, including those on leave under the Debtors' policies and those who the Debtors considered part-time.  By agreement of the

2747149.15 115719-100281

parties, and with the Court's approval, the Debtors' deadline to answer or respond to the complaint has been extended through and including November 1, 2019.  Based on the information currently available, the Debtors and Committee estimate that the maximum potential exposure is approximately $1.1 million.  The Debtors and Committee believe that the Debtors have valid defenses to the action and absent an agreement to resolve the matter with opposing counsel may be required to litigate such defenses before the Court.

8.    Life Insurance Note Receivable

The Debtors made certain premium payments on four (4) policies of insurance on the life of Mr. Shevell aggregating $10,000,000, and Shevell family trusts issued notes to the Debtors memorializing the obligation to repay the amount of the premium payments (in the aggregate, the "Life Insurance Note Receivable").  As of the Petition Date, the Life Insurance Note Receivable was $5,208,569 inclusive of approximately $2 million of accrued interest.  The Life Insurance Note Receivable is secured by collateral assignments to the Debtors of the four (4) life insurance policies.  The Life Insurance Note Receivable is payable upon the death of Mr. Shevell, who is currently eighty-four (84) years old.  The current annual premium on the four (4) insurance policies is approximately $141,500.

9.    Settlement with Certain Prepetition Lenders

During the course of the liquidation of the Debtors' assets disputes subsequently arose between the Debtors, Committee, and Prepetition Lenders relating to, among other things, the validity of claims, administrative expenses and professional fees, and creditor recoveries, including, but not limited to $5,958,117 held in escrow from the Eastern Sale (the "Escrow Funds") relating to a $6,235,745 administrative claim asserted by the NEMF estate against the Eastern and Carrier estates (the "NEMF Administrative Claim").  As of the date hereof, the Debtors and Committee reached settlement agreements (each a "Lender Settlement Agreement" and,

40

collectively, the "Lender Settlement Agreements") with Santander Bank, N.A., Fifth Third Bank, Wells Fargo Equipment Finance, Inc., and VFS US LLC (collectively, the "Settling Lenders"). and, together with the Debtors and Committee, the "Settling Parties").   The Debtors and the Committee have reached agreements in principle with JPMorgan Chase Bank, N.A. and MBFS USA LLC/Daimler AG, which agreements are subject to final client review and approval (together with the Settling Lenders, the "Settling Parties").Negotiations continue between the Debtors, Committee, and the following lenders: Webster Capital Finance, Inc.; Capital One, N.A.; East West Bank; and T.D. Bank, N.A.  A motion to approve the Lender Settlement Agreements pursuant to Bankruptcy Rule 9019 was filed with the Bankruptcy Court on October 21, 2019 [Docket No. ____] (the "Lender 9019 Motion I").

Generally, each of the Settling Parties has agreed to the following:

(a)   The Settling Parties have agreed to resolve the dispute over the NEMF Administrative Claim so that 75% of the NEMF Administrative claim ($4,676,809) shall be paid from the Escrow Funds to NEMF and the Eastern and Carrier bankruptcy estates retain the balance ($1,281,308).

(b)   The Plan has been shared with the Settling Parties who support the Plan, and any and all final successor documents, amendments, and supplements related to the Plan that substantially conform to the agreements set forth in Lender Settlement Agreements.  The Settling Parties shall not object to the Court's confirmation of the Plan and shall affirmatively vote in favor of the Plan, including, but not limited to the provisions of the Lender Settlement Agreements, which are incorporated herein.[5]

(c)   The Committee's Challenges have expired.

(d)   The Settling Parties and the Debtors shall support the Committee's recommendations to establish a post-Plan confirmation trust and to appoint Kevin Clancy, having offered a monthly flat fee for his services, as its trustee.

(e)   The Committee's and Debtors' professionals shall provide reporting to each Settling Party and the Committee from October 1, 2019 through the

---

[5] Some of the Settling Lenders reserve the right to object to provisions of the Plan not specifically provided for or addressed in the Lender Settlement Agreements.

effective date of the Plan in order to provide controls on the accrual and amount of administrative claims.[6]  Each Settling Party's right to object to unreasonable fees and expenses from October 1, 2019 through the effective date of the Plan shall be reserved.  Each Settling Party agrees that the Eastern and Carrier bankruptcy estates shall continue to pay an allocation of 16% of the professional fees as currently budgeted by the Debtors and the Committee.

(f)    The Debtor and the Committee agree that each Settling Lender shall have an allowed unsecured claim against the consolidated NEMF estates[7] in the amount of the Settling Lender's deficiency claim in NEMF after application of all adequate assurance payments and receipt of sale proceeds (the "NEMF Claim").  The Settling Lender shall also have allowed unsecured claims against the consolidated Eastern and Carrier estates in the amount of the Settling Lender's proof of claim amount in the Eastern and Carrier case minus adequate protection payments and proceeds it received in connection with the Eastern sale (the Eastern Claims, together with the NEMF Claim, the "Claims").  Settling Lenders have guarantees against the Eastern and Carrier estates on behalf of NEMF obligations and can assert the full amount of their proof of claim against NEMF in guarantee claims against the Eastern and Carrier estates without the need to reduce the guarantee to the amount of the NEMF Claim under the "Limitation-of-Dividend Approach" as adopted in *Ivanhoe Bldg. & Loan v. Orr*, 295 U.S. 243, 55 Sup. Ct. 685, 79 L. Ed. 1419 (1935) and its progeny.  However, the Settling Lender shall receive no more in total than the face value of the NEMF claim plus reasonable attorney's fees, expenses, and interest, as applicable.[8]

(g)    Each of the Claims shall be allowed pursuant to the Court's Order approving the Lender 9019 Motion I, or subsequently filed 9019 motion, as applicable, and shall be included in the Plan as an Allowed Claim.

---

[6] Some Settling Lenders have reviewed the estate professional's fees and expenses to date, including weekly reporting by the CRO, budgets, and filed fee applications, and have found those fees and expenses reasonable.  The Settling Lenders have agreed that the go forward reporting and efforts by the estate professionals to coordinate and allocate tasks amongst estate professionals addresses concerns regarding professional fees.

[7] New England Motor Freight, Inc. (7697); NEMF World Transport, Inc. (2777); Apex Logistics, Inc. (5347); Jans Leasing Corp. (9009); Myar, LLC (4357); MyJon, LLC (7305); and NEMF Logistics, LLC (4666).  These entities were either not operating or were consolidated into the New England Motor Freight operations because they had de minimis assets or operations.

[8] The Settling Lender shall be permitted to assert the full amount of its Claims for Plan voting and Plan distribution purposes.  *See In re Realty Assocs. Sec. Corp.*, 66 F. Supp. 416, 424 (E.D.N.Y. 1946), *aff'd sub nom. Kelby v. Manufacturers Tr. Co.*, 162 F.2d 350 (2d Cir. 1947), *and aff'd in part, modified in part*, 163 F.2d 387 (2d Cir. 1947) ("[T]he holder of a claim upon which several parties are liable may prove its entire claim against the estate of any who become bankrupt and recover dividends calculated on the basis of such entire claim as it existed when the petition was filed, without regard to partial payments made by other obligors until from all sources it has been paid in full.").  Settling Lenders have guarantees against the Eastern and Carrier estates on behalf of NEMF obligations and can assert the full amount of their proof of claim in NEMF in guarantee claims against the Eastern and Carrier estates without reduction for proceeds or adequate assurance received under the *In re Realty Assocs. Sec. Corp.*, case.  *See also Ivanhoe Bldg. & Loan v. Orr*, 295 U.S. 243, 55 Sup. Ct. 685, 79 L. Ed. 1419 (1935).

In addition, the Debtors, Committee and each Settling Lender have reconciled the claims filed by each Settling Lender to account for the proceeds each Settling Lender received on account of the NEMF Sale, the Going Concern Sale of Eastern and Carrier to Estes, adequate protection payments, as well as with respect to each Settling Lender's asserted administrative expense claims, if any, and their unsecured deficiency claims. The reconciled amounts are reflected in Article IV as qualified in its entirety by Articles V and VI of the Plan.

As the Lender Settlement Agreements are subject to Bankruptcy Court approval, none of the above-referenced settlement terms shall be deemed incorporated into the Plan until such time as the respective Lender Settlement Agreement is approved pursuant to Bankruptcy Rule 9019. For the avoidance of doubt, any subsequent motion filed to approve additional lender settlement agreements, if any, shall be approved pursuant to Bankruptcy Rule 9019 and incorporated into the Plan upon approval by the Court.

TD Bank NA reached a partial settlement with the Committee and the Debtors in exchange for resolution of the opposition of the Official Committee of Unsecured Creditors (the "Committee") to the Motion, such opposition filed by letter dated March 19, 2019, to the Court [D.E. 282] ("Committee Objection") to the *Motion of T.D. Bank, N.A. ("TD Bank") For Relief From The Automatic Stay To Exercise Its Rights And Remedies With Respect To Four Deposit Accounts* [D.E. 134]. As a result of the resolution of the Committee Objection, TD Bank NA agreed to resolve the dispute over the NEMF Administrative Claim so that 75% of the NEMF Administrative claim ($4,676,809) shall be paid from the Escrow Funds to NEMF and the Eastern and Carrier bankruptcy estates retain the balance ($1,281,308).

10.     Settlement with Equity Holders and Affiliates

Following its appointment herein, the Committee was designated and authorized by the Debtors to undertake the identification, investigation, presentment, and potential resolution of any

43

and all claims and causes of action that could be asserted against the Equity Holders and Affiliates. The Committee worked with the Debtors and the Debtors' CRO to obtain information necessary to complete its investigation and regularly updated the Debtors on its efforts and negotiations.  The Committee was further authorized by the Debtors to explore the best manner in which to both monetize and maximize the value of the Life Insurance Note Receivable.

The Committee conducted an extensive investigation of potential claims and causes of action against the Equity Holders and Affiliates.  The Committee presented these alleged claims and causes of action to the Equity Holders and Affiliates. The Equity Holders and Affiliates disputed the factual and legal basis for each of the asserted claims and causes of action presented by the Committee.  Thereafter, and over a period of several months, the Committee and the Equity Holders and Affiliates exchanged information and engaged in extensive negotiations in an attempt to resolve the asserted claims and causes of action presented by the Committee.  As part of those negotiations, the Equity Holders and Affiliates expressed a desire to assist the Committee and the Debtors with the cost of liquidating the Debtors' assets and in maximizing the value of the Life Insurance Note Receivable for the benefit of the Debtors' Estates and their Creditors.

The extensive and protracted negotiations between the parties resulted in the Committee, the Debtors, and the Equity Holders and Affiliates reaching a global agreement and settlement for the resolution of any and all asserted claims and causes of action, the cash monetization of the Life Insurance Note Receivable, relinquishment and waiver of claims, and other financial assistance and contributions by the Equity Holders and Affiliates to the Debtors and their Estates. Accordingly, and without admitting any liability, but with the good faith intention of assisting the Estates in enhancing distributions to Creditors, the Equity Holders and Affiliates, the agreed to resolve and settle fully any and all asserted and potential claims and causes of action, and entered

2747149.15 115719-100281

into a settlement agreement (the "Equity Holders and Affiliates Settlement"), which will be submitted to the Bankruptcy Court for approval pursuant to Bankruptcy Rule 9019, with all terms and provisions of the settlement to be incorporated and restated in this Plan for ratification and implementation.  The Plan shall serve as and be deemed a motion for entry of an order by the Bankruptcy Court under Bankruptcy Rule 9019 approving the Equity Holders and Affiliates Settlement.

The terms of the Equity Holders and Affiliates Settlement are as follows:

A.    The Equity Holders and Affiliates shall remit to the Debtors and the Debtors' Estates cash and non-cash contributions and consideration comprised of cash in the total sum of $6,100,000 (the "Cash Payment"), relinquishment of certain Lease Rejection Claims, the assumption of debt, and the relinquishment of any and all other Claims.  The Cash Payment shall be paid in the following manner:

i.    An initial cash payment in the amount of $2,000,000 (the "Initial Payment") shall be paid into an escrow account with Whiteford, Taylor & Preston LLP within five (5) business days after the entry of a Final Order of the Bankruptcy Court approving the Equity Holders and Affiliates Settlement Agreement.

ii.    The remaining balance of $4,100,000 of the Cash Payment (the "Final Payment") shall be paid on the date of transfer of the Life Insurance Note Receivable to the Equity Holders and Affiliates (or their designee), and conditioned upon the entry of a Final Order of the Bankruptcy Court confirming the Plan.  The Initial Payment shall be released from escrow and paid to the Debtors or Liquidating Trustee, as applicable, at the time that the Final Payment is paid to the Debtors or Liquidating Trustee, as applicable,

2747149.15 115719-100281

subject to the use of funds provision contained in Section 2(c) of the Equity Holders and Affiliates Settlement Agreement.

iii.    $500,000 of the Cash Payment shall be a contribution earmarked for the Liquidating Trust and used for the purposes of implementing the Plan, claims reconciliation and claims objections, the pursuit of avoidance actions, and any other actions necessary to complete the administration of the Chapter 11 Cases.

iv.    The Equity Holders and Affiliates will, in their sole discretion, but without affecting in any way the distribution of the Cash Payment agreed to and provided for under this Plan, determine and designate the allocation of the cash and non-cash contributions and consideration among the settlement and release of asserted claims and causes of action against the Equity Holders and Affiliates, the assets being transferred by the Debtors or the Liquidating Trustee, as applicable, to the Equity Holders and Affiliates pursuant to the Equity Holders and Affiliates Settlement Agreement, and the obligations being assumed by the Equity Holders and Affiliates pursuant to the Equity Holders and Affiliates Settlement Agreement.

B.    <u>Transfer of Life Insurance Note Receivable</u>.  Upon the entry of a Final Order of the Bankruptcy Court confirming this Plan and payment in full of the Cash Payment, the Debtors or Liquidating Trustee shall take all actions necessary and deliver all documents necessary to transfer the Life Insurance Note Receivable to the Equity Holders and Affiliates (or their designees).  The Committee agrees to support and assist in such efforts as may be required.  Attached as Exhibits to the Equity Holders and Affiliates Settlement Agreement are the documents to be executed and delivered by the Debtors to effectuate the transfer of the Life Insurance Note Receivable.

2747149.15 115719-100281

C.      <u>Transfer of Solar Generation Systems and Debt Assumption</u>.  Upon the entry of a final order of the Bankruptcy Court confirming this Plan, the Debtors shall take all actions necessary and deliver all documents necessary to transfer ownership of the solar power generation systems located at 1618 Union Avenue, Pennsauken, New Jersey and 3101 Hollywood Avenue, S. Plainfield, New Jersey, together with all rights, claims, and interests of the Debtors relating to the solar power generation systems to the Equity Holders and Affiliates (or their designee).  The Committee agrees to support and assist in said transfer as may be required.  The Equity Holders and Affiliates (or their designee) shall assume the debt obligations of the Debtors to Public Service Electric and Gas Company ("<u>PSEGC</u>") in the maximum amount of $1,140,814 as well as any PSEGC true-up, such true-up not to exceed $5,000.00, relating to the solar power generation systems.  Attached as Exhibits to the Equity Holders and Affiliates Settlement Agreement are the documents to be executed and delivered by the Debtors to effectuate the transfer of the solar generation systems and the assumption of debt.  Upon entry of a Final Order approving this Plan, the bankruptcy cases of Debtors Hollywood Avenue Solar, LLC and United Express Solar, LLC shall be dismissed.

D.      <u>Lease Rejection Damages Claims</u>.  The Equity Holders and Affiliates filed Proofs of Claim for lease rejection damages in the total amount of $11,827,660.38 (the "<u>Lease Rejection Claims</u>").  The Equity Holders and Affiliates agree to vote the Lease Rejection Claims in favor of the Combined Plan and Disclosure Statement, <u>provided</u> that the Combined Plan and Disclosure Statement incorporates all terms of the Equity Holders and Affiliates Settlement, including the releases for the Equity Holders and Affiliates, the Debtors' Estates and Committee provided therein, and <u>provided further</u>, <u>however</u>, that the Equity Holders and Affiliates shall not be obligated to vote Lease Rejection Claims that have been pledged as collateral (the "<u>Pledged Claims</u>") to

47

certain mortgage lenders if such mortgage lenders do not consent to the voting of the Pledged Claims. The Equity Holders and Affiliates agree to relinquish any and all Distributions relating to the Lease Rejection Claims from the Debtors' Estates, except for the Pledged Claims. The Equity Holders and Affiliates will relinquish any and all Distributions relating to the Pledged Claims only upon the consent of the certain mortgage lenders. In the absence of such relinquishment of the Distributions for the Pledged Claims, any Distributions relating to the Pledged Claims shall be paid to the applicable claim holder and thereafter remitted to the certain mortgage lenders in accordance with their applicable loan agreements. In such event, simultaneously with the receipt of any Distribution, the Equity Holders and Affiliates shall make repayment to the Debtors' Estates or the Liquidating Trust, as applicable, in an amount equal to such Distributions. For the avoidance of doubt, in the event of a potential repayment to the Debtors' Estates, the net economic effect is that the Equity Holders and Affiliates shall not receive any Distribution or dividend from the Debtors' Estates.

E.      <u>Combined Plan and Disclosure Statement</u>. The Equity Holders and Affiliates Settlement shall be fully incorporated into this Plan and the Plan shall be consistent in all respects with all terms and provisions of the Equity Holders and Affiliates Settlement Agreement, including but not limited to, the releases for the Equity Holders and Affiliates, the Debtors' Estates and Committee contained therein. These mutual releases are included in this Plan with all other releases as part of the section entitled Exculpation, Releases and Injunctions. Any order approving this Plan shall be in a form and substance acceptable to the Equity Holders and Affiliates, the Debtors, and the Committee.

