U.S. BANKRUPTCY COU[
FILED
NEWARK, NJ

2023 DEC 4 P 2:

JEANNE A. NAUGHTON
BY:
CLERK

**UNITED STATES BANKRUPTYC COURT**

**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE: | Chapter 11 |
| NEW ENGLAND MOTOR FREIGHT, INC., *Et al.,* | Case No. 19-12809 (JKS) |
| | Jointly Administered |
| Debtors, | |
| | **Hearing Date: December 12, 2023 at 10:00 a.m. (ET)** <br> **Obj. Deadline: December 5, 2023 at 4:00 p.m. (ET)** |

### OBJECTION OF CREDITOR HAROLD WILLIAMS TO THE LIQUIDATING TRUSTEE'S ELEVENTH OMNIBUS OBJECTION TO WILLIAMS' CLAIM AS "(III) LACKING SUPPORT"

On behalf of creditor Harold Williams, his counsel, Friedman & Houlding LLP serves and files this Opposition to the Liquidating Trustee's Objection to his Proof of Claim (as set forth in the Liquidating Trustee's Eleventh Omnibus Objection to Certain Claims as (I) Late Filed, (II) Satisfied, or (III) Lacking Support), on or before the due date of December 5, 2023. For the reasons set forth below, the Liquidating Trustee's Objection to Williams' claim should be overruled as it wholly lacking in support – or even articulation of the basis for its objection – and because Creditor Harold Williams' Proof of Claim, which includes supporting Declarations, clearly sets forth his claims for racial harassment, retaliation and constructive discharge pursuant to 42 U.S.C. § 1981 and the Connecticut Human Rights and Opportunities Act.

### INTRODUCTION

Harold Williams worked for New England Motor Freight, Inc. ("NEMF") from January 2018 through June 26, 2018, when he was constructively discharged as a result of racial harassment and retaliation, in violation of the Connecticut Human Rights and Opportunities Act (Connecticut Code - Sec. 46a-60 et. seq. (the "Act")) and Section One of the 1866 Civil Rights Act, 42 USC § 1981 ("§1981" or "Section 1981").

On August 2, 2018, Williams timely filed a Charge of Discrimination with the Connecticut

Commission on Human Rights & Opportunities ("CHRO"). See Proof of Claim attached hereto as Exhibit A, at 15-18.[1]

On January 30, 2019, the CHRO issued a Release of Jurisdiction, establishing that Williams had exhausted his administrative remedies under Connecticut law, and was entitled to file a Complaint in Court within 90 days of receipt of the Release of Jurisdiction under the Connecticut Human Rights and Opportunities Act. See Exhibit B.

Less than two weeks later, on February 11, 2019, NEMF filed a petition under Chapter 11 of the Code. The automatic stay prevented Williams from filing any claims in court. 11 U.S.C. 362(a)(1) ("a petition filed under section 301, 302, or 303 of this title . . . operates as a stay applicable to all entities, of—(1) the **commencement** or continuation, including the issuance or employment of process, of a **judicial**, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;..")(emphasis added); see also *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 638 B.R. 291, 299 (Bankr. D.N.J. 2022) ("The Third Circuit has explained that the purpose of the automatic stay is "two-fold." First, it serves to "protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him or her into bankruptcy[.]" Second it "protect[s] creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors." Id.)(internal quotations and citations omitted).

On June 16, 2019, Williams timely filed a Proof of Claim (the POC) in the instant action, in the amount of $500,000. See Exhibit A.

---

[1] Citations are to page numbers at the lower right corner of each page.

## THE PROOF OF CLAIM

The POC includes a letter brief by Williams' counsel, which explains the legal and evidentiary requirements for each claim he asserts, and the damages that can be recovered, four sworn declarations which establish the evidentiary basis for a hostile work environment claim and his filing with the CHRO. Williams has claims under Section 1981 and the Connecticut Human Rights and Opportunities Act for a hostile work environment, retaliation and constructive discharge, for which he provides the legal and factual support in his POC and supporting attachments. POC (Exhibit A) at 22-27. For example, counsel provides the substantive requirements of a racially hostile work environment under § 1981, supported by controlling authorities:

> To bring a claim under 42 USC 1981 for a racially discriminatory hostile work environment, a plaintiff need only show that 1) he suffered discrimination based on his race, 2) the discrimination was severe or pervasive, 3) it affected the plaintiff negatively and would have affected a reasonable person in like circumstances, and 4) there is a basis to hold employer liable. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996).

POC (Exhibit A) at 23. He identifies his claim for retaliation and the legal grounds therefore at 24-25, and for constructive discharge at 25.

In support of his claims, he provides abundant factual support, in addition to identifying the legal claims themselves. For instance, Williams' Declaration quotes numerous offensive racial insults and comments made by his Supervisor, Phil Alberto, which would be offensive to any reasonable African American, such as "you must be disappointed you woke up black," and "why are your people offended at being called [n***a or n*****]." Exhibit A at 5, ¶ 12.

The Williams Declaration easily establishes that if Williams' testimony were believed by a jury, NEMF would be held liable for Alberto's racial harassment. Williams affirms that he complained to his Supervisor, Kenny, who directly witnessed Alberto engaged in racial harassment in April 2018 (id. ¶ 17 ("Harold what do you think of slavery"); Harvey, Alberto's Supervisor, acknowledged that Alberto was offensive, establishing notice and negligence

attributable to NEMF (¶¶ 20-22), the Terminal manager Tom Wasserback acknowledged to Williams after mid-April (¶23), that he was aware of Alberto's racial harassment, and had to reverse two of his racially motivated attempts to fire Williams, which had cost Williams' a week's pay (¶ 26), he was forced to make a second complaint to his Terminal Manager in or after May 2018 (¶ 29), and he complained to his union rep, Ray, between May and August 2018, which may be deemed notice in a union environment, where collective bargaining members are permitted to address complaints to the employer through union grievances (¶ 32).

Eventually NEMF's failure to stop the racial harassment became so painful that Williams was forced to ask his father for help. His father called Ray, the union rep, who in turn made another complaint to the Terminal Manager. Nonetheless the racial harassment continued (¶¶ 33-35).

On June 20, 2018, Williams sent an email to NEMF Human Resources, providing details of the racial harassment, and explaining that NEMF had failed to address the racial harassment after numerous complaints. See Exhibit A to the instant Exhibit A, at p. 11.

Even following Williams' email to Human Resources, Alberto continued his racial harassment, and on top of that, Williams' Terminal Manager began retaliating against him. His direct Supervisor went so far as to suggest that he find another job. *Id.* ¶¶ 37-40.

On June 26 he emailed Human Resources in pertinent part that:

> I work two jobs...When I leave NEMF I go to the other job [which] is Bob's. I am now afraid of Tom and Phil. Tom told me why did I call HR. I told him he couldn't handle Phil. All [I] know is that they have an over the top racist working. He bull[ied] me [and] undermined my human race....I email you guys thinking I was safe an[d] I would see results but [what] I get is the terminal manager [asking] me why I call[ed] HR. I don't feel safe there anymore. I thought I was going to work but I get tormented [and] insult[s] said to me by Phil my supervisor...I am not satisfied and afraid of the crazy place I have worked.

See Exhibit A, at p. 12. Feeling that the environment at NEMF was too hostile for Williams to continue working safely, and overwhelmed from the retaliation by the Terminal Manager and his Supervisor, he tendered his resignation. He told Human Resources that he felt as though he was working "back in the civil rights movement," in other words, before employment discrimination

4

laws were enacted.