2747149.15 115719-100281

11.     <u>Claims Process and Bar Date</u>

(a)     *Section 341(a) Meeting of Creditors*

On April 10, 2019, the United States Trustee held a meeting of creditors under Bankruptcy Code § 341 in these Chapter 11 cases.

(b)     *Schedules and Statements*

On April 5, 2019, each of the Debtors, as debtors in possession, filed their respective Schedules of Assets and Liabilities and related Statement of Financial Affairs.  On May 7, 2019, NEMF and Eastern filed Amended Schedules of Assets and Liabilities for all Debtors.   On August 26, 2019, NEMF and Eastern filed a second Amended Schedules of Assets and Liabilities for all Debtors related to certain Auto Liability Claims.

(c)     *Bar Dates*

Pursuant to the Bar Date Order, the Bankruptcy Court established, among others, the following bar dates for filing Proofs of Claim:

(i)     <u>General Bar Date/Government Bar Date</u>:   June 18, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for creditors holding pre-petition claims (including any 503(b)(9) Claims) to file Proofs of Claim in the Chapter 11 Cases; August 12, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for all Governmental Units to file Proofs of Claim in the Chapter 11 Cases;

(ii)    <u>Amended Schedules Bar Date</u>:   With respect to any Claim affected, as described in the Bar Date Order, by the Debtors' amendment, if any, of the Amended Schedules, the holder of any such affected Claim must file a Proof of Claim on or before the later of (i) the General Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) or 60 days after the Debtors provide notice to the holder of the amendment whichever is later; and

(iii)   <u>Rejection Claims Bar Date</u>:   With respect to Claims arising from the Debtors' rejection of Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code, any such Creditor must file a Proof of Claim based on such rejection by the later of (i) the General Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is 30 days following the entry of the Order approving the rejection of an Executory Contract or

49

Unexpired Lease under which the Person or Entity asserting such claim is a party.

(d)    *Special Administrative Claims Bar Date for Auto Liability Claims*

Pursuant to the Special Administrative Claims Bar Date Order, the Bankruptcy Court established August 12, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for any person or entity holding or asserting an administrative expense claim relating to Auto Liability Claims which arose from the Petition Date through April 9, 2019.

(e)    *Post-Petition Health Care Claims Bar Date*

The Debtors shall file a motion with the Bankruptcy Court to establish a date prior to the Effective Date, or as early thereafter as the Bankruptcy Court may approve, as the deadline for any person holding or asserting an Administrative Expense Claim relating to Post-Petition Health Care-Related Claim to assert such Claims.

12.    <u>Auto Liability Claims Protocol</u>

The Debtors are party to several insurance contracts related to their commercial trucking operations:

a.    An Excess Indemnity Contract with United States Fire Insurance Company ("<u>U.S. Fire</u>") for the period April 10, 2018 through April 10, 2019 related to Auto Liability Claims (the "<u>U.S. Fire Contract</u>").

b.    A Large Fleet Trucking Excess Contract with Protective Insurance Company ("<u>Protective</u>") for the period April 10, 2017 to April 10, 2018 (the "<u>2017-2018 Protective Contract</u>").

c.    A Large Fleet Trucking Excess Contract with Protective for the period April 10, 2016 to April 10, 2017 (the "<u>2016-2017 Protective Contract</u>").

d.    A Large Fleet Trucking Excess Contract with Protective for the period April 1, 2015 to April 11, 2017 (the "<u>2015-2017 Protective Contract</u>").

e.    A Fleet Trucking Excess Contract with Protective for the period April 10, 2014 to April 10, 2016 (the "<u>2014-2016 Protective Contract</u>," and collectively with the 2015-2017 Protective Contract, the 2016-2017 Protective Contract, the 2017-2018 Protective Contract, and the U.S. Fire

Contract, the "Excess Indemnity Contracts," and each individually an "Excess Indemnity Contract").

The terms and provisions contained in each of the Excess Indemnity Contracts speak for themselves and govern the obligations of the parties to each such contract. Notwithstanding, the Debtors represent that the terms and conditions are materially the same across all of the Excess Indemnity Contracts. Under the Excess Indemnity Contracts' self-retention provisions, the Debtors are self-insured for the first $500,000 in damages, fees and costs (the "Self-Retention"). The Auto Insurers are obligated to indemnify one or more of the Debtors for amounts paid by the Debtors on a per occurrence basis above the Self-Retention.

In order to guarantee the Debtors' obligations to the public for the payment of claims within the Self-Retention (and above, up to $1,000,000 "for each accident"), both U.S. Fire and Protective filed Surety Bonds with federal and state regulatory agencies and others. The Debtors signed various collateral and indemnity agreements with U.S. Fire and Protective providing for reimbursement to U.S. Fire and Protective, respectively, by the Debtors if U.S. Fire and/or Protective made payments of claims under the Surety Bonds because of the Debtors' inability or refusal to make such payments. The Surety Bonds are judgment bonds under which the Auto Insurer "agree[s] to be responsible for the payment of any final judgment or judgments against [one or more of the Debtors] for public liability, property damage, and environmental restoration liability claims", including any final judgment issued against one or more of the Debtors relating to Auto Liability Claims, in the amount of $1,000,000 "for each accident". Surety Bonds, pp. 1-2. The Auto Insurers retain the right and ability to settle and pay such claims prior to judgment without interference or objection by the Debtors. In exchange for the foregoing surety obligations, the Debtors executed various collateral and indemnity agreements with the Auto Insurers providing for the Debtors' indemnification of the Auto Insurers for payments pursuant to the terms

2747149.15 115719-100281

and conditions of the Surety Bonds because of the Debtors' inability or refusal to make such payments.

As collateral to secure the Debtors' Self-Retention and potential indemnification obligations, the Debtors caused letters of credit to be issued in favor of both Protective and U.S. Fire.  After receiving notice by certain lenders that the Debtors' letters of credit with those lenders would not be renewed, both Protective (in the amount of $9,539,000) (the "Protective Auto Liability LC Proceeds") and U.S. Fire (in the amount of $2,450,000) (the "U.S. Fire Auto Liability LC Proceeds," and collectively with the Protective Auto Liability LC Proceeds, the "Auto Liability LC Proceeds") drew down on their respective letters of credit.  The Protective Auto Liability LC Proceeds were paid by East West Bank and Santander Bank, and the U.S. Fire Auto Liability LC Proceeds were paid by JPMorgan Chase Bank, N.A. (collectively, the "Payor Banks").

On the Petition Date, there were approximately 73 active lawsuits involving Auto Liability Claims with loss dates since 2014 pending against the Debtors (with approximately 63 of those lawsuits having a driver formerly employed by the Debtors named as a co-defendant) in state and federal courts across multiple states (the "Auto Liability Actions").  Approximately 227 Proofs of Claim were filed which could be characterized as Auto Liability Claims, which includes Claims related to the Auto Liability Actions.

On March 14, 2019, the Debtors commenced an adversary proceeding styled *New England Motor Freight, Inc., et al. v. State Farm Mutual Automobile Insurance Company, a/s/o Riquet Simplice, et. al.*, Adv. Pro. No. 19-01119 in the United States Bankruptcy Court for the District of New Jersey (the "Auto Liability Injunction Action").  The purpose of the Auto Liability Injunction Action was to (i) seek a preliminary injunction under 11 U.S.C. §§ 105(a) and 362(a) enjoining the continuation or commencement of any action against any of the Debtors' employees and/or

2747149.15 115719-100281

former employees (collectively, the "Drivers") potentially liable for Auto Liability Claims, and/or (ii) extend the automatic stay to protect the Debtors' estates on account of possible indemnity claims the Drivers may possess against the Debtors if judgment is entered against a Driver in any Auto Liability Action.

On April 16, 2019, the Court entered a temporary restraining order in the Auto Liability Injunction Action staying the Auto Liability Actions (the "TRO"), and directed the parties to meet and confer regarding a consensual protocol to govern the orderly resolution of all Auto Liability Claims.  The Court subsequently extended the TRO, with the consent of the parties—including the Auto Insurers and an ad hoc group of counsel representing Holders of Auto Liability Claims— while those discussions continued, including through the General Bar Date and the Special Administrative Claims Bar Date.  The TRO is presently in effect through November 5, 2019.

<u>The Auto Liability Claims Protocol; Proposed Settlement With the Auto Insurers</u>

The Debtors, the Committee, U.S. Fire, and Protective are continuing to negotiate the terms of a proposed Auto Liability Claims Protocol.  The Plan shall serve as and be deemed a motion for entry of an order by the Bankruptcy Court under Bankruptcy Rule 9019 approving the proposed Auto Liability Claims Protocol between the Debtors, the Committee, U.S. Fire, and Protective, the terms of which are set forth in the proposed Auto Liability Claims Protocol Settlement Agreement, attached as Exhibit C hereto.  Generally, Holders of Auto Liability Claims shall not be entitled to receive any Distribution under the Plan from the Liquidating Trust Assets, but shall be entitled to receive up to 100% of the agreed upon, settled or judgment value of an Auto Liability Claim from the Protective Auto Liability LC Proceeds and/or the U.S. Fire Auto Liability LC Proceeds (as applicable), and/or the Auto Insurers directly.  Except as otherwise modified by the Auto Liability Protocol, the Debtors and the Auto Insurers reserve all of their rights under the Excess Indemnity Contracts, the Surety Bonds, and/or any and all collateral and/or indemnity agreements between

53

the Debtors and an Auto Insurer relating in any way to one or more Excess Indemnity Contracts or Surety Bonds. Pursuant to the Auto Liability Claims Protocol, after the final resolution of all Auto Liability Claims by the Auto Insurers, the Auto Insurers, consistent with the terms of any applicable contractual obligations and applicable law, shall turn over any excess Auto Liability LC Proceeds to the Liquidating Trust, and upon the Effective Date the Payor Bank(s) shall be deemed to have released and shall have no rights and no claims against the Auto Insurers relating to any excess Auto Liability LC Proceeds. As more fully set forth in the Auto Liability Claims Protocol, to the extent an Auto Insurer has exhausted its respective Auto Liability LC Proceeds, any Auto Insurer Unsecured Indemnity Claim held by such Auto Insurer shall be deemed waived, released, and discharged against the Debtors and/or the Liquidating Trust as of the Effective Date of the Plan, and such Auto Insurer shall not be entitled to any Distribution from the Liquidating Trust Assets on account of such Auto Insurer Unsecured Indemnity Claim. The Debtors and the Committee believe that the proposed Auto Liability Claims Protocol is in the best interests of the Debtors and will provide an orderly procedure with respect to the determination of the Class 5B Auto Liability Claims, the Class 3A Auto Insurer Secured Claims and the Class 5C Auto Insurer Unsecured Indemnity Claims.

The Auto Liability Claims Injunction and Mandatory ADR Procedures[9]

The alternative dispute resolution procedures (the "ADR Procedures") described in the proposed Auto Liability Claims Protocol Settlement Agreement shall apply to all Holders of Auto Liability Claims whether or not such Holder has filed a Proof of Claim against one or more of the Debtors. Pursuant to the Auto Liability Claims Injunction contained in Article X(D) of the Plan, all Holders of Auto Liability Claims shall be prohibited from taking any of the following actions

---

[9] This summary is not intended to be a complete recitation of the Auto Liability Claims Protocol, which is set forth in Exhibit C hereto.

for the purpose of, directly or indirectly, litigating, collecting, recovering, or receiving payment

of, on account of or with respect to any Auto Liability Claims, from or against the Debtors, the

Drivers, the Debtors' Estates, all Estate representatives, the Exculpated Parties, and the Released

Parties and/or the Liquidating Trust (collectively, the "Auto Liability Claims Released Parties"),

or from or against the Auto Insurers, until such Holder participates in the ADR Procedures set

forth in the Auto Liability Claims Protocol, including, but not limited to:

a.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against or affecting the Auto Liability Claims Released Parties and/or the Auto Insurers or any property or interests in property of the Auto Liability Claims Released Parties and/or the Auto Insurers; and

b.    proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the ADR Procedures, except in conformity and compliance with the ADR Procedures contained in the Auto Liability Claims Protocol.

Following the Effective Date, each Holder of an Auto Liability Claim — either individually

or through its agents, attorneys and representatives — shall engage with the applicable Auto

Insurer pursuant to the ADR Procedures in a good faith effort to resolve the Auto Liability Claims.

Litigation After Unsuccessful Mandatory Mediation

Should an Auto Liability Claim fail to be resolved pursuant to the ADR Procedures, the

applicable Auto Insurer and the Holder of the Auto Liability Claim shall file a joint statement with

the Bankruptcy Court, with notice to Liquidating Trustee, advising the Court that mediation did

not result in a settlement (an "Unsuccessful Mediation Filing"), and within two (2) business days

of the Unsuccessful Mediation Filing the Holder of the Auto Liability Claim shall be permitted to

pursue any legally available remedy, so as to liquidate and fix the value of such Auto Liability

Claim. Notwithstanding the foregoing, such parties may reserve their respective rights to agree to

2747149.15 115719-100281

such additional mediation, arbitration or other alternative dispute resolution procedures as may be mutually acceptable to them.

To the extent a Holder of an Auto Liability Claim elects to file a lawsuit to liquidate its Auto Liability Claim after the Unsuccessful Mandatory Mediation, then (i) the statute of limitations for such Holder of the Auto Liability Claim to file a lawsuit to liquidate such Auto Liability Claim in the forum in which the Auto Liability Claim arose shall be extended to sixty (60) days from the date the Auto Insurer and the Holder of the Auto Liability Claim filed their joint statement of the Unsuccessful Mediation provided, however, that such statute of limitations had not expired prior to the Petition Date; (ii) the Holder of the Auto Liability Claim may name one or more of the Debtors as a "nominal party" in a lawsuit filed after the Unsuccessful Mandatory Mediation, but service of any Summons and Complaint shall be accepted and considered valid once perfected on the applicable Auto Insurer.

## ARTICLE III.

## DISCLOSURES AND RISK FACTORS

ALL IMPAIRED HOLDERS OF CLAIMS OR INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE FACTS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

### A.      Financial Information; Disclaimer

Although the Debtors and the Committee have used their best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available to the Debtors and the Committee at the time of the preparation of the Plan.  While the Debtors and the Committee expect that such financial information fairly reflects the financial

56

condition of the Debtors, the Debtors and the Committee are unable to warrant or represent that

the information contained herein and attached hereto is without inaccuracies.

**B.      Certain Federal Income Tax Consequences**

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF PROCEEDS FROM CLAIMS INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN (NON-US) TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.   THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND SHOULD NOT BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY CREDITOR, EQUITY INTEREST HOLDER OR OTHER PARTY IN INTEREST.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

THE CONFIRMATION AND EXECUTION OF THE PLAN MAY HAVE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS.  THE DEBTORS AND COMMITTEE DO NOT OFFER AN OPINION AS TO ANY FEDERAL, STATE, LOCAL OR OTHER TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AS A RESULT OF THE CONFIRMATION OF THE PLAN.

This discussion is provided for information purposes only, and is based on provisions of

the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated

thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on

the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or

promulgated after the date hereof could alter or modify the analyses set forth below with respect

to the United States federal income tax consequences of the Plan.  Any such changes or

interpretations may be retroactive and could significantly, and adversely, affect the United States

federal income tax consequences of the Plan.  To the extent that the following discussion relates

2747149.15 115719-100281

to the consequences to Holders of Allowed Claims or Interests, it is limited to Holders that are

United States persons within in the meaning of the IRC.  For purposes of the following discussion,

a "United States person" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

- An estate, the income of which is subject to federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be

relevant to a particular Holder in light of its particular facts and circumstances, or to certain types

of Holders subject to special treatment under the IRC.  Examples of Holders subject to special

treatment under the IRC are governmental entities and entities exercising governmental authority,

foreign companies, persons who are not citizens or residents of the United States, banks and certain

other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real

estate investment trusts, small business investment companies, regulated investment companies,

Holders that are or hold their Claims or Interests through a partnership or other pass-through entity,

dealers in securities or foreign currency, persons that have a functional currency other than the

U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against,

currency risk or that are part of a straddle, constructive sale, or conversion transaction.  This

discussion assumes that Holders hold their Claims or Interests as capital assets for U.S. federal

income tax purposes. Generally, a capital asset is property held for investment.  This discussion

does not address other U.S. federal taxes or the foreign, state, or local tax consequences of the

2747149.15 115719-100281

Plan.  Furthermore, this discussion generally does not address the U.S. federal income tax consequences to Holders that are unimpaired under the Plan.

The tax treatment of Holders of Claims or Interests and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for federal income tax purposes; (xi) whether the Claim, and any instrument received in exchange therefor, is considered a "security" for U.S. federal income tax purposes; and (xii) whether the "market discount" rules apply to the Holder.  Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan.  Events occurring after the date of the Disclosure

Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.  No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.  To the extent any Debtor is treated as a disregarded entity for federal income tax purposes, because all of its tax attributes are reported by its owner, this discussion does not separately address the tax consequences to such disregarded entity, if any.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim or Interest.  This discussion is not binding upon the IRS or other taxing authorities.  No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

**C.**    **Certain U.S. Federal Income Tax Consequences to the Debtors**

1. <u>Tax Effects of Sale Process</u>.