The POC encloses a sworn declaration from Horacio Mercado, who worked with Williams for Alberto, corroborating that Alberto made offensive racial comments to him as well, that Alberto's racial comments were reported to Human Resources in June, and that following the complaint Alberto continued his racial harassment. Exhibit A, pp. 12-14. Mercado's "me too" testimony will be admissible at trial to establish that the docks at NEMF where Mercado and Williams worked were a pervasively racially hostile work environment (Exh. A, p. 13-14, ¶7), a reasonable employee of color would have been offended by Alberto's racial harassment (id., pp. 13014), and that Alberto's Supervisors were aware of it but failed to take remedial action, and (id., at ¶ 10), even after his racial harassment was reported to Human Resources in June 2018 (id., ¶ 11). *See, eg, Molchan v. Delmar Fire Dep't, Inc.,* No. 19-082 (MN), 2021 U.S. Dist. LEXIS 231654, at *14-15 (D. Del. Dec. 3, 2021) ("Here, the Court is persuaded that at least some of the offered "me too" evidence is relevant, at least because several declarants appear to have experienced or witnessed Rementer's harassment and suggest that Delmar FD was aware of repeated instances of it. Some of the evidence also suggests that Rementer's conduct was well-known within the fire department and thus may bear on whether Plaintiff subjectively perceived the environment to be abusive."); *Carey v. Chadds Ford Tavern,* No. 20-4236, 2021 U.S. Dist. LEXIS 225059 (E.D. Pa. Nov. 22, 2021)(admitting "me too" evidence in a sexual harassment case and noting the Third Circuit finds that "me too" evidence is neither per se admissible or inadmissible); *Murray v. Miron,* No. 3:11 CV 629 (JGM), 2015 U.S. Dist. LEXIS 85260, at *24 (D. Conn. July 1, 2015)(reviewing circumstances where "me too" evidence is admissible); *Zucchella v. Olympusat, Inc.,* 2023 U.S. Dist. LEXIS 53275, at *49-50 (C.D. Cal. Jan. 10, 2023)(denying in part motion in limine to exclude "me too" evidence); *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1287 (11th Cir. 2008)(affirming trial court's admission of "me too" evidence).

The POC also includes a sworn declaration from another coworker, Jonathan Edwards, whose testimony will be admissible to establish that the NEMF terminal where he and Williams

worked, was a racially hostile work environment, because of Phil Alberto's use of bigoted language against minorities. POC p. 19.

The POC also encloses the declaration of Catina Barnes, who lived with Williams during and after the racial harassment. She provides detailed evidence showing how Williams was injured by the racial harassment, retaliation and constructive discharge. POC, Exhibit A, pp. 20-21. Her testimony would also be admissible to establish that a reasonable African American would have found the racial harassment offensive, and that Williams found it subjectively offensive, establishing two evidentiary requirements set forth in counsel's letter brief (Exhibit A at 23).

The Declarations provided also support Williams' claims for retaliation and constructive discharge, as more fully set forth in the POC, pp. 22-27.

Finally, the POC includes a discussion of relevant cases in which courts in this Circuit sustained damage awards considerably higher than sought in the POC, or where juries returned higher verdicts, and which were also hostile work environment cases and/or retaliation cases. POC (Exhibit A), pp. 26-27.

In sum, the POC identifies Williams' legal claims, articulates the elements of each cause of action, and provides evidence that if credited by a jury would easily support a verdict against NEMF, for racial harassment, retaliation and/or constructive discharge, in excess of the claim amount of $500,000.

## ARGUMENT

When the Federal Rules of Bankruptcy Procedure ("FRBP" or "Rules"), Section 3001 are met, the proof of claim ("POC"), is prima facie evidence of the validity and amount of the claim. See FRBP 3001(f)("Evidentiary Effect. A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). FRBP 3001(a) requires that a "proof of claim . . .conform substantially to the appropriate Official Form." The appropriate official form is Official Form 410 Proof of Claim.

FRBP 3001(b) requires that a "proof of claim . . . be executed by the creditor or the creditor's authorized agent."

None of 3001(c) through 3001(e) is applicable, therefore the instant POC need only properly meet the requirement that it provide the information required by Form 410 and be properly executed, to be deemed "prima facie evidence of the validity and amount of the claim."

Once the court determines that the POC contains all the information required by FRBP 3001(c) through 3001(e), if any, and that it complies with 3001(a) and 3001(b), it is deemed presumptively valid. The burden of production shifts then to the party objecting to the POC to provide evidence which shows that the POC claim is not entitled to the presumption, and why:

> "[T]he Court finds that the Claim and its attachments contain all information required by Rule 3001(c)-(e) and is regular on its face, rendering it presumptively valid under Rule 3001(f) and shifting the burden to the Debtors to offer evidence rebutting that presumption."

*In re Jones,* No. 22-50121, 2023 Bankr. LEXIS 2292, at *11 (Bankr. M.D.N.C. June 15, 2023). Once the prima facie case is made the burden is on the objecting party to produce evidence of equal or greater weight, and which if believed would vitiate at least one of the claim's essential elements. As the *In re Jones,* court explained:

> "In order to satisfy this burden, 'the objector must produce evidence equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal validity.'"[2]

In re Jones at *6.

If the objection fails to challenge a critical element of the POC with equally probative *evidence,* the court is required to overrule it. *See id.* at *19 ("most importantly, the Debtors' Objection and the testimony of Mr. Jones fails to challenge any of the facts supporting U.S. Bank's claim . . . [t]herefore, the Court must overrule the Objection").

---

[2] Quoting *In re Wright,* 438 B.R. at 553 (quoting *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992)); *see also* 4 Collier on Bankruptcy ¶ 501.02(3)(d).

7

The POC contains all the requirement of Rule 3001. It goes considerably further, providing sworn statements and legal authorities, which establish that Williams can prevail before a jury. *See supra,* and Exhibit A. By contrast, the Objection is wholly devoid of evidence or legal authorities, literally. All that it contains is a bald accusation that Williams' Proof of Claim "fails to assert a claim and lacks sufficient support as required under the Bar Date Order." Even a casual review of the POC establishes this is no more than smoke.

The sole criticism the Trustee levels is that "the Unsupported Claim does not assert any formal cause of action against the Consolidated NEMF Debtors, nor is there any indication that the CCHRO has asserted any formal causes of action against the Consolidated NEMF Debtors." Objection (Case 19-12809-JKS Doc 1699) at 7.

If taken literally this means that the Trustee believes that if a creditor fails to bring an action in court—in violation of the automatic stay—he has no cause of action.

As discussed above, by January 30, 2019, Williams had perfected administrative exhaustion before the CHRO and received his Release of Jurisdiction permitting him to file under the Act in court for 90 days. See Exhibit B. When on February 11, 2019, NEMF filed its bankruptcy petition, Williams had 78 days remaining to file his live claims under the Act in court. He had over two years to file his federal claims remaining under § 1981.[3] The only thing that prevented Williams from asserting his claims under § 1981 and the CHRA in court was his obedience to the automatic stay.

Williams is not required to resort to tea leave to determine what the Trustee's Objection

---

[3] As explained in POC, the § 1981 is similar to the Act in its evidentiary requirements, however § 1981 allows for uncapped emotional distress and punitive damages. Exhibit A p 22. See also https://www.natlawreview.com/article/5-differences-between-title-vii-and-section-1981-can-help-your-employment-race (four year statute of limitations and uncapped damages under § 1981). The article notes that § 1981 has the same elements as Title VII. Likewise, the elements of the Act are derived from Title VII, thus proof of a violation of § 1981 suffices to establish a violation of the Act.

means. The Trustee has failed <u>entirely</u> to level <u>any</u> legally valid criticism of the POC in the Objection.

The Trustee does not provide even an iota of evidence or case law which would cast doubt on a single element of Williams claims. As the court explained in *In re Jones*:

> "In order to satisfy this burden, 'the objector must produce evidence equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal validity.'" In re Wright, 438 B.R. at 553 (quoting In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992)); see also 4 Collier on Bankruptcy ¶ 501.02(3)(d).