As noted elsewhere in this Plan (see Art. II(C)(4), "Sale Process"), the Debtors have sold certain  properties. These sales have given rise to taxable gain or loss measured by the difference between the amount realized on the sale and the tax basis of the Debtors in the properties that  were sold. The character of the gain or loss (i.e., as ordinary or capital gain or loss) depends on  the asset in question, the extent to which certain depreciation recapture is involved and other  possible factors under the IRC and/or applicable state and local tax laws, including potential  recapture of credits. In the case of Debtors that are S corporations, this income or loss will be  allocated to their shareholders and will need to be taken into account by those shareholders for tax purposes.

2. <u>Tax Effects of Cancellation of Debt Income</u>.

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("<u>COD Income</u>") realized during the taxable year.

Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court. Section 108 of the IRC requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers which include, in the case of an S corporation, losses previously allocated to an S corporation shareholder that exceeded that shareholder's adjusted basis of stock or debt with respect to the S corporation (collectively, "NOLs"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. A taxpayer may elect to apply the tax attribute reduction to depreciable basis of property before other attributes. Attributes are reduced only after the tax for the year of the discharge has been determined. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of certain Allowed Claims or Interests are expected to receive less than full payment on their Claims or Interests. The Debtors' liability to the Holders of such Allowed Claims or Interests in excess of the amount satisfied by Distributions under the Plan will be canceled and therefore will result in COD Income to the Debtors. The Debtors should not realize any COD Income, however, to the extent that payment of such Allowed General Unsecured Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD Income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to section 108 of the IRC described above, because

61

the cancellation will occur in a case under the Bankruptcy Code, while the taxpayer is under the jurisdiction of the bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court.

The exclusion of the COD Income, however, will result in a reduction of certain tax attributes of the Debtors, such as the NOLs, as described above.  The shareholders of those Debtors that have elected to be taxed as an "S" corporation for federal income tax purposes may have NOL attributes (from losses that were allocated to such Debtor's shareholders in current and prior taxable years) reduced as a result of the exclusion of COD Income.  Because attributes are reduced only after the tax for the year of discharge has been determined, the COD Income realized by the Debtors under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.  However, the tax rules with respect to COD income and tax attribute and basis deduction are complex and the results will differ for each shareholder.

D.      **Consequences of the Liquidating Trust**

The Liquidating Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Thus, the Liquidating Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684.  In general, such a liquidating trust is treated for U.S. federal income tax purposes as a "grantor trust."  Under federal income tax laws, a grantor trust is disregarded, and the grantors are treated as if they directly owned undivided interests in all of the trust's assets. No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary

2747149.15 115719-100281

position to the classification of the Liquidating Trust.  If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity-level tax).

For all U.S. federal income tax purposes, all parties with respect to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) must treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust Beneficiaries, followed by (ii) a transfer of the Liquidating Trust Assets by such beneficiaries to the Liquidating Trust, with the beneficiaries being treated as the grantors and owners of the Liquidating Trust. Each Holder that is a beneficiary of the Liquidating Trust generally will recognize gain or loss in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim or Interest and its adjusted tax basis in the Claim or Interest. The amount realized generally should equal the fair market value of the Liquidating Trust Assets deemed received for U.S. federal income tax purposes under the Plan in respect of each Holder's Claim or Interest, less the amount, if any, attributable to accrued but unpaid interest.  The Debtors and beneficiaries of the Liquidating Trust must value the Liquidating Trust Assets consistently and use these valuations for all U.S. federal income tax purposes.  A Holder that is deemed to receive for U.S. federal income tax purposes the Liquidating Trust Assets under the Plan in respect of its Claim or Interest generally should then have a tax basis in the Liquidating Trust Assets in an amount equal to the fair market value of the Liquidating Trust Assets on the date of receipt, less the amount, if any, attributable to accrued but unpaid interest.

Because each Holder's share of the Liquidating Trust Assets in the Liquidating Trust may change depending upon the resolution of Disputed Claims, a Holder may be prevented from recognizing for tax purposes all of its loss from the consummation of the Plan until all Disputed Claims have been resolved.

In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to IRC Sections 671 *et. seq.*, owned by the persons who are treated as transferring assets to the Liquidating Trust.  Each Holder of a beneficial interest in the Liquidating Trust must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust.  None of the Debtors' loss carry- forwards will be available to reduce any income or gain of the Liquidating Trust.  Moreover, upon the sale or other disposition (or deemed disposition) of any of the Liquidating Trust Assets, each Liquidating Trust Beneficiary must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust asset so sold or otherwise disposed of and (2) its adjusted tax basis in its share of the Liquidating Trust asset.  The character of any such gain or loss to the Holder will be determined as if such Holder itself had directly sold or otherwise disposed of the Liquidating Trust asset.  The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in the Liquidating Trust, and the ability of the Holder to benefit from any deductions or losses, will depend on the particular circumstances or status of the Holder.

Given the treatment of the Liquidating Trust as a grantor trust, each Liquidating Trust Beneficiary has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Liquidating Trust asset) which is not dependent on the

2747149.15 115719-100281

Distribution of any cash or other Liquidating Trust assets by the Liquidating Trust. Accordingly, a Liquidating Trust Beneficiary may incur a tax liability as a result of owning a share of the Liquidating Trust Assets, regardless of whether the Liquidating Trust distributes cash or other assets sufficient to fund such tax. Due to the requirement that the Liquidating Trust maintain certain reserves, the Liquidating Trust's ability to make current cash Distributions may be limited or precluded. In addition, due to possible differences in the timing of income on, and the receipt of cash from the Liquidating Trust Assets, a Liquidating Trust Beneficiary may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the Holder during the year.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust assets (*e.g*., income, gain, loss, deduction and credit). Each Holder of a beneficial interest in the Liquidating Trust will receive a tax information statement and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust Beneficiaries who received their interests in connection with the Plan.

### E.    Backup Withholding Tax

Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (i) each Holder that is to receive a Distribution pursuant to this Combined Plan and Disclosure Statement shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of the Distribution, and (ii) no Distribution will be made to or on behalf of such Holder pursuant to the Combined Plan and Disclosure Statement unless and until such Holder has made arrangements satisfactory to the Liquidating Trust or other payor, as applicable, for the

2747149.15 115719-100281

payment and satisfaction of withholding tax obligations or any tax obligation that would be imposed in connection with the Distribution. Any property to be distributed pursuant to the Combined Plan and Disclosure Statement will, pending the implementation of the Distribution, be treated as an undeliverable Distribution.

Moreover, under certain circumstances, Holders may be subject to federal income tax "backup withholding" with respect to payments made pursuant to the Combined Plan and Disclosure Statement, unless such Holder either (i) comes within certain exempt categories, which generally include corporations, and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the Holder is a U.S. person, the taxpayer identification number is correct, and the taxpayer is not subject to backup withholding because of a failure to report dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## F.     Alternate Plan

If the Plan is not confirmed, the Debtors and Committee, or any other party in interest could attempt to formulate a different plan. The additional costs—including, among other amounts, additional professional fees—would constitute Administrative Expense Claims (subject to allowance) that may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7. The Debtors and Committee believe that conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code will result in the incurrence of significant additional fees and expenses (which would have priority over Administrative Expense Claims of the Chapter 11 Cases and General Unsecured Claims), to the

2747149.15 115719-100281

detriment of Creditors.  Accordingly, the Debtors and Committee believe that the Plan enables

Creditors to realize the best return under the circumstances.

## G.    Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim

or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a

value, as of the Effective Date, that is not less than the value such Holder would receive if the

Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Because of the increased

expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases

under Chapter 7, the value of any Distributions to Holders of Claims or Equity Interests if the

Chapter 11 Cases were converted to cases under Chapter 7 of the Bankruptcy Code would be less

than or equal to the value of Distributions under the Plan.  This is because conversion of the

Chapter 11 Cases to Chapter 7 cases would require the appointment of a chapter 7 trustee, and in

turn, such chapter 7 trustee's likely retention of new professionals.  The "learning curve" that the

Chapter 7 trustee and new professionals would be faced with comes with additional costs to the

Estates and delay compared to the time of Distributions under the Plan.

## H.    Liquidation Analysis

The Plan will provide Holders of Allowed Claims and Equity Interests not less than what

would be available to them in a Chapter 7 liquidation.  It proposes to pay all Holders of Allowed

Claims of administrative and priority creditors in full.

A hypothetical Chapter 7 liquidation analysis is attached to the Plan as Exhibit B.  In a

Chapter 7 liquidation, the fees and expenses of a Chapter 7 trustee and his or her professionals will

be substantial.  The new Chapter 7 trustee and his or her retained professionals would require much

time and effort to get up to speed and to administer the Chapter 7 cases.  The value of any

distributions if the Debtors' Chapter 11 Cases were converted to cases under Chapter 7 of the

Bankruptcy Code would be less than the value of Distributions under the Plan.  Accordingly, the

Debtors and the Committee believe that the "best interests" test of Bankruptcy Code section 1129

is satisfied.

## I.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the Plan is not

likely to be followed by the liquidation, or the need for further financial reorganization, of the

Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization

is proposed in the Plan.  As set forth herein, the Debtors commenced these Chapter 11 Cases to

allow for an efficient and orderly wind down process; the Plan provides for the liquidation of the

Debtors' Estates for the benefit of Creditors and the transfer of all of the Debtors' remaining assets

to the Liquidating Trust.  The Debtors will not be conducting any business operations after the

Effective Date.

As such, _provided_ that the Plan is confirmed and consummated, the Estates will not be

subject to future reorganization or liquidation. Accordingly, the Debtors and Committee believe

that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

## J.      Certain Risk Factors to be Considered

Holders of Claims and Equity Interests should read and consider carefully the risk factors

below, as well as the other information set forth in the Plan, the documents attached to the Plan,

and the documents referred to or incorporated by reference in the Plan.  These factors should not

be regarded as constituting the only risks present in connection with the Plan and its

implementation.

2747149.15 115719-100281

1.      <u>Risk Factors that May Affect the Debtors' Ability to Consummate the Plan</u>

(a)      *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a Chapter 11 plan.  While, as set forth below, the Debtors believe that the Plan complies with or will comply with all such requirements, there can be no guarantee that the Bankruptcy Court will agree.

(b)      *Risk of Non-Occurrence of the Effective Date*

There can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  Further, to the extent Allowed Administrative Expense Claims exceed available Cash, the Plan cannot go effective.

(c)      *Parties May Object to the Classification of Claims and Equity Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors and the Committee believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

(d)      *No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors and the Committee as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Neither the Debtors nor the Committee have a duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2747149.15 115719-100281

# ARTICLE IV.

## SUMMARY OF DEBTORS' ASSETS AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS

**A.    Summary of Assets**

On the Effective Date, the Liquidating Trust Assets shall include, without limitation, all Cash on hand after payment of any claims due on the Effective Date, the Causes of Action (including those net recoveries realized from the prosecution and/or settlement of Causes of Action), any tax refunds, all rights of setoff and recoupment and other defenses that the Debtors' Estates may have with respect to any Claim, all Insurance Policies, and the rights to any excess letter of credit proceeds related to such Insurance Policies.

**B.    Summary of Treatment of Claims and Equity Interests**

The following charts provide a summary of treatment of the classified Claims and Equity Interests.  The treatment provided in these charts is for informational purposes only and is qualified in its entirety by Articles V and VI of the Plan.

| CONSOLIDATED NEMF DEBTORS | | | |
|---|---|---|---|
| CLASS | TREATMENT/VOTING STATUS | RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED NEMF DEBTORS [1] | ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED NEMF DEBTORS |
| Class 1: | Unimpaired / Deemed to Accept / Not Entitled to Vote | $333,154 | 100% |

2747149.15 115719-100281

| CONSOLIDATED NEMF DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED NEMF DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED NEMF DEBTORS** |
| Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim. | | |
| **Class 2A:** Lender Secured Claims – TD Bank | Impaired / Entitled to Vote | $6,728,262 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2B:** Lender Secured Claims – East West Bank | Impaired / Entitled to Vote | $8,381,905 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2C:** Lender Secured Claims – JPMorgan Chase | Impaired / Entitled to Vote | $3,638,974[10] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2D:** Lender Secured Claims – Fifth Third | Impaired / Entitled to Vote | $6,796,224[11] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2E:** Lender Secured Claims – Santander | Impaired / Entitled to Vote | $4,351,274[12] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2F:** Lender Secured Claims – Wells Fargo | Impaired / Entitled to Vote | $3,159,000[13] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2G:** | Impaired / Entitled to Vote | | |

[10] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[11] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[12] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[13] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

2747149.15 115719-100281

| CONSOLIDATED NEMF DEBTORS | | | |
|---|---|---|---|
| CLASS | TREATMENT/VOTING STATUS | RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED NEMF DEBTORS [1] | ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED NEMF DEBTORS |
| Lender Secured Claims – Mercedes Benz | | $6,026,263[14] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2H:** Lender Secured Claims – Volvo | Impaired / Entitled to Vote | $1,046,494[15] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2I:** Lender Secured Claims – Capital One | Impaired / Entitled to Vote | $1,913,407 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2J:** Lender Secured Claims – Webster Capital | Impaired / Entitled to Vote | $829,399 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 3A:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | | |
| Auto Insurer Secured Claims | Each Auto Insurer shall be entitled to retain the collateral it is holding in the form of Auto Liability LC Proceeds, and to use its collateral in accordance with the applicable Excess Indemnity Contract and all other related agreements in which it is a party with a Debtor or Debtors. | Protective - $9,539,000 U.S. Fire - $2,450,000 | 100% |
| **Class 3B:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | | |
| Insurer Secured Claims (WC) [2] | Each Workers' Comp Insurer shall be entitled to retain the collateral it is holding in the form of letter of credit proceeds, and to use its collateral in accordance with the applicable Insurance Policy and any other agreements in which it is a party with a Debtor or Debtors. | Hartford - $14,775,000 Travelers - $46,000 Fidelity - $1,585,000 Arch - $1,000,000 Liberty - $428,000 | 100% |
| **Class 4:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | $1,134,534 | 100% |

---

[14] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[15] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

72

| CONSOLIDATED NEMF DEBTORS | | | |
| --- | --- | --- | --- |
| CLASS | TREATMENT/VOTING STATUS | RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED NEMF DEBTORS [1] | ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED NEMF DEBTORS |
| Other Secured Claims | Class 4 Other Secured Claims are the Secured Claims of lessors and utilities to the extent that such holder has a non-avoidable Lien on property in which the Estates have an interest and only to the extent of the value of such interest in the Estates' interest in such property, as provided by section 506(a) of the Bankruptcy Code. | | |
| | To the extent that a Person or Entity holds an Allowed Other Secured Claim, on the Effective Date, the automatic stay shall be lifted and the Holder may exercise its rights to its collateral or security deposit for satisfaction of its Allowed Secured Claim.  Any deficiency that exists between the total Allowed amount of such Holder's Claim and the Allowed amount of its Other Secured Claim shall be treated as a Class 5 General Unsecured Claim. | | |
| **Class 5A:** | Impaired /Entitled to Vote | | |
| General Unsecured Claims- Other than Lender Deficiency Claims | Each Holder of an Allowed General Unsecured Claim- Other than Lender Deficiency Claim shall receive a pro rata share of funds available for Distribution on account of such General Unsecured Claim. | $12,359,823 to $15,359,823 | 7-11% |
| **Class 5B:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | Unliquidated and Unknown [3] | 0% |

2747149.15 115719-100281

| CONSOLIDATED NEMF DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED NEMF DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED NEMF DEBTORS** |
| Auto Liability Claims | As of the Effective Date of the Plan, each Holder of an Auto Liability Claim will be subject to the Auto Liability Claims Protocol and shall be entitled to receive up to 100% of the agreed upon, settled or judgment value of such Holder's Auto Liability Claim from the Protective Auto Liability LC Proceeds and/or the U.S. Fire Auto Liability LC Proceeds (as applicable), and/or the Auto Insurers. | | |
| **Class 5C** | Impaired / Deemed to Reject the Plan/ Not Entitled to Vote | | |
| Auto Insurer Unsecured Indemnity Claims | As of the Effective Date of the Plan, each Holder of an Auto Insurer Unsecured Indemnity Claim shall be deemed to have waived and released such Auto Insurer Indemnity Claim against each of the Auto Liability Claims Released Parties and such Holder shall not be entitled to any Distribution from the Liquidating Trust. | N/A | 0% |
| **Class 5D** | Impaired /Entitled to Vote | | |
| General Unsecured Claims – Lender Deficiency Claims | Each Holder of an Allowed General Unsecured Claim-Lender Deficiency Claim shall receive a pro rata share of funds available for Distribution on account of such General Unsecured Claim. | | |
| | 5th 3rd | $2,070,654[16] | 7-11% |
| | Capital One | $934,157 | 7-11% |
| | Chase | $4,007,818[17] | 7-11% |
| | Mercedes Benz | $2,133,725[18] | 7-11% |
| | EastWest | $8,413,119 | 7-11% |

[16] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[17] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[18] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

2747149.15 115719-100281

| CONSOLIDATED NEMF DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED NEMF DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED NEMF DEBTORS** |
| | Santander | $5,565,071[19] | 7-11% |
| | TD | $8,768,743 | 7-11% |
| | VFS | $583,577[20] | 7-11% |
| | Webster | $74,516 | 7-11% |
| | Wells Fargo | $719,493[21] | 7-11% |
| **Class 6:** | Impaired / Deemed to Reject / Not Entitled to Vote | | |
| Intercompany Claims | Holders of Intercompany Claims shall not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Claims. | N/A | 0% |
| **Class 7:** | Impaired / Deemed to Reject / Not Entitled to Vote | | |
| Equity Interests | Holders of Equity Interests shall not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Equity Interests. | N/A | 0% |
| **NOTES:** | **[1]** | The low amounts in the range are based on the Debtors' books and records. The high amounts in the range are based on filed proofs of claim. All filed and scheduled claims remain subject to further review and challenge. | |
| | **[2]** | Letters of credit related to workers' compensation insurance policies secured obligations of both NEMF and Eastern; the liabilities shown for Class 3B represent the aggregate liability. | |
| | **[3]** | The Auto Liability Claims are disputed, unliquidated and contingent Claims. | |