*In re Jones,* No. 22-50121, 2023 Bankr. LEXIS 2292, at *6.

This Court is therefore required to overrule the objection *Id.* at *19 ("most importantly, the Debtors' Objection and the testimony of Mr. Jones fails to challenge any of the facts supporting U.S. Bank's claim . . . [t]herefore, the Court must overrule the Objection"). If the LT submits a reply in further support offering new or additional grounds for its objection, the Court should reject any argument that could or should have been raised in its initial papers, and in the alternative allow creditor Williams to submit a response to any new argument that could not have been anticipated due to the LT's generic and vague moving papers.

## **CONCLUSION**

For the above stated reasons, the Objection should be overruled. The Liquidating Trustee's Eleventh Omnibus Objection to Williams' claim as "lacking support" is meritless, and should be denied.

Dated: December 1, 2023

Respectfully Submitted,

By: _____
     Joshua Friedman, Esq.
     Counsel for Creditor Harold Williams
     Friedman & Houlding LLP
     1050 Seven Oaks Lane

Mamaroneck, NY 10543
Tel (212) 308-4338 x 4
Fax (866) 731-5553
josh@friedmanhouldingllp.com

### Certificate of Service

This is to certify that on this 1st Day of December, 2023, the foregoing OBJECTION OF

CREDITOR HAROLD WILLIAMS TO THE LIQUIDATING TRUSTEE'S ELEVENTH

OMNIBUS OBJECTION TO WILLIAMS' CLAIM AS "(III) LACKING SUPPORT" along with

Exhibits A and B, are being served by the undersigned on counsel to the Liquidating Debtors,

Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, Attn.: Mary E

Seymour, Esq. (mseymour@lowenstein.com) and Michael Papandrea, Esq.

(mpapandrea@lowenstein.com), by emailing the foregoing emailing addresses as well as

depositing same in the U.S. Mail, in a postage paid envelope, to the foregoing mailing address,

and further, that the instant papers are being timely filed with the Clerk of Court, by sending them

on this first day of December 1, 2023, by Federal Express to the Clerk of Court for the United

States Bankruptcy Court for the District of New Jersey, Martin Luther King Jr., Federal Building,

50 Walnut Street, Third Floor, Newark, New Jersey 07102, for receipt on December 4, 2023, prior

to the deadline of December 5, 2023 at 4 p.m.


/s/ Rebecca Houlding
Rebecca Houlding



44489-986

**Fill in this information to identify the case:**

| Debtor 1 | New England Motor Freight, Inc. |
| --- | --- |

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   United States Bankruptcy Court -
District of New Jersey

Case number   19-12809

RECEIVED
6/16/2019 11:26:06 PM (Eastern Time)
US BANKRUPTCY COURT-DRC
Claim No. ECN-401

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense other than a claim arising under section 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. Who is the current creditor? | Harold Williams |
| --- | --- |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| 2. Has this claim been acquired from someone else? | ☑ No |
| --- | --- |
| | ☐ Yes.  From whom? _____ |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- | --- |
| | Harold Williams<br>Effat Hussain<br>1050 Seven Oaks Lane<br>Mamaroneck New York 10543<br>United States<br>8883691119 ext. 6<br>Effat@friedmanhouldingllp.com | |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| 4. Does this claim amend one already filed? | ☐ No<br>☑ Yes.  Claim number on court claims registry (if known) ECN-400 | Filed on 6/16/2019<br>MM / DD / YYYY |
| --- | --- | --- |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |
| --- | --- |

Claim: 401-1 Dated: 6/16/2019          44489-986

---

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7. How much is the claim?**  $ __$500,000.00__

**Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Race based hostile work environment, retaliation, constructive discharge

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____
Amount of the claim that is secured: $_____
Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

2

---

Claim: 401-1 Dated: 6/16/2019          44489-986

| 12. Is all or part of the claim entitled to: (i) priority under 11 U.S.C. § 507(a), or (ii) administrative expense under 11 U.S.C. § 503(b)(9)?<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | ☐ Value of goods received by the debtor within 20 days before the date of commencement of the case. 11 U.S.C. § 503(b)(9). | $_____ |
| | * Amounts are subject to adjustment on 04/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

### Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   6/16/2019
                   MM / DD / YYYY

*/s/ Harold Williams*
Signature

**Print the name of the person who is completing and signing this claim:**

Harold Williams
Creditor
1050 Seven Oaks Lane
Mamaroneck New York 10543
United States
8883691119 ext. 6
Effat@friedmanhouldingllp.com

3

## DECLARATION OF HAROLD WILLIAMS
## PURSUANT TO 28 U.S.C. § 1746 UNDER THE PENALTY OF PERJURY

1. I am over the age of 18 and make this Declaration based on personal knowledge.

2. My name is Harold Williams. I am African American.

3. In January 2018, New England Motor Freight, Inc. ("NEMF") hired me as a dock worker. My job duties included loading and unloading freight from trucks. I worked the third shift, from 1 AM to 9:30 AM. Kenny LNU (last name unknown), and Phil Alberto supervised me directly.

4. Tom Wasserback was the terminal manager at NEMF.

5. When I was first hired I was a probationary employee. I was closely monitored by NEMF.

6. I was told that because of my exceptional work ethic, NEMF promoted me to a full-time position in April 2018.

7. Throughout my time at NEMF, I was punctual and was never disciplined, except under discriminatory circumstances by Alberto. When Alberto disciplined me, the Mr. Wasserback told me that any discipline I received was baseless.

8. Kenny, one of my supervisors, regularly praised my work. He told me that even despite the little training NEMF offered, I had adapted to the fast-paced work environment of loading and unloading trucks.

9. In contrast, Phil Alberto, my other supervisor, was unusually critical of me. He belittled me regularly, yelled at me in the presence of his coworkers, called me dumb and stupid, and questioned my basic abilities.

10. How Alberto treated me was very different from how he treated white workers. In general, Alberto cared about the feelings of white workers, he overlooked their mistakes, and he criticized them discreetly.

11. Within the first weeks of my employment with NEMF, Alberto directed racial statements at me.

4

He had a derogatory, racist or negative remark for me almost every day we worked near one another.

12. He made statements such as: "why do blacks feel that whites owe them," "you must be disappointed you woke up black," and "why are your people offended at being called [n***a or n*****]."

13. Alberto's racial harassment brought me to tears.

14. I told Alberto, "I haven't done anything to you to get this in return," but Alberto continued to make racial comments.

15. I explained to Alberto that the n-word was offensive saying, "[n***a or n****] is an ignorant person, so it wouldn't apply to me." Alberto continued his harassment.

16. I repeated to Alberto that the language he used was inappropriate telling him "the dumbest and weird[est] stuff [comes] out [your] mouth." Alberto didn't listen to me.

17. I brought the Alberto's treatment of me to the attention of my supervisor. For example, around April 2018, in front of multiple workers including Kenny, Alberto taunted me, "Harold what do you think of slavery" after I had expressed my family's deep connection with the civil rights movement, that my father had marched for civil rights, and my great grandparents had been slaves. I turned to Alberto in front of Kenny and said I wonder how Tom would react to your "out of control" remarks.

18. My coworker, Flute, was also upset, turned to me and said, "Harold, you can tell his comments are racially motivated, listen to what he said."

19. I do not believe that Kenny took any action in response to my complaint.

20. Separately, Harvey, Alberto's supervisor, also told me that he understood that Alberto was offensive but he tried to rationalize that he was "rough around the edges."

21. I also do not believe Harvey took any disciplinary action towards Alberto.

22. I believe that because the supervisors did not discipline Alberto, he continued to harass me. He repeatedly threatened to fire me and did fire me on multiple occasions.