---

[19] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[20] Volvo shall be deemed to hold an Allowed Unsecured Claim against the Consolidated NEMF Debtors' estate in the amount of $583,577 (less the amount of net proceeds recovered from the sale of a 2014 Mack Tractor bearing VIN ending in 6568 plus continuing legal fees and costs incurred after September 13, 2019), and an Allowed Unsecured Claim against the Consolidated Eastern Debtors' estate in the amount of $1,677,895 (plus continuing legal fees and costs incurred after September 13, 2019). VFS US shall also retain all proceeds generated by the sale of the Mack Tractor bearing VIN ending in 6568. Volvo shall not, however, receive more than **$583,577** on account of its Claims, plus $112,960 in reasonable legal fees and costs through September 13, 2019 (as verified by the Committee and the Debtors), and reasonable continuing legal fees and costs incurred thereafter, less the amount of proceeds recovered by Volvo from the sale of a 2014 Mack Tractor bearing VIN ending in 6568. Finally, Volvo shall have an allowed administrative claim in the amount of $16,271.36 against the Consolidated Eastern Debtors.
[21] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

2747149.15 115719-100281

| CONSOLIDATED EASTERN DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED EASTERN DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED EASTERN DEBTORS** |
| **Class 1:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | | |
| Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim. | $7,347 | 100% |
| **Class 2A:** Lender Secured Claims – TD Bank | Impaired / Entitled to Vote | $452,708 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2B:** Lender Secured Claims – East West Bank | Impaired / Entitled to Vote | $578,979.01 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2C:** Lender Secured Claims – Reserved | | $0 | |
| **Class 2D:** Lender Secured Claims – Fifth Third | Impaired / Entitled to Vote | $2,836,281.74[22] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2E:** Lender Secured Claims – Santander | Impaired / Entitled to Vote | $2,845,799.71[23] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2F:** | Impaired / Entitled to Vote | $1,103,509.38[24] | |

---

[22] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[23] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[24] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

2747149.15 115719-100281

| CONSOLIDATED EASTERN DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED EASTERN DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED EASTERN DEBTORS** |
| Lender Secured Claims – Wells Fargo | | | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2G:** | | | |
| Lender Secured Claims – Mercedes Benz | Impaired / Entitled to Vote | $1,369,751.02[25] | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2H:** | | | |
| Lender Secured Claims – Reserved | | $0 | |
| **Class 2I:** | | | |
| Lender Secured Claims – Capital One | Impaired / Entitled to Vote | $748,636.51 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 2J:** | | | |
| Lender Secured Claims – Webster Capital | Impaired / Entitled to Vote | $86,089.72 | 100% of the value of the Pre-petition Lender's Collateral |
| **Class 3A:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | | |
| Auto Insurer Secured Claims | Each Auto Insurer shall be entitled to retain the collateral it is holding in the form of Auto Liability LC Proceeds, and to use its collateral in accordance with the applicable Excess Indemnity Contract and all other related agreements in which it is a party with a Debtor or Debtors. | Protective - $9,539,000 U.S. Fire - $2,450,000 | 100% |
| **Class 3B:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | | |
| Insurer Secured Claims (WC) [2] | Each Workers' Comp Insurer shall be entitled to retain the collateral it is holding in the form of letter of credit proceeds, and to use its collateral in accordance with the applicable Insurance Policy and any other agreements in which it is a party with a Debtor or Debtors. | Hartford - $14,775,000 Travelers - $46,000 Fidelity - $1,585,000 Arch - $1,000,000 Liberty - $428,000 | 100% |

---

[25] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

2747149.15 115719-100281

| CONSOLIDATED EASTERN DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED EASTERN DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED EASTERN DEBTORS** |
| **Class 4:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | | |
| Other Secured Claims | Class 4 Other Secured Claims are the Secured Claims of lessors and utilities to the extent that such holder has a non-avoidable Lien on property in which the Estates have an interest and only to the extent of the value of such interest in the Estates' interest in such property, as provided by section 506(a) of the Bankruptcy Code. | $0 | 100% |
| | To the extent that a Person or Entity holds an Allowed Other Secured Claim, on the Effective Date, the automatic stay shall be lifted and the Holder may exercise its rights to its collateral or security deposit for satisfaction of its Allowed Secured Claim.  Any deficiency that exists between the total Allowed amount of such Holder's Claim and the Allowed amount of its Other Secured Claim shall be treated as a Class 5 General Unsecured Claim. | | |
| **Class 5A:** | Impaired /Entitled to Vote | | |
| General Unsecured Claims- Other than Lender Deficiency Claims | Each Holder of an Allowed General Unsecured Claim- Other than Lender Deficiency Claim shall receive a pro rata share of funds available for Distribution on account of such General Unsecured Claim. | $524,024 | 3-7% |
| **Class 5B:** | Unimpaired / Deemed to Accept / Not Entitled to Vote | Unliquidated and Unknown [3] | 0% |

2747149.15 115719-100281

| CONSOLIDATED EASTERN DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED EASTERN DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED EASTERN DEBTORS** |
| Auto Liability Claims | As of the Effective Date of the Plan, each Holder of an Auto Liability Claim will be subject to the Auto Liability Claims Protocol and <u>shall be entitled to receive up to 100% of the agreed upon, settled or judgment value of such Holder's Auto Liability Claim from the</u> Protective Auto Liability LC Proceeds and/or the U.S. Fire Auto Liability LC Proceeds (as applicable), and/or the Auto Insurers. | | |
| **Class 5C** | Impaired / Deemed to Reject the Plan/ Not Entitled to Vote | | |
| Auto Insurer Unsecured Indemnity Claims | As of the Effective Date of the Plan, each Holder of an Auto Insurer Unsecured Indemnity Claim shall be deemed to have waived and released such Auto Insurer Indemnity Claim against each of the Auto Liability Claims Released Parties and such Holder shall not be entitled to any Distribution from the Liquidating Trust. | $0 | 0% |
| **Class 5D** | Impaired /Entitled to Vote | | |
| General Unsecured Claims – Lender Deficiency Claims | Each Holder of an Allowed General Unsecured Claim-Lender Deficiency Claim shall receive a pro rata share of funds available for Distribution on account of such General Unsecured Claim. | | |
| | 5th 3rd | $7,630,028[26] | 3-7% |
| | Capital One | $2,463,041 | 3-7% |
| | Chase | $14,280,282[27] | 3-7% |
| | Mercedes Benz | $7,467,348[28] | 3-7% |
| | EastWest | $15,109,520 | 3-7% |

[26] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[27] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.
[28] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

2747149.15 115719-100281

| CONSOLIDATED EASTERN DEBTORS | | | |
|---|---|---|---|
| **CLASS** | **TREATMENT/VOTING STATUS** | **RANGE OF ESTIMATED ALLOWED CLAIM AMOUNTS AGAINST CONSOLIDATED EASTERN DEBTORS [1]** | **ESTIMATED RECOVERIES OR AMOUNTS AVAILABLE FOR DISTRIBUTION FROM CONSOLIDATED EASTERN DEBTORS** |
| | Santander | $9,916,345[29] | 3-7% |
| | TD | $15,992,921 | 3-7% |
| | VFS | $1,677,895[30] | 3-7% |
| | Webster | $74,516 | 3-7% |
| | Wells Fargo | $3,325,771[31] | 3-7% |
| | | | |
| **Class 6:** | Impaired / Deemed to Reject / Not Entitled to Vote | | |
| Intercompany Claims | Holders of Intercompany Claims shall not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Claims. | N/A | 0% |
| **Class 7:** | Impaired / Deemed to Reject / Not Entitled to Vote | | |
| Equity Interests | Holders of Equity Interests shall not receive or retain any property under the Combined Plan and Disclosure Statement on account of such Equity Interests. | N/A | 0% |
| **NOTES:** | **[1]** | | **The low amounts in the range are based on the Debtors' books and records. The high amounts in the range are based on filed proofs of claim. All filed and scheduled claims remain subject to further review and challenge.** |
| | **[2]** | | **Letters of credit related to workers' compensation insurance policies secured obligations of both NEMF and Eastern; the liabilities shown for Class 3B represent the aggregate liability.** |
| | **[3]** | | **The Auto Liability Claims are disputed, unliquidated and contingent claims.** |

---

[29] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

[30] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

[31] An Allowed Claim, pending approval by the Court under Bankruptcy Rule 9019.

2747149.15 115719-100281

C.    **Analysis of Potential Distribution under the Proposed Plan**

For illustration and informational purposes only, the analysis on the following page is intended as an estimate of potential distributions under this "two pot" Plan, and as a comparison to the potential distributions under a complete substantive consolidation of the Debtors.

*[rest of the page intentionally left blank]*

81

Preliminary Estimate of Potential Distribution Under the proposed Two Pot Plan

## NEMF - Eastern Carrier Proposed Distribution Summary
### September 8, 2019

| Bank Balances | NEMF | Eastern | NEMT & NEMF Log. | Total | |
|---|---|---|---|---|---|
| Bank Account Balance as of 7/26 | 9,759,780 | 656,568 | 364,854 | 350,425 | 11,490,510 | attached exhibit |
| NEMF reimbursement for the amount of their "overpayment" of the cash collateral to Chase based on timing | (1,882,076) | 1,882,176 | – | – | – | attached exhibit |
| Remaining cash collateral returned to Chase | (3,227,120) | | | | (3,227,120) | attached exhibit |
| Operating activity between 7/26 and 9/1 | (306,823) | (50,040) | (47,440) | (130,337) | (753,008) | attached exhibit |
| Bank Account Balance as of 9/1 | 4,343,646.6 | 2,511,907 | 313,736 | 331,560 | 7,431,887 | attached exhibit |

| Source of Funds - By Entity | NEMF* | Eastern/Carrier | Totals | |
|---|---|---|---|---|
| Unencumbered Rolling Stock Auction Proceeds | 6,095,907 | | 6,095,907 | pg. 42 |
| Account Rec'v - Pre & Post Petition Collections | 34,321,039 | 6,524,902 | 40,850,401 | pg. 42 |
| Shareholder Loan Repayment | 6,711,711 | | 6,711,711 | pg. 42 |
| Miscellaneous Receipts (Insurance Rebates) | 211,406 | | 211,406 | pg. 42 |
| **Total Source of Funds** | **53,309,083** | **6,629,562** | **59,995,175** | |
| *Includes NEMT & NEMF Log. | | | | |

| Expenses - By Entity | NEMF* | Eastern/Carrier | Totals | |
|---|---|---|---|---|
| Total Eastern Disbursements 3/11 - 9/1 | | (5,867,942) | (5,867,942) | attached exhibit |
| Chase Cash Collateral recovery | | 2,600,000 | 2,600,000 | attached exhibit |
| Total NEMF Disbursements 3/11 - 9/1 | (47,477,573) | | (47,477,573) | pg. 41 |
| Total Use of Funds | (47,477,573) | (3,367,942) | (50,845,515) | pg. 41 |
| **Ending Book Balance as of 9/1** | **4,883,261** | **3,261,620** | **6,873,660** | |

| | NEMF* | Eastern/Carrier | Totals | |
|---|---|---|---|---|
| Book to Bank Balance Float | (19,517) | 596,253 | 546,727 | pg. 50 |
| *Includes NEMT & NEMF Log. | | | | |
| Bank Balance as of 9/1 | 4,392,764 | 2,827,671 | 7,431,887 | pg. 50 |
| Bank Balance as of 9/8 | 5,791,640 | 3,671,758 | 9,432,398 | |
| Bank Balance as of 9/6 | 5,495,971 | 3,654,410 | 9,135,391 | |
| Bank Balance as of 9/15 | 6,373,646 | 3,659,919 | 9,033,566 | |
| Bank Balance as of 9/22 | 6,255,976 | 3,978,795 | 7,956,671 | |
| Bank Balance as of 9/29 | 4,233,089 | 3,672,209 | 7,787,298 | |
| Bank Balance as of 10/6 | 5,772,562 | 3,755,966 | 9,526,506 | |
| **Bank Balance as of 10/13** | **5,863,201** | **3,754,674** | **9,616,250** | Updated from Tab's -Eastern Rollforward from 9-16 + NEMF Roll Forward from 9-16 |

| FORECASTED Source of Funds - By Entity | NEMF* | Eastern/Carrier | Totals | | |
|---|---|---|---|---|---|
| Proposed Settlement for the Distribution of the Eastern Escrow Acc't. ($5,955,117) | 75% | 4,976,000 | 5,261,500 | 5,061,117 | NEMF Claim - $9,235,745.56  $4,976,606.19  75%  See Eastern Roll  Eastern/Carrier Residual  $1,264,507.02  Forward for Detail  pg. 74 |
| Note Receivable - Life Insurance Policies - (Insider Settlement) | 2,520,000 | 480,000 | 3,000,000 | | |
| Unencumbered Rolling Stock - Missing Titles | 40,750 | | 40,750 | | |
| Settlement Recovery from Insiders | 2,594,000 | 456,000 | 3,050,000 | Allocation Calculation |
| Settlement Recovery from TBM - (Final) | 700,000 | | 100,000 | Based on asset value as of Filing Date (3/11/2019) |
| Potential Recovery for Preference Actions | | | | NEMF  $382.3 Million  84% |
| **Total Forecasted Source of Funds** | **9,526,550** | **2,177,508** | **11,751,860** | Eastern/Carrier  $30.0 Million  16% |
| | | | | $382.3 Million |

| Expenses - By Entity | NEMF | Eastern/Carrier | Totals | | |
|---|---|---|---|---|---|
| Wind Down Expense thru December | | | (787,744) | |
| Class Action Settlement 2 | (825,300) | | (825,300) | Updated Windown Budget Thru 11/10 |
| Re-Allocation of Professional Fees Paid thru 9/30 - Accrued Thru June | 671,378 | (671,378) | | Updated Windown Budget Thru 11/10 |
| Allocation of Accrued Prof Fees Thru June | (216,938) | (54,953) | (342,736) | Updated From New Tab - Professional Fee Allocation |
| Professional fees Accrued for July + August | (1,387,550) | (241,591) | (1,636,440) | Updated From New Tab - Professional Fee Allocation |
| Professional Fees (Sept - Dec.) - Estimate | (2,500,000) | (480,000) | (3,000,000) | |
| Total Forecasted Expenses | (4,215,825) | (1,425,925) | (5,798,145) | |
| Estimated Book Cash Balance at 12/31 | 11,355,570 | 4,257,862 | 15,813,431 | |
| **Estimated Book Cash Balance at 12/31** | **11,355,570** | **4,257,862** | **15,513,431** | $15,513,431.40 |

## Preliminary Estimate of a "Two Pot Plan"

### Eastern/Carrier Distribution

| Cash for Distribution | 4,257,562 |
|---|---|
| Less: (Based on Gibson) Preliminary Analysis) | |
| Total Priority Claims | 17,367 |
| | |
| Administrative Claims | |
| Post Petition Health Care-Related Claims (From Deloitte Valuation) | 590,960 |
| Post Petition Acct Liability Claims | 3191,395 |
| 503(b) (9) Claims | 16,904 |
| Other Admin. Claims | 316,474 |
| Chapter 7 Trustee Fees & Commissions | (0) |
| Total Admin Claims | 3,895,809 |
| | |
| Total Priority & Admin. Claims | 3,935,006 |
| | |
| Cash Available for General Unsecured Claims ("GUC") | 34,964,866 |
| | |
| General Unsecured Claims | |

| Secured Lender Deficiency Claims and LDC Claims | LC's | % | Deficiency Claim | Total Est. Unsecured Claims | % | | | |
|---|---|---|---|---|---|---|---|---|
| TD Bank | $7,340,215 | 33% | $6,682,705 | $5,982,001 | 20.9% | 19.45% | $776,230 | |
| East West Bank | $5,995,572 | 27% | $6,142,960 | $5,106,520 | 19.9% | 19.39% | $725,787 | |
| Santander | $4,267,344 | 20% | $5,526,001 | $4,315,240 | 13.0% | 12.06% | $475,390 | |
| Chase | $3,361,758 | 18% | $10,396,523 | $4,230,240 | 15.7% | 17.37% | $586,300 | |
| Daimler | | | $7,487,346 | 7,487,346 | 9.9% | 9.39% | $359,136 | |
| 5th 3rd | | | $7,535,003 | 7,535,003 | 10.0% | 9.29% | $397,014 | |
| Capital One | $425,000 | 2% | $535,137 | 584,157 | 1.2% | 1.14% | $46,504 | |
| Wells Fargo | | | $330,771 | 330,771 | 4.4% | 4.06% | $156,974 | |
| VFS | | | $1,877,845 | 1,877,845 | 2.2% | 2.0% | $60,738 | |
| Webster | | | $74,515 | 74,515 | 0.0% | 0.0% | $3,554 | |
| **Bank Claim Totals** | $22,023,890 | | $56,396,998 | 78,469,710 | 100.0% | 92.81% | $3,573,359 | 78,469,710 |
| Auto Liability Claims | | | | | | 4.77% | $188,596 | 3,919,536 |
| Executory Contract Rejection Damages Claims | | | | | | 2.10% | $84,005 | 1,787,024 |
| Auto Insurer Indemnity Claims | | | | | | | $0 | |
| Other GUC's | | | | | | 0.15% | $6,187 | 124,024 |
| | | | | | | 7.10% | $273,716 | 5,610,548 |
| Total Preliminary General Unsecured Claims | | | | | | | | 82,518,596 |
| Cash Available for General Unsecured Claims ("GUC") | | | | | | 100.00% | $3,944,277 | 34,964,866 |
| Preliminary Potential Percentage Recovery for GUC's | | | | | | | | 4.4% |

Page 1

82

2747149.15 115719-100281

Preliminary Estimate of Potential Distribution Under the proposed Two Pot Plan



## NEMF and Other(s) Distribution

### Compared To:

### Substantive Consolidation Scenario:

**D.      Confirmation Procedure**

1.      <u>Confirmation Hearing</u>

A hearing before the Honorable John K. Sherwood has been scheduled for **_____, 2020 at __:__ __.m. (Prevailing Eastern Time)**, at the United States Bankruptcy Court for the District of New Jersey, 50 Walnut street, 3rd Floor, Courtroom 3D, Newark, New Jersey 07102 to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

2.      <u>Procedure for Objections</u>

Any objection to confirmation of the Plan must: (a) be in writing, (b) conform to the Bankruptcy Rules and Local Bankruptcy Rules, and (c) be filed with the Bankruptcy Court and served so as to be actually received on or before **_____, 2019 at __:___ p.m. (prevailing Eastern Time) ("<u>Confirmation Objection Deadline</u>")**, by (i) counsel for the Debtors, Gibbons P.C., One Gateway Center, Newark, NJ 07102 (Attn: Karen A. Giannelli, Esq.; (ii) counsel to the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068 (Attn: Mary E. Seymour, Esq. and Joseph J. DiPasquale) and Elliott Greenleaf, P.C., 1105 North Market Street, Suite 1700, Wilmington, DE 19801 (Attn:  Rafael X. Zahralddin-Aravena, Esq.); and (iii) Office of the United States Trustee, One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, NJ 07102 (Attn:  Peter J. D'Auria, Esq.).  **Unless an objection is timely filed and served by the Confirmation Objection Deadline, such objection may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

2747149.15 115719-100281

3.      Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation is that the Plan be:  (a) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (b) feasible.  The Bankruptcy Court must also find that:

(a)      The Plan satisfies the requirements for adequacy of disclosure under section 1125 of the Bankruptcy Code;

(b)      The Plan has classified Claims and Equity Interests in a permissible manner;

(c)      The Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

(d)      The Plan has been proposed in good faith.