23. On a Tuesday mid-April, following my complaint about Alberto's comments on slavery, Alberto approached me saying "I know how to hurt you, by sending you home and messing with your money." He then said, "You're fired."

24. I had just clocked in. I had not even started to work yet. I was shocked and confused at Alberto's treatment of me.

25. I went home. I was not paid for the entire week.

26. That Friday, I went to pick up my paycheck from NEMF. I saw the terminal manager, Wasserback, who told me that Alberto had baselessly fired me. Tom asked me to return to work. He assured me that he would speak to Alberto and "all would be settled."

27. Alberto's attitude towards me only became worse when I returned to work. On May 2018, when I clocked into work, Alberto asked me about the whereabouts of the freight from the week before. I responded that I did not know it. Alberto became enraged. He yelled that at me that it was my fault that Alberto would have to speak to the customer to say the freight was lost.

28. I told Alberto I was tired of hearing Alberto yell. Telling him "you would not treat me like this if I was the other color." In response, Alberto jumped up, and said, "get out, you're fired."

29. I had to go back to Wasserback to complain that Alberto had fired me. Wasserback again requested that I return to work.

30. I believe that because Wasserback did not do enough to stop Alberto's harassment, Alberto

continued to harass me.

31. In May 2018, my coworker Luke and I were both sitting at a table completing paperwork. Alberto approached me, and prodded at me, "Aye Martin Luther King, let me ask you a question." I became upset. Williams' saw that I was upset but continued to taunt, "Martin Luther King before you shut me down can you take me to New York." That was the last straw for me.

32. That month, I called Ray, the union representative at NEMF. I described Alberto's ongoing racial harassment. To my surprise,  Ray dismissed the harassment like other NEMF representatives had. He said he could not address my complaints until after August 2018.

33. I was upset. I called my father for help.  My father, also upset for me, called Ray. My father angrily asked Ray, "how long is my son expected to tolerate the n-word before something is done." Ray defended Alberto, telling my father that Alberto was rough around the edges. Nonetheless, he said that he would speak to Wasserback to ask Alberto to "tone it down."

34. Within a day of my complaint, Wasserback reached out to me; I repeated the same complaints to Wasserback.

35. Despite my complaint, Alberto still continued to make racial remarks, for example saying, "why do people build fences around walls…[they build them] to keep out intruders…that's why Trump wants the wall built."

36. Not trusting that Wasserback or the union would adequately address my complaints, I escalated my complaints to Human Resources. On June 20, 2018 I sent an email to NEMF Human Resources which stated that:

My supervisor [P]hil on third shift..[h]as been very rude from February this year until now. He has ask[ed] me why do blacks get mad when white people say nigga. He has said I know you're disappointed you woke up still black. He has ask[ed] me why do blacks think white people owe them something. He has sent me home with in a 10 minute punch [in]…he called me Martin

Luther King an[d] said can I ask you a question....he continued with can [you] take me to New York ...it's much more...He [is] threatening my job almost ...everyday. I have reported him to his boss an[d] the union rep. I was told he had a rough up bringing an[d] that THEY will get him to tone it down. Just last night he say why do people put fences up around [their] house. Some one ask[,] why phil [?] he say to keep intruders out then he say thats why [T]rump wants the wall built. **See Exhibit A hereto.**

37. When HR notified Wasserback of my complaint, Wasserback's angrily asked, "why did you go to HR!!"

38. Wasserback's reaction frightened me. I believed that my job was in danger.

39. I responded to Wasserback saying, "you couldn't handle Phil." I listed out the ongoing racial comments Alberto had directed at me, about which Wasserback had been aware, including the n-word. Again, even after my complaint to Human Resources, Wasserback tried to excuse Alberto's behavior saying that Alberto was "rough around the edges."

40. Later that day, Kenny LNU, my other Supervisor approached me. He asked about my meeting with Wasserback. I told Kenny that I had complained to Wasserback about Alberto's ongoing racial harassment and use of the n-word. Kenny said to me, "maybe you should find another job so you don't get in any trouble."

41. Both Wasserback and Kenny's handling of my complaints, discouraged me from complaining further.

42. I believe my fears were warranted. For example, throughout my time at NEMF, I had consistently received approximately 8 hours of overtime a week, but NEMF required me to work under Alberto during the overtime. In early June, worried that Alberto would succeed in getting me fired given Wasserback and Kenny's response to my complaints, I begged Wasserback not to assign me to work with Alberto. Instead of assigning me to a different supervisor to work overtime, I was no longer given overtime work. I missed out on approximately $200/day because

Claim: 401-1 Dated: 6/16/2019                    44489-986

I could not receive overtime.

43. Regularly, NEMF still required me to work around Alberto. On June 26, 2019, I clocked into

work, and worked my usual shift. Wasserback knew that I had a second job which required me

to leave NEMF at the end of his shift, at 9:30 AM. Instead of allowing me to leave at the end of

my shift, as is customary for all workers, Wasserback singled me out and asked me to check in

with Wasserback before I left. The additional monitoring was unusual, and after Wasserback's

angry comment after I had compled to HR, I was worried that Wasserback was trying to sabotage

my second job in retaliation for my complaints.

44. That day, June 26, I sent another email to HR which stated that:

> I work two jobs…When I leave NEMF I go to the other job [which] is Bob's. I am now afraid
> of Tom and Phil. Tom told me why did I call HR. I told him he couldn't handle Phil. All [I]
> know is that they have an over the top racist working. He bull[ied] me [and] undermined my
> human race….I email you guys thinking I was safe an[d] I would see results but [what] I get is
> the terminal manager [asking] me why I call[ed] HR. I don't feel safe there anymore. I thought I
> was going to work but I get tormented [and] insult[s] said to me by Phil my supervisor…I am
> not satisfied and afraid of the crazy place I have worked. **See Exhibit B, hereto.**

45. I resigned that day because I could no longer endure the racially hostile work environment at

NEMF.  NEMF had undertaken no investigation, other than a cursory interview of Alberto, into

my  complaints of racial harassment at the time I resigned.

46. I learned that Alberto also racially harassed other workers. For example, Horacio Mercado, also

experienced daily harassment from April 2017 to July 25, 2018. Alberto directed racial comments

at him including calling him "spic," "Spanish," and "you fucking Puerto Rican." Often

Supervisors Kenny and Harvey were within ear shot of the comments, but took no action to

address the harassment.  Mercado also complained to his union representative about Alberto's

harassment. He stated:

[Phil Alberto] has been mouthing and say[ing] racial slurs at me. When in Wednesday 25th of July and he called me an F Puerto Rican. I got mad because its been months of this verbal abuse that I said you want to get hurt. That's when he said you're fired. **See Declaration of Horatio Mercado dated May 15, 201  attached herewith as Exhibit C**

47.     I also learned that separately, Jonathon Edwards also complained to his supervisor about Alberto's racial remarks, that "he does not believe that Puerto Ricans born on the island are genuine Americans."

48.     I heard from my coworkers that months after I separated from NEMF, instead of disciplining Alberto for harassment, NEMF promoted him.

49.     On August 2, 2018, both my coworker Horacio Mercado and I filed sworn complaints with the Connecticut Human Rights Commission outlining Alberto's racial harassment. [1]

50. Throughout the time I was harassed by Alberto I was anxious, upset and worried. My family and friends told me they noticed personality changes in me. I was short-tempered, angry and prone to bouts of depression. I had problems sleeping and my weight changed. Shortly before I resigned, the stress became overwhelming.  I had to be rushed to the emergency room because of chest pains. I could no longer take the stress of the racially hostile work environment and was forced to resign.

51. The pain and suffering caused by working in a racially hostile work environment continues to affect me to this day.

I declare under penalty of perjury that the foregoing is true and correct.