The Debtors and the Committee believe that the Plan complies, or will comply, with all such requirements.

4.      Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Plan creates separate Classes to deal respectively with the various classes of Claims and Equity Interests.  The Debtors and the Committee believe that the Plan's classifications place substantially similar Claims or Equity Interests in the same Class and thus meets the requirements of section 1122 of the Bankruptcy Code.

5.      Impaired Claims or Equity Interests

Section 1124 of the Bankruptcy Code provides that a Class of Claims or Equity Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests.  Holders of Claims or Equity Interests that are Impaired are entitled to

2747149.15 115719-100281

vote on the Plan.  Holders of Claims that are Unimpaired by the Plan are deemed to accept the

Plan and do not have the right to vote on the Plan.  Under the Plan, the Holders of Intercompany

Claims and Equity Interests will not receive or retain any property under the Plan and are deemed

to reject the Plan and do not have the right to vote.  Finally, the Holders of Claims that are not

classified under the Plan are not entitled to vote on the Plan.

      6.      <u>Eligibility to Vote on the Plan</u>

Unless otherwise ordered by the Bankruptcy Court, only Holders of Claims in Classes 2,

5A and 5D may vote on the Plan (collectively, the "<u>Impaired Claims</u>").

      7.      <u>Solicitation Notice</u>

All Holders of Impaired Claims will receive, among other documents, the Confirmation

Notice, a form of Ballot, a copy of the Plan, and a Cover Letter from the Committee summarizing

the Plan.

All other creditors not entitled to vote on the Plan will only receive (i) the Confirmation

Notice, and (ii) a non-voting notice containing (a) the website address,

<u>https://www.donlinrecano.com/Clients/nemf/Static/CaseInformation</u>, where parties in interest

may download electronic copies of the Plan and other related pleadings to the Chapter 11 Cases,

(b) the address for the Voting Agent, Donlin, Recano & Company, Inc., Re: New England Motor

Freight, Inc., *et al.* Balloting Attn: Voting Department, P.O. Box 199043, Blythebourne Station,

Brooklyn, NY 11219, pursuant to which parties in interest may request copies of the Plan, Ballot,

and related documents and (c) reference to the Bankruptcy Court's website, through which parties

in interest can download copies of the Plan, Ballot and other related pleadings.

      8.      <u>Procedure/Voting Deadline</u>

In order for your Ballot to count, you must (i) complete, date and properly execute the

Ballot, and (ii) properly deliver the Ballot to the Voting Agent by First Class mail to the following

2747149.15 115719-100281

address:  Donlin, Recano & Company, Inc., Re: New England Motor Freight, Inc., *et al.* Balloting Attn: Voting Department, P.O. Box 199043, Blythebourne Station, Brooklyn, NY 11219 or via overnight courier, messenger or hand deliver to Donlin, Recano & Company, Inc., Re: New England Motor Freight, Inc., *et al.* Balloting Attn: Voting Department, 6201 15th Ave., Brooklyn, NY 11219.

The Voting Agent must ACTUALLY RECEIVE Ballots on or before the Voting Deadline. Except as otherwise ordered by the Bankruptcy Court or agreed to by the Debtors, you may not change your vote or election once after the Voting Deadline.

Any Ballot that is timely received from a party entitled to vote, that contains sufficient information to permit the identification of the party casting the Ballot, and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan; provided, however, that the following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (a) any Ballot received after the Voting Deadline (unless extended by the Bankruptcy Court or Debtors); (b) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (c) any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan; (d) any Ballot cast for a Claim that is scheduled as contingent, unliquidated or disputed or as zero or unknown in amount and for which no timely motion is made pursuant to Bankruptcy Rule 3018 (the "Rule 3018(a) Motion"); (e) any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and rejection of the Plan; (f) any Ballot that casts part of its vote in the same Class to accept the Plan and part to reject the Plan; (g) any form of Ballot other than the official form sent by the Voting Agent; (h) any form of Ballot received that the Voting Agent cannot match to an existing database

87

record; (i) any Ballot that does not contain an original signature; (j) any Ballot that is submitted by facsimile, or by other electronic means (other by email); or (k) any Ballot sent only to Debtors, including but not limited to the CRO or the Debtors' professionals, and not the Voting Agent.

9.      Acceptance of the Plan

As a Creditor, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (i.e., more than half) and at least two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan.  At least one impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan.  The Debtors and the Committee urge that you vote to accept the Plan.

10.      Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, shall be deemed deleted from the Plan for all purposes, including for purposes of: (i) voting on the acceptance or rejection of the Plan; and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE V.

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article VI.

**A.      Administrative Expense Claims**

1.      General Administrative Expense Claims

Requests for payment of General Administrative Expense Claims (other than Post Petition Auto Liability Claims governed by the Special Administrative Claims Bar Date) must be filed by

2747149.15 115719-100281

no later than the Administrative Claims Bar Date.  On the Effective Date or as soon thereafter as

is reasonably practicable, each Holder of an Allowed General Administrative Expense Claim shall

receive payment in full in Cash of the Allowed amount of such Claim (as determined by settlement

or Final Order of the Bankruptcy Court) or such other treatment as may be agreed upon by such

Holder of an Allowed General Administrative Expense Claim.

     2.      Post-Petition Health Care-Related Claims

Requests for payment of Post-Petition Health Care-Related Claims that have not already

been satisfied must be filed by no later than the latest applicable Administrative Claims Bar Date,

to be established by separate motion.  On August 17, 2019, the Bankruptcy Court approved the

Debtors' retention of Deloitte Consulting LLP ("Deloitte") to perform an independent estimate of

the Debtors' liability for Post-Petition Health Care-Related Claims as of July 31, 2019.  Deloitte

estimated the Debtors' liability for Post-Petition Health Care-Related Claims to be in the total

amount of $506,179 (with $425,191 attributable to the Consolidated NEMF Debtors, and $80,988

attributable to the Consolidated Eastern Debtors).  On the Effective Date or as soon thereafter as

is reasonably practicable, each Holder of an Allowed Post-Petition Health Care-Related Claim

shall receive payment in full in Cash of the Allowed amount of such Claim (as determined by

settlement or Final Order of the Bankruptcy Court) or such other treatment as may be agreed upon

by such Holder of an Allowed Post-Petition Health Care-Related Claims.

     3.      Professional Fee Claims

     (a)     *Pre-Effective Date Fees and Expenses*

All Claims for fees and expenses incurred by Retained Professionals from the Petition Date

through the Effective Date, to the extent not already paid, shall receive payment in full in Cash of

the Allowed amount of such Claim (as determined by settlement or Final Order of the Bankruptcy

Court) or such other treatment as may be agreed upon by such Holder of an Allowed Professional

Fee Claim.

(b)    *Post-Effective Date Fees and Expenses*

After the Effective Date, any requirement that Retained Professionals comply with

sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation

for services rendered after such date shall terminate, and the Liquidating Trustee may employ and

pay any Retained Professional in the ordinary course of business without any further notice, to or

action, order, or approval of, the Bankruptcy Court.

4.    Statutory Fees

All Statutory Fees that become due and payable prior to the Effective Date shall be paid by

the Debtors or the Liquidating Trustee within thirty (30) days after the Effective Date.  After the

Effective Date, the Liquidating Trustee shall pay any and all such fees when due and payable for

each of the two consolidated debtor groups, and shall file quarterly reports in the form prescribed

by the United States Trustee.

**B.    Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid prior to

the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim

shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Priority

Tax Claim, at the option of the Liquidating Trustee, (a) Cash in an amount equal to such Allowed

Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes

an Allowed Priority Tax Claim, or as soon thereafter as is practicable, (b) in accordance with

section 1129(a)(9)(C) of the Bankruptcy Code, equal annual Cash payments commencing on the

first anniversary of the Effective Date in an aggregate amount equal to such Allowed Priority Tax

Claim, together with interest on any outstanding balance from the Effective Date at the applicable

90

rate under non-bankruptcy law, over a period not exceeding five (5) years after the Petition Date

or (c) upon such other terms determined by the Bankruptcy Court to provide the Holder of such

Allowed Priority Tax Claim with deferred Cash payments having a value, as of the Effective Date,

equal to such Allowed Priority Tax Claim; provided, however, that the Liquidating Trustee shall

have the right to pay any Allowed Priority Tax Claim, or any remaining balance, in full, at any

time on or after the Effective Date, without premium or penalty.

## ARTICLE VI.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    Classification of Claims

1.    Consolidated NEMF Debtors

| CLASS | TYPE | STATUS UNDER PLAN | VOTING STATUS |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2A | Lender Secured Claims – TD Bank | Impaired | Entitled to Vote |
| 2B | Lender Secured Claims – East West Bank | Impaired | Entitled to Vote |
| 2C | Lender Secured Claims – JPMorgan Chase | Impaired | Entitled to Vote |
| 2D | Lender Secured Claims – Fifth Third | Impaired | Entitled to Vote |
| 2E | Lender Secured Claims – Santander | Impaired | Entitled to Vote |
| 2F | Lender Secured Claims – Wells Fargo | Impaired | Entitled to Vote |
| 2G | Lender Secured Claims – Mercedes Benz | Impaired | Entitled to Vote |
| 2H | Lender Secured Claims – Volvo | Impaired | Entitled to Vote |
| 2I | Lender Secured Claims – Capital One | Impaired | Entitled to Vote |
| 2J | Lender Secured Claims – Webster Capital | Impaired | Entitled to Vote |
| 3A | Auto Insurer Secured Claims | Unimpaired | Deemed to Accept |
| 3B | Insurer Secured Claims (WC) | Unimpaired | Deemed to Accept |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |

91

| CLASS | TYPE | STATUS UNDER PLAN | VOTING STATUS |
|---|---|---|---|
| 5A | General Unsecured Claims - Other than Lender Deficiency Claims | Impaired | Entitled to Vote |
| 5B | Auto Liability Claims | Unimpaired | Deemed to Accept |
| 5C | Auto Insurer Unsecured Indemnity Claims | Impaired | Deemed to Reject |
| 5D | General Unsecured Claims Lender Deficiency Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

2.    Consolidated Eastern Debtors

| CLASS | TYPE | STATUS UNDER PLAN | VOTING STATUS |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2A | Lender Secured Claims – TD Bank | Impaired | Entitled to Vote |
| 2B | Lender Secured Claims – East West Bank | Impaired | Entitled to Vote |
| 2C | Lender Secured Claims – RESERVED | Impaired | Entitled to Vote |
| 2D | Lender Secured Claims – Fifth Third | Impaired | Entitled to Vote |
| 2E | Lender Secured Claims – Santander | Impaired | Entitled to Vote |
| 2F | Lender Secured Claims – Wells Fargo | Impaired | Entitled to Vote |
| 2G | Lender Secured Claims – Mercedes Benz | Impaired | Entitled to Vote |
| 2H | Lender Secured Claims – RESERVED | Impaired | Entitled to Vote |
| 2I | Lender Secured Claims – Capital One | Impaired | Entitled to Vote |
| 2J | Lender Secured Claims – Webster Capital | Impaired | Entitled to Vote |
| 3A | Auto Insurer Secured Claims | Unimpaired | Deemed to Accept |
| 3B | Insurer Secured Claims (WC) | Unimpaired | Deemed to Accept |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5A | General Unsecured Claims - Other than Lender Deficiency Claims | Impaired | Entitled to Vote |
| 5B | Auto Liability Claims | Unimpaired | Deemed to Accept |

92

| CLASS | TYPE | STATUS UNDER PLAN | VOTING STATUS |
|---|---|---|---|
| 5C | Auto Insurer Unsecured Indemnity Claims | Impaired | Deemed to Reject |
| 5D | General Unsecured Claims Lender Deficiency Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

This Plan is premised upon the substantive consolidation of the Debtors into two groups. Accordingly, for purposes of the Plan only, the assets and liabilities of the Debtors are deemed the assets and liabilities of two separate substantively consolidated entities and no value is attributed to the membership interests held by NEMF in MyJon, and held by Eastern in Myar.  Claims filed against more than one Debtor seeking recovery of the same debt shall be treated as one non-aggregated Claim against the consolidated Estates to the extent that such Claim is an Allowed Claim.

The categories of Claims and Equity Interests listed below are classified for all purposes, including voting, confirmation and Distribution pursuant to the Plan, as follows:

**B.     Treatment of Claims and Equity Interests**

1.     Consolidated NEMF Debtors

(a)     *Class 1:  Priority Non-Tax Claims*

Class 1 consists of the Priority Non-Tax Claims.

Except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors agrees to less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

2747149.15 115719-100281

Class 1 is Unimpaired.  The Holders of Allowed Other Priority Claims are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(b)      *Classes 2A through 2J:  Lender Secured Claims – Prepetition Lenders*

Classes 2A through 2J consist of the Lender Secured Claims for each of the Debtors' Prepetition Lenders.  These classes are Impaired.  The Holder(s) of the Allowed Lender Secured Claims are entitled to vote on the Plan.

(c)      *Classes 3A and 3B:  Insurer Secured Claims*

Class 3A consists of Auto Insurer Secured Claims; Class 3B consists of Insurer Secured Claims (WC).  These classes are Unimpaired.  The Holders of Allowed Auto Insurer Secured Claims are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  The Holders of Allowed Insurer Secured Claims (WC) are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(d)      *Class 4: Other Secured Claims*

Class 4 consists of the Other Secured Claims.  Each Other Secured Claim is secured only to the extent that any such Holder has a non-avoidable Lien on property in which the Estates have an interest and only to the extent of the value of such Holder's interest in the respective Estate's interest in such property.

On the Effective Date, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, at the option of the Debtors or Liquidating Trustee, each holder of an Allowed Other Secured Claim shall receive: (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date or the date such Other Secured Claims becomes an Allowed Other Secured Claim, (ii) delivery of the collateral securing such Allowed Other Secured Claims and payment of any interest required by section 506(b) of the

94

Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

Class 4 is Unimpaired.  The Holders of Allowed Other Secured Claims are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(e)    *Class 5A:    General Unsecured Claims Other than Lender Deficiency Claims*

Class 5A consists of General Unsecured Claims other than Lender Deficiency Claims. Each Holder of an Allowed General Unsecured Claim other than NEMF Lender Deficiency Claim shall receive a Beneficial Interest that entitles it to its *pro rata* share (in proportion to each Holder's Allowed Claim to aggregate amount of Allowed Claims in Class 5A) of the Liquidating Trust Assets available for Distribution.  Class 5A Claims will share *pro rata* with Class 5D Claims.

Class 5A is Impaired.  Holders of General Unsecured Claims in Class 5A are entitled to vote on the Plan.

(f)    *Class 5B: Auto Liability Claims*

Class 5B consists of Auto Liability Claims.  All Auto Liability Claims are Disputed. Auto Liability Claims shall be administered pursuant to the Auto Liability Claims Protocol and shall be subject to the Auto Liability Claims Injunction provision set forth in Article X(D) of this Plan, and the Release provisions set forth in Article X(B) of the Plan. To the extent any Auto Liability Claim becomes an Allowed Claim, such Claim shall be treated pursuant to the Auto Liability Claims Protocol, unless otherwise agreed by the Liquidation Trustee, the applicable Insurer and the Holder of such Allowed Auto Liability Claim.