_____          06 / 16 / 2019

Harold Williams                  Date

---

[1] See Exhibit D, CHRO complaint submitted by Williams.

Claim: 401-1 Dated: 6/16/2019            44489-986



---- Forwarded by James Pluscauski/NEMF on 06/21/2018 06:13 AM ----

| | |
|---|---|
| From: | Harold Williams <kountrykash43@gmail.com> |
| To: | human_resources@nemf.com |
| Date: | 06/20/2018 05:01 PM |
| Subject: | |

Hello my name is HAROLD WILLIAMS i am a dock work at nemf Meriden ct. My supervisor
phil on third shift. Has been very rude from February this year until now. He has ask me why do
blacks get mad when white people say nigga. He has said i know you're disappointed you woke
up still black. He has ask me why do blacks think white people owe them something. He has sent
me home with in a 10 minute punch in to work. He ask me like THIS he called me Martin Luther
king an said can i ask you a question.i said wow ok he continued with can u take me to New
York i lol . its much more but. I have to many run in with him. He threatening my job almost
have of my shift everyday. I have reported him to his boss an the union rep. I was told he had a
rough up bringing an that THEY will get him to tone it down. Just last night he say why do
people put fences up around there house. Some one ask why phil he say to keep intruders out. Lol
.then he say thats why trump wants the wall built.

leave at 9:30 unless i choose to stay later. I work 2 jobs so WHEN i leave nemf i go to the other job. Which is BOBS.  I am now afraid of Tom an PHIL. Tom told me why did i call HR. I told him he COULDN'T handle PHIL. I just cant rap my hands around everyone from union rep to Tom an john webber. All know they have a over the top racist working. He bully me underminded my human race an as a human being. An i email you guys thinking i was safe an i would see results but wat i get was an terminal MANAGER ask me why i call HR . I DONT FEEL SAFE THERE ANYMORE. I THOUGHT I WAS GOING TO WORK BUT I GET TORMENTED INSULT SAID TO ME BU PHIL MY SUPVISOR. THEN TO GET THE WHY YOU CALL HR. HOW ABOUT ME .GETTING UP FOLLOWING THERE RULES TO GET NO FAIR JUSTICE. I GOT SENT HOW WHEN I ONLY BEEN THERE FOR 10 OR 15 MINTUES. SENT HOME. ASK TOM ABOUT HE SAY HE LOOKED INTO IT AN PHIL DID SEND ME HOME FOR KNOW GOOD REASON. BUT I DIDNT GET KNOW PAY FROM THAT.. I am not satisfied an afraid crazy place I have ever worked. But its ok i will be calling labor board tomorrow. I will call KIM FROM NAACP IN MERIDEN AN I WILL BE CALLING DONNA FROM CIVIL RIGHT FOR HOSTILE WORK ENVIRONMENT NOT A THREAT I HAVE NEVER BEEN IN A WORK PLACE TO BE DEGRADE TO A LEVEL OF U FEEL YOU'RE BACK IN CIVIL RIGHTS MOVEMENT. THANKS FOR CHECKING BACK WITH THE PERSON THAT'S COMPLAINING ME HAROLD WILLIAMS SICK TO MY STOMACH STRESSED OUT

May  15  2019  12:46PM  Casa  Boricua  Fax  2032384866                                page  2

Claim: 401-1 Dated: 6/16/2019                    44489-986

# DECLARATION OF HORACIO MERCADO
## PURSUANT TO 28 U.S.C. § 1746 UNDER THE PENALTY OF PERJURY

1. I am over the age of 18 and make this Declaration based on personal knowledge.

2. My name is Horacio Mercado. I was employed as a dock worker at New England Motor Freight from October 2016 to July 25, 2018.

3. I am Hispanic. My ancestry is Puerto Rican.

4. Phil Alberto was my supervisor. He is Caucasian.

5. Mr. Harold Williams was also employed as a dock worker at New England Motor Freight. Mr. Williams is African American. Phil Alberto supervised him.

6. Mr. Williams and I worked the same shift and I saw him regularly at work.

7. Approximately six months into my employment at New England Motor Freight Alberto began directing race-based comments at me. He regularly referred to me as "spic," and "Spanish." He often asked, "what are you, Puerto Rican."

8. He often threatened to fire me.

9. Once or twice a week, Mr. Williams complained to me that Alberto directed racial language at him.

10. Harvey, Alberto's supervisor, and Kenny, another New England Motor Freight supervisor, were often present when Alberto used racial slurs. Kenny sometimes laughed when Alberto used racial slurs.

11. I believe that Human Resource had received complaints about Alberto because in June 2018, the terminal manager, Tom, requested statements from New England Motor Freight's employees about Alberto's interactions with them.

12. I was not asked for a statement.

13. Alberto continued to direct racial slurs at me after June 2018.

Claim: 401-1 Dated: 6/16/2019                44489-986

14. July 25, 2018 was my last day at New England Motor Freight. After I had received my assignment, Alberto yelled at me, "you fucking Puerto Rican." Upset that he continued use racial language, I confronted him and asked him whether he wanted to get hurt for making racist comments. Alberto fired me on the spot.

15. I submitted the following complaint to my union, following my termination:

[Phil Alberto] has been mouthing and say[ing] racial slurs at me. When in Wednesday 25th of July and he called me an F Peurto Rican. I got mad because its been months of this verbal abuse that I said you want to get hurt. That's when he said you're fired.

16. After my union complaint, I found out that New England Motor Freight had promoted Phil Alberto to replace his boss Harvey.

I declare under penalty of perjury that the foregoing is true and correct.

_Horacio Mercado Jr_        _5/15/19_
Horacio Mercado              Date

14

FORM 103(1)

**AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE**

| FOR CHRO USE ONLY |
|---|

Case No.   1930103                                    Date: _____

EEOC No.   _____

RECEIVED
STATE OF CONNECTICUT

AUG - 2 2018

Comm. On Human Rights & Opportunities
WEST CENTRAL REGION

My name is:                    Harold Williams
My mailing address is:         1102 East Main Street   Meriden, CT 06450
My telephone number is:        203 850.2670
My email address is:           Kountrykash43@gmail.com
The respondent is:             New England Motor Freight
Whose business address is:     Corporate address: 1-71 North Avenue East, Elizabeth, NJ 07201
                               Work location: Terminal 16, 475 Research Parkway, Meriden, CT 06450

**I was ...**
(Include the date of the actions taken against you. If ongoing, write "ongoing".)

☒ discriminated against in terms and conditions

| | | | | |
|---|---|---|---|---|
| ☐ terminated | _____ | ☐ not hired/promoted | _____ |
| ☐ suspended | _____ | ☐ given unequal duties | _____ |
| ☐ placed on probation | _____ | ☐ harassed | _____ |
| ☐ demoted | _____ | ☐ sexually harassed | _____ |
| ☐ warned | _____ | ☐ earning different pay | _____ |
| ☐ given a poor evaluation | _____ | ☒ constructively discharged | 6/26/2018 |
| ☐ denied a raise | _____ | ☒ retaliated against | _____ |
| ☐ less trained | _____ | ☐ transferred | _____ |
| ☐ denied an office | _____ | ☐ given difficult assignment | _____ |
| ☐ denied equal service(s) | _____ | ☐ not recalled | _____ |
| ☐ other: | _____ | | _____ |

**I believe that my...**
(Identify the protected class status you believe you were discriminated against because of)

| | | | |
|---|---|---|---|
| ☒ Race   **African American** | ☐ Mental disability | |
| ☒ Color   **black** | ☐ Intellectual disability | |
| ☐ Religious creed | ☐ Learning disability | |
| ☐ Age | ☐ Physical disability | |
| ☐ Gender identity/expression | ☐ Veteran status | |
| ☐ Marital status | ☐ Prior criminal conviction | |
| ☐ National origin | ☐ Sexual orientation | |
| ☐ Sex: ☐ Male Female | ☐ Pregnancy | |
| ☐ Ancestry | ☐ Lawful source of income | |
| ☐ Other: | ☐ Genetic information | |
| ☒ Previous opposition to discriminatory conduct | **Contacted HR on 6/20/2018** | |