(g)    *Class 5C: Auto Insurer Unsecured Indemnity Claims*

Class 5C consists of Auto Insurer Unsecured Indemnity Claims.  Auto Insurer Unsecured Indemnity Claims, if any, are Disputed.  Pursuant to the Auto Liability Claims Protocol, the Auto

2747149.15 115719-100281

Insurers have each agreed to waive and/or release any and all Auto Insurer Unsecured Indemnity Claims that such Auto Insurer may have against each of the Auto Liability Claims Released Parties as of the Effective Date of the Plan.  All Auto Insurer Unsecured Indemnity Claims shall be subject to the Injunction provision set forth in Article X(D) of the Plan, and the Release provisions set forth in Article X(B) of the Plan. Holders of Auto Insurer Unsecured Indemnity Claims are not entitled to receive any Distribution from the Liquidating Trust Assets on account of any such Auto Insurer Unsecured Indemnity Claims.

(h)      *Class 5D: General Unsecured Claims- Lender Deficiency Claims*

Class 5D consists of General Unsecured Claims- Lender Deficiency Claims.  Each Holder of an Allowed General Unsecured Claim- Lender Deficiency Claim shall receive a Beneficial Interest that entitles it to its pro rata share (in proportion to each Holder's Allowed Claim to aggregate amount of Allowed Claims in Class 5D) of the Liquidating Trust Assets available for Distribution. <u>Class 5D Claims will share *pro rata* with Class 5A Claims.</u>

Class 5D is Impaired.  Holders of General Unsecured Claims in Class 5D are entitled to vote on the Plan.

(i)      *Class 6:  Intercompany Claims*

Class 6 consists of the Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished and deemed cancelled.  The Holders of Intercompany Claims will receive no Distribution under the Plan.

Class 6 Claims are Impaired.  Holders of Class 6 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2747149.15 115719-100281

    (j)    *Class 7:  Equity Interests*

Class 7 consists of Equity Interests.  On the Effective Date, Equity Interests in each of the Consolidated NEMF Debtors shall be deemed to be cancelled.  The Holders of Equity Interests will receive no Distribution or other recovery on account of such Equity Interests.

    2.    <u>Consolidated Eastern Debtors</u>

    (a)    *Class 1:  Priority Non-Tax Claims*

Class 1 consists of the Priority Non-Tax Claims.

Except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors agrees to less favorable treatment of such Claim, each such Holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

Class 1 is Unimpaired.  The Holders of Allowed Other Priority Claims are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

    (b)    *Classes 2A through 2J:  Lender Secured Claims – Prepetition Lenders*

Classes 2A through 2J consist of the Lender Secured Claims for each of the Debtors' Prepetition Lenders.  These Classes are Impaired.  The Holder(s) of the Allowed Lender Secured Claims are entitled to vote on the Plan.  Classes 2C and 2H are reserved.

    (c)    *Classes 3A and 3B:  Insurer Secured Claims*

Class 3A consists of Insurer Secured Claims (Auto); Class 3B consists of Insurer Secured Claims (WC).  These classes are Unimpaired.  The Holders of Allowed Insurer Secured Claims (Auto) are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  The Holders of Allowed Insurer Secured Claims (WC) are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

97

(d)    *Class 4: Other Secured Claims*

Class 4 consists of the Other Secured Claims.  Each Other Secured Claim is secured only to the extent that any such Holder has a non-avoidable Lien on property in which the Estates have an interest and only to the extent of the value of such Holder's interest in the respective Estate's interest in such property.

On the Effective Date, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, at the option of the Debtors or Liquidating Trustee, each holder of an Allowed Other Secured Claim shall receive: (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date or the date such Other Secured Claims becomes an Allowed Other Secured Claim, (ii) delivery of the collateral securing such Allowed Other Secured Claims and payment of any interest required by section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

Class 4 is Unimpaired.  The Holders of Allowed Other Secured Claims are unimpaired and deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(e)    *Class 5A:    General Unsecured Claims Other than Lender Deficiency Claims*

Class 5A consists of General Unsecured Claims other than Lender Deficiency Claims. Each Holder of an Allowed General Unsecured Claim other than NEMF Lender Deficiency Claim shall receive a Beneficial Interest that entitles it to its *pro rata* share (in proportion to each Holder's Allowed Claim to aggregate amount of Allowed Claims in Class 5A) of the Liquidating Trust Assets available for Distribution.  Class 5A Claims will share *pro rata* with Class 5D Claims.

Class 5A is Impaired.  Holders of General Unsecured Claims in Class 5A are entitled to vote on the Plan.

98

(f)      *Class 5B: Auto Liability Claims*

Class 5B consists of Auto Liability Claims.  All Auto Liability Claims are Disputed. Auto Liability Claims shall be administered pursuant Auto Liability Claims Protocol and shall be subject to the Auto Liability Claims Injunction provision set forth in Article X(D) of the Plan, and the Release provisions set forth in Article X(B) of the Plan. To the extent any Auto Liability Claim becomes an Allowed Claim, such Claim shall be treated pursuant to the Auto Liability Claims Protocol, unless otherwise agreed by the Liquidation Trustee, the applicable Insurer and the Holder of such Allowed Auto Liability Claim.

(g)      *Class 5C: Auto Insurer Unsecured Indemnity Claims*

Class 5C consists of Auto Insurer Unsecured Indemnity Claims.  Auto Insurer Unsecured Indemnity Claims, if any, are Disputed.  Pursuant to the Auto Liability Claims Protocol, the Auto Insurers have each agreed to waive and/or release any and all Auto Insurer Unsecured Indemnity Claims that such Auto Insurer may have against each of the Auto Liability Claims Released Parties as of the Effective Date of the Plan.  All Auto Insurer Unsecured Indemnity Claims shall be subject to the Injunction provision set forth in Article X(D) of the Plan, and the Release provisions set forth in Article X(B) of the Plan. Holders of Auto Insurer Unsecured Indemnity Claims are not entitled to receive any Distribution from the Liquidating Trust Assets on account of any such Auto Insurer Unsecured Indemnity Claims.

(h)      *Class 5D: General Unsecured Claims – Lender Deficiency Claims*

Class 5D consists of General Unsecured Claims- Lender Deficiency Claims.  Each Holder of an Allowed General Unsecured Claim- Lender Deficiency Claim shall receive a Beneficial Interest that entitles it to its *pro rata* share (in proportion to each Holder's Allowed Claim to aggregate amount of Allowed Claims in Class 5D) of the Liquidating Trust Assets available for Distribution.  Class 5D Claims will share *pro rata* with Class 5A Claims.

Class 5D is Impaired.  Holders of General Unsecured Claims in Class 5D are entitled to vote on the Plan.

        (i)     *Class 6:  Intercompany Claims*

Class 6 consists of the Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished and deemed cancelled.  The Holders of Intercompany Claims will receive no Distribution under the Plan.

Class 6 Claims are Impaired.  Holders of Class 6 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

        (j)     *Class 7:  Equity Interests*

Class 7 consists of Equity Interests.  On the Effective Date, Equity Interests in the Consolidated Eastern Debtors shall be deemed to be cancelled.  The Holders of Equity Interests in the Consolidated Eastern Debtors will receive no Distribution or other recovery on account of such Equity Interests.

**C.**     **Modification of Treatment of Claims and Equity Interests**

At any time after the Confirmation Date, the Liquidating Trustee has the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the Holder of such Claim or Equity Interest with the consent of the Holder of such Claim or Equity Interest.

**D.**     **Cramdown and No Unfair Discrimination**

With respect to the Impaired Classes that are deemed to have rejected the Plan, the Debtors and Committee hereby request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to each such non-accepting Class, in which case the Plan shall constitute a motion for such relief.

Confirming the Plan under such circumstances is known as a "cramdown."  A "cramdown" is appropriate where the Bankruptcy Court finds that such plan does not "unfairly discriminate" against the objecting class and is "fair and equitable" with respect to such objecting Class.  A plan "unfairly discriminates" against a Class if another Class of equal priority will receive greater value under the plan than the non-accepting Class without reasonable justification.  A plan is "fair and equitable" if no claim or interest junior to the objecting Class shall receive or retain any property under the plan.

## ARTICLE VII.

## POST-CONFIRMATION LIQUIDATING TRUST

### A.    The Liquidating Trust.

    1.    <u>Plan Administration</u>

The Plan will be administered by the Liquidating Trustee, and all actions taken under the Plan after the Effective Date in the name of the Debtors will be taken through the Liquidating Trustee.[32]  Upon the Distribution of all Liquidating Trust Assets pursuant to the Plan and the Liquidating Trust Agreement, and the filing by Liquidating Trustee of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the final decree), the Debtors will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; <u>provided</u>, <u>however</u>, that the Liquidating Trustee may, but will not be required to, take appropriate action to dissolve the Debtors under applicable law.

---

[32] Except as set forth elsewhere in this Plan or in the Confirmation Order.

2.      <u>Appointment of the Liquidating Trustee</u>

Kevin P. Clancy ("<u>Clancy</u>") shall serve as the Liquidating Trustee and shall serve in such capacity pursuant to the terms of the Liquidating Trust Agreement.  The Liquidating Trustee's compensation shall be set at a flat rate of $25,000 per month, which amount shall be pro-rated for the first month if the Effective Date falls on any date other than the first of the month.  The appointment of Clancy as the Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date.  In accordance with the Liquidating Trust Agreement, the Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Liquidating Trust is dissolved in accordance with Section 6.2(1) and (ii) the date such Liquidating Trustee resigns, is terminated or is otherwise unable to serve, <u>provided</u>, <u>however</u>, that, in the event that the Liquidating Trustee resigns, is terminated or is unable to serve, then the Bankruptcy Court, upon the motion of any party-in-interest, including, but not limited to, counsel to the Liquidating Trust, shall approve a successor to serve as the Liquidating Trustee.  Any such successor Liquidating Trustee shall serve in such capacity until the Liquidating Trust is dissolved.

3.      <u>Powers and Duties of the Liquidating Trustee</u>

The powers, rights and responsibilities of the Liquidating Trustee, all of which shall arise upon the occurrence of the Effective Date, shall include, but are not limited to:

i.      making Distributions as contemplated herein;

ii.      conducting an analysis of any and all Claims and Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with Article VII of the Plan;

iii.      asserting and enforcing all legal and equitable remedies and defenses belonging to the Debtors or their Estates, including, without limitation, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code;

2747149.15 115719-100281

iv.    pursuing, litigating or settling Causes of Action in accordance with the Plan and paying all associated costs; except, however, the pursuit of any preference claims under section 547 of the Bankruptcy Code shall only be done on the basis of a contingency fee arrangement with the prosecuting law firm;

v.    making payments in connection with Liquidation Trustee Expenses;

vi.    marshaling and liquidating the Liquidating Trust's Assets, including abandoning any property constituting the Liquidating Trust's Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Liquidating Trustee's reasonable judgment;

vii.    preparing and filing post-Effective Date quarterly reports;

viii.    filing appropriate tax returns in the exercise of the Liquidating Trustee's fiduciary obligations;

ix.    retaining such professionals as are necessary and appropriate in furtherance of Liquidating Trustee's fiduciary obligations;

x.    taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust; and

xi.    such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Liquidating Trust Agreement, the Plan or Order of the Bankruptcy Court.

Notwithstanding any of the foregoing, the Liquidating Trustee may (i) modify or change the amounts in Reserves, (ii) make Distributions under the Plan, or (iii) extend any applicable Bar Date, by entry of an order by the Bankruptcy Court.

2747149.15 115719-100281

4.      <u>Establishment of a Liquidating Trust</u>

Except as otherwise provided for in the Plan, any and all of the Estates' Assets accruing to the Debtors or assertable as accruing to the Debtors shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall be transferred to and vest in the Liquidating Trust free and clear from any and all Claims and Liens for the uses and purposes set forth herein and for the benefit of the Liquidating Trust Beneficiaries. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidating Trust and the Liquidating Trustee shall have the right to pursue or not to pursue, or, subject to the terms of the Plan and the Liquidating Trust Agreement, compromise or settle any Liquidating Trust Assets.  From and after the Effective Date, the Liquidating Trust and the Liquidating Trustee may commence, litigate and settle any Causes of Action or Claims relating to the Liquidating Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidating Trust and Liquidating Trustee on or after the Effective Date, except as otherwise expressly provided in the Plan and the Liquidating Trust Agreement.  Other than as set forth herein, no other Person may pursue such Liquidating Trust Assets on or after the Effective Date.  The Liquidating Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for either the Committee or each Debtor in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidating Trust Asset without the need for Filing any motion for such relief.  On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall have established the Liquidating Trust pursuant to the Plan. In the event of any conflict between the terms of this Article VII and the terms of the Liquidating Trust Agreement, the terms of this Article VII shall control.

2747149.15 115719-100281

5.    <u>Liquidating Trust Assets</u>

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidating Trust Assets become available, the Debtors shall be deemed to have automatically transferred to the Liquidating Trust all of their right, title, and interest in and to all of the Liquidating Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege, all such assets shall automatically vest in the Liquidating Trust free and clear of all Claims and liens, subject only to the Allowed Claims or Allowed Interests of the Liquidating Trust Beneficiaries as set forth in the Plan and the expenses of the Liquidating Trust as set forth herein and in the Liquidating Trust Agreement.

6.    <u>Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor in-Interest</u>

The Liquidating Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely Distributions to the Liquidating Trust Beneficiaries and not unduly prolong its duration. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement. Beneficial interests in the Liquidating Trust are not and will not be represented by any certificate or other instrument.

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating

2747149.15 115719-100281

Trust.  For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims or Allowed Interests of Liquidating Trust Beneficiaries entitled to Distributions from the Liquidating Trust Assets, followed by a transfer by such Holders to the Liquidating Trust.  Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as reasonably practicable on or after the Effective Date, the Liquidating Trustee (to the extent that the Liquidating Trustee deems it necessary or appropriate in the Liquidating Trustee's sole discretion) shall value the Liquidating Trust Assets based on the good faith determination of the value of such Liquidating Trust Assets.  The valuation shall be used consistently by all parties (including the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) for all federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power to invest such Liquidating Trust Assets (pending distributions in accordance with the Plan) in Permissible Investments.

Pursuant to the Liquidating Trust Agreement, the Liquidating Trustee will need approval of the Bankruptcy Court for the following actions:

      i.     the sale or liquidation of the Liquidating Trust's Assets for an amount in excess of $100,000;

106

    ii.     the settlement of a Cause of Action for an amount greater than $100,000;

    iii.    the allowance of a Disputed Claim that was Filed in an unliquidated amount or in an amount greater than $100,000 or is unliquidated;

    iv.    the estimation of Disputed Claim for the purposes of maintaining Reserves in accordance with the Plan or for other purposes; and

    v.    the granting of releases entered into on behalf of the Debtors' Estates.

7.    <u>Expenses of Liquidating Trustee</u>

Fees and expenses incurred by the Liquidating Trustee shall be paid from the Liquidating Trust Expense Reserve in accordance with Article VII of the Plan.

8.    <u>Bonding of Liquidating Trustee</u>

The Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his or her sole discretion, in which case the expense incurred by such bonding shall be paid by the Liquidating Trust.

9.    <u>Fiduciary Duties of the Liquidating Trustee</u>

Pursuant to the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms of the Plan.

10.    <u>Dissolution of the Liquidating Trust</u>

The Liquidating Trust shall be dissolved no later than four (4) years from the Effective Date unless the Bankruptcy Court, upon a motion Filed at least ninety (90) days prior to the expiration of the four year term or the end of any extension period approved by the Bankruptcy Court (the Filing of which shall automatically extend the term of the Liquidating Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the

2747149.15 115719-100281

Liquidating Trust Assets.    After (a) the final Distribution of the Reserves and the balance of the

Assets or proceeds of the Liquidating Trust pursuant to the Plan, (b) the Filing by or on behalf of

the Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance

with the Plan, and (c) any other action deemed appropriate by the Liquidating Trustee, the

Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other

or further actions.

11.    <u>Liability, Indemnification of the Liquidating Trust Protected Parties</u>

The Liquidating Trust Protected Parties shall not be liable for any act or omission of any

other member, designee, agent, or representative of such Liquidating Trust Protected Parties, nor

shall such Liquidating Trust Protected Parties be liable for any act or omission taken or not taken

in their capacity as Liquidating Trust Protected Parties other than for specific acts or omissions

resulting from such Liquidating Trust Protected Parties' willful misconduct, gross negligence, or

fraud.  The Liquidating Trustee may, in connection with the performance of the Liquidating

Trustee's functions, and in the Liquidating Trustee's sole and absolute discretion, consult with the

Liquidating Trustee's attorneys, accountants, financial advisors and agents.  Notwithstanding such

authority, the Liquidating Trustee shall not be under any obligation to consult with its attorneys,

accountants, financial advisors, and agents, and the Liquidating Trustee's determination not to do

so shall not result in the imposition of liability on the Liquidating Trustee or the Liquidating Trust

Protected Parties, unless such determination is based on willful misconduct, gross negligence, or

fraud.  The Liquidating Trust shall indemnify and hold harmless the Liquidating Trust Protected

Parties from and against and in respect of all liabilities, losses, damages, claims, costs, and

expenses (including, without limitation, reasonable attorney's fees, disbursements and related

expenses), which such Liquidating Trust Protected Parties may incur or to which such Liquidating

Trust Protected Parties may become subject to in connection with any action, suit, proceeding, or

108

investigation brought by or threatened against such Liquidating Trust Protected Parties arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Liquidating Trust Protected Parties for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

12.    Full and Final Satisfaction of Claims against Liquidating Trust

On and after the Effective Date, the Liquidating Trust shall have no liability on account of any Claims or Interests except as set forth in the Plan and in the Liquidating Trust Agreement.  All payments and all Distributions made by the Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Interests against the Liquidating Trust; provided, however, that nothing contained in the Plan, the Confirmation Order, the Liquidating Trust Agreement, or any other document or agreement shall constitute, be deemed to constitute or shall result in a discharge of any Debtor under section 1141(d) of the Bankruptcy Code.

## ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT

**A.    Method of Payment**

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or an electronic wire.

2747149.15 115719-100281

**B.      No Interest**

No Holder of an Allowed Claim will be entitled to the accrual of post-Petition Date interest

or the payment of post-Petition Date interest, penalties or late charges on account of such Claim

for any purpose, except to the extent permitted by Section 506(b) of the Bankruptcy Code.

**C.      Claims Objection Deadline; Prosecution of Claims Objections**

Except as otherwise provided for in the Plan, as soon as reasonably practicable on or after

the Effective Date, but in no event later than the Claims Objection Deadline (unless extended by

an Order of the Bankruptcy Court), the Liquidating Trustee shall File Objections to Claims and

serve such objections upon the Holders of each of the Claims to which Objections are made.  The

Liquidating Trustee shall be authorized to resolve all Disputed Claims by withdrawing or settling

such Objections thereto, or by litigating to judgment in the Bankruptcy Court, or such other court

having competent jurisdiction, the validity, nature, and/or amount thereof.  If the Liquidating

Trustee agrees with the Holder of a Disputed Claim to compromise, settle, and resolve a Disputed

Claim by granting such Holder an Allowed Claim, then the Liquidating Trustee may compromise,

settle, or resolve such Disputed Claim without Bankruptcy Court approval.

**D.      Estimation of Claims**

The Liquidating Trustee, may at any time, request that the Bankruptcy Court estimate any

Contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless

of whether the Debtors, the Liquidating Trustee or any party in interest previously objected to such

Claim.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during

litigation or a hearing concerning any objection to any Claim, including, without limitation, during

the pendency of any appeal relating to any such objection.  Subject to the provisions of

Section 502(c) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any

Contingent or unliquidated Claim, the amount so estimated shall constitute the maximum Allowed

110

amount of such Claim.  If the estimated amount constitutes the maximum Allowed amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court, or in accordance with the Plan.

**E.    Claims Reserve**

On any date that Distributions are to be made under the terms of the Plan, the Liquidating Trustee shall reserve Cash or property equal to one-hundred percent (100%) of the Cash or property that would be Distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, unless otherwise Ordered by the Bankruptcy Court following notice to the affected Claim Holder. Such Cash or property, as the case may be, shall be held for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

**F.    Distribution After Allowance**

Within the later of (i) ten (10) Business Days after a Claim other than a General Unsecured Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the applicable objection deadline, the Liquidating Trustee shall distribute all Cash or other property, including any interest, dividends or proceeds thereof, to which a Holder of an Allowed Claim is then entitled.

**This section VIII.F does not apply to General Unsecured Claims and Allowed General Unsecured Claims because the process regarding such claims is set forth in the Liquidating Trust Agreement.**

2747149.15 115719-100281

G.      **Adjustments to Claims Without Objection**

After the Effective Date, any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be marked as satisfied, adjusted or expunged on the register of Claims in the Chapter 11 Cases by the Liquidating Trustee without a Claims objection having to be Filed and without any further notice to or action, Order or approval of the Bankruptcy Court.

H.      **Late Claims and Amendments to Claims After Confirmation Date**

Except as provided herein or otherwise agreed, any and all Holders of Proofs of Claim Filed after the applicable Bar Date shall not be treated as Creditors for purposes of Distribution pursuant to Bankruptcy Rule 3003(c)(2) and the Bar Date Order unless on or before the Confirmation Date such late Claim has been deemed timely Filed by a Final Order.  After the Confirmation Date, a Proof of Claim may not be Filed or amended without the authorization of the Bankruptcy Court.

I.      **Distribution Record Date**

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes.  The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.  In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the Proof of Claim Filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that are actually known to the Liquidating Trustee as of the Distribution Record Date.

**J.      Delivery of Distributions**

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (1) at the addresses set forth on the respective Proofs of Claim or interest Filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim or interest; or (3) at the address reflected in the Schedules if no Proof of Claim or interest is Filed and the Liquidating Trustee has not received a written notice of a change of address.

If any Distribution is returned as undeliverable, the Liquidating Trustee shall make a reasonable effort to find the correct address, but shall otherwise have no obligation to determine the correct current address, and no Distribution to such Holder shall be made unless and until the Liquidating Trustee is notified, in writing, by the Holder of the current address within sixty (60) days of such Distribution, at which time a Distribution shall be made to such Holder without interest.  In the event the Liquidating Trustee does not receive timely notification the Distribution shall be deemed an Unclaimed Distribution and shall revert to the Liquidating Trust to be distributed in accordance with the terms of the Plan, and the right or claim of the Holder to such Distribution shall be discharged and forever barred.

**K.      Unclaimed Distributions**

Any Cash or other property to be Distributed to a Holder of an Allowed Claim under the Plan shall revert to the Liquidating Trust if it is not claimed by the Holder on or before the Unclaimed Distribution Deadline. If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Holder shall be deemed to be reduced to zero.  In such event, the Unclaimed Distribution shall be added to the Funds or other property to be Distributed on a *Pro Rata* basis to the Holders of Allowed Claims in accordance with the Plan.

2747149.15 115719-100281

**L.**    *De Minimis* **Distributions**

Distributions of fractions of dollars will not be made, but will be rounded to the nearest dollar (up or down), with half dollars being rounded down.  No Distribution will be made to any Creditor if either the cost of making the Distribution would exceed the amount of the Distribution, or the amount of Distribution is less than $50.00 in the aggregate, and such amounts shall revert to the Liquidating Trust.  Any Cash not distributed pursuant to this Article VII of the Plan will be the property of and revert to the Liquidating Trust.

**M.**    **Setoff and Recoupment**

The Liquidating Trustee shall retain the right to reduce any Claim by way of setoff and recoupment in accordance with the Debtors' Books and Records upon notice to the claimant. Rights of setoff of any Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action of the Debtors or their Estates, as applicable.

**N.**    **Allocation of Distributions Between Principal and Interest**

To the extent that any such Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**O.**    **Privileges as to Causes of Action**

Notwithstanding the establishment of the Liquidating Trust or the appointment of the Liquidating Trustee, the Privileges of the Debtors, including any Privileges relating to any Causes Action pursued, investigated, or considered by the Debtors prior to the Effective Date, will not be waived or released.  Upon the Effective Date, all of the Privileges shall be assumed by the Liquidating Trustee, who shall possess the sole right and discretion to assert or waive the Privileges.  No such Privilege will be deemed waived by disclosures to the Liquidating Trustee of

114

the Debtors' documents, information, or communications subject to the attorney-client privilege, work product protection or other immunities (including those related to the common interest or joint defense with third parties), or protections from disclosure held by the Debtors. The Privileges will remain subject to the rights of the third parties under applicable law, including any rights arising from the common interest doctrine, the joint defense doctrine, joint attorney-client representation, or any agreement. For the avoidance of doubt, nothing contained in this Plan or the establishment of the Liquidating Trust or the appointment of the Liquidating Trustee will be deemed to waive or release the Privileges or affect in any way the right to assert such Privileges.

**P.     Books and Records**

On the Effective Date, the Books and Records will be transferred to the Liquidating Trust. The Liquidating Trustee shall have the sole discretion to abandon, destroy, or otherwise dispose of any such Books and Records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any court order.

**Q.     Withholding and Reporting Requirements**

In connection with the consummation of the Plan, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution. The Liquidating Trustee has the right, but not the obligation, not to make a Distribution until such Holder has made satisfactory arrangements for payment of any such tax obligations.

2747149.15 115719-100281

The Liquidating Trustee may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder. If the Liquidating Trustee makes such a request and the Holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Trust and any Claim in respect of such Distribution shall be disallowed and forever barred from assertion against the Debtors, Liquidating Trustee or their property.

## ARTICLE IX.

## IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED PLAN AND DISCLOSURE STATEMENT

### A.      Means for Implementation of the Plan

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan:

1.      Substantive Consolidation

The Plan provides for substantive consolidation of the Debtors' Estates into two (2) groups, the Consolidated Eastern Debtors and the Consolidated NEMF Debtors, but solely for the purposes of the Plan, including making any Distributions to Holders of Allowed Claims. The Debtors and Committee propose substantive consolidation because the Debtors:

(a)      had overlapping officers and directors;

(b)      shared management and strategic decisions based on the expected affect or impact on the consolidated group of companies;

(c)      shared employees and departments, including, but not limited to, office space, accounting systems, an equipment maintenance department, management and governance, and financial services systems that were offered to their customers in the industry;

(d)      paid payroll, health benefits, taxes, and insurance for all Debtors under one entity, usually NEMF;

116

(e)     funded the payment of expenses, including employee payroll and other debts, including certain trade debts, that were owed by another Debtor;

(f)     provided their bank lenders and trade creditors evidence of credit-worthiness as a consolidated group;

(g)     provided consolidated financial statements to their bank lenders and other creditors; and

(h)     filed consolidated tax returns.

For the foregoing reasons, the Debtors and the Committee believe substantive consolidation as provided for herein is in the best interest of all Creditors.

On the Effective Date, as to each of the Consolidated Eastern Debtors and the Consolidated NEMF Debtors, respectively, (i) all assets and liabilities of each respective consolidated group will, solely for Distribution purposes, be treated as if they were merged; (ii) all intercompany claims within each respective consolidated group will be eliminated; (iii) each Claim Filed or to be Filed against each respective consolidated group will be deemed a single non-aggregated Claim against, and a single non-aggregated obligation of, each respective consolidated group; (iv) all guarantees of any Debtor within each respective consolidated group of the payment, performance, or collection of obligations of any other Debtor within each respective consolidated group shall be eliminated and canceled; and (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates within each respective consolidated group hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates within each respective consolidated group.  Holders of Allowed Claims against the Consolidated Eastern Debtors and/or the Consolidated NEMF Debtors entitled to Distributions under the Plan shall be entitled to their *Pro Rata* share of assets available for Distribution, if any, on account of such Claim without regard to which Debtor within the respective consolidated group was originally liable for

117

such Claim.  Except as set forth herein, such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Debtors.

The Debtors and Committee propose substantive consolidation to avoid depletion of the funds held by the Estates that would be required in order to properly segregate the assets and liabilities of the Debtors for the purpose of making Distributions to Entity-specific Claims. Substantive consolidation has been approved by the Bankruptcy Court under similar circumstances.  *See In re Owens Corning*, 419 F.3d 195 (3d Cir. 2006); *see also In re I.R.C.C., Inc.*, 105 B.R. 237, 239 (Bankr. S.D.N.Y. 1989) (substantively consolidating corporate subsidiaries where they had operated as a single economic unit commingling funds, holding common assets and filing consolidated tax returns and the trustee testified that the "financial affairs of the subsidiaries in the [corporate group] were so entangled that it would be virtually impossible to deal with them separately"); *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 780 (Bankr. S.D.N.Y. 1997) (substantively consolidating debtors where the "debtors' operations, cash, and decision-making were all shared such that it would be detrimental to the estates to attempt to disentangle those operations.")

2.      Automatic Dissolution of the Debtors

Immediately upon the Effective Date, the Debtors will be deemed dissolved without further action under applicable state law.

3.      Funding of the Plan

The Plan shall be funded by (i) available Cash and other available Estate Assets on the Effective Date, and (ii) funds available after the Effective Date from, among other things, the liquidation of the Liquidating Trust Assets, including the prosecution and resolution of Causes of Action.

118

4.    <u>Preservation of Causes of Action</u>

To the extent not otherwise waived, released, settled, assigned or sold pursuant to a prior Order, the Liquidating Trustee specifically retains and reserves the right to assert, after the Effective Date, any and all of the Claims, Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing.  The Liquidating Trustee may pursue, abandon, settle or release any or all such Causes of Action, as he or she deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court, except as set forth in the Liquidating Trust Agreement.  To the extent the Liquidating Trustee commences an actual lawsuit (whether by adversary proceeding or otherwise), such lawsuits will be filed on the docket of the Bankruptcy Court or another court of competent jurisdiction.

5.    <u>Corporate Action; Effectuating Documents; Further Transactions</u>

On the Effective Date, all matters and actions provided for under the Plan that would otherwise require approval of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the Debtors.  The Debtors, or the Liquidating Trustee, as applicable, are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

6.    <u>Good Faith</u>

Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed by the Debtors, the Committee, and each of their respective members, officers, directors, agents, financial advisors, attorneys, and other retained professionals, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125(e) and 1129(a)(3), and all other applicable non-bankruptcy laws, rules and regulations; (ii) is in furtherance of and in

119

compliance with the Debtors' and the Committee's fiduciary duties; and (iii) all Persons' solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.  As such, the Debtors, the Committee, and each of their respective members, officers, directors, agents, financial advisors, attorneys, and other retained professionals are entitled to the protections afforded by the Bankruptcy Code and, to the extent applicable, the release, exculpation and injunctive provisions set forth in the Plan.

## ARTICLE X.

## EXCULPATION, RELEASES AND INJUNCTIONS

A.     **Exculpation**

The Debtors, the Estates and the Exculpated Parties shall not have or incur any liability to any Person or Entity, including any Holder of a Claim or Equity Interest, for any act or omission taken or not taken in connection with, relating to, or arising out of the Chapter 11 Cases, including but not limited to: the negotiation and Filing of the Plan, the Filing of the Chapter 11 Cases, the prosecution and/or settlement of Claims, the performance, termination or rejection of Executory Contracts, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be Distributed under the Plan (collectively, the "Post-Petition Activities"), except for their willful misconduct or gross negligence or any obligations that they have under or in connection with the Plan or the transactions contemplated in the Plan.  For the avoidance of doubt, other than the Exculpated Parties, no other Person or Entity shall be exculpated for any Post-Petition Activities under the terms of the Plan. Nothing herein shall preclude the Exculpated Parties from asserting as a defense to any claim of willful misconduct or gross negligence that he or she reasonably relied upon the advice of counsel with respect to his duties and responsibilities in the Chapter 11 Cases, under the Plan or otherwise.

120

**B.**     **Releases**

1.     <u>Releases by the Debtors</u>

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Debtors' Estates, and any Estate representative appointed or selected pursuant to the Bankruptcy Code shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void, extinguish and discharge any of the Released Parties and their respective assets and properties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, based in whole or in part on any act, omission, transaction, or other occurrence or circumstances: (i) that took place prior to or after the Petition Date relating to and/or in connection with any of the Debtors prior to or on the Effective Date; and (ii) that was taken or not taken in connection with, relating to, or arising out of, in whole or in part the Chapter 11 Cases, the Sale, the negotiation and Filing of the Plan and/or any related documents, the Filing of the Chapter 11 Cases, the prosecution and/or settlement of Claims prior to or during the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the performance, termination or rejection of Executory Contracts, the pursuit of confirmation of or the solicitation of votes on the Plan, the consummation of the Plan, or the administration of this Combined Plan and Disclosure Statement or the property to be Distributed under the Plan, except for their willful misconduct or gross negligence or any obligations that they have under or in connection with the Plan or the transactions contemplated in the Plan.  For the avoidance of doubt, other than the Released Parties, no other Person or Entity is being released from any Cause of Action under the terms of the Plan.

2747149.15 115719-100281

2.    <u>Releases Pursuant to the Auto Liability Claims Protocol</u>

As of the Effective Date, all Holders of Auto Liability Claims, in accordance with the Auto Liability Claims Protocol, shall be deemed to grant a release of Auto Liability Claims in favor of the Auto Liability Claims Released Parties <u>provided</u>, <u>however</u>, that Holders of Auto Liability Claims shall not be deemed to release their rights to include one or more of the Debtors as a "nominal" party to any future litigation against an Auto Insurer in order to seek payment of such Auto Liability Claims from the Auto Insurers and/or the Auto Liability Claims LC Proceeds, pursuant to the Auto Liability Claims Protocol.  No Holder of an Auto Liability Claim shall be entitled to receive a Distribution from the Liquidating Trust on account of such Auto Liability Claim. *For the avoidance of doubt, Holders of Auto Liability Claims shall not be deemed to grant any release in favor of the Auto Insurers upon or after the Effective Date, except as provided for in the Auto Liability Claims Protocol.*

3.    <u>Release of Equity Holders and Affiliates</u>

Except as expressly set forth in the Equity Holders and Affiliates Settlement, in consideration of the representations, warranties, and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Debtors, the Committee, the Estates, all Creditors, whether or not any such Creditor filed a Proof of Claim against one or more of the Debtors and/or is entitled to receive any Distribution pursuant to the Plan and/or the Auto Liability Claims Protocol, the Debtors' employees, insurers and brokers, the Liquidating Trust, and all other parties in interest in the Chapter 11 Cases, and their respective representatives, agents, predecessors, successors, and assigns (collectively the "<u>Debtors Releasing Parties</u>"), hereby remise, release, and forever acquit and discharge each and all of the Equity Holders and Affiliates, and their officers, directors, shareholders, members, managers, agents, employees, attorneys, and representatives (the "<u>Equity Holder and Affiliates Released</u>

122

Parties"), of and from any and all manner of acts and actions, cause and causes of actions, arbitrations, mediations, conciliations, dues, sums of money, reckonings, bonds, bills, specialties, contracts, controversies, variances, trespasses, damages, judgments, executions, rights, claims, demands, suits, proceedings, debts, accounts, warranties, covenants, liabilities, agreements, and promises of any nature whatsoever in law or in equity, whether known or unknown, whether sounding in tort or contract or any other basis, that the Debtors Releasing Parties have, have had, or may at any time hereafter have against the Equity Holder and Affiliates Released Parties in any capacity, for, upon, or by reason of any matter, cause, or thing whatsoever, in any way relating to one or more of the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Cases, the same subject matter as the Claim held by any Creditor against one or more of the Debtors, or this Combined Plan and Disclosure Statement (other than the rights under this Combined Plan and Disclosure Statement and the Plan Documents); provided, however, that this release shall not extend to and is not intended to release any mortgage directly owed by any of the Equity Holder and Affiliates Released Parties on real property such Equity Holder and Affiliates Released Parties own that was formerly used or occupied by the Debtors in their business operations.  This release shall be effective only upon (i) payment in full of the Cash Payment, (ii) the repayment of any distribution in respect of Pledged Claims referenced in Section 5 of the Equity Holders and Affiliates Settlement, and (iii) the assumption of debt referenced in Section 4 of the Equity Holders and Affiliates Settlement.