**Was/Were in part a factor(s) in this action.**

44489-986

Claim: 401-1 Dated: 6/16/2019

| THIS SECTION TO BE FILLED OUT BY CHRO STAFF |
|---|

The respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

☒ CONN. GEN. STAT. § 46a-60(b)(1)
☒ CONN. GEN. STAT. § 46a-60(b)(4)
☐ CONN. GEN. STAT. § 46a-60(b)(5)
☐ CONN. GEN. STAT. § 46a-60(b)(7)
☐ CONN. GEN. STAT. § 46a-60(b)(8)
☐ CONN. GEN. STAT. § 46a-64
☐ CONN. GEN. STAT. § 46a-70
☐ CONN. GEN. STAT. § 46a-71
☐ CONN. GEN. STAT. § 46a-80
☐ CONN. GEN. STAT. § 46a-81

☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed)

☐ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed)

☐ Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

☐ Equal Pay Act of 1964, U.S.C. § 206
☐ Section 504 of the Rehabilitation Act of 1973

☐ Other _____

I provide the following particulars:

1. My name is Harold Williams and I reside at 1102 East Main St, Meriden, CT 06450.

2. The Respondent is New England Motor Freight, whose corporate address is 1-71 North Avenue East, Elizabeth, NJ 07201, and business address, where I worked, is Terminal 16, 475 Research Parkway, Meriden, CT 06450.

3. The Respondent employs at least 15 people.

4. My race is African American and color black.

5. I was hired by Respondent in January 2018 as a dock worker.

6. During my employment my supervisor was Phil Alberto (Caucasian, white).

7. On or about February 5, 2018, Phil called me "dumb" after he had learned that I had put the incorrect freight on the wrong truck.

8. Phil was yelling aggressively at me and I attempted to stand my ground because he did not tell me what to do previously.

9. Phil's body language was that of a high temper and it caused my other supervisor, Kenny (Caucasian, white), to stand in between us in an attempt to diffuse the situation and prevent any further altercation.

10. Kenny would frequently defend me against Phil's harsh criticism.

44489-986

Claim: 401-1 Dated: 6/16/2019

16

11. The following week, Phil would unfairly criticize my abilities to drive a fork lift, when this is something that I do at my other job.

12. I have witnessed him treat other African American and Hispanic dock workers harshly when he had an issue with them.

13. If he had an issue with a Caucasian dock worker he would pull them aside instead.

14. In March 2018, I reported to work and Phil told me that I was disappointed because I woke up and realized I was still black.

15. He also would tell me that he couldn't wait to tell me "You're fired."

16. In April 2018, I reported to work and Phil asked me "why do you or black people get mad when white people call us 'Nigga'."

17. I asked him what he meant by that, but I told him that 'Nigga' is an ignorant person and so that does not apply to me. Phil agreed with me and walked away to his office.

18. Phil then came back to me and said "What's up my Nigga?"

19. I just shook my head in disbelief at Phil.

20. Phil later came back to me and asked me how I felt about slavery.

21. In May 2018, I was with Luke, another dock worker, in the lunch room when Phil approached me and said, "Hey Martin Luther King, let me ask you a question."

22. I regularly told Tom (Caucasian, white), the terminal manager, and my union representative, about Phil and the issues I was having with regards to him making racist remarks.

23. Tom would just tell me that they know how Phil is and that he had a rough life and was rough around the edges.

24. On June 20, 2018, I emailed Jim Pluscauski, the director of human resources, about the issues I was having with Phil and how Tom and my union representative were unsuccessful in helping me resolve the issues.

25. I did not receive any word back from Pluscauski.

26. On June 26, 2018, I was called into Tom's office where he questioned me as to why I called human resources. I told him that I felt that he was not properly addressing the issues with Phil.

27. I also noticed on June 26, 2018, that Phil was being kind to me, something that was out of character for Phil.

28. Later on June 26, 2018, I emailed Pluscauski who responded to my email by asking me to call him.

29. I called Pluscauski, but did not receive a call back.

30. I felt that the work environment was so hostile and discriminatory that I had to quit and was therefore constructively discharged.

Claim: 401-1 Dated: 6/16/2019                    44489-986

31. I believe this situation occurred, at least in part, due to my race and color and retaliation for my opposition to discrimination.

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above-cited laws and secure for me any remedy to which I may be entitled.

<u>Harold Williams</u> being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in __Waterbury, CT__ on this _2nd day of August, 2018_.

Complainant's Signature

Subscribed and sworn before me on  8-2-18
Date

Notary Public/Commissioner of the Superior Court

My commission expires: _____

Rebecca J. Cannon
Notary Public-Connecticut
My Commission Expires
May 31, 2023

44489-986

Claim: 401-1 Dated: 6/16/2019

18

Claim: 401-1 Dated: 6/16/2019                    44489-986

## DECLARATION OF JONATHAN EDWARDS
## PURSUANT TO 28 U.S.C. § 1746 UNDER THE PENALTY OF PERJURY

1. I am over the age of 18 and make this Declaration based on personal knowledge.

2. My name is Jonathan Edwards. I was employed at New England Motor Freight ("NEMF") for approximately four years. I spent three and a half of the years I was at NEMF working as a dock worker.

3. My job duties required me to interact with Phil Alberto.

4. I saw Phil treat minorities more aggressively than non-minorities and heard him make racially discriminatory statements.

5. For example, in or around July 2018, I heard Phil comment that "I don't believe that Puerto Ricans born on the island are genuine Americans."

6. I complained to my direct supervisor about this racially discriminatory comment.

7. I am not aware of any disciplinary action taken against Phil for his comments.

8. Phil also made other racially discriminatory comments that I cannot currently recall.

I declare under penalty of perjury that the foregoing is true and correct.

_Jonathan Edwards_                    6/15/19
Jonathan Edwards                      Date

19

DECLARATION OF CATINA BARNES

PURSUANT TO 28 U.S.C. § 1746 UNDER THE PENALTY OF PERJURY

1.  I am over the age of 18 and make this Declaration based on personal knowledge.

2.  My name is Catina Barnes. I have known Harold for two to three years. We started dating about a year ago. We both worked at NEMF.

3.  I worked as a biller in Tom Wasserback's office.

4.  We were together during his ongoing racial harassment at New England Motor Freight.

5.  When Harold first started working at NEMF, he loved the job. He wanted to stay there a long time and retire from there.

6.  Around February or March 2018, Harold started coming home and regularly telling me, "you wouldn't believe what Phil said to me today." Once the racial comments started, they didn't stop.  At first, Harold tried to brush off Phil's comments as jokes. He is the type of person who doesn't go looking for conflict or a fight. But he came home upset and stressed almost every day.

7.  He started complaining about the harassment to managers but nothing changed. I noticed that he became increasingly consumed about the harassment. He was always talking about it and thinking about it.

8.  His personality changed. He went from a person who was calm, rational, happy, to one who would fly off the handle unexpectedly and was constantly upset and angry.

9.  We stopped sleeping in the same bedroom. He moved to the living room because he slept inconsistently and was regularly tossing and turning. He also stopped eating as much as he usually did, and I noticed that he was losing considerable weight.

20

10. Around June 2018, he became so upset that he had to be taken to the emergency room with chest pain.

11. The racial harassment and the emotional stress Harold suffered from the harassment continues to affect our relationship today.