4.    Release of Debtors, Debtors' Estates and the Committee

Except as expressly set forth in this Agreement, in consideration of the representations, warranties, and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Equity Holders and Affiliates hereby waive and release any and all claims that they have or may have against the Debtors, the Debtors' Estates,

2747149.15 115719-100281

the Committee and their respective members, officers, directors, shareholders, agents, employees, attorneys, and representatives (collectively the "Debtors Released Parties") of and from any and all manner of acts and actions, cause and causes of actions, arbitrations, mediations, conciliations, dues, sums of money, reckonings, bonds, bills, specialties, contracts, controversies, variances, trespasses, damages, judgments, executions, rights, claims, demands, suits, proceedings, debts, accounts, warranties, covenants, liabilities, agreements, and promises of any nature whatsoever in law or in equity, whether known or unknown, whether sounding in tort or contract or any other basis, including but not limited to any matter relating directly or indirectly to all Claims which the Equity Holders and Affiliates have, have had, or may at any time hereafter have against the Debtor Released Parties; provided, however, that this release shall not release or impair any rights under insurance policies or coverage or indemnification related to the Debtors to which any of the Equity Holders or Affiliates may be entitled by agreement or law.

5.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of any of the Debtors' Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert or otherwise transfer to the Liquidating Trust.

C.      **Injunction**

Except as expressly otherwise provided in the Plan or the Confirmation Order, on the Effective Date of the Plan, all Entities or Persons that hold, have held or may hold or have asserted,

assert or may assert Claims, causes of action, liabilities against or Equity Interests in the Debtors

and their Estates including Holders of Auto Liability Claims (subject only to the Auto Liability

Claims Protocol and as expressly set forth in the Plan and/or the Confirmation Order), shall be

permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from

taking any of the following actions against any of the Debtors, their Estates, the Liquidating Trust,

the Auto Liability Released Parties (as related to Auto Liability Claims) or any of their property,

whether directly or indirectly, derivatively or otherwise, on account of or based on the subject

matter of such Claim or Equity Interest: (i) commencing, conducting or continuing in any manner,

directly or indirectly, any suit, action or other proceeding (including, without limitation, any

judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching

(including, without limitation, any prejudgment attachment), collecting, or in any way seeking to

recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way

enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or

contributions from, or subrogation against, or otherwise recouping in any manner, directly or

indirectly, any amount against any liability or obligation owed to any Person or Entity released

under this Plan, except with respect to the Debtors' right of setoff asserted prior to the entry of the

Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise

contemplated or allowed by the Plan; and (v) commencing or continuing in any manner, in any

place of any judicial, arbitration or administrative proceeding in any forum, that does not comply

with or is inconsistent with the provisions of the Plan or the Confirmation Order.

### D.    Auto Liability Claims Injunction

Pursuant to 11 U.S.C. § 105(a), upon entry of the Confirmation Order, all Holders of Auto

Liability Claims shall be enjoined from taking any action, directly or indirectly, for the purpose of

collecting, recovering or receiving payment or recovery with respect to any Auto Liability Claim

2747149.15 115719-100281

until and unless each such Holder comply with the terms of the ADR Procedures set forth in the Auto Liability Claims Protocol (the "Auto Liability Claims Injunction").  In accordance with the Auto Liability Claims Protocol, the Auto Liability Claims Injunction shall dissolve automatically with respect to any Auto Liability Claim two (2) business days after the filing of an Unsuccessful Mediation Notice (as defined in the Auto Liability Claims Protocol) for such Auto Liability Claim. Upon the filing of such Unsuccessful Mediation Notice, the Holder of such Auto Liability Claim shall automatically be deemed to have been granted relief from the automatic stay, the Injunction listed in Article X(D) above, and this Auto Liability Injunction for the limited purpose, if necessary, of listing one or more of the Debtors as a "nominal" party to any future litigation commenced by such Holder to seek payment of such Auto Liability Claim from the Auto Insurers and/or the Auto Liability Claims LC Proceeds, including any amount within the Self-Retention. For the avoidance of doubt, no Holder of Auto Liability Claim, even after the Auto Liability Injunction is dissolved, shall be entitled to receive any Distribution from the Liquidating Trust Assets on account of such Auto Liability Claim.  Holders of Auto Liability Claims shall only be entitled to receive payment on account of such Auto Liability Claim from the applicable Auto Insurer and the Auto Liability Claims LC Proceeds held by such Auto Insurer.

### E.    Reservation of Rights

Except as specifically provided in the Plan or in the Confirmation Order, nothing contained in the Plan or in the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan or any Cause of Action or other right or remedy of the Debtors and/or the Estates. The Liquidating Trustee will have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses which the Debtors had immediately

2747149.15 115719-100281

prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all legal and equitable rights of any Debtors respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced, except to the extent such Claim has been specifically waived or released. The Liquidating Trustee's right to commence and prosecute Causes of Action will not be abridged or materially altered in any manner by reason of confirmation of the Plan. No defendant party to any Causes of Action brought by the Debtors or the Liquidating Trustee will be entitled to assert any defense based, in whole or in part, upon confirmation of the Plan, and confirmation of the Plan will not have any res judicata or collateral estoppel effect upon the commencement and prosecution of the Causes of Action.

## ARTICLE XI.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Executory Contracts and Unexpired Leases Deemed Rejected

Except as otherwise provided for in the Plan, on the Effective Date, all of the Debtors' Executory Contracts and Unexpired Leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, except to the extent: (a) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract or Unexpired Lease, (b) such Executory Contract or Unexpired Lease expired or terminated pursuant to its own terms or by agreement of the parties thereto, or (c) prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract or unexpired lease on which the Bankruptcy Court has not ruled.  Subject to the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts and Unexpired Leases pursuant to this Article XI and Sections 365(a) and 1123 of the Bankruptcy Code.

127

**B.      Insurance Policies**

Notwithstanding anything to the contrary in the Plan, the Auto Liability Claims Protocol, or Confirmation Order, any insurance policies of the Debtors in which the Debtors are or were insured parties (including, without limitation, any policies covering directors' or officers' conduct) or any related insurance agreement issued prior to the Petition Date shall continue in effect after the Effective Date pursuant to their respective terms and conditions and shall be treated as if assumed.  To the extent that any insurance policies or related insurance agreements are deemed Executory Contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume, assume and assign, or ratify such insurance policies or insurance agreements.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption is in the best interest of the Estates.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to the respective insurance policy or insurance agreement assumed by the Debtors pursuant to this Section.

**C.      Bar Date For Rejection Damages**

If the rejection by the Debtors of an Executory Contract or an Unexpired Lease pursuant to Article XI of the Plan results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages arising from such rejection shall not be enforceable against the Debtors or their Estates or agents, successors, or assigns, unless a Proof of Claim is Filed with the Claims Agent, Donlin Recano & Company, Inc., **so as to actually be received on or before the Rejection Claim Bar Date**.

2747149.15 115719-100281

## ARTICLE XII.

## CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE

**A.     Conditions Precedent to Confirmation**

The following are conditions precedent to Confirmation that must be satisfied or waived:

(i)      The Confirmation Order shall be reasonably acceptable in form and substance to the Debtors and the Committee; and

(ii)     Any exhibits or schedules incorporated as part of the Plan shall be reasonably acceptable in form and substance to the Debtors and the Committee.

**B.     Conditions Precedent to the Effective Date**

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived:

(i)      Entry of the Confirmation Order;

(ii)     There shall exist sufficient Cash to satisfy Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims which are or become Allowed Claims; and

(iii)    The Confirmation Order becomes a Final Order.

**C.     Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be the first Business Day after all conditions specified in Article XII(B) have been satisfied or waived by the Debtors or the Liquidating Trustee.  On or within three (3) Business Days of the Effective Date, the Liquidating Trustee shall File and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, the Administrative Claims Bar Date, the deadline by which Professionals must

129

file and serve any Professional Fee Claims and the deadline to file a proof of claim relating to

damages from the rejection of any Executory Contract pursuant to the terms of the Plan.

## ARTICLE XIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective

Date, following the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the

Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is

necessary to ensure that the interests and purposes of the Plan are carried out.  The Bankruptcy

Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11

Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy

Code and for, among other things, the following purposes:

(i)     To hear and determine any objections to Claims and to address any issues

relating to Disputed Claims;

(ii)    To enter and implement such Orders as may be appropriate in the event the

Confirmation Order is for any reason stayed, revoked, modified or vacated;

(iii)   To issue such Orders in aid of execution and consummation of the Plan, to

the extent authorized by section 1142 of the Bankruptcy Code;

(iv)    To consider any amendments to or modifications of the Plan, to cure any

defect or omission, or reconcile any inconsistency in any Order of the

Bankruptcy Court, including, without limitation, the Confirmation Order;

(v)     To hear and determine all requests for compensation and reimbursement of

expenses under sections 330, 331 or 503 of the Bankruptcy Code;

(vi)    To hear and determine disputes arising in connection with the interpretation,

implementation or enforcement of the Plan;

130

(vii)   To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Liquidating Trustee for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(viii)   To hear any other matter not inconsistent with the Bankruptcy Code;

(ix)   To enter a final decree closing the Chapter 11 Cases;

(x)   To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(xi)   To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(xii)   To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan or the Liquidating Trust Agreement, except as otherwise provided herein;

(xiii)   To determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, the Liquidating Trust Agreement, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Plan, including any disputes that may arise in connection with the Auto Liability Claims Protocol and/or ADR Procedures pursuant thereto;

131

(xiv) To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(xv) To resolve disputes concerning any Reserves with respect to Disputed Claims or the administration thereof;

(xvi) To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the General Bar Date, the Special Administrative Claims Bar Date, the Administrative Claims Bar Date, the Government Bar Date, the Amended Schedules Bar Date, the Rejection Claims Bar Date, and/or the hearing on the approval of the Plan for the purpose of determining whether a Claim or Equity Interest is Allowed and/or enjoined hereunder or for any other purpose;

(xvii) To hear and determine pending applications for the assumption or rejection of Executory Contracts or Unexpired Leases, if any are pending, and the allowance of any Claims resulting therefrom;

(xviii) To recover all assets of the Liquidating Trust and property of the Liquidating Trust, wherever located;

(xix) To issue such orders as may be necessary or appropriate to expand or otherwise modify the powers and duties of the Liquidating Trustee; and

(xx) To resolve any other matter or for any purpose specified in the Plan, the Confirmation Order, or any other document entered into in connection with any of the foregoing.

132

# ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

**A.      Transfer of Debtors' Assets**

Except as otherwise provided herein, any assets that are property of the Debtors' Estates on the Effective Date including, without limitation, any Causes of Action, shall transfer to the Liquidating Trust on the Effective Date.  Thereafter, the Liquidating Trustee may use, sell or dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or Bankruptcy Court approval, except as otherwise provided in the Combined Plan and Disclosure Statement or the Confirmation Order.  Except as specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all Liquidating Trust Assets shall be free and clear of any liens, Claims, encumbrances and interests of any kind.  To the extent the Chapter 11 Cases are converted post-confirmation, property transferred to the Liquidating Trust shall re-vest in the converted Debtors' Estates.

**B.      Termination of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date shall terminate on the Effective Date, at which time the injunctions and stays set forth in the Plan shall take effect.

**C.      Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp or similar tax.

2747149.15 115719-100281

### D.    Amendment or Modification of the Plan

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors and the Committee, at any time before the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors and the Committee shall have complied with section 1125 of the Bankruptcy Code.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. Prior to the Effective Date, the Debtors and the Committee may make appropriate technical non-material modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical modifications do not adversely affect the treatment of Holders of Claims.

### E.    Severability

In the event the Bankruptcy Court determines, before the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the Holder or Holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable.  The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan and shall not require the re-solicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

### F.    Revocation or Withdrawal of the Plan

The Debtors and the Committee reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors and the Committee revoke or withdraw the Plan before the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained

herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors and the Estates.

**G.      Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims and the Holders of Equity Interests, and their respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is impaired under the Plan and whether or not such Holder has accepted the Plan.

**H.      Notices**

All notices, requests and demands to or upon the Liquidating Trustee, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as shall be set forth in the Confirmation Order.

**I.      Revised Bankruptcy Rule 2002 Service List**

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Cases must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002 within thirty (30) days of the Effective of the Plan.  To the extent a renewed request is not filed with the Bankruptcy Court, the Liquidating Trustee is authorized to limit notice and not include such Entities or Persons on any official Post-Effective Date service lists.

**J.      Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey, without giving effect to the principles of conflicts of law of such jurisdiction.

2747149.15 115719-100281

**K.     Headings**

Headings are used in the Plan for convenience and reference only, and shall not constitute

a part of the Plan for any other purpose.

**L.     Exhibits/Schedules**

All exhibits and schedules to the Plan are incorporated into and are a part of the Plan as if

set forth in full herein.

**M.     Filing of Additional Documents**

On or before substantial consummation of the Plan, the Debtors, the Committee and/or

Liquidating Trustee, as applicable, may File with the Bankruptcy Court such agreements and other

documents as may be necessary or appropriate to effectuate and further evidence the terms and

conditions of the Plan.

**N.     No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be

deemed as an admission by any Entity with respect to any matter set forth herein.

**O.     Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan

shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or

assign of such Person or Entity.

**P.     Return of Deposits**

Unless the Debtors and the Committee have agreed otherwise in a written agreement,

stipulation or order approved by the Bankruptcy Court, all deposits provided by the Debtors to any

Person or Entity at any time shall be returned to the Liquidating Trust within twenty (20) days

after the Effective Date, without deduction or offset of any kind and any such deposits shall be.

2747149.15 115719-100281

**Q.      Implementation**

The Debtors, the Committee and/or Liquidating Trustee, as applicable, shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in the Plan.

**R.      Inconsistency**

In the event of any inconsistency among the Plan and any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.  Notwithstanding the foregoing, nothing in the Plan shall affect the validity of the Eastern Sale Order, the Real Property Sale Order, and the Rolling Stock Sale Order.

**S.      Cancellation of Equity Interests**

On the Effective Date, all existing Equity Interests shall, without further act or action by any party, be cancelled, annulled, and extinguished, and any Certificates representing such cancelled, annulled and extinguished Equity Interests shall be null and void.

**T.      Dismissal of Hollywood Solar and United Solar**

Immediately upon the Bankruptcy Court's entry of the Confirmation Order, the Chapter 11 Cases of Hollywood Solar and United Solar  (collectively, the "Dismissed Debtors") shall be deemed dismissed pursuant to Sections 105(a) and 1112(b) of the Bankruptcy Code.  In connection with the dismissal of the Dismissed Debtors, the Liquidating Trustee is authorized to take all actions necessary to effectuate the dismissal of the Dismissed Debtors.

**U.      Dissolution of the Remaining Debtors**

Immediately upon the Effective Date, the Debtors, other than Hollywood Solar and United Solar, will be deemed dissolved (the "Dissolved Debtors") without further action under applicable state law.  In connection with and following the closing of the Chapter 11 Cases, the Liquidating Trustee is authorized (a) to take any and all actions necessary to effect the Dissolved Debtors'

2747149.15 115719-100281

dissolution for all purposes under applicable state law; and (b) to file any required, final federal, state and local tax returns and to take such other action as shall be necessary or appropriate to effect a final determination of any amounts of Post-Petition Date federal, state or local taxes owed by the Dissolved Debtors.

**V.      Request for Expedited Determination of Taxes**

The Liquidating Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after each Debtor's respective Petition Date through the Effective Date.

## ARTICLE XV.

## CONFIRMATION REQUEST

The Plan Proponents hereby request confirmation of this Plan as a Cramdown Plan with respect to any Impaired Class that does not accept this Plan or is deemed to have rejected this Plan.

2747149.15 115719-100281

Dated: October 21, 2019

Respectfully submitted,


NEW ENGLAND MOTOR FREIGHT, INC., ET AL.


BY: _____*/s/ Vincent J. Colistra*_____
        VINCENT J. COLISTRA,
        CHIEF RESTRUCTURING OFFICER

-and-

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF NEW ENGLAND MOTOR FREIGHT,
INC., ET AL.


BY: _____*/s/ Dawn Bowers*_____
        DAWN BOWERS,
        LANDSTAR TRANSPORTATION LOGISTICS,
        INC., CHAIR OF THE COMMITTEE

2747149.15 115719-100281