12. Even after he resigned, he continued to be angry and depressed. He also faced the additional worry of wondering whether he would be able to provide for his five biological children and one step-daughter as he had before. He is not earning what he used to at his current job, has lost his health insurance and the benefits he had at NEMF.

13. He is still dealing with the consequences of the racial harassment he experienced at NEMF. It still comes up every day.

I declare under penalty of perjury that the foregoing is true and correct.

_____          06 / 15 / 2019
Catina Barnes                    Date

Claim: 401-1 Dated: 6/16/2019          44489-986



a civil rights law firm

## SUMMARY OF LEGAL CLAIMS

I.    INTRODUCTION

From February 2018 until he was constructively discharged from New England Motor
Freight ("NEMF"), on June 26, 2018, Mr. Harold Williams suffered daily unremitting
racial harassment at the hands of his supervisor Phil Alberto. As Williams escalated
complaints to supervisors, a terminal manager, a union representative, and an out-of-state
human resources department, NEMF's bureaucracy did nothing, and then retaliated. All
the while, Williams' supervisor Alberto continued to openly call Williams the n-word,
taunted him that "you must be disappointed you woke up black," devalued him based on
his race, and humiliated him. Unable to bear NEMF's callous disregard for racial
harassment to which he was subjected, Williams was forced to resign.

On August 2, 2018, Williams filed a complaint of race-based harassment, retaliation and
constructive discharge with the Connecticut's Commission on Human Rights and
Opportunities ("CHRO") against New England Motor Freight. His claims were similar to
those independently filed with the CHRO by his coworker Horacio Mercado against the
same supervisor. Despite the multiple internal and external complaints made against
Alberto for racial harassment, even as late as September 5, 2018, NEMF persisted in its
claim that NEMF had never received racial discrimination complaints from minority
workers against Alberto.

As detailed below, Mr. Williams' racial harassment, discrimination, retaliation, and
constructive discharge claims are actionable under 42 USC 1981. The statute entitles him
to uncapped compensatory and punitive damages.

II.    LEGAL ANALYSIS

Mr. Harold Williams' claims for racial discrimination, retaliation, constructive discharge
are actionable under 42 USC 1981, Title VII, and the CHRO. The statutes are similarly
interpreted.[1] Under 42 USC 1981 a plaintiff is entitled to uncapped damages; for brevity's
sake, Williams' claims under 42 USC 1981 are reviewed.

---

[1] *See, e.g., Verdin v. Weeks Marine Inc.*, 124 Fed. Appx. 92, 95 (3d Cir. 2005) ("Regarding [Plaintiffs']
hostile work environment claim, the same standard used under Title VII applies under Section 1981)";

Joshua Friedman – Rebecca Houlding
Giselle Schuetz | Effat Hussain | Jesse Centrella | Jenna Pollock | Shilpa Narayan
Debra Kaplove, Psy.D. Investigator and Paralegal

1050 Seven Oaks Lane, Mamaroneck, NY 10543 | Tel. (888) 369-1119 | Fax (866) 731-5553
www.friedmanhouldingllp.com | www.sexualharassmentlawyerblawg.com

effat@friedmanhouldingllp.com

22

Claim: 401-1 Dated: 6/16/2019          44489-986

June 16, 2019
Page 2 of 6

To bring a claim under 42 USC 1981 for a racially discriminatory hostile work environment, a plaintiff need only show that 1) he suffered discrimination based on his race, 2) the discrimination was severe or pervasive, 3) it affected the plaintiff negatively and would have affected a reasonable person in like circumstances, and 4) there is a basis to hold employer liable. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996).

Williams is African-American and he suffered discrimination based on his race. His supervisor directed race-based remarks at him on an almost daily basis such as "you must be disappointed you woke up black," "why do blacks feel that whites owe them," and "why are your people offended at being called n***a." These facts satisfy the first element of a hostile work environment claim.

Additionally, Williams' supervisor's racial remarks will also meet the Third Circuit's threshold for severity or pervasiveness. Third Circuit Court of Appeals has unequivocally found that though context specific, "it is clear one such instance of [a supervisor using the n-word] can suffice to state a claim." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017); *Griffin v. Harrisburg Prop. Servs.*, No. 1:CV-08-1655, 2009 U.S. Dist. LEXIS 109097, at *18 (M.D. Pa. Nov. 23, 2009)(holding that two racially derogatory jokes and a text message using the slur 'n***a' was "sufficiently severe to turn [the work environment] into a hostile work environment); Straub v. First Media Radio, LLC, No. 2003-237J, 2005 U.S. Dist. LEXIS 31617, at *50-52 (W.D. Pa. Nov. 28, 2005)(denying summary judgment on Plaintiff's hostile work environment claim and stating harassment occurring once per month "can be viewed by a jury as creating a hostile work environment).

Because Williams has suffered significant emotional distress from the ongoing harassment and a reasonable person would have been similarly affected, he is able to meet the third element of a hostile work environment claim.

NEMF can be held liable for Alberto's harassment on multiple bases. First, NEMF is strictly liable for Alberto's harassment because his harassment culminated in tangible employment actions. *In re Tribune Media Co.*, 902 F.3d 384, 399-400 (3d Cir. 2018) (stating "if the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."). In April, Alberto purported to fire Williams shortly after Williams protested Alberto's remarks related to slavery. Alberto said, "I know how to hurt you, by sending you home and messing with your money. You're fired." A second time, in May 2018, Alberto purported to fire Williams in response to his protest that Alberto was bullying him because of his race. Both incidents were tangible employment actions, defined as a "significant change in employment status, such as hiring, firing, failing to

*Ocasio v. Lehigh Valley Family Health Center*, 92 Fed. Appx. 876, 879-80 (3d Cir. 2004) ("As amended by the 1991 Civil Rights Act, § 1981 now encompasses hostile work environment claims, and we apply the same standards as in a similar Title VII claim."); *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 412 (3d 13 Cir. 1999) (citing *Goss v. Exxon Office Systems Co.*, 747 F.2d 885 (3d Cir. 1984))(applying Title VII precedent to constructive discharge claims); *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 335-36 (D.N.J. 1995) (noting that with respect to retaliation claims, "The Civil Rights Act of 1991 extended § 1981 to the reaches of Title VII.").

June 16, 2019
Page 3 of 6

promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 431, 133 S. Ct. 2434, 2443 (2013)(internal citations omitted).

Second, NEMF is liable for Alberto's racial harassment because it knew or should have known about it, and failed to take appropriate remedial action. Kenny and Harvey were frequently present when Alberto directed racial remarks at Williams' coworkers. Williams also complained to Wasserback about Alberto's treatment beginning in April 2018. Despite his complaints to Wasserback, Alberto was able to racially bully and fire Williams. In May 2018, Williams escalated his complaints to the union. The union spoke to a senior manager. Because of NEMF's lack of response to the grievance, Williams reiterated his complaint to NEMF's Human Resources Department on June 20, 2019. The racial harassment continued. On June 26, 2019, Williams was constructively terminated as a result of the unbearable racial harassment. As of the date of his resignation, NEMF had not investigated his complaints. After Williams separated from NEMF, Alberto was promoted.

Williams also has sufficient evidence to demonstrate that NEMF is liable for the retaliation to which Mr. Williams was subjected. To bring a claim for retaliation, a plaintiff must show that 1) he engaged in protected activity, 2) he was subjected to a materially adverse action for engaging in protected activity, and 3) a causal relationship existed between the protected activity and materially adverse action. Third Cir. Model Civ. Jury Instructions §6.1.6 (2018).

Clearly, Williams engaged in protected activity. Williams actively complained about racial harassment to his supervisors, the terminal manager, and NEMF's human resources department. Also obvious is that management responded to his complaints in a manner meant to discourage a reasonable person from complaining. Alberto fired Williams twice within weeks of Williams' race-based complaint to his supervisor. When Williams complained to Wasserback about Alberto's racial harassment, Wasserback stopped assigning Williams to overtime. When Williams continued to escalate his complaints to human resources, both his direct supervisor Kenny and Wasserback implied that Williams' job was in danger. Kenny stated, maybe you should find another job so you don't get in any trouble" and Wasserback remonstrated, "why did you go to HR!!" After Williams' final complaint, Wasserback singled Williams out and required him to stay beyond his shift at the last minute, though Wasserback knew that Williams had a second job, and could lose his second job were he delayed. The Third Circuit has held that loss of work hours, firing, and actions beyond petty annoyances like those Williams was subjected to rise to the level of 'materially adverse actions.' *E.g.* Moody v. Atl. City Bd. of Educ., 870 F.3d 156 206, 220 (3d Cir. 2017).

The Third Circuit has held that a temporal proximity of less than three months between the protected activity and the materially adverse action is highly suggestive of a causal connection between the two. Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 221 (3d Cir. 2017)(citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)). Here, the time between Williams' complaints and the adverse actions to which he

June 16, 2019
Page 4 of 6

was subjected, can be counted in days rather than months, raising a strong inference of causal connection sufficient to make out a question of fact to be put to a judge or jury.

Finally, Mr. Williams also has sufficient evidence to establish constructive discharge. "A plaintiff must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Hanna v. Giant Eagle Inc.*, Civil Action No. 15-1009, 2017 U.S. Dist. LEXIS 34699, at *56-57 (W.D. Pa. Mar. 9, 2017) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996)). The Third circuit has found that the threat of discharge, a reduction in pay or benefits, and suggestions and encouragement of resignation all support a finding of constructive discharge. *Hartman v. Sterling, Inc.*, Civil Action No. 01-CV-2630, 2003 U.S. Dist. LEXIS 18140, at *40 (E.D. Pa. Sep. 10, 2003)(citing *Stremple v. Nicholson*, 289 F. App'x 571, 574 n.1 (3d Cir. 2008)).Williams' suffered all three. He was no longer given overtime after he complained about Alberto, and was not compensated for his time away from work when Alberto fired him. Additionally, his supervisors implicitly and explicitly communicated to him that he would be fired for continuing to complain. For example, when Williams informed Kenny that he had complained to the terminal manager about Alberto's use of the n-word, Kenny recommended that Williams seek other employment. Also, Wasserback remonstrated at Williams, "why did you go to HR?" Alberto actually fired Williams at least twice and ultimately, the terminal manager took actions that threated Williams' second job. These circumstances are sufficient to demonstrate an environment so intolerable that a reasonable person subject to them would resign.

III.    DAMAGES

Williams continues to suffer emotional distress from NEMF's racially hostile work environment.

Catina Barnes, Williams' girlfriend, attests to the following[2] about the toll the racial harassment has taken on Williams:

> I have known Harold for two to three years. We started dating about a year ago. We both worked at NEMF. I worked as a biller in Tom Wasserback's office. We were together during his ongoing racial harassment at New England Motor Freight.

> When Harold first started working at NEMF, he loved the job. He wanted to stay there a long time and retire from there. Around February or March 2018, Harold started coming home and regularly telling me, "you wouldn't believe what Phil said to me today." Once the racial comments started, they didn't stop. At first, Harold tried to brush off Phil's comments as jokes. He is the type of person who doesn't go looking for conflict or a fight. But he came home upset and stressed almost every day.

---

[2] Declaration of Catina Barnes dated June 15, 2019 attached herewith as Exhibit F

June 16, 2019
Page 5 of 6

He started complaining about the harassment to managers but nothing changed. I noticed that he became increasingly consumed about the harassment. He was always talking about it and thinking about it.

His personality changed. He went from a person who was calm, rational, happy, to one who would fly off the handle unexpectedly and was constantly upset and angry.

We stopped sleeping in the same bedroom. He moved to the living room because he slept inconsistently and was regularly tossing and turning. He also stopped eating as much as he usually did, and I noticed that he was losing considerable weight.

Around June 2018, he became so upset that he had to be taken to the emergency room with chest pain.

The racial harassment and the emotional stress Harold suffered from the harassment continues to affect our relationship today. Even after he resigned, he continued to be angry and depressed. He also faced the additional worry of wondering whether he would be able to provide for his five biological children and one step-daughter as he had before

He is not earning what he used to at his current job, has lost his health insurance and the benefits he had at NEMF.

He is still dealing with the consequences of the racial harassment he experienced at NEMF. It still comes up every day.

In addition to Ms. Catina Barnes' statements, Mr. Williams is able to offer further attestations in support of his ongoing emotional distress from friends and family members, as well as expert forensic psychiatric testimony. Unlike Title VII, 42 USC §1981 does not cap compensatory damages. *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001)(stating that Title VII cap doesn't apply to 42 USC 1981). Also, uncapped punitive damages are available under 42 USC §1981. *Goodwin v. Seven-Up Bottling Co.*, 1998 U.S. Dist. LEXIS 11852, at *17 (E.D. Pa. July 31, 1998) quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1064 (8th Cir. 1997)("because § 1981 [where compensatory and punitive damages are not limited] was a basis for recovery, the Title VII cap on compensatory and punitive damages does not apply.").

Third Circuit Courts and New Jersey state courts have sustained significant verdicts, where evidence of emotional distress is offered:

In *Charnitski v. MotorWorld Group*, 3:2010-cv-02024 (M.D. Pa. 2013), the court sustained a jury award of $750,000 to a car dealership sales representative who endured race- and gender-based harassment at work.

June 16, 2019
Page 6 of 6

In *McKenna v. City of Phila.*, No. 98-5835, 2010 U.S. Dist. LEXIS 73667, at *3 (E.D. Pa. July 20, 2010), Plaintiffs' brought retaliation claims under Title VII for speaking up against racial discrimination. A jury returned verdicts for the three plaintiffs, respectively at $5,000,000, $2,000,000 and $3,000,000. In this case, under 42 USC 1981, there are no damage caps, as there are under Title VII.

Similarly, in *Hall v. Pa Dep't of Corr.*, 2006 U.S. Dist LEXIS 68670 (M.D. Pa. Sep. 25, 2006) plaintiff brought claims of gender based hostile work environment and retaliation under Title VII and the PHRA. The jury returned a verdict of $1,000,000. As discussed, the Title VII damage caps are not present under 42 USC 1981.

In *Cuevas v. Wentworth Grp.*, No. A-3079-11T3, 2014 N.J. Super. Unpub. LEXIS 2237 (Super. Ct. App. Div. Sep. 15, 2014) plaintiffs brought claims of racial discrimination under the uncapped state civil rights statute. The New Jersey State appeals court upheld emotional distress compensatory damages of $800,000 and $600,000 respectively.

Also, in *Lockley v. State of New Jersey Dept. of Corrections*, 177 N.J. 413, 419 (2003), the state's supreme court upheld an emotional distress damage verdict of $750,000.

Given the significant verdicts in the Third Circuits for claims similar to Mr. Harold Williams,' his claims are conservatively valued at $500,000 in compensatory damages and back pay.

27



STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

<u>Harold Williams</u>
**COMPLAINANT**

CHRO No. 1930103
EEOC No.  16A201801636

vs.

<u>New England Motor Freight</u>
**RESPONDENT**

<u>RELEASE OF JURISDICTION</u>

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint.  The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides.  If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served.  Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

<u>The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.</u>

*Tanya A. Hughes*

**DATE:** January 30, 2019                    Tanya A. Hughes, Executive Director

Service:
Complainant: kountrykash43@gmail.com
Complainant's attorney: n/a
Respondent: jpulscauski@nemf.com
Respondent's attorney: n/